JUDGE CROTTY

07 CV 5867

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUN 2 0 2007

U.S.D.C. S.D. N.Y.
CASHIERS

---

MINNEAPOLIS FIREFIGHTERS'
RELIEF ASSOCIATION, on behalf of
itself and all others similarly situated,

                Plaintiff,

    v.

BRISTOL-MYERS SQUIBB COMPANY,
PETER R. DOLAN, and ANDREW R.J.
BONFIELD,

                Defendants.

CIVIL ACTION No.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL
SECURITIES LAWS

**JURY TRIAL DEMANDED**

---

      Plaintiff Minneapolis Firefighters' Relief Association ("Plaintiff"), by its

attorneys, on behalf of itself and all others similarly situated, alleges the following based

upon the investigation of Plaintiff's counsel, except as to allegations specifically

pertaining to Plaintiff, which are based on personal knowledge. The investigation of

counsel included, among other things, a review of Bristol-Myers Squibb Company's

("BMY" or the "Company") public filings with the United States Securities and

Exchange Commission ("SEC"), press releases issued by the Company, media and news

reports about the Company, and publicly available trading data relating to the price and

volume of BMY's securities.

## I.      INTRODUCTION

    1.      This is a federal class action brought on behalf of a class consisting of all

persons who purchased BMY securities between March 22, 2006 and August 8, 2006,

inclusive (the "Class Period").

2.     This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC by plaintiff on behalf of all those who purchased BMY securities during the Class Period to recover damages caused to the Class by defendants' violations of the securities laws.

3.     BMY claims to engage in "the discovery, development, licensing, manufacturing, marketing, distribution, and sale of pharmaceuticals, and related health care products worldwide."

4.     On March 22, 2006, BMY announced that it, along with Sanofi-Aventis SA, had entered into a settlement agreement with Apotex, Inc. ("Apotex") to resolve a patent infringement lawsuit ("Apotex Settlement") in which BMY and Sanofi-Aventis SA sought to keep Apotex's generic version of the drug Plavix off the market until 2011. Under the terms of the agreement:  (1) Apotex would receive a royalty-bearing license; and (2) Apotex would agree not to sell its generic version of Plavix until 2011.  The Apotex Settlement was also subject to certain conditions, including antitrust review by the Federal Trade Commission and state attorneys general.  If approval was not obtained, the Apotex Settlement would be terminated and litigation would be reinstated.  Also, BMY stated that if the litigation was reinstated, it intended to "vigorously pursue" enforcement of its patent rights in Plavix.

5.     Throughout the Class Period, BMY made numerous statements regarding the terms of the Apotex Settlement.  However, the Company failed to disclose material facts regarding the Apotex Settlement, including:  (1) that BMY had relinquished material rights in connection with the settlement, including the right to seek treble

damages; (2) that if the Apotex Settlement was not approved, Apotex could flood the market with its generic version of Plavix; and (3) that BMY had negotiated improper side agreements in connection with the Apotex Settlement, including that BMY would oppose the launch of an authorized generic Plavix in the future if the Apotex Settlement was not finalized.

6.      On July 27, 2006, the Company revealed that the Antitrust Division of the United States Department of Justice ("DOJ") was conducting a criminal investigation into the Apotex Settlement.

7.      As a result of the Company's disclosure that the DOJ was conducting a criminal investigation regarding the Apotex Settlement, the price of BMY's securities declined $1.95 per share, or 7.5%, to close at $24.04 per share, on unusually heavy trading volume.

8.      On August 8, 2006, the Company disclosed additional material facts surrounding the Apotex Settlement, which had not been previously disclosed.  These facts included that:  (1) BMY had agreed to not move for a preliminary injunction against Apotex for at least five (5) business days after the launch of generic Plavix; and (2) BMY had given up its right to treble damages in the event its patent infringement suit against Apotex was successful.

9.      As a result of the disclosure of these material facts regarding the Apotex Settlement, BMY's securities declined $1.56 per share, or approximately 7%, to close at $21.21 per share, on unusually heavy trading volume.

10.      On September 12, 2006, the Company announced the departure of its Chief Executive Officer ("CEO"), Peter R. Dolan, effective immediately.

11.     On May 10, 2007, BMY issued a press release announcing that the Company had "agreed to plead guilty to federal charges of making false statements to a government agency and pay a fine of up to $1 million in connection with its failed attempt to resolve a drug patent dispute last year." These federal charges were in connection with the Apotex Settlement.  In particular, "Apotex alleged in court documents that a [BMY] executive involved in the negotiations, Andrew Bodnar, reached certain side agreements with Apotex that weren't included in the written settlement agreement submitted to government regulators." Specifically, the Company revealed that the federal charges pertained to false statements made by a former BMY senior executive during the renegotiation of the Apotex Settlement.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  BMY's headquarters office is located at 345 Park Avenue, New York, New York.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.    THE PARTIES

15.    Plaintiff Minneapolis Firefighters' Relief Association purchased BMY's securities as detailed in the attached Certification and was damaged thereby.

16.    Defendant BMY is a corporation organized under the laws of Delaware and its principal executive office is located in New York, New York.

17.    Defendant Peter R. Dolan ("Dolan") was CEO of the Company during the Class Period.  During the Class Period, Dolan signed the Company's quarterly reports on Form 10-Q filed with the SEC for the periods ended March 31, 2006 and June 30, 2006.

18.    Defendant Andrew R.J. Bonfield  ("Bonfield") was Chief Financial Officer of the Company during the Class Period.  During the Class Period, Bonfield signed the Company's quarterly reports on Form 10-Q filed with the SEC for the periods ended March 31, 2006 and June 30, 2006.

19.    The individuals named as defendants in ¶¶ 17-18 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BMY's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which

were being made were then materially false and misleading.  The Individual Defendants
are liable for the false statements pleaded herein, as those statements were each "group-
published" information, the result of the collective actions of the Individual Defendants.

## IV.    CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action as a class action pursuant to Federal Rules of
Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased the
securities of BMY during the period from March 22, 2006 through August 8, 2006,
inclusive (the "Class").

21.    The members of the Class are so numerous that joinder of all members is
impracticable.  While the exact number of Class members is unknown to plaintiff at the
present time and can only be ascertained through appropriate discovery, plaintiff believes
that there are hundreds of members of the Class located throughout the United States.
Throughout the Class Period, BMY was actively traded on the NYSE in an efficient
market.

22.    Plaintiff's claims are typical of the claims of the members of the Class.
Plaintiff and all members of the Class have sustained damages because of defendants'
unlawful activities alleged herein.  Plaintiff has retained counsel competent and
experienced in class and securities litigation and intends to pursue this action vigorously.
The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff
has no interests which are contrary to or in conflict with those of the Class that plaintiff
seeks to represent.

23.    A class action is superior to all other available methods for the fair and
efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be

encountered in the management of this action that would preclude its maintenance as a class action.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)    whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)    whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and the proper measure of such damages.

## V.    <u>FALSE AND MISLEADING STATEMENTS</u>

25.    The Class Period begins on March 22, 2006, following the Company's disclosure after the close of trading on March 21, 2006 that:

> **Sanofi-aventis and Bristol-Myers Squibb Announce Agreement to Settle U.S. PLAVIX® Litigation with Apotex Subject to Certain Conditions**
>
> PARIS and NEW YORK, March 21 /PRNewswire-FirstCall/ -- Sanofi-aventis (Paris Bourse: EURONEXT: SAN; and New York: NYSE: SNY) and Bristol-Myers Squibb Company (NYSE: BMY) announced today that they have reached an agreement subject to certain conditions with Apotex Inc. and Apotex Corp. to settle the patent infringement lawsuit pending between the parties in the U.S. District Court for the Southern District of New York. The lawsuit relates to the validity of a composition of matter patent for clopidogrel bisulfate (the '265 patent), a medicine made available in the United States by sanofi-aventis and Bristol-Myers Squibb as PLAVIX®.

* * *

Under the terms of the proposed settlement, sanofi-aventis would grant Apotex a royalty-bearing license under the '265 patent to manufacture and sell its FDA-approved clopidogrel bisulfate product in the United States, and Apotex would agree not to sell a clopidogrel product in the United States until the effective date of the license. The license would be exclusive (except for the PLAVIX® brand product) and would be effective on September 17, 2011, with the possibility of an effective date earlier in 2011 if sanofi-aventis does not receive an extension of exclusivity for pediatric use under the '265 patent. If a third party obtains a final decision that the '265 patent is invalid or unenforceable, under certain circumstances, the license to Apotex may become effective earlier.

* * *

The agreement includes other provisions, including payments by sanofi-aventis and Bristol-Myers Squibb to Apotex in the event of either finalization of the proposed settlement or termination of the agreement. Payments due to Apotex under the agreement are payable 50% by sanofi-aventis and 50% by Bristol-Myers Squibb.

The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated in the same Court.

If the litigation were reinstated, sanofi-aventis and Bristol-Myers Squibb intend to **vigorously pursue** enforcement of their patent rights in PLAVIX®.  (Emphasis added)

26.     On April 27, 2006, the Company held an earnings release conference call

for the quarter ended March 31, 2006.  In that conference call, Bonfield stated:

Finally, let me briefly touch on a topic I know you are all very focused on. In March, we announced the proposed settlement with Apotex related to the Plavix patent litigation.  We have since submitted the settlement to the FTC and is it (sic) currently under consideration.  Consistent with the terms of our consent decree, we have also submitted the proposal to the Attorney's General for review.  We cannot predict at this point in time, how long they will take to evaluate the agreement.

As we indicated in our release, there is significant risk that the required antitrust clearance will not be obtained.  In the event that the agreement is finalized or terminated, payments will be due to Apotex, payable 50% by us and 50% by Sanofi.  We have established a reserve in the first quarter for $40 million, representing the minimum estimate.  The Bristol-Myers Squibb share of this is some $20 million.  I know you all have many questions on this matter but I would ask for your understanding as to why we can't elaborate any further at this point in time.

27.      On May 8, 2006, the Company filed its quarterly report with the SEC on Form 10-Q for the period ended March 31, 2006.  The 10-Q, signed by defendants Dolan and Bonfield stated, among other things:

On March 21, 2006, the Company and Sanofi announced that they have reached an agreement subject to certain conditions with Apotex Inc. and Apotex Corp. to settle the patent infringement lawsuit pending between the parties in the U.S. District Court for the Southern District of New York. The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that the required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated in the same Court. If the litigation were reinstated, Sanofi and the Company intend to **vigorously pursue enforcement of their patent rights in PLAVIX\***. If reinstated, it is not possible reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX\*. (Emphasis added).

\* \* \*

The Company's expectations for future sales growth include increases in sales of PLAVIX\*, which had net sales of $3.8 billion for 2005, and is currently the Company's largest product ranked by net sales. The composition of matter patent for PLAVIX\*, which expires in 2011, is currently the subject of litigation in the United States. As previously disclosed, the Apotex litigation has been suspended pending possible finalization of the previously announced proposed settlement among the parties.

\* \* \*

It is not possible at this time reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX\*. Apotex announced in January 2006 that it had received final approval of

9

its aNDA for clopidogrel bisulfate from the FDA. As a result, if the litigation were reinstated, Apotex could launch a generic clopidogrel product at risk.

28.     On June 25, 2006, BMY issued a press release stating, among other things:

**Update on Plavix® Litigation Settlement**

PARIS, NEW YORK and TORONTO, June 25 /PRNewswire-FirstCall/ -- Sanofi- aventis (Paris Bourse: EURONEXT: SAN; and New York: NYSE: SNY) and Bristol- Myers Squibb (NYSE: BMY) (the"companies") and Apotex Inc. and Apotex Corp. ("Apotex") today announced that in response to concerns raised by the Federal Trade Commission ("FTC") and state attorneys general to the previously announced proposed settlement the companies reached with Apotex relating to patent infringement litigation on Plavix® (clopidogrel bisulfate), the companies and Apotex have amended the agreement. Review of the modified agreement by the FTC and state attorneys general continues.

Among other revisions, under the terms of the modified agreement, Apotex's license to manufacture and sell its FDA approved clopidogrel bisulfate product in the United States would be effective on June 1, 2011, rather than September 17, 2011, as disclosed in the press release issued by the companies on March 21, 2006.

There is no assurance that the revised agreement will address all of the concerns of the FTC and state attorneys general and there remains a significant risk that antitrust clearance will not be obtained.

29.     The statements referenced above in ¶¶ 25-28 were materially false and misleading because they failed to disclose the following facts, among others:

a.   The Company had relinquished material legal rights, including the right

to seek treble damages, in order to reach the Apotex Settlement, which

would have maintained BMY's market exclusivity for Plavix through

2011;

b.   That if the Apotex Settlement was not approved, Apotex would be able

to flood the market with generic Plavix, which would greatly reduce the

sales of BMY's Plavix drug; and

c.   That BMY had negotiated improper side agreements, designed to avoid

the regulatory scrutiny of the Apotex Settlement, including that BMY

would oppose the launch of an authorized generic Plavix in the future if

the Apotex Settlement was not finalized.

## VI.    THE TRUTH BEGINS TO EMERGE

30.    On July 27, 2006, before the opening of trading, the Company issued a

press release that stated, in part:

> The company learned yesterday that the Antitrust Division of the United
> States Department of Justice is conducting a criminal investigation
> regarding the proposed settlement of the Apotex litigation.

31.    On July 27, 2006, during a conference call with analysts, in response to

questions regarding the criminal investigation into the Apotex Settlement, Dolan stated,

"all of [the Company's] conduct related to the proposed Plavix settlement has been

**entirely appropriate**."  (Emphasis added).

32.    On July 27, 2006, the price of BMY's securities declined $1.95 per share,

or 7.5%, to close at $24.04 per share, on unusually heavy trading volume.

33.    On July 28, 2006, after the close of trading, BMY issued a press release

stating, among other things:

> **PLAVIX® Litigation Settlement Fails to Receive Antitrust Clearance
> From States Attorneys General**
>
> PARIS and NEW YORK, July 28 /PRNewswire-FirstCall/ -- Sanofi-
> aventis (Paris Bourse: EURONEXT: SAN; and New York: NYSE: SNY)
> and Bristol-Myers Squibb (New York: NYSE: BMY) ("companies") today

announced that their agreement, as amended, with Apotex Inc. and Apotex Corp., ("Apotex") to settle the patent infringement lawsuit pending between the parties in the U.S. District Court for the Southern District of New York has failed to receive required antitrust clearance from the state attorneys general.

* * *

As previously disclosed, the companies learned earlier this week that the Antitrust Division of the United States Department of Justice is conducting a criminal investigation regarding the proposed settlement. It is not possible at this time reasonably to assess the outcome of the investigation or its impact on the companies.

It is also not possible at this time reasonably to assess the outcome of the PLAVIX® litigation, including the Apotex matter, or the timing of potential generic competition for PLAVIX®. Apotex announced in January 2006 that it had received final approval of its aNDA for clopidogrel bisulfate from the FDA. As a result, Apotex could launch a generic clopidogrel product at its risk.

34.     On July 31, 2006, the next trading day, the price of BMY's securities declined $0.50 per share, or 2%, to close at $23.97 per share, on unusually heavy trading volume.

35.     On August 8, 2006, BMY filed its quarterly report on Form 10-Q for the quarter ended June 30, 2006.  In that 10-Q, the Company revealed material facts concerning the Apotex Settlement which had not been previously disclosed.  The facts disclosed on this date included that:  (1) BMY had agreed it would not move for a preliminary injunction against Apotex for at least five (5) business days after the launch of Apotex's generic Plavix; and (2) BMY had relinquished its right to seek treble damages in the event the patent infringement suit against Apotex in connection with the Plavix drug was successful.

36.     On August 9, 2006, the next trading day, BMY's securities declined $1.56 per share, or approximately 7%, to close at $21.21 per share, on unusually heavy trading volume.

37.     On September 12, 2006, the Company announced the resignation of Dolan, effective immediately.

38.     On January 25, 2007, BMY disclosed that as a result of Apotex's launch of generic Plavix, BMY's sales of Plavix declined 62% during the quarter ended December 31, 2006, representing a loss of $700-750 million in sales to BMY.

39.     On May 10, 2007, BMY announced that the Company had agreed to plead guilty for making false statements in connection with the Apotex Settlement. Furthermore, BMY disclosed that a BMY executive had "reached certain side agreements with Apotex that weren't included in the written settlement agreement submitted to government regulators."

40.     On June 11, 2007, BMY disclosed that it had pleaded guilty to two counts of violating 18 U.S.C. Sec. 1001 in U.S. District Court for the District of Columbia. Furthermore:

> The company acknowledged that a former Bristol-Myers Squibb senior executive made oral representations to Apotex for the purpose of causing Apotex to conclude that the company would not launch an authorized generic in the event that the parties reached a final revised settlement agreement. Those representations included the former senior executive's statement that he expected to oppose personally the launch of an authorized generic in the future, his statement that he expected to advocate against such a launch, and his implied suggestion that the company's former CEO shared his views. The failure to disclose this information to the Federal Trade Commission (FTC) in connection with the FTC's review of the revised settlement agreement operated as incomplete and therefore false statements to the FTC. The company acknowledged in court today its responsibility for the conduct of the former senior officer.

41.     On June 19, 2007, BMY announced that the United States District Court for the Southern District of New York upheld the validity and enforceability of the Company's patent for Plavix, maintaining the main patent protection for this product in the United States until November 2011. The Company further stated that "[t]he Court also ruled that Apotex's generic clopidogrel bisulfate infringes Sanofi-Aventis' patent, and has enjoined Apotex from marketing this product in the United States until the patent expires."

## VII.     LOSS CAUSATION/ECONOMIC LOSS

42.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated BMY's stock price and operated as a fraud or deceit on Class Period purchasers of BMY securities by misrepresenting several material terms of the Apotex Settlement. Defendants failed to disclose that the Company had agreed to relinquish material legal rights, including the right to seek treble damages, in connection with the Apotex Settlement. Defendants also failed to disclose that the Company had entered into improper side agreements related to this settlement, including that BMY would oppose the launch of an authorized generic Plavix if the companies did not reach a finalized settlement agreement. In addition, defendants failed to disclose that if the Apotex Settlement was not approved, Apotex could flood the market with the generic version of Plavix. Later, however, when defendants' prior misrepresentations were disclosed and became apparent to the market, the price of BMY stock declined precipitously as the prior artificial inflation came out of BMY's stock price. As a result of their purchases of

BMY's securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

43.     At all relevant times, the market for BMY securities was an efficient market for the following reasons, among others:

(a)     The Company's securities met the requirements for public listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)     The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

44.     As a result, the market for the Company's securities promptly digested current information with respect to BMY from all publicly available sources and reflected such information in the price of the Company's securities.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the securities of BMY at artificially inflated prices and a presumption of reliance applies.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

45.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading.  Furthermore, they knew that such statements or documents would be issued or disseminated to the investing public.

Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding the terms of the Apotex Settlement, their control over, and/or receipt and/or modification of BMY's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Apotex Settlement, participated in the fraudulent scheme alleged herein.

46.      Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

47.      Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of BMY, issued statements and press releases on behalf of BMY and had the opportunity to commit the fraud alleged herein.

## X.      **NO SAFE HARBOR**

48.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BMY who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
**For Violation of Section 10(b) of the 1934 Act
and Rule 10b-5 Against All Defendants**

49.     Plaintiff incorporates ¶¶1-48 by reference.

50.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BMY securities during the Class Period.

52.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BMY's securities. Plaintiff and the Class would not have purchased BMY's securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and material omissions.

53.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of BMY securities during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

54.     Plaintiff incorporates ¶¶1-48 by reference.

55.     The Individual Defendants acted as a controlling person of BMY within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to

18

copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.    As set forth above, BMY and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of BMY's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 20, 2007

       KAPLAN FOX & KILSHEIMER LLP

       By: _____

       Frederic S. Fox (FF 9102)
       Joel B. Strauss (JS 6585)
       Jeffrey P. Campisi (JC 7264)
       805 Third Avenue, 22nd Floor
       New York, New York 10022
       Tel: (212) 687-1980
       Fax: (212) 687-7714

          -and-

       LOCKRIDGE GRINDAL & NAUEN,
       P.L.L.P.
       Richard A. Lockridge
       Karen H. Riebel
       100 Washington Avenue South, Suite 2200
       Minneapolis, MN 55401
       Tel: (612) 339-6900
       Fax: (612) 399-0981

       *Attorneys for Plaintiff*

## PLAINTIFF CERTIFICATION

I, Walter C. Schirmer, hereby state:

1.    I, Walter C. Schirmer, on behalf of the Minneapolis Firefighters' Relief Association ("MFRA"), have reviewed a Complaint against Bristol-Myers Squibb Company, Peter R. Dolan, and Andrew R.J. Bonfield, and have authorized the filing of the same or a similar complaint on MFRA's behalf.

2.    MFRA did not purchase any Bristol-Myers Squibb Company securities at the direction of counsel or in order to participate in this private action.

3.    MFRA is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of MFRA's transactions in Bristol-Myers Squibb Company securities during the Class Period (March 22, 2006 through August 8, 2006) as defined in the Complaint:

| TRANSACTION (PURCHASE, SALE, EXCHANGE, CALL, PUT, ETC.) | TRADE DATE | PRICE | QUANTITY |
|---|---|---|---|
| Purchase | 4/3/06 | $24.8287 | 1,908 |
| Sale | 4/11/06 | $23.9716 | 399 |
| Sale | 4/18/06 | $24.7041 | 301 |
| Purchase | 7/3/06 | $25.7492 | 1,472 |
| Purchase | 7/5/06 | $25.3258 | 1,121 |

5.    MFRA has filed the following civil actions as a representative party on behalf of a class under the federal securities laws during the last three years.

MFRA v. Ceridian Corp. et al (Del. Ch. 2996)

6.    MFRA will not accept any payment for serving as a representative party on behalf of a class except to receive its pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of JUNE , 2007.

_W. C. Schirmer_

Walter C. Schirmer, Executive Secretary
Minneapolis Firefighters' Relief Association

Hennepin County

370548-1