# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE BRISTOL-MYERS SQUIBB CO. SECURITIES LITIGATION | X : : : : : : : : X | NO. 07-CV-5867 (PAC) |
| | | AMENDED CLASS ACTION COMPLAINT |
| | | **JURY TRIAL DEMANDED** |

Court-appointed Lead Plaintiff, the Ontario Teachers' Pension Plan Board ("Ontario

Teachers" or "Lead Plaintiff"), and Plaintiff Minneapolis Firefighters' Relief Association

("Minneapolis Firefighters") bring this class action under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder

on behalf of themselves and all other persons or entities, other than Defendants and their

affiliates, who purchased or acquired common stock of Bristol-Myers Squibb Company

("Bristol-Myers" or the "Company") between March 21, 2006 after the close of the market

through and including August 8, 2006 (the "Class Period"), to recover damages caused by

Defendants' violations of the securities laws.  Plaintiffs allege the following facts upon

knowledge, with respect to their own acts, and with respect to all other facts, based upon the

investigation of Lead Plaintiff's counsel, which included, among other things, a review of

Bristol-Myers' public filings with the Securities and Exchange Commission ("SEC"), press

releases and other public statements issued by Defendants, media and news reports about the

Company, publicly available trading data relating to the price and volume of Bristol-Myers

common stock, and other information set forth below.  Plaintiffs believe that further substantial

evidentiary support will exist for the allegations set forth below after a reasonable opportunity

for discovery.

## I.    <u>NATURE OF THE ACTION</u>

1.    This action arises from materially false, incomplete, and misleading statements and omissions made or caused to be made by Defendants to Bristol-Myers investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act.  As set forth in detail below, Defendants' materially false and misleading statements and omissions all concerned Bristol-Myers' closely watched attempt to obtain approval for a proposed settlement agreement with a Canadian generic pharmaceutical company, Apotex Inc., and its United States subsidiary, Apotex Corp. (collectively "Apotex"), to prevent Apotex from introducing into the marketplace a generic equivalent of Bristol-Myers' largest selling drug, Plavix.

2.    Defendants first deceived investors beginning after the close of the market on March 21, 2006, by omitting critical facts from their public announcement of the proposed settlement agreement with Apotex, including no mention of significant limitations on Bristol-Myers' damages and patent enforcement rights should the settlement agreement not receive regulatory approval.  The risk of non-approval was real given required review and consent by the Federal Trade Commission (the "FTC") and the attorneys general of the fifty states under prior consent decrees entered into by the Company resulting from allegations of serious prior anti-competitive behavior by Bristol-Myers.  Nonetheless, investors, because they were completely unaware of the material rights Bristol-Myers had forfeited in the event of non-approval in order to consummate the settlement agreement with Apotex, reacted favorably to Defendants' announcement, sending the price of Bristol-Myers stock up by approximately 11 percent, on heavy trading volume on March 22, 2006.

3.    Defendants' materially false and misleading statements and omissions continued in connection with the reporting of Bristol-Myers' first quarter 2006 financial results on April

27, 2006, and at the Company's annual stockholders meeting on May 2, 2006.  Among other things, Defendants repeatedly stated that Bristol-Myers would "vigorously pursue" enforcement of its patent rights in the event of non-approval and that any generic launch by Apotex in the event of non-approval would be "at risk" without disclosing to investors that, in fact, Bristol-Myers had agreed to significant limitations on its damages and enforcement rights in the event of non-approval, which substantially reduced the financial risk to Apotex of any generic launch.

4.    On May 5, 2006, the state attorneys general notified Bristol-Myers that they would not approve the settlement agreement.  Defendants made no disclosure of this fact either in Bristol-Myers' Form 10-Q filed on May 8, 2006, or at a May 31, 2006 conference when they spoke about the prospects for regulatory approval of the settlement agreement.  Defendants instead entered into a renegotiated settlement agreement with Apotex, which now included secret oral terms which were not reported to investors, nor to the regulators.  By using these secret oral side agreements, Defendants hoped to keep Apotex on board with even more concessions and favorable terms for Apotex and to simultaneously secure regulatory approval of the settlement agreement, by criminally deceiving the regulators regarding the full terms of the amended agreement.  However, unbeknownst to Defendants, outside counsel to Apotex confidentially reported the unlawful oral side agreements to the FTC and the Department of Justice ("DOJ"), and, as a result, the DOJ immediately opened a criminal investigation into Bristol-Myers.

5.    At the same time, Defendants continued their public deception by repeatedly assuring Bristol-Myers investors that Bristol-Myers would "vigorously pursue" enforcement of its patent rights in the event of non-approval and that any generic launch by Apotex in the event of non-approval would be "at risk."

6.    The true facts began to be revealed to investors on July 27, 2006, when

Defendants were forced to confirm news of an FBI search of Bristol-Myers' headquarters in New York City relating to the Apotex agreement. The price of Bristol-Myers stock declined by approximately 7.5% immediately following this news.

7.      On August 8, 2006, the last day of the Class Period, investors finally discovered the previously undisclosed material terms of the Apotex settlement agreement which significantly weakened Bristol-Myers' damages and enforcement rights in the event of non-approval (which now had occurred) and greatly increased the risk of a generic launch by Apotex (which now had begun). The price of Bristol-Myers stock declined by another 7% immediately upon disclosure of these terms, with numerous analysts and news reporters highlighting the importance of these adverse settlement terms that Defendants had previously omitted in all of their materially false and misleading Class Period statements and disclosures to investors.

8.      Shortly after the end of the Class Period, the Company announced the involuntary termination of both its CEO, Defendant Peter R. Dolan, as well as its General Counsel because of their conduct relating to the Apotex settlement agreement. Several months later, the Company agreed to plead guilty to two criminal felony counts of making false statements to a government agency, admitting that the Company had failed to disclose important facts to the FTC regarding the proposed Apotex agreement.

9.      Through this action, Plaintiffs seek to recover the significant damages suffered by the Class as the result of Defendants' material deception of investors throughout the Class Period.

## II.      JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has

jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Bristol-Myers' headquarters is located at 345 Park Avenue, New York, New York 10154.

12.     In connection with the wrongful acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate and international telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities market located in this District.

### III.     THE PARTIES

13.     Lead Plaintiff Ontario Teachers is a public pension system organized for the benefit of current and retired teachers in Ontario, Canada.  As of December 31, 2006, Ontario Teachers managed approximately $106 billion (CDN) in net assets.  Ontario Teachers is responsible for the retirement income of approximately 271,000 active and retired elementary and secondary school teachers.  Ontario Teachers purchased Bristol-Myers common stock during the Class Period on the NYSE as detailed in the attached certification and suffered damages as a result of the violations of the federal securities laws alleged herein.  On September 20, 2007, this Court appointed Ontario Teachers as Lead Plaintiff for this litigation.

14.     Plaintiff Minneapolis Firefighters finances and pays service, disability and dependency pensions to its eligible members – firefighters of the City of Minneapolis, Minnesota – and their dependents.  As of December 31, 2006, Minneapolis Firefighters had net plan assets of approximately $260 million and had approximately 620 members.  Minneapolis Firefighters

purchased Bristol-Myers common stock during the Class Period on the NYSE as detailed in the

attached certification and suffered damages as a result of the violations of the federal securities

laws alleged herein.

15.    Defendant Bristol-Myers is a corporation organized under the laws of Delaware

with its principal executive office located in New York, New York.  Bristol-Myers engages in

the discovery, development, licensing, manufacturing, marketing, distribution, and sale of

pharmaceuticals and related health care products worldwide.  As of June 30, 2006, there were

1,966,542,358 shares of Bristol-Myers common stock outstanding.  During the Class Period,

Bristol-Myers was listed on the NYSE, where its stock was publicly traded under the symbol

"BMY."

16.    Defendant Peter A. Dolan ("Dolan") was CEO and a Director of the Company

and Chairman of the Company's Executive Committee during the Class Period.  During the

Class Period, Dolan signed the Company's quarterly reports on Form l0-Q filed with the SEC for

the periods ended March 31, 2006 and June 30, 2006.

17.    Dolan, because of his senior position with the Company, possessed the power and

authority to control the contents of Bristol-Myers' quarterly reports, press releases and

presentations to securities analysts, money and portfolio managers and institutional investors,

i.e., the market.  Dolan was provided with copies of the Company's reports and press releases

alleged herein to be misleading prior to their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected.  Because of his position and access to

material non-public information available to him, but not to the public, Dolan knew that the

adverse facts specified herein had not been disclosed to and were being concealed from the

public and that the representations which were being made were then materially false and

misleading.  Dolan himself signed many of the written statements and delivered many of the oral public statements that are alleged herein to be materially false or incomplete when made.

18.    Defendant Andrew Bodnar ("Bodnar"), a medical doctor and attorney, was the Company's Senior Vice President for Strategy and Medical and External Affairs and a member of the Company's Executive Committee during the Class Period.  As set forth below, Bodnar was the Company's principal negotiator with Apotex regarding Plavix, reporting directly to Dolan.

19.    Because of his position and access to material non-public information available to him, but not to the public, Bodnar knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations which were being made were then materially false and misleading.  Bodnar's participation in the negotiation of the terms of the Apotex Settlement and Amended Apotex Settlement (as defined in ¶¶ 33 & 39) that were concealed from investors during the Class Period, as well as the unlawful oral side agreements with Apotex that were also concealed from investors during the Class Period, constituted a manipulative or deceptive device or contrivance, a device, scheme or artifice to defraud, and an act, practice, or course of business which operated or would operate as a fraud or deceit upon investors in connection with the purchase or sale of Bristol-Myers common stock.

## IV.    CLASS ACTION ALLEGATIONS

20.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who purchased or acquired Bristol-Myers common stock during the period from after the close of the market on March 21, 2006 through August 8, 2006, inclusive (the "Class Period") and suffered damages as a result.

21.     Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of individual Defendants Dolan and Bodnar; (iii) any person who was an executive officer or director of Bristol-Myers during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant; (v) any person who actively participated in the wrongdoing at issue; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

22.     Bristol-Myers common stock was actively traded on the NYSE, which is an efficient market, throughout the Class Period.  Numerous securities analysts published reports about Bristol-Myers during the Class Period, including analysts from A.G. Edwards & Sons, Inc., Banc of America Securities, Bear Stearns & Co., Citigroup Global Markets Inc., Cowen and Co., Credit Suisse First Boston, Friedman, Billings, Ramsey & Co., Inc., Goldman, Sachs & Co., J.P. Morgan Securities Inc., Lehman Brothers, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley Dean Witter, Prudential Equity Group, LLC, SunTrust Robinson Humphrey, a Division of SunTrust Capital Markets, Inc., and UBS.  Many national, international, and financial news publications published articles about Bristol-Myers during the Class Period, including the *Wall Street Journal*, *New York Times*, *Financial Times*, Associated Press, Reuters, and Bloomberg.  More than two million shares of Bristol-Myers common stock were traded every business day during the Class Period and, on numerous trading days, over ten million Bristol-Myers shares were traded.

23.     The members of the Class, purchasers of Bristol-Myers stock on the NYSE, are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be ascertained through appropriate discovery, Plaintiffs believe that there are

thousands of members of the Class, if not millions. As noted in ¶ 15, there were almost 2 billion shares of Bristol-Myers common stock outstanding during the Class Period.

24. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.

25. Plaintiffs will fairly and adequately protect the interests of the members of the Class, and Lead Plaintiff has retained Court-appointed Lead Counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class that Plaintiffs seek to represent.

26. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

27. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether Defendants' public statements, including Defendants' SEC filings, press releases, and conference calls, contained misstatements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether Defendants acted with scienter in omitting or misrepresenting material facts in the Company's SEC filings, press releases, conference calls, and other public statements;

(d)    whether the market price of Bristol-Myers common stock during the Class Period was artificially inflated due to the material misrepresentations and omissions alleged herein;

(e)    with respect to Plaintiffs' claims pursuant to Section 20(a) of the Exchange Act, whether Defendants Dolan and Bodnar were controlling persons of the Company during the Class Period; and

(f)    whether the members of the Class have sustained damages as a result of the misconduct complained of herein and, if so, the proper measure of such damages.

28.    Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

29.    The names and addresses of the record owners of Bristol-Myers stock purchased or acquired during the Class Period are obtainable from information in the possession of the Company's transfer agent(s).  Notice can be provided to such record owners via first-class mail using techniques and a form of notice similar to those customarily used in class actions.

## V.    FACTUAL ALLEGATIONS PERTINENT TO PLAINTIFFS' CLAIMS FOR RELIEF

30.    Bristol-Myers, one of the world's largest pharmaceutical companies, and the French pharmaceutical company Sanofi-Aventis ("Sanofi") jointly manufacture and sell the prescription drug Plavix, which is marketed to prevent myocardial infarction (heart attack), stroke, and vascular deaths in patients with atherosclerosis indicated by recent myocardial

infarction, stroke, or established peripheral arterial disease; to prevent thrombotic complications after coronary stenting; and to treat acute coronary syndrome. The United States Food and Drug Administration ("FDA") first approved Bristol-Myers' application to market Plavix in 1997. Under the Bristol-Myers/Sanofi partnership agreement, Bristol-Myers sells Plavix in the United States, and Sanofi in most other countries. Bristol-Myers' Plavix sales in the United States totaled more than $3.8 billion in 2005, making it the Company's largest-selling drug and the second largest-selling drug in the world. Sales of Plavix were responsible for approximately one fifth of the Company's reported earnings in 2005. Bristol-Myers' primary patent covering Plavix expires on or about November 11, 2011.

31.     Apotex Inc. filed the first Abbreviated New Drug Application ("ANDA") for generic Plavix with the FDA in November 2001, seeking regulatory approval to market generic Plavix prior to expiration of Bristol-Myers' patent and asserting that the patent was invalid, unenforceable, and/or not infringed by the generic product. If approved by the FDA, a first-filed ANDA asserting the brand-name patent's invalidity, unenforceability, or non-infringement grants the generic manufacturer 180 days of generic marketing exclusivity, which prevents any subsequent generic applicants from marketing their products for the first 180 days of generic competition against the brand-name drug.

32.     Bristol-Myers and Sanofi sued Apotex in March 2002 in the Southern District of New York, alleging that Apotex's ANDA infringed their patent rights in Plavix. This litigation triggered a statutory 30-month stay of FDA approval of Apotex's ANDA. This stay expired in May 2005, and the FDA granted final approval of Apotex's ANDA on January 20, 2006. From January to August 2006, Apotex manufactured large quantities of generic Plavix and entered into contracts with customers in preparation to launch the generic product. Bristol-Myers learned

about these preparations and sought to negotiate a settlement of the patent litigation with Apotex, under which the launch of Apotex's generic Plavix would be delayed until shortly before expiration of Bristol-Myers' patent in November 2011.

33.     After the close of the market on March 21, 2006 and at the start of the Class Period, Bristol-Myers issued a press release announcing that it, along with its Plavix partner Sanofi, had entered into a settlement agreement with Apotex to resolve the patent infringement lawsuit (the "Apotex Settlement").  A trial in the patent lawsuit had been scheduled for June 2006, but the trial date was suspended pending the finalization of the proposed settlement. Under the publicly disclosed terms of the Apotex Settlement:  (1) Apotex would receive a royalty-bearing license to manufacture and sell generic Plavix in the United States; (2) Apotex would agree not to sell its generic version of Plavix in the United States until September 17, 2011 (or an earlier date in 2011 if Bristol-Myers did not receive an extension of exclusivity for pediatric use under the patent); and (3) Bristol-Myers and Sanofi would make payments (in equal amounts from each company) in undisclosed amounts to Apotex in the event of either finalization of the proposed settlement or termination of the agreement.

34.     Bristol-Myers' March 21, 2006 press release also reported that the Apotex Settlement was subject to certain conditions, including approval by both the FTC and state attorneys general under the terms of a consent decree in prior antitrust litigation by the regulators against Bristol-Myers relating to previous allegations of anticompetitive agreements to delay generic competition with other Bristol-Myers drugs.  The FTC alleged in a 2003 complaint that Bristol-Myers violated the antitrust laws by entering into an agreement with a generic drug company, under which the other company agreed not to introduce a generic version of Bristol-Myers' popular anxiety drug BuSpar.  In March 2003, Bristol-Myers agreed to the filing of a ten-

year FTC order against it, which barred it from entering into anticompetitive agreements to delay

generic competition to its branded drugs and gave the FTC authority to review and approve any

future agreements between the Company and generic competitors (including the Apotex

Settlement). The Apotex Settlement also required the approval of the attorneys general of the

fifty states under a 2003 consent decree relating to the Company's alleged anticompetitive

settlement of patent litigation relating to the cancer drug Taxol.

35.    The importance of the Company's compliance with the FTC and state attorneys

general consent decrees was further heightened by a deferred prosecution agreement that Bristol-

Myers entered into with the United States Attorney for New Jersey in June 2005 to resolve

criminal charges of securities fraud. Under the deferred prosecution agreement, Bristol-Myers

promised not to commit any new criminal violation for two years; to hire a corporate monitor

acceptable to the U.S. Attorney; to give the monitor unfettered access to Company information;

and to adopt all recommendations contained in each report submitted by the monitor, who was

granted the authority to require Bristol-Myers to take any steps he believed necessary to comply

with the agreement. Former U.S. District Judge and U.S. Attorney Frederick Lacey was

appointed as the monitor on or about June 27, 2005.

36.    Bristol-Myers' March 21, 2006 press release stated that if the required regulatory

approvals of the Apotex Settlement were not obtained, the settlement would be terminated and

the patent litigation would be reinstated. Bristol-Myers stated in the press release (and

repeatedly thereafter) that if the litigation was reinstated, it intended to "vigorously pursue"

enforcement of its patent rights in Plavix, and that Apotex would be able to launch its generic

Plavix only "at risk." An "at risk" launch of an unlicensed generic drug prior to expiration of the

brand-name drug's patent means that the generic manufacturer runs the risks under the patent

laws of a preliminary and/or permanent injunction against selling the generic and of damages, including treble damages, for generic sales prior to any injunction.

37.     Critically, Bristol-Myers failed, in its March 21, 2006 press release and subsequent public statements during the Class Period, to disclose material facts regarding the Apotex Settlement, including that Bristol-Myers had agreed that: (1) if the regulators rejected the settlement and Bristol-Myers won the patent litigation, Bristol-Myers' damages for any past infringement by Apotex would be limited to only 70% of Apotex's net sales of generic Plavix if Bristol-Myers had not launched an authorized generic and only 60% of net sales if Bristol-Myers had launched an authorized generic; (2) Bristol-Myers agreed not to seek increased (up to treble) damages under the patent laws; (3) if the regulators rejected the settlement, the parties would jointly ask the court hearing the patent case to set a trial date not earlier than 2 ½ months after the date of the request; and (4) if the regulators rejected the settlement, Bristol-Myers would not seek a temporary restraining order or preliminary injunction against Apotex's sales of generic Plavix until five business days after either Bristol-Myers gave notice of its intention to do so, or Apotex launched its generic Plavix (which would allow Apotex to flood the market with its generic version of Plavix).  These material omissions rendered Bristol-Myers' public statements on March 21, 2006 and repeatedly during the Class Period that it would "vigorously pursue" enforcement of its patent rights in Plavix if the regulators rejected the settlement, and that any generic launch by Apotex would be "at risk," materially false, incomplete, and misleading when made.  When these terms of the Apotex Settlement (that were concealed by Bristol-Myers from the public throughout the Class Period) were first publicly disclosed on August 8, 2006, the last day of the Class Period, the price of Bristol-Myers stock declined precipitously on unusually heavy trading volume, and the media and securities analysts attributed this decline to the

previously undisclosed and highly disadvantageous settlement terms agreed to by the Company.

38.     Bristol-Myers submitted the Apotex Settlement for review by the FTC and state attorneys general under the terms of its consent decrees.  According to a sworn Declaration of Bernard Sherman, Apotex's Chairman ("Sherman"), which was filed in the Plavix patent litigation after the end of the Class Period on August 31, 2006 ("Sherman Decl."), the state attorneys general first notified Bristol-Myers on May 5, 2006 that they would not provide the required approval.  (Sherman Decl. ¶ 34.)  Bristol-Myers then withdrew its request for approval by the FTC.  (*Id.*)  Bristol-Myers publicly disclosed neither the rejection of the Apotex Settlement by the state attorneys general, nor its withdrawal of the request for FTC approval of the Apotex Settlement.  Indeed, Bristol-Myers' Chief Executive Officer, Defendant Dolan, specifically commented publicly on the status of the FTC review on May 31, 2006, without disclosing any of these material facts.

39.     Rather than make any public disclosure at that time, Bristol-Myers confidentially sought to renegotiate the settlement agreement with Apotex in hopes of securing the regulators' approval of an amended agreement.  Defendant Bodnar met with Sherman at Apotex's headquarters in Weston, Ontario on May 12 and 24, 2006 to renegotiate the agreement.  (Sherman Decl. ¶ 35.)  Sherman was personally involved in all of the Plavix-related negotiations between Apotex and Bristol-Myers.  (Sherman Decl. ¶ 31.)  On May 26, 2006, Bristol-Myers and Apotex entered into an amended written settlement agreement (the "Amended Apotex Settlement"), which Bristol-Myers submitted for regulatory review.  (Sherman Decl. ¶ 32; Ex. 99.2 to Bristol-Myers Form 10-Q filed Aug. 8, 2006.)  At the same time, Bristol-Myers, through Bodnar and Dolan, entered into secret oral side agreements with Apotex that Defendants unlawfully concealed from the FTC and state attorneys general.  (Sherman Decl. ¶¶ 37-46 and

Exs. F-O to Sherman Decl.)

40.    Nearly one month later, on June 25, 2006, the Company publicly announced that in response to "concerns" expressed by the regulators, an amended agreement had been negotiated and resubmitted for the regulators' review.  The only substantive term of the Amended Apotex Agreement that Bristol-Myers publicly disclosed on June 25, 2006 or in any of its public statements prior to the end of the Class Period was that Apotex's license to manufacture and sell generic Plavix in the United States would be effective on June 1, 2011, rather than September 17, 2011, as previously stated in the press release issued by Bristol-Myers on March 21, 2006.

41.    Bristol-Myers failed to publicly disclose at any time prior to the end of the Class Period that the Amended Apotex Settlement provided that: (1) if the regulators rejected the Amended Apotex Settlement and Bristol-Myers won the patent litigation, damages would be limited to only 50% of Apotex's net sales of generic Plavix if Bristol-Myers had not launched an authorized generic and only 40% of Apotex's net sales if Bristol-Myers had launched an authorized generic (reduced from 70% and 60%, respectively, in the original Apotex Settlement); (2) Bristol-Myers would not seek increased (up to treble) damages under the patent laws; (3) if the regulators rejected the Amended Apotex Settlement, the parties would seek a rescheduled trial date in the patent litigation not earlier than 2 ½ months after the date of the request; and (4) if the regulators rejected the Amended Apotex Settlement, Bristol-Myers would not in any event seek a temporary restraining order against Apotex's launch of generic Plavix (as the original Apotex Settlement permitted Bristol-Myers to do after five business days' notice or after Apotex launched its generic), and would not seek a preliminary injunction until five business days after giving notice of its intent to do so to Apotex, which notice would not be given before Apotex

launched its generic Plavix (which would allow Apotex to flood the market with generic Plavix). These terms that were concealed by Bristol-Myers from the public were only publicly disclosed on August 8, 2006, the last day of the Class Period, when the Company filed the Amended Apotex Settlement as Exhibit 99.2 to its second-quarter Quarterly Report on Form 10-Q before the opening of the market.  The Amended Apotex Settlement agreement was not publicly filed until after it failed to receive regulatory approval for a second time.

      42.     In addition to the undisclosed written terms of the Amended Apotex Settlement described in ¶ 41, Bristol-Myers also entered into unlawful oral side agreements with Apotex, which Bristol-Myers concealed from both the regulators and the public.  (Sherman Decl. ¶¶ 37-38, 46.)  Bodnar and Apotex's outside counsel, Evan Chesler, Esq. ("Chesler"), acting as Bristol-Myers' authorized negotiators, insisted that the side agreements be oral because, as Bodnar and Chesler stated to Sherman, the FTC would not approve the amended agreement if the side agreements were disclosed to it.  (*Id.* ¶¶ 37 & 39-40 and Exs. G & H.)  Bodnar told Sherman on May 12, 2006 (as memorialized by Sherman in a May 14, 2006 e-mail to colleagues at Apotex who were present at the May 12 meeting with Bodnar (Sherman Decl. ¶ 39 and Ex. G)) that the FTC would not approve a revised agreement unless the agreement omitted, among other things, Bristol-Myers' undertaking in the original Apotex Settlement not to launch an authorized generic during Apotex's 180 days of exclusivity and a $60 million break-up fee included in the original Apotex Settlement.  The oral side agreements were that: (1) if the regulators approved the amended agreement, Bristol-Myers would not launch an authorized generic during Apotex's period of exclusivity; (2) Apotex's signing the new agreement would not constitute a waiver of Apotex's vested right to the $60 million break-up fee under the original Apotex Settlement; and (3) the parties agreed to interpretations of certain terms of the written amended agreement set

forth in an email from Sherman to Bodnar on May 25, 2006, including that – contrary to the original Apotex Settlement – Apotex would not have to pay Bristol-Myers any royalty for its license.  (Sherman Decl. ¶¶ 38 & 45 and Ex. N.)  Unbeknownst to Defendants, the secret oral side agreements were confirmed in a letter, dated June 5, 2006, from Robert S. Silver, Esq. of Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Apotex's patent counsel, to the FTC and Department of Justice ("DOJ").  (Ex. F to Sherman Decl.)

43.    Sherman stated in his Declaration that he "was so startled by the conduct of the negotiations that [he] made contemporaneous e-mails in which I reported these facts to others at Apotex, including other Apotex officials who were present, to contemporaneously record what had occurred."  (Sherman Decl. ¶ 37.)  As memorialized in Sherman's May 14, 2006 email (Ex. G to Sherman Decl.), which was reviewed by two other Apotex executives who were present for portions of Sherman's meeting with Bodnar (Sherman Decl. ¶ 39), Bodnar told Sherman on May 12, 2006:

> With respect to the undertaking of Sanofi/BMS not to launch an authorized generic, he said that FTC required that there be no agreement that one would not be launched, but that did not mean that Sanofi/BMS must launch an authorized generic; and that ***they would still be prepared to give us a guarantee of no authorized generic, but that it could not be in writing.  We would have to rely on Bodnar's personal pledge and that of BMS's CEO, Peter Dolan, that they would not launch an authorized generic during our exclusivity.***  [Emphasis added.]
>
> * * *
>
> ***We discussed that we could probably get around FTC's objection to the "break-up fee", by leaving any mention of it out of a new agreement, but having it understood that we would still have that right pursuant to the previous agreement***; and the new agreement would be without prejudice to the rights that we now have under the previous agreement by reason of FTC not having approved the first proposal.  [Emphasis added.]
>
> The rest of the discussion focused primarily on how we could possibly rely on Bodnar's and Dolan's unwritten guarantee of no authorized generic.

* * *

*Bodnar stated that his personal assurance was completely reliable, and that Dolan was also in full agreement.* [Emphasis added.] He further stated that the only possibility of the understanding not being honoured would be if neither he nor Dolan were at BMS 5 years from now, but it was virtually certain that they would both still be there. He stated that the only possibility of the pledge not being honoured was: "to put it in biblical terms, if a new Pharaoh arose in the land, and he knew not Moses."

* * *

*While Bodnar is clearly an intelligent man, it appears to me that he is very naïve and/or blinded by the eagerness to preserve the monopoly. . . . [H]e should recognize that what he has proposed would be a fraud upon FTC and/or a fraud on us, which would expose BMS, Dolan and him to serious consequences.* [Emphasis added.]

44.      Bristol-Myers' secret agreement not to launch an authorized generic during Apotex's 180-day exclusivity period was highly significant because, as Gregory Gilbert, an analyst at Merrill Lynch, stated in a May 25, 2006 Associated Press article (prior to the public disclosure that Bristol-Myers had made such an agreement), an authorized generic can cut the exclusive generic competitor's profit by 59 percent.

45.      Sherman also memorialized his discussions with Bodnar and Bristol-Myers' outside counsel Chesler on May 24, 2006 about the unlawful oral side agreement to pay the $60 million break-up fee in an email to Kay and others at Apotex on the same day (Ex. H to Sherman Decl.). Sherman wrote:

We discussed the issue of the USD60 million that they now owe us because of FTC denial of approval of first deal. I explained that we would not sign new agreement without acknowledgement that so doing did not terminate our rights under the first agreement, including specifically the right to the USD60 million.

Bodnar got their lawyer, Evan Chesler, on the phone to discuss. *Evan and Andrew stated that they did not want to have in writing in the new agreement that our right to the $60 million survived, as they felt that such a term might result in another regulatory denial.* [Emphasis added.] However, they were prepared to give me their personal pledge that, if we sued to enforce our rights under the first agreement, and if they feel that they are compelled to defend

-19-

against same, they will not assert as a defense that our rights under the first agreement are terminated by entry into the second agreement. I asked if I could bring a witness into the room to confirm that they were giving that pledge, and they said that I could do so. I asked Joanne Mauro to join us, and Evan confirmed (on speakerphone) his personal pledge that, if they defend against a suit by us to enforce the first agreement, they will not raise as a defense that any right was lost by reason of entry into the second agreement.

***Once again it seems extraordinary to me that the[y] are prepared proceed on the basis of side agreements that will not be disclosed to FTC.*** [Emphasis added.]

46. According to the Sherman Declaration, Joanne Mauro wrote and signed a memorandum dated May 24, 2006 memorializing the same conversation as follows:

> Re: Agreement with Sanofi
> - they owe $60 million
> - have new agreement
> - assurances from Andrew Bodner [sic] and Mr. Chesler that they will not assert that the new agreement relieves them of their obligation under the old agreement in respect to the $60 million.

(Ex. I to Sherman Decl.) The Mauro memorandum's reference to "Sanofi" means Bristol-Myers in accordance with the Apotex Settlement and Amended Apotex Settlement, in which "the term 'Sanofi' refers to Sanofi-Aventis, Sanofi-Synthelabo, Inc., Bristol-Myers Squibb Company, and the Bristol-Myers Squibb Sanofi Pharmaceuticals Holding Partnership, collectively and individually . . . ." (Sherman Decl., Exs. B and C at ¶ 1.)

47. Bristol-Myers' concern that the $60 million payment to Apotex would lead the regulators to reject the Amended Apotex Settlement, if it was disclosed to them, was well founded. As the *Financial Times* reported on April 25, 2006, the FTC generally considered such payments unlawful under the antitrust laws:

> The FTC . . . says it supports settlements between drug makers: just not those that involve generics being paid money. One official says the agency would not take issue with a settlement in which two companies, each with a legal understanding of the relative strength of each other's case, settled patent disputes by agreeing on an earlier entry date for a generic. Adding the allure of a cash payment changes that equation, the official argues, by giving generics little choice but to accept the settlement – an option that is most likely in the best interest of that company's

shareholders.

48.     Similarly, Tim Anderson, an analyst at Prudential Equity Group, was quoted by the *Financial Times* on July 11, 2006 (when only portions of the original Apotex Settlement terms had been publicly disclosed), as saying that "[i]t is the up-front cash payment to Apotex [under the original Apotex Settlement] that could represent the biggest sticking point" for regulatory approval.

49.     According to his Declaration, Sherman negotiated the Amended Apotex Settlement and the accompanying oral side agreements without consulting with his counsel, and when he informed Apotex's counsel of their terms, his counsel advised him that Apotex was obligated to inform the FTC about the side agreements.  (Sherman Decl. ¶ 38.)  On June 5, 2006, Apotex confidentially notified the FTC and the Antitrust Division of the DOJ of the side agreements described in ¶ 42.  (Sherman Decl. ¶ 38 and Ex. F.).  Unbeknownst to Bristol-Myers investors, the DOJ then began an immediate criminal investigation into whether Bristol-Myers had made false statements to the FTC in seeking approval of the Amended Apotex Settlement (Sherman Decl. ¶ 46), which eventually led to a guilty plea by the Company on June 11, 2007.

50.     According to the Government's factual proffer at the hearing on June 11, 2007 regarding Bristol-Myers' guilty plea to making false statements to the FTC about the Amended Apotex Settlement, on or about June 8, 2006, the FTC requested written certification from Bristol-Myers that the Company had not made any representation, commitment, or promise to Apotex, whether oral or written, that was not explicitly set forth in the Amended Apotex Settlement, including the representation that Bristol-Myers would not launch an authorized generic version of Plavix during Apotex's period of exclusivity.  According to the Government's factual proffer, Bristol-Myers filed the requested certification, which Bristol-Myers knew to be materially false, with the FTC on or about June 12, 2006.  During the Class Period, the Company

made no public disclosure about the FTC's request and the Company's certification.

51.    According to news reports, on July 26, 2006, FBI agents executed a search warrant at Bristol-Myers' headquarters in New York City as part of a DOJ investigation, searched offices including Dolan's and Bodnar's offices, and seized documents.  (On the very same day that the FBI raided Bristol-Myers headquarters, former U.S. District Judge Lacey, as the Company's Monitor, and senior Bristol-Myers executives were meeting with the U.S. Attorney for Massachusetts in Boston, trying to settle allegations by that U.S. Attorney's office that the Company had inflated drug prices on bills to insurers and government agencies.  The Company settled civil charges relating to those allegations in September 2007, agreeing to pay a penalty of $499 million.)

52.    On July 27, 2006 before the market opened, the Company confirmed that the DOJ was conducting a criminal investigation into the Apotex settlement.  As a result of this (partial) disclosure, the price of Bristol-Myers' stock declined $1.95 per share, or 7.5%, to close at $24.04 per share on July 27, 2006, on unusually heavy trading volume of more than 29 million shares.  The next day, Bristol-Myers reported, after the close of the market, that its amended agreement with Apotex failed to win regulatory approval, sending its stock price down another $0.50 per share, or an additional 2%, on unusually heavy trading volume of approximately 17 million shares on the next trading day, July 31, 2006.

53.    On August 8, 2006 (the last day of the Class Period) before the market opened, the Company filed its second-quarter Form 10-Q, which disclosed additional material facts about the Apotex Settlement and Amended Apotex Settlement that had not been previously publicly disclosed.  These facts included that: (1) Bristol-Myers had agreed not to move for a preliminary injunction against Apotex for at least five business days after the launch of generic Plavix; and

(2) Bristol-Myers had given up its right to treble damages in the event its patent infringement suit

against Apotex was successful.

54.    As a result of the disclosure of these material facts regarding the Apotex

Settlement and Amended Apotex Settlement, the price of Bristol-Myers' stock declined $1.56

per share, or approximately an additional 7%, to close at $21.21 per share on August 8, 2006, on

unusually heavy trading volume of more than 64 million shares.

55.    Shortly after the end of the Class Period, on September 12, 2006, the Company

announced the involuntary termination of its CEO, Dolan, and its General Counsel, Richard

Willard ("Willard"), effective immediately.  Former U.S. District Judge and Bristol-Myers

Monitor Lacey was quoted in *Corporate Counsel* magazine on October 1, 2007 as stating that he

recommended the termination of Dolan and Willard at a Bristol-Myers Board of Directors

meeting on September 11, 2006 because of their conduct in relation to the Amended Apotex

Settlement, and that New Jersey U.S. Attorney Christie also attended the Board meeting and

indicated that his office supported Lacey's recommendation.

56.    On May 10, 2007, Bristol-Myers issued a press release announcing that the

Company had agreed to plead guilty to two felony counts of making false statements to a

government agency under 18 U.S.C. § 1001 and pay a fine of up to $1 million in connection with

its misrepresentations and omissions to the FTC relating to the Amended Apotex Settlement.

The Company's press release stated that "[t]he charges relate to representations made by a

former Bristol-Myers Squibb senior executive during the renegotiation of the proposed

settlement agreement in May 2006 that were not disclosed to the U.S. Federal Trade

Commission."  On June 11, 2007, the Company pleaded guilty to two felony counts of violating

18 U.S.C. § 1001.  The Company's plea agreement preserves the Government's right to file

related criminal charges against Dolan, Bodnar and Willard.

57.     Bodnar negotiated and signed both the Apotex Settlement and Amended Apotex Settlement on behalf of Bristol-Myers and was authorized by Dolan to enter into the secret and unlawful oral side agreements on behalf of Bristol-Myers.  Bodnar worked closely with Dolan and was promoted by Dolan to Senior Vice President for Strategy, as well as his prior assignments handling Medical and External Affairs, in November 2002.  At that time, a Company press release about Bodnar's promotion quoted Dolan:  "'Andy's contributions to the company have had a significant impact on a wide range of our operations,' Mr. Dolan said.  'He is ideally suited to this expanded role where his insights and expertise will be utilized in framing the company's long term strategic planning and execution.'"  The *New York Times* on August 9, 2006 quoted Apotex's Chairman Sherman as saying that "'Bodnar kept saying that he was in contact with Peter Dolan and Dolan was 100 percent behind whatever he was negotiating.'"  The *Wall Street Journal* reported on September 2, 2006 that "Mr. Dolan let Dr. Bodnar go to Canada alone [for the two meetings with Sherman to negotiate the Amended Apotex Settlement], without any legal representation, partly because company lawyers approved the solo trips.  'It was a gesture of goodwill,' says a person familiar with the events.  'The thinking was that the negotiations would be more effective this way.'"  On June 11, 2007, in its allocution pleading guilty to two counts under 18 U.S.C. § 1001 of making false statements to the FTC about the Amended Apotex Settlement, Bristol-Myers stated that "[t]he company acknowledges its responsibility for the conduct of its former senior officer" – Bodnar.  The participation of the Company's outside counsel, Chesler, in Bodnar's discussion with Sherman of the secret and unlawful oral side agreements, and the termination of the Company's CEO and general counsel, are also evidence that Bodnar acted with authority from the top management of the Company in

negotiating the Apotex Settlement, Amended Apotex Settlement, and secret, unlawful oral side

agreements.

## VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

58.     The Class Period begins on March 21, 2006, at the time of the Company's

disclosure in a press release issued after the close of trading on that day that:

SANOFI-AVENTIS AND BRISTOL-MYERS SQUIBB ANNOUNCE AGREEMENT TO
SETTLE U.S. PLAVIX® LITIGATION WITH APOTEX SUBJECT TO CERTAIN
CONDITIONS PARIS, FRANCE AND NEW YORK, NEW YORK (March 21, 2006) –

Sanofi-aventis (Paris Bourse: EURONEXT: SAN; and New York: NYSE:
SNY) and Bristol-Myers Squibb Company (NYSE: BMY) announced today that
they have reached an agreement subject to certain conditions with Apotex Inc.
and Apotex Corp. to settle the patent infringement lawsuit pending between the
parties in the U.S. District Court for the Southern District of New York. The
lawsuit relates to the validity of a composition of matter patent for clopidogrel
bisulfate (the '265 patent), a medicine made available in the United States by
sanofi-aventis and Bristol-Myers Squibb as PLAVIX®. The trial in the lawsuit
had previously been scheduled to begin in June 2006. As a result of the
agreement, the Court has now suspended the trial date pending the possible
finalization of the proposed settlement.

Under the terms of the proposed settlement, sanofi-aventis would grant
Apotex a royalty-bearing license under the '265 patent to manufacture and sell its
FDA-approved clopidogrel bisulfate product in the United States, and Apotex
would agree not to sell a clopidogrel product in the United States until the
effective date of the license. The license would be exclusive (except for the
PLAVIX® brand product) and would be effective on September 17, 2011, with the
possibility of an effective date earlier in 2011 if sanofi-aventis does not receive an
extension of exclusivity for pediatric use under the '265 patent. If a third party
obtains a final decision that the '265 patent is invalid or unenforceable, under
certain circumstances, the license to Apotex may become effective earlier.

* * *

The agreement includes other provisions, including payments by sanofi-
aventis and Bristol-Myers Squibb to Apotex in the event of either finalization of
the proposed settlement or termination of the agreement. Payments due to Apotex
under the agreement are payable 50% by sanofi-aventis and 50% by Bristol-
Myers Squibb.

The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated in the same Court.

*If the litigation were reinstated, sanofi-aventis and Bristol-Myers Squibb intend to vigorously pursue enforcement of their patent rights in PLAVIX®.* [Emphasis added.]  It is not possible at this time reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX®. Apotex announced in January 2006 that it had received final approval of its aNDA for clopidogrel bisulfate from the FDA. As a result, if the litigation were reinstated, Apotex could launch a generic clopidogrel product *at risk*.  [Emphasis added.]

It also is not possible reasonably to estimate the impact of this lawsuit on sanofi-aventis and Bristol-Myers Squibb. However, loss of market exclusivity of PLAVIX® and the subsequent development of generic competition would be material to sanofi-aventis' and Bristol-Myers Squibb's sales of PLAVIX® and results of operations and cash flows, and could be material to sanofi-aventis' and Bristol-Myers Squibb's financial condition and liquidity.

59.    As the Associated Press reported on March 22, 2006, "Bristol-Myers jumped 11 percent after the drugmaker and its partner, Sanofi-Aventis SA, announced an agreement to settle a patent challenge."  The Company's stock rose from a close of $22.83 on March 21 to close at $25.24 on March 22, 2006, on above-average volume of approximately 50 million shares. Securities analysts, including analysts at Citigroup, Merrill Lynch, Morgan Stanley, and UBS, upgraded Bristol-Myers in response to the announcement of the settlement.  The Associated Press reported that UBS "said the news eliminates the key risk in owning Bristol-Myers shares."

60.    However, the Company's March 21, 2006 press release was materially false, incomplete, and misleading when issued because it failed to disclose that Bristol-Myers agreed that: (1) if the regulators rejected the settlement and Bristol-Myers won the patent litigation, Bristol-Myers' damages for any past infringement by Apotex would be limited to only 70% of Apotex's net sales of generic Plavix if Bristol-Myers had not launched an authorized generic and only 60% of net sales if Bristol-Myers had launched an authorized generic; (2)

Bristol-Myers agreed not to seek increased (up to treble) damages under the patent laws; (3) if the regulators rejected the settlement, the parties would jointly ask the court hearing the patent case to set a trial date not earlier than 2 ½ months after the date of the request; and (4) if the regulators rejected the settlement, Bristol-Myers would not seek a temporary restraining order or preliminary injunction against Apotex's sales of generic Plavix until five business days after either Bristol-Myers gave notice of its intention to do so, or Apotex launched its generic Plavix (which would allow Apotex to flood the market with its generic version of Plavix). These undisclosed facts rendered Bristol-Myers' public statements that it would "vigorously pursue" enforcement of its patent rights in Plavix if the regulators rejected the settlement, and that any generic launch by Apotex would be "at risk," materially false, incomplete, and misleading when made. As set forth below, when the true facts were eventually disclosed, analysts and the media immediately noted their importance, and the price of Bristol-Myers stock declined precipitously. Plaintiffs' allegations of the undisclosed terms of the Apotex Settlement are based on a review of the Apotex Settlement (Ex. B to Sherman Decl.; Bristol-Myers Form 10-Q filed Aug. 8, 2006, Ex. 99.1).

61.     The Company's 2005 Form 10-K's "Risk Factors" section, which was filed with the SEC on March 14, 2006 and cited in the March 21, 2006 press release quoted in ¶ 58, stated:

Item 1A. RISK FACTORS.

Any of the factors described below could significantly and negatively affect our business, prospects, financial condition, operating results, or our credit ratings, which could cause the trading price of our common stock to decline. Additional risks and uncertainties not presently known to the Company, or risks that the Company currently considers immaterial, may also impair the Company's operations.

*Litigation—PLAVIX**

The Company cannot predict the outcome of the PLAVIX* litigation in the U.S., which is scheduled to go to trial in June 2006. Although **the plaintiffs intend to**

**vigorously pursue enforcement of their patent rights in PLAVIX***, it is not possible at this time reasonably to assess the outcome of this litigation, or, if the Company were not to prevail in the litigation, or, if Apotex Inc. and Apotex Corp. (Apotex), which now has final approval of its sNDA in the U.S. were to enter the market with a generic product **at risk**, the timing of potential generic competition for PLAVIX*.  [Emphasis added.]  However, loss of market exclusivity for PLAVIX* and the subsequent development of generic competition and/or a decision by Apotex to launch generic clopidogrel at risk, would be material to the Company's sales of PLAVIX* and results of operations and cash flows, and could be material to its financial condition and liquidity.

62.    The "Risk Factors" quoted in ¶ 61 and referred to in the Company's March 21, 2006 press release failed to render the misleading statements and omissions in the March 21, 2006 press release not misleading, because they failed to disclose the facts then known to Defendants about the material undisclosed terms of the Apotex Settlement, as discussed in ¶ 60. As a result, even if any of Defendants' March 21, 2006 statements (including regarding their claimed intention to vigorously pursue enforcement of their patent rights in Plavix) are held to be forward-looking, Defendants failed to include meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements.  The "Risk Factors" referred to by Defendants in the March 21, 2006 press release were actually materially false, incomplete, and misleading themselves, in light of the undisclosed facts.

63.    The Company also filed the March 21, 2006 press release quoted in ¶ 58 with the SEC as an exhibit to a Current Report on Form 8-K after the close of the market on March 21, 2006.  The Form 8-K stated:

On March 21, 2006, sanofi-aventis and Bristol-Myers Squibb Company (the "Company) issued a joint press release announcing that they have reached an agreement subject to certain conditions with Apotex Inc. and Apotex Corp. to settle the patent infringement lawsuit pending between the parties in the U.S. District Court for the Southern District of New York. The lawsuit relates to the validity of a composition of matter patent for clopidogrel bisulfate, a medicine made available in the United States by sanofi-aventis and the Company as PLAVIX®. The trial in the lawsuit had previously been scheduled to begin in June

2006. As a result of the agreement, the Court has now suspended the trial date pending the possible finalization of the proposed settlement.

The agreement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated in the same Court. ***If the litigation were reinstated, sanofi-aventis and the Company intend to vigorously pursue patent enforcement of their patent rights in PLAVIX®.*** [Emphasis added.]

It is not possible at this time reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX®. Apotex announced in January 2006 that it had received final approval of its aNDA for clopidogrel bifulfate from the FDA. As a result, if the litigation were reinstated, Apotex could launch a generic clopidogrel ***at risk***. [Emphasis added.]

64.     The March 21, 2006 Form 8-K was materially false, incomplete, and misleading for the reasons discussed in ¶ 60.

65.     The Company also posted "Questions and Answers" about the agreement with Apotex on its website on March 21, 2006 and filed them as an exhibit to the Form 8-K quoted in ¶ 63. Among other things, the Questions and Answers stated:

Q8.     What happens if the antitrust review and clearance is not obtained?

A8.     As discussed in the release, if antitrust review and clearance is not obtained, the agreement would be terminated, Apotex would receive a payment, the litigation would be reinstated and Apotex could launch a generic clopidogrel at risk. ***If the litigation is reinstated, we would vigorously pursue enforcement of our patent rights in Plavix.*** [Emphasis added.]

66.     The March 21, 2006 "Questions and Answers" were materially false, incomplete and misleading for the reasons discussed in ¶ 60. In none of these disclosures did Defendants reveal that (1) if the regulators rejected the settlement and Bristol-Myers won the patent litigation, Bristol-Myers' damages for any past infringement by Apotex would be limited to only 70% of Apotex's net sales of generic Plavix if Bristol-Myers had not launched an authorized generic and only 60% of net sales if Bristol-Myers had launched an authorized generic; (2) Bristol-Myers agreed not to seek increased (up to treble) damages under the patent laws; (3) if

the regulators rejected the settlement, the parties would jointly ask the court hearing the patent

case to set a trial date not earlier than 2 ½ months after the date of the request; and (4) if the

regulators rejected the settlement, Bristol-Myers would not seek a temporary restraining order or

preliminary injunction against Apotex's sales of generic Plavix until five business days after

either Bristol-Myers gave notice of its intention to do so, or Apotex launched its generic Plavix

(which would allow Apotex to flood the market with its generic version of Plavix). These

undisclosed facts rendered Bristol-Myers' repeated public statements that it would "vigorously

pursue" enforcement of its patent rights in Plavix if the regulators rejected the settlement, and

that any generic launch by Apotex would be "at risk," materially false, incomplete, and

misleading when made.

      67.    On April 27, 2006, the Company issued a press release reporting its first quarter

2006 financial results and filed the press release with the SEC as an exhibit to a Current Report

on Form 8-K. The press release stated:

> ### BRISTOL-MYERS SQUIBB COMPANY REPORTS FIRST QUARTER 2006 FINANCIAL RESULTS
>
> - Posts First Quarter 2006 GAAP EPS of $0.36 and Non-GAAP EPS of $0.32
>
> - Reaffirms 2006 EPS Guidance
>
> - Reports on Launches of 2 New Products and on Developments of Pipeline
>
> (NEW YORK, April 27, 2006) – Bristol-Myers Squibb Company (NYSE:BMY) today reported financial results for the first quarter of 2006 and reaffirmed earnings guidance for the full year.
>
>                               * * *
>
> "This was another solid quarter for Bristol-Myers Squibb, as we continued to grow our key products, execute our strategy and advance our pipeline," said Peter R. Dolan, chief executive officer, Bristol-Myers Squibb. "All of our growth drivers – PLAVIX®, AVAPRO®/AVALIDE®, ABILIFY®, REYATAZ® and ERBITUX® – delivered double-digit sales increases."

* * *

As previously disclosed, in March 2006, the company and sanofi-aventis announced they have reached an agreement with Apotex Inc. and Apotex Corp. to settle the PLAVIX® patent infringement lawsuit that had been pending between the parties in the U.S. District Court for the Southern District of New York.  The settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general.  There is a significant risk the required antitrust clearance will not be obtained.

* * *

The company's expectations for future sales growth include increases in sales of PLAVIX®, which had net sales of $3.8 billion for 2005, and is currently the company's largest product ranked by net sales. The composition of matter patent for PLAVIX®, which expires in 2011, is currently the subject of litigation in the United States. As previously disclosed, the Apotex litigation has been suspended pending possible finalization of the previously announced proposed settlement among the parties. The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated. ***If the litigation were reinstated, sanofi-aventis and Bristol-Myers Squibb intend vigorously to pursue enforcement of their patent rights in PLAVIX®.*** [Emphasis added.]  Similar proceedings involving PLAVIX® are ongoing in Canada. There are no enforcement proceedings outside of the U.S. and Canada. The company continues to believe that the U. S. and Canadian patents are valid and infringed, and with its alliance partner and patent-holder sanofi-aventis, is vigorously pursuing these cases. It is not possible at this time reasonably to assess the outcome of these litigations, or if there were an adverse determination in these litigations, the timing of potential generic competition for PLAVIX®.

* * *

For additional discussion of legal matters including PLAVIX® patent litigation, see "Item 8. Financial Statements and Supplementary Data-Note 20 Legal Proceedings and Contingencies" in the company's Form 10-K Annual Report for 2005.

68.    The April 27, 2006 press release, including its reference to the Company's 2005

Form 10-K "Risk Factors," were materially false, incomplete and misleading when it was issued,

for the reasons discussed in ¶¶ 60 and 62.  Item 8 – Note 20 of Bristol-Myers' 2005 Form 10-K,

which was filed with the SEC on March 14, 2006 and was cited in the April 27, 2006 press

release quoted in ¶ 67, summarized the procedural posture of the patent litigation between the

Bristol-Myers/Sanofi Aventis partnership and Apotex and stated:

> Although **the plaintiffs intend to vigorously pursue enforcement of their patent rights in PLAVIX*** [emphasis added], it is not possible at this time reasonably to assess the outcome of these lawsuits, or, if the Company were not to prevail in these lawsuits, or, if Apotex, which now has final approval of its aNDA in the U.S. were to enter the market with a generic product at risk, the timing of potential generic competition for PLAVIX*. It also is not possible reasonably to estimate the impact of these lawsuits on the Company.
>
> However, loss of market exclusivity of PLAVIX* and the subsequent development of generic competition would be material to the Company's sales of PLAVIX* and results of operations and cash flows, and could be material to its financial condition and liquidity.

69.    The foregoing risk factor failed to render the April 27, 2006 press release not

misleading or include meaningful cautionary statements, because it failed to disclose the facts

then known to Defendants about the undisclosed terms of the original Apotex Settlement, as

discussed in ¶ 62.  Thus, this "risk factor" referred to by Defendants in the April 27, 2006 press

release was actually materially false, incomplete, and misleading itself, in light of the

undisclosed facts.

70.    On May 2, 2006, Bristol-Myers held its annual meeting of stockholders at the

Hotel DuPont in Wilmington, Delaware.  At the stockholders' meeting, the Company's

Chairman of the Board, James Robinson, said:

> Effective corporate governance is critical to the success of any company and so it is at Bristol-Myers Squibb.  We're committed to maintaining a strong culture of integrity, aided by our processes that enable us to operate individually and collectively with the highest standards of ethical conduct.  That's our responsibility to you, our shareholders.  We take it very seriously.
>
> Over the past few years the Board and the executive team established a clear priority, a priority that we have the right culture, the right tone at the top, a culture that is embraced throughout the company.  Now, we've done this through fostering openness and communications and transparency, training personnel on regulatory, accounting and compliance issues, assuring that the BMS standards of conduct and ethics is understood, understood and made an integral part of our

business across the company, expanding the scope and reach of our compliance programs and continually assessing and managing business risks.

Consistent with this, the Board has taken several initiatives during the last year to enhance corporate governance, to embrace leadership, accountability and integrity.  We believe these steps represent best practice and position us well.

\* \* \*

Now, let me mention the deferred prosecution agreement signed last June with the U.S. Attorney in New Jersey.  Your Board and I as Chairman have been diligent in overseeing the company's adherence to this agreement and, in my view, meeting the various requirements of the deferred prosecution agreement is making us an even sounder company.

71.    At the stockholders' meeting, Dolan purported to agree with Chairman Robinson's comments, but then continued to make materially false, incomplete, and misleading statements and omissions regarding the Apotex agreement:

I also want to echo Jim's comments on the paramount importance of compliance, transparency and good corporate governance at Bristol-Myers Squibb.  Through our efforts in those areas that Jim outlined, we aim to ensure that everything we do as a company and as a business adheres to the highest standards of ethics and reflects an uncompromising commitment to integrity.

\* \* \*

Plavix, an anti-platelet therapy that we co-developed and co-commercialized with Sanofi Aventis, is another key growth driver with sales of $3.8 billion in 2005.  Plavix is our largest product and is the second largest pharmaceutical product in the world in terms of global sales.  You probably know that the main patent for Plavix has been challenged by several generic drug companies.  In March we announced an agreement with one of the generics companies, Apotex, to settle the patent infringement litigation subject to government clearance.  There is a significant risk this clearance will not be obtained and if it's not, we, together with our partner Sanofi Aventis, will resume litigation and ***continue to defend our patent vigorously***.  [Emphasis added.]

72.    Dolan's statements at the stockholders' meeting regarding the Apotex agreement were materially false, incomplete, and misleading when made for the reasons discussed in ¶ 60.

73.    On May 8, 2006, the Company filed its Quarterly Report on Form l0-Q for the period ended March 31, 2006 with the SEC. The Form l0-Q, signed by Dolan, stated, among

other things:

> On March 21, 2006, the Company and Sanofi announced that they have reached an agreement subject to certain conditions with Apotex Inc. and Apotex Corp. to settle the patent infringement lawsuit pending between the parties in the U.S. District Court for the Southern District of New York.  The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general.  There is a significant risk that the required antitrust clearance will not be obtained.  In such event, the proposed settlement would be terminated, and the litigation would be reinstated in the same Court.  ***If the litigation were reinstated, Sanofi and the Company intend to vigorously pursue enforcement of their patent rights in PLAVIX***.  If reinstated, it is not possible reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX\*.  Apotex announced in January 2006 that it had received final approval of its aNDA for clopidogrel bisulfate from the FDA.  As a result, if the litigation were reinstated, Apotex could launch a generic clopidogrel product ***at risk***.  [Emphasis added.]

* * *

> The Company's expectations for future sales growth include increases in sales of PLAVIX\*, which had net sales of \$3.8 billion for 2005, and is currently the Company's largest product ranked by net sales.  The composition of matter patent for PLAVIX\*, which expires in 2011, is currently the subject of litigation in the United States.  As previously disclosed, the Apotex litigation has been suspended pending possible finalization of the previously announced proposed settlement among the parties.  The proposed settlement is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated***. If the litigation were reinstated, Sanofi-Aventis and Bristol-Myers Squibb intend to vigorously pursue enforcement of their patent rights in PLAVIX\*.*** Similar proceedings involving PLAVIX\* are ongoing in Canada. ***The Company continues to believe that the U.S. and Canadian patents are valid and infringed, and with its alliance partner and patent-holder Sanofi-Aventis, is vigorously pursuing these cases.*** It is not possible at this time reasonably to assess the outcome of these litigations, and/or the timing of potential generic competition for PLAVIX\*.  [Emphasis added.]

* * *

Item1A. RISK FACTORS

There have been no material changes in our risk factors from those disclosed in our 2005 Annual Report on Form 10-K except for the following:

*Litigation – PLAVIX\**

The agreement that Sanofi-Aventis and the Company have reached with Apotex Inc. and Apotex Corp. to settle the PLAVIX* litigation is subject to certain conditions, including antitrust review and clearance by the Federal Trade Commission and state attorneys general. There is a significant risk that required antitrust clearance will not be obtained. In such event, the proposed settlement would be terminated, and the litigation would be reinstated. *If the litigation were reinstated, Sanofi-Aventis and the Company intend to vigorously pursue patent enforcement of their patent rights in PLAVIX\*.* It is not possible at this time reasonably to assess the outcome of this lawsuit or the timing of potential generic competition for PLAVIX*. Apotex announced in January 2006 that it had received final approval of its aNDA for clopidogrel bisulfate from the FDA. As a result, if the litigation were reinstated, Apotex could launch a generic clopidogrel *at risk*.  [Emphasis added.]

74.    Pursuant to Section 302 of the Sarbanes-Oxley Act, Dolan also personally certified that the Company's first quarter 2006 Form 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report" and that he was personally responsible for the Company's disclosure controls and procedures.

75.    The Company's first quarter 2006 Form 10-Q and Dolan's certifications therein were materially false, incomplete, and misleading when made for the reasons discussed in ¶ 60, and for the additional reason that they did not disclose, as set forth in ¶ 34 of the Sherman Declaration, that the regulators had rejected the original Apotex Settlement on May 5, 2006, or three days before the foregoing statements were made to the SEC and investors.

76.    More than three weeks later, on May 31, 2006, Dolan spoke to securities analysts at the Sanford C. Bernstein & Co. Strategic Decisions Conference.  Dolan said:

First and foremost, continued growth of our currently marketed products is, obviously, critical to our future.  I'll talk a little bit more about our growth drivers and what our expectations are broadly for them, because they're a critical part of our future growth story.

* * *

***Key to revenue growth, obviously, is maintaining Plavix exclusivity.*** [Emphasis added.] You have read that we have a settlement proposal that is being vetted and evaluated. There's a significant risk that it doesn't get approved. I don't have much more to offer today about Plavix, but it clearly is critical to our future growth.

* * *

In the first quarter, we had very solid performance from our key growth drivers. Plavix almost $1 billion, up 12%.

* * *

Let me talk for just a little bit about some of our key growth drivers and give you an update on some of those products. First of all, Plavix, which is the largest product in the Company. Overall it's the number two product globally in the pharmaceutical world, behind Lipitor. The growth in 2005 at about 10% as it exited the year. We had stronger Rx growth in the first quarter of 2006.

* * *

***Plavix is, obviously, critical to our future, and Plavix growth rate is important as well.*** [Emphasis added.]

77.      In response to questions at the May 31, 2006 Sanford C. Bernstein & Co.

conference about the timing of the FTC's and state attorney generals' reviews of the Apotex

Settlement and what would happen if the regulators rejected it, Dolan said:

To the first question, we don't control the timetable. We are hopeful that we get a timely response from the FTC. We have no way of knowing within what timeframe we would get a response from them. ***In the event that it is not approved as an agreement***, we believe that the patent is valid and, if infringed, ***we would, with our partner Sanofi, continue to aggressively defend it and litigate it if necessary.*** [Emphasis added.] We're hoping that as we look at the certainty of a settlement that we can get this approved, but it remains a significant risk. And it's up to the FTC and the State Attorney General to ultimately weigh in as to whether they will approve this agreement or not.

78.      Dolan's statements at the Sanford C. Bernstein & Co. conference were materially

false, incomplete and misleading for the reasons discussed in ¶ 60, and because they did not

disclose that the regulators had rejected the Apotex Settlement on May 5, 2006 and that by May

31, 2006, Bristol-Myers had entered into the Amended Apotex Settlement, including its secret

and unlawful oral side agreements, on May 12 and 26, 2006, as set forth in ¶¶ 35-38 of the

Sherman Declaration and Exs. C, F, G, H, I, and N thereto.

79.    On June 25, 2006, Bristol-Myers issued a press release stating, among other

things:

Update on Plavix® Litigation Settlement

PARIS, NEW YORK and TORONTO, June 25 /PRNewswire-FirstCall/ --
Sanofi- aventis (Paris Bourse: EURONEXT: SAN; and New York: NYSE: SNY)
and Bristol- Myers Squibb (NYSE: BMY) (the "companies") and Apotex Inc. and
Apotex Corp. ("Apotex") today announced that in response to concerns raised by
the Federal Trade Commission ("FTC") and state attorneys general to the
previously announced proposed settlement the companies reached with Apotex
relating to patent infringement litigation on Plavix® (clopidogrel bisulfate), the
companies and Apotex have amended the agreement. Review of the modified
agreement by the FTC and state attorneys general continues.

Among other revisions, under the terms of the modified agreement, Apotex's
license to manufacture and sell its FDA approved clopidogrel bisulfate product in
the United States would be effective on June 1, 2011, rather than September 17,
2011, as disclosed in the press release issued by the companies on March 21,
2006.

There is no assurance that the revised agreement will address all of the concerns
of the FTC and state attorneys general and there remains a significant risk that
antitrust clearance will not be obtained.

80.    The June 25, 2006 press release was materially false, incomplete and misleading

when issued because it did not disclose that the Amended Apotex Settlement provided that: (1) if

the regulators rejected the Amended Apotex Settlement and Bristol-Myers won the patent

litigation, damages would be limited to only 50% of Apotex's net sales of generic Plavix if

Bristol-Myers had not launched an authorized generic and only 40% of Apotex's net sales if

Bristol-Myers had launched an authorized generic (reduced from 70% and 60%, respectively, in

the original Apotex Settlement); (2) Bristol-Myers would not seek increased (treble) damages

under the patent laws; (3) if the regulators rejected the Amended Apotex Settlement, the parties

would seek a rescheduled trial date in the patent litigation not earlier than 2 ½ months after the

date of the request; and (4) if the regulators rejected the Amended Apotex Settlement, Bristol-Myers would not in any event seek a temporary restraining order against Apotex's launch of generic Plavix (as the original Apotex Settlement permitted Bristol-Myers to do after five business days' notice or after Apotex launched its generic), and would not seek a preliminary injunction until five business days after giving notice of its intent to do so to Apotex, which notice would not be given before Apotex launched its generic Plavix (which would allow Apotex to flood the market with generic Apotex).  Thus, the Company's disclosure that the Amended Apotex Settlement might not be approved by the regulators did not adequately disclose that if the regulators rejected the settlement, Bristol-Myers would be unable to "vigorously pursue patent enforcement of [its] patent rights in Plavix," as the Company had repeatedly told investors it would do.  Plaintiffs' allegations of the undisclosed terms of the Amended Apotex Settlement are based on a review of the Amended Apotex Settlement (Ex. C to Sherman Decl.; Bristol-Myers Form 10-Q filed Aug. 8, 2006, Ex. 99.2).

81.     The June 25, 2006 press release was also materially false, incomplete and misleading when issued because it did not disclose that Bristol-Myers had entered into secret and unlawful oral side agreements that: (1) if the regulators approved the amended agreement, Bristol-Myers would not launch an authorized generic during Apotex's period of exclusivity; (2) Apotex's signing the new agreement would not constitute a waiver of Apotex's vested right to a $60 million break-up fee under the original Apotex Settlement; and (3) the parties agreed to interpretations of certain terms of the written amended agreement set forth in an email from Sherman to Bodnar on May 25, 2006, including that – contrary to the original Apotex Settlement – Apotex would not have to pay Bristol-Myers any royalty for its license.  While Bristol-Myers' June 25, 2006 press release stated that there was "no assurance" of regulatory approval, the

existence of these unlawful side agreements greatly increased the risk of rejection of the

Amended Apotex Settlement.  Plaintiffs' allegations of the undisclosed, unlawful side

agreements are based on a review of the Sherman Declaration and its exhibits (¶¶ 37-46 and Exs.

G-O), the June 5, 2006 letter from Robert S. Silver, Esq. to the FTC and DOJ (Sherman Decl.

Ex. F), and the Government's factual proffer and Bristol-Myers' plea allocution in pleading

guilty on June 11, 2007 to two counts of making false statements to the FTC.

## VII.    THE TRUTH BEGINS TO EMERGE

82.    On July 27, 2006, before the opening of trading, the Company issued its second

quarter 2006 earnings press release, which stated, in part:

> BRISTOL-MYERS SQUIBB COMPANY REPORTS FINANCIAL RESULTS FOR THE
> SECOND QUARTER AND FIRST HALF OF 2006
> * * *
> The company's expectations for future sales growth include increases in
> sales of PLAVIX®, which had net sales of $3.8 billion for 2005, and is currently
> the company's largest product ranked by net sales. The composition of matter
> patent for PLAVIX®, which expires in 2011, is currently the subject of litigation
> in the United States. As previously disclosed, the Apotex litigation has been
> suspended pending possible finalization of the previously announced proposed
> settlement among the parties. The proposed settlement is subject to certain
> conditions, including antitrust review and clearance by the Federal Trade
> Commission (FTC) and state attorneys general. In the response to concerns raised
> by the FTC and state attorneys general to that proposed settlement agreement, the
> company, sanofi-aventis and Apotex have amended the agreement. The modified
> agreement remains under review by the FTC and the state attorneys general.
> There is no assurance that the terms of the modified agreement will address all the
> concerns of the FTC or the state attorneys general. There remains significant risk
> that antitrust clearance will not be obtained. In such event, the proposed
> settlement would be terminated, and the litigation would be reinstated. *If the
> litigation were reinstated, sanofi-aventis and Bristol-Myers Squibb intend to
> vigorously pursue enforcement of their patent rights in PLAVIX®.* [Emphasis
> added.] Additional patent proceedings involving PLAVIX® are ongoing in the
> United States and in less significant markets for the product. The company
> continues to believe that the PLAVIX® patents are valid and infringed, and with
> its alliance partner and patent-holder sanofi-aventis, is vigorously pursuing these
> cases. It is not possible at this time reasonably to assess the ultimate outcome of
> these litigations, or the timing of potential generic competition for PLAVIX®.

> *The company learned yesterday that the Antitrust Division of the United States Department of Justice is conducting a criminal investigation regarding the proposed settlement of the Apotex litigation described above.*  [Emphasis added.]

83.    On July 27, 2006, during the Company's second quarter earnings conference call beginning at 10:00 AM eastern time, which was open to securities analysts, investors and the general public, Dolan stated:

> First, let me address the PLAVIX issue that you probably read about.  We learned just yesterday that the Anti-Trust Division of the Justice Department is conducting a criminal investigation regarding the proposed settlement with Apatex [sic] of the PLAVIX patent litigation.  *We don't have any specific information on the basis for or focus of the investigation.  I want to emphasize that the Company believes that all of its conduct relating to the proposed PLAVIX settlement has been entirely appropriate and we coordinated throughout with senior outside counsel.*  [Emphasis added.]  We intend to cooperate fully with the investigation and have no further comment on it at this time.

84.    In response to a question on the July 27, 2006 conference call about how "the PLAVIX situation" would affect the patent litigation against Apotex, Dolan said: "If the settlement were not to be accepted, we believe the patent is valid and it's infringed.  *We would continue to defend it vigorously with our partner Sanofi and we would pursue those proceedings at the appropriate time.*"  [Emphasis added.]

85.    On July 27, 2006, the price of Bristol-Myers stock declined $1.95 per share, or 7.5%, to close at $24.04 per share, on unusually heavy trading volume in response to the news of the DOJ's criminal investigation of the Company.  The Associated Press reported on July 27 after the close of the market:

> Bristol-Myers shares fell nearly 8 percent after it announced the U.S. Department of Justice had launched an investigation into a settlement awaiting regulatory approval it reached with Apotex Inc. to keep a generic version of blood-thinner Plavix off the market until at least 2011.
>
> Analysts said the justice department inquiry casts further doubt over the future of Bristol-Myers best selling drug just when the market is awaiting the outcome, as

early as [July 28, 2006], of an investigation by states' attorneys general into the same deal.

* * *

A criminal probe into the agreement is highly unusual, if not unprecedented, and is likely to prevent further arrangements, said patent lawyer Thomas Carey.

"No company wants to find itself on the wrong end of a criminal action.  It is a political black eye," Carey said.  It could mean jail time" for executives.

* * *

Deutsche Bank analyst Barbara Ryan said Bristol-Myers reported a good quarter, with many of its newer products generating solid sales.  Yet she said that won't matter if Bristol-Myers loses Plavix revenue because none of its newer drugs can compensate for the loss.  Plavix sales rose 18 percent to $1.15 billion in the second quarter.

86.     Nonetheless, Defendants' fraud was not yet fully revealed to investors, because the Company's July 27, 2006 press release and Dolan's statements on the July 27, 2006 conference call that the Company would "vigorously pursue" enforcement of its patent rights in the event of a regulatory denial of the proposed Apotex agreement and that all conduct relating to the Amended Apotex Settlement was "entirely appropriate" were materially false, incomplete and misleading when made for the reasons discussed in ¶¶ 80-81.  Indeed, HSBC upgraded Bristol-Myers stock on July 28 after its July 27 drop, and Friedman Billings Ramsey analyst David Moskowitz was cited in an Associated Press report on July 28 as saying that "he believes the action [by the Justice Department] to be more a cause for vigilance than anxiety given the company's past dealings with antitrust issues.  Moskowitz thinks it unlikely that the company or its lawyers failed to prepare for potential red flags regarding the settlement agreement." Similarly, Lehman Brothers analyst C. Anthony Butler was quoted by the *New York Times* on July 28, 2006 as saying: "I'm not clear that it's a major setback. . . . It does scare investors.  Criminal investigation is a negative phrase."

87.     On July 28, 2006, after the close of trading, Bristol-Myers issued a press release

stating, among other things:

> PLAVIX® Litigation Settlement Fails to Receive Antitrust Clearance From States
> Attorneys General
>
> PARIS and NEW YORK, July 28 /PRNewswire-FirstCall/ -- Sanofi-aventis (Paris
> Bourse: EURONEXT: SAN; and New York: NYSE: SNY) and Bristol-Myers
> Squibb (New York: NYSE: BMY) ("companies") today announced that their
> agreement, as amended, with Apotex Inc. and Apotex Corp., ("Apotex") to settle
> the patent infringement lawsuit pending between the parties in the U.S. District
> Court for the Southern District of New York has failed to receive required
> antitrust clearance from the state attorneys general. The lawsuit relates to the
> validity of a composition of matter patent for clopidogrel bisulfate (the '265
> patent), a medicine made available in the United States by sanofi-aventis and
> Bristol-Myers Squibb as PLAVIX®. When sanofi-aventis and Bristol-Myers
> Squibb initially announced the settlement on March 21, 2006, the companies said
> that there was a significant risk that required antitrust clearance would not be
> obtained.
>
> The agreement also required the approval of the Federal Trade Commission
> ("FTC"). The FTC has not yet advised the companies of its decision. However,
> the agreement requires the approval of both the FTC and the states attorneys
> general to become effective. The originally scheduled trial date had been
> suspended pending possible finalization of the proposed settlement. A new trial
> date has not yet been established. As previously disclosed, sanofi- aventis and
> Bristol-Myers have filed patent infringement claims against three other generic
> pharmaceutical companies with respect to the '265 patent.
>
> As previously disclosed, the companies learned earlier this week that the Antitrust
> Division of the United States Department of Justice is conducting a criminal
> investigation regarding the proposed settlement. It is not possible at this time
> reasonably to assess the outcome of the investigation or its impact on the
> companies.
>
> It is also not possible at this time reasonably to assess the outcome of the
> PLAVIX® litigation, including the Apotex matter, or the timing of potential
> generic competition for PLAVIX®. Apotex announced in January 2006 that it had
> received final approval of its aNDA for clopidogrel bisulfate from the FDA. As a
> result, Apotex could launch a generic clopidogrel product *at its risk*.  [Emphasis
> added.]
>
> Under the terms of the agreement, Apotex may be eligible to receive a
> reimbursement payment from the companies for certain short-dated inventories of
> Apotex's clopidogrel bisulfate product, the amount, if any, of which has not been
> quantified. Any payment to Apotex will be paid 50% by sanofi-aventis and 50%

by Bristol-Myers Squibb. As previously disclosed, each of the companies recorded reserves in the amount of $20 million in the first quarter of this year. It also is not possible reasonably to estimate the impact of the PLAVIX® litigation on sanofi-aventis and Bristol-Myers Squibb. However, loss of market exclusivity of PLAVIX® and the subsequent development of generic competition would be material to sanofi-aventis' and Bristol-Myers Squibb's sales of PLAVIX® and results of operations and cash flows, and could be material to sanofi-aventis's and Bristol-Myers Squibb's financial condition and liquidity.

***The companies intend to vigorously pursue enforcement of their patent rights in PLAVIX®.*** [Emphasis added.]

* * *

Statements on Cautionary Factors

* * *

Bristol-Myers Squibb

This press release contains certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 regarding, among other things, statements relating to goals, plans and projections regarding Bristol-Myers Squibb's future operating performance. Such forward-looking statements are based on current expectations and involve inherent risks and uncertainties, including factors that could delay, divert or change any of them, and could cause actual outcomes and results to differ materially from current expectations. Bristol-Myers Squibb cannot predict the outcomes of the PLAVIX® litigation or the U.S. Department of Justice's criminal investigation. For further details and a discussion of these and other risks and uncertainties, see Bristol-Myers Squibb's periodic reports, including current reports on Form 8-K, quarterly reports on Form 10-Q and those listed under "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements" in the annual report on Form 10-K for the year ended December 31, 2005, furnished to and filed with the Securities and Exchange Commission. Bristol-Myers Squibb undertakes no obligation to publicly update any forward-looking statement, whether as a result of new information, future events or otherwise.

88.     The July 28, 2006 press release was materially false, incomplete and misleading when issued for the reasons discussed in ¶¶ 80-81. The Company's 2005 Form 10-K "Risk Factors," which were referenced in the July 28, 2006 press release, failed to render the misleading statements and omissions in the press release not misleading, because they failed to disclose the facts then known to Defendants about the material undisclosed terms of the

Amended Apotex Settlement and the unlawful oral side agreements, as discussed in ¶¶ 80-81.
As a result, even if any of Defendants' July 28, 2006 statements (including regarding their
claimed present intention to vigorously pursue enforcement of their patent rights in Plavix) are
found to be forward-looking, Defendants failed to include meaningful cautionary statements
identifying important factors that could cause actual results to differ materially from those in the
forward-looking statements.  Thus, the "Risk Factors" referred to by Defendants were actually
materially false, incomplete, and misleading themselves, in light of the undisclosed facts.

89.     Securities analysts' reports confirm that the market still believed as of July 28,
2006 and at all times prior to August 8, 2006 that if Apotex launched its generic Plavix, it would
be truly "at risk," i.e., exposed to the possibility of treble damages and a preliminary injunction
or TRO.  For example, a report by J.P. Morgan Securities Inc. on July 28, 2006 stated:

> [W]ill Apotex launch at risk? . . . The company apparently began producing an
> inventory of generic product and was approaching distributors about carrying it
> when the proposed settlement was announced.  Whether this was a bluff remains
> to be seen.

> Launching at risk would be a "bet-the-company" endeavor for Apotex . . . .
> Bristol and sanofi might be able to collect treble damages from Apotex if they can
> show *willful infringement* . . . . [Emphasis in original]

90.     In an article on July 31, 2006, Reuters reported:

> Industry analysts cautioned on Monday [July 31, 2006] that Apotex Inc. has the
> right to immediately launch its copycat form of Bristol-Myers Squibb Co.'s
> blockbuster anti-clotting drug, although it is unlikely to do so because of huge
> financial risks to the generic drug maker.

> The analysts highlighted the danger after a group of state attorneys general late on
> Friday rejected a proposed settlement between Bristol-Myers and Apotex that
> could have delayed by years the launch of the cheaper Apotex generic.

>                                    * * *

> A spokesman for Apotex declined to comment about its plans.

> Deutsche Bank analyst Barbara Ryan said Apotex "could launch . . . at any time"

because its product has already received final marketing approval from U.S. regulators.

But she said it would be highly risky to do so because Bristol-Myers and its marketing partner Sanofi-Aventis have sued Apotex alleging its generic would infringe their Plavix patents.

Under federal law, if a drug maker launches a generic that is later found to have infringed the branded drug's patent, it can be forced to pay the original drug maker three times its lost sales due to the generic rival.

"Although it's possible Apotex could launch now, I'd say the odds of it doing so are 20 percent or less because it would be such a big risk," Ryan said.

91.    In a report issued on August 4, 2006, J.P. Morgan Securities Inc. wrote:

**An at-risk launch of generic clopidogrel [Plavix] could result in very significant liabilities for Apotex.  Treble damages are a possibility (but not a certainty).**  If Apotex launches at risk and Sanofi and Bristol prevail in litigation against the company, the patent holder and licensee will be entitled to collect damages.  Patent infringement damages are typically based on one of: the lost profits of the patent holder, the profits gained by the infringer, or a "reasonable" royalty rate.  These damages may be "enhanced" – up to three times the base damages – at the discretion of the court if the patent infringer acted with willfulness or bad faith.  This determination relies on all the facts and circumstances of the case and typically turns in part on whether the infringer obtained a patent opinion that reasonably concludes that the relevant patent is invalid or will not be infringed.  We note that in any case *the damages that Apotex could be required to pay could very possibly be more than Apotex will earn in an at-risk launch*.  [Emphasis in original.]  Apotex will undoubtedly be considering its steps carefully.

92.    A Citigroup Global Markets Inc. report issued on August 4, 2006 also reflected

the market's continuing belief that any generic Plavix launch by Apotex would be truly "at risk":

We note an at-risk launch is a highly risky strategy that could potentially bankrupt Apotex (3x damages with a loss in court).

* * *

An Apotex "at risk" launch of generic clopidogrel [Plavix] prior to the district court trial, would likely expose the company to potentially bankrupting treble damages if BMY/Sanofi ultimately wins the litigation.  If Apotex delays the launch until after the trial, this would conceivably diminish (but would not preclude) the possibility of treble damages.  We have no confirmation of an at-risk launch of generic Plavix by Apotex.

If Apotex were to launch prior to a decision in the trial, BMY/Sanofi would likely file a motion for a preliminary injunction or a temporary restraining order. The judge would then need to render a finding of likelihood of success at trial.

93.     Similarly, the *New York Times* reported on August 5, 2006:

Bristol-Myers vowed to fight any challenge to the Plavix patent . . . .

* * *

A decision by Apotex to begin marketing the drug while the patent is still in force would be a move known in the industry as an "at-risk launch." It means Apotex could be responsible for repaying the brand-name companies three times their sales losses if they end up successfully defending their patent in court.

* * *

Jeffrey MacDonald, a spokesman for Bristol-Myers, which is based in New York, said in a statement that his company and Sanofi believed their patent had been infringed and planned to fight vigorously to defend it.

94.     On July 31, 2006, the next trading day after the July 28 announcement that the regulators rejected the amended settlement, the price of Bristol-Myers stock declined $0.50 per share, or an additional 2%, to close at $23.97 per share, on unusually heavy trading volume.

95.     On August 8, 2006, the last day of the Class Period, before the opening of the market, Bristol-Myers filed its quarterly report on Form 10-Q for the quarter ended June 30, 2006. In that 10-Q, the Company attached a copy of the Amended Apotex Settlement agreement, revealing for the first time material facts concerning the Apotex Settlement that had not been previously disclosed. The facts disclosed by the Amended Apotex Settlement agreement included that: (1) Bristol-Myers had agreed it would not move for a preliminary injunction against Apotex for at least five business days after the launch of Apotex's generic Plavix; and (2) Bristol-Myers had relinquished its right to seek treble damages in the event the patent infringement suit against Apotex in connection with Plavix was successful.

96.     On August 8, 2006, the price of Bristol-Myers stock declined $1.56 per share, or

approximately 7%, to close at $21.21 per share, on unusually heavy trading volume of more than

64 million shares.

97.     Analysts and news reports confirmed that the stock price drop was in reaction to

the disclosure of the previously concealed facts about the terms of the original and Amended

Apotex Settlements.  For example, J.P. Morgan Securities Inc. highlighted the importance of the

Company's previously concealed concessions in a report issued on August 8, 2006:

> **_Bristol and Sanofi have given up their right to seek treble damages_**, and have limited their base damages to 50% of Apotex's clopidogrel [Plavix] sales (40% if the innovators launch an authorized generic).  [Emphasis in original.]

> * * *

> **Bristol and Sanofi are prohibited from seeking a temporary restraining order or a preliminary injunction until five days after Apotex has launched generic clopidogrel.**  [Emphasis in original.]

98.     Reuters reported on August 9, 2006:

> The new generic and settlement details surprised analysts.  "Disrobed Plavix settlement raises eyebrows, lowers EPS," Morgan Stanley research said.  ABN AMRO saw the "Devil in the detail."

> * * *

> Before the details of the settlement were disclosed analysts expected the odds of Apotex introducing a Plavix copy at risk – before a court ruling – to be slim due to high costs Apotex could face if the court put Sanofi and BMS in the right.

> But the details showed that for Apotex damages would be much more limited than usual if a U.S. court ruled against its Plavix generic after its launch.

> "The settlement appears to be so favourable to Apotex that one would have to assume they would launch at risk," JP Morgan analyst Craig Maxwell said.  "It's a surprise . . . and does seem to signal a very low confidence Sanofi had in the intellectual property position of Plavix."

> * * *

> "It now looks like Apotex has been very clever," Dresdner Kleinwort said in a research note, referring to the settlement.  "Investors may view this as a management credibility issue."

99.     Dow Jones reported on August 9, 2006:

Under the terms of what appears to have been a rather disadvantageous patent settlement with Apotex, Sanofi and Bristol-Myers Squibb must wait five business days from the launch of generics before seeking to legally prevent shipments. Apotex started selling plavix in the U.S. Tuesday [August 8, 2006].

100.    The *New York Times* reported on August 9, 2006:

Despite the government's rejection of the deal, some terms of that agreement remain in effect.  And they hold at least two significant disadvantages for Bristol and Sanofi.  Under the terms, the companies must wait five business days before seeking a federal injunction against Apotex's shipments, giving the generic company an opportunity to potentially flood the market with its generic drug before a court can step in.

The big companies also negotiated away their rights under federal law to seek triple financial damages if they eventually win the patent dispute in court.  That proviso removed one of the major deterrents to a generic competitor's entering the market while a drug is still under patent.

Analysts said the developments raised doubts about the leadership of Bristol-Myers and Sanofi and the wisdom of the concessions they had made to Apotex. And because the abortive patent settlement is also now the subject of a federal criminal inquiry, some analysts raised questions about whether Peter R. Dolan, Bristol-Myers's chief executive, can survive.

"On the surface, it doesn't look good," said Jami Rubin, a Morgan Stanley analyst.  "Credibility, I think, has been severely set back."

101.    The *Houston Chronicle* reported on August 9, 2006:

Typically, the damages would amount to three times the patent holder's lost profits.  But under the terms of the deal, Apotex will only have to pay either 40 percent or 50 percent of its sales to the brand name makers if a court finds it infringed on the patent.

* * *

"That was a big strategic mistake," said Albert Rauch, an analyst at A.G. Edwards & Sons Inc., who downgraded Bristol-Myers shares to a sell.

102.    The *Newark Star-Ledger* reported on August 9, 2006:

The announcement [of Apotex's launch of generic Plavix] prompted a mutiny by Wall Street analysts, who speculated Bristol-Myers may be forced to slash its dividend.  Only a week ago, many of the same experts predicted a generic Plavix launch was unlikely.

103.     Friedman Billings Ramsey analyst David Moskowitz, who was reported on July 28, 2006 as saying that it was "unlikely that the company or its lawyers failed to prepare for potential red flags regarding the settlement agreement" (¶ 86), was now quoted by the *Newark Star-Ledger* on August 10, 2006 as saying: "It certainly looks like Bristol has made a strategic error . . . Regardless, it looks like an irresponsible move to leave themselves open by removing their chances to sue for treble damages and filing a timely temporary restraining order."

104.     The *Financial Times* also reported on August 10, 2006 about the importance of the previously concealed agreement not to seek a preliminary injunction for five business days after the launch of generic Plavix:

> This provision was part of the agreement that remained in effect if regulators blocked the deal.
>
> This five-day window, however, is likely to have lasting effects on the market for Plavix and, potentially, other competitors' blood-thinning drugs in the future.
>
> The five-day window has opened the market to Apotex, which could flood the market with cheaper generic Plavix both in the five-day window and during subsequent legal wrangling.

## VIII.     POST-CLASS PERIOD EVENTS

105.     On September 12, 2006, the Company announced the termination of CEO Dolan and General Counsel Willard, effective immediately.  They were terminated at the recommendation of former U.S. District Judge Lacey, the corporate monitor for Bristol-Myers under the company's 2005 deferred prosecution agreement for securities fraud.  As disclosed by the Company in a press release on September 12:

> The Board of Directors of Bristol-Myers Squibb Company (NYSE: BMY) announced today that Peter R. Dolan will leave the position of chief executive officer, effective immediately.

* * *

At a previously scheduled meeting of the company's Board yesterday, the Board received reports from the company's outside counsel on issues relating to the PLAVIX® patent litigation with Apotex Inc. and Apotex Corp. These reports were prepared and delivered at the request of the Board as part of its ongoing assessment of this matter. During the Board's deliberations, the Board also heard from former Federal Judge Frederick B. Lacey, the Monitor under the company's deferred prosecution agreement with the office of the U.S. Attorney for the District of New Jersey, who made his own preliminary recommendation to the Board that the employment of both Mr. Dolan and Mr. Willard be terminated. The U. S. Attorney for New Jersey, Christopher J. Christie, also attended a portion of the Board meeting.

106.    On January 25, 2007, Bristol-Myers disclosed that, even though it had prevailed in obtaining a preliminary injunction on August 31, 2006, preventing further generic sales by Apotex, as a result of Apotex's launch of generic Plavix, Bristol-Myers' sales of Plavix declined 62% during the quarter ended December 31, 2006, representing a loss of $563 million in sales to Bristol-Myers.  Significantly, Bristol-Myers first attempted to enjoin Apotex's generic launch without giving five business days' notice as it had agreed with Apotex, but the Court required Bristol-Myers to comply with that contractual term and renew its preliminary injunction motion after five business days.

107.    On May 10, 2007, Bristol-Myers announced that the Company had agreed to plead guilty to two felony counts of making false statements in connection with the Amended Apotex Settlement.  Although the Company disclosed that the plea agreement related to statements by a "former senior executive" – Bodnar – the Company has never publicly disclosed the date nor the circumstances of Bodnar's departure from employment.  However, a Company spokesman told a reporter for CNBC that Bodnar had "recently retired" from Bristol-Myers, and Bodnar resigned only three days earlier, on May 7, 2007, from the board of directors of ImClone Systems Inc., in which Bristol-Myers has a large equity investment and on whose board he served as Bristol-Myers' designee.

108.    On June 11, 2007, Bristol-Myers pleaded guilty to two felony counts of violating

18 U.S.C. § 1001 in U.S. District Court for the District of Columbia.  As stated in the Company's

press release disclosing the guilty plea:

> The company acknowledged that a former Bristol-Myers Squibb senior executive
> made oral representations to Apotex for the purpose of causing Apotex to
> conclude that the company would not launch an authorized generic in the event
> that the parties reached a final revised settlement agreement.  Those
> representations included the former senior executive's statement that he expected
> to oppose personally the launch of an authorized generic in the future, his
> statement that he expected to advocate against such a launch, and his implied
> suggestion that the company's former CEO shared his views.  The failure to
> disclose this information to the Federal Trade Commission (FTC) in connection
> with the FTC's review of the revised settlement agreement operated as incomplete
> and therefore false statements to the FTC.  The company acknowledged in court
> today its responsibility for the conduct of the former senior officer.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

109.    During the Class Period, as detailed herein, Defendants engaged in a course of

conduct that artificially inflated Bristol-Myers' stock price and operated as a fraud or deceit on

Class Period purchasers of Bristol-Myers stock by misrepresenting or omitting material terms of

the original Apotex Settlement, the Amended Apotex Settlement, and the secret and unlawful

oral side agreements between the Company and Apotex.  In publicly describing the terms of the

agreements, Defendants failed to disclose that the Company had agreed to relinquish material

legal rights in connection with the original and Amended Apotex Settlements, including the right

to seek treble damages and to seek a temporary restraining order or preliminary injunction

immediately upon Apotex's launch of generic Plavix.  Defendants also failed to disclose that the

Company had entered into unlawful oral side agreements related to the Amended Apotex

Settlement, including that Bristol-Myers would not launch an authorized generic Plavix during

Apotex's exclusivity period if the settlement received regulatory approval and was finalized.

Later, however, when Defendants' prior misrepresentations and fraudulent conduct began to be

disclosed and became known to the market, the price of Bristol-Myers stock declined

precipitously as the prior artificial inflation was removed from the Company's stock price.  As a result of their purchases of Bristol-Myers stock at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered substantial economic loss, i.e., damages under the federal securities laws, as the truth was revealed.

110.    Starting on July 27, 2006 through the end of the Class Period, on August 8, 2006, investors began to learn the truth through a number of disclosures, including Defendants' own admissions, revealing, among other things: (1) Bristol-Myers had agreed not to seek a TRO or preliminary injunction for five business days after Apotex launched its generic Plavix; (2) Bristol-Myers had agreed not to seek treble damages in the event that its patent infringement suit relating to Plavix was successful; and (3) Defendants had not complied with their obligation to present the original and Amended Apotex Settlements accurately to the FTC and state attorneys general, which caused a criminal investigation by the Antitrust Division of the Department of Justice.  As investors and the market became aware of the true facts, which had been obfuscated for months by Defendants, the prior artificial inflation came out of Bristol-Myers stock price, damaging investors.

111.    As a direct result of these disclosures, Bristol-Myers stock price dropped from its trading range of $23.86 to $25.99 per share from March 22, 2006 to July 26, 2006, to as low as $20.24 per share on August 11, 2006.  In particular:

(a)    On July 27, 2006, the stock fell from a closing price of $25.99 on July 26, 2006, to close at $24.04, a decrease of $1.95 per share or 7.5%, on above-average trading volume of more than 29 million shares in response to the Company's announcement on July 27 before the market opened that the Department of Justice had commenced a criminal investigation into the Amended Apotex Settlement;

(b)      On July 31, 2006, the stock fell from a closing price of $24.47 on July 28 (the prior trading day) to close at $23.97, a decrease of $0.50 per share or 2%, on above-average volume of more than 16 million shares, in response to the Company's announcement on July 28 after the market closed that the regulators had rejected the Amended Apotex Settlement; and

(c)      On August 8, 2006, the Company filed its Form 10-Q before the market opened, disclosing among other things that the Company had agreed not to seek a TRO or preliminary injunction until five business days after the launch of Apotex's generic Plavix and not to seek treble damages in the patent suit.  The stock price fell in response to these disclosures by $1.56 per share, or 7%, from a close of $22.77 on August 7 to a close of $21.21 on August 8.  The market continued to react to the material adverse facts disclosed on August 8, reaching a low closing price of $20.24 on August 11, 2006.

112.    Each of the declines in the Company's stock price described in ¶ 111 was significant after taking into account changes on the same days in the overall stock market and in relevant industry indices.  Furthermore, as set forth above, each of these stock price declines is attributable to the disclosure of previously concealed information relating to the materially false or incomplete statements alleged herein.

113.    In sum, as the truth about Defendants' fraud was revealed, the Company's stock price declined, the artificial inflation came out of the stock, and Plaintiffs and other members of the Class were damaged.

114.    The declines in Bristol-Myers stock price beginning on July 27, 2006 through the end of the Class Period, and the resulting damages suffered by Plaintiffs and the other members of the Class, are directly attributable to the market's reaction to the disclosure of information about the original and Amended Apotex Settlements that had previously been misrepresented or

concealed by Defendants, and to the market's adjustment of the Company's stock price to reflect the newly emerging truth about the Company's condition. The timing and magnitude of Bristol-Myers stock price decline negate any inference that the losses suffered by Plaintiffs and other Class members were caused by other changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## X.    PRESUMPTION OF RELIANCE

115.    At all relevant times, the market for Bristol-Myers stock was an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the Company's stock price. Throughout the Class Period:

(a)    The Company's stock met the requirements for public listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)    As a regulated issuer, the Company filed periodic public reports with the SEC and NYSE;

(c)    The Company regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases which were carried by national news wires and through other wide-ranging public disclosures, including analyst and investor conference calls and communications with the financial press and other similar reporting services;

(d)    National, international, and financial news media frequently published articles about the Company;

(e)    Securities analysts followed and published research reports regarding Bristol-Myers that were publicly available to investors;

(f)    The market price of Bristol-Myers stock reacted promptly to the dissemination of public information regarding the Company;

(g)    The average daily trading volume of Bristol-Myers stock during the Class Period was approximately 8.5 million shares or $210 million, and the average weekly trading volume during the Class Period was approximately 39 million shares or $969 million; and

(h)    The Company's market capitalization was approximately $51 billion on July 26, 2006 (its Class Period high) and approximately $42 billion on August 8, 2006 (its Class Period low).

116.    Under these circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

117.    Plaintiffs and the other Class members relied on the integrity of the market price for the Company's stock and were substantially damaged as a direct and proximate result of their purchases of Bristol-Myers stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

118.    Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by the Defendants, or been aware of the truth behind the Defendants' material misstatements and omissions, they would not have purchased Bristol-Myers stock at inflated prices.

119.    Plaintiffs are also entitled to the *Affiliated Ute* presumption of reliance because Defendants' fraudulent scheme included a failure to disclose and/or concealment of the material facts concerning the adverse terms of the original and Amended Apotex Settlements, the regulators' rejection of the original Apotex Settlement, Defendants' unlawful oral side agreements with Apotex, and Defendants' concealment of the side agreements from the FTC and

state attorneys general, which information investors would have wanted to know and which would have caused investors not to purchase shares of Bristol-Myers at the prices at which they traded during the Class Period.

## XI.     ADDITIONAL SCIENTER ALLEGATIONS

120.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false, incomplete, and misleading when made.  Furthermore, they knew that such statements or documents would be issued or disseminated to the investing public.

121.     Defendants knowingly and substantially participated in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the terms of the Apotex Settlement, Amended Apotex Settlement, and unlawful oral side agreements, their control over, and/or receipt and/or modification of Bristol-Myers' materially misleading misstatements and omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the original and Amended Apotex Settlements, participated in the fraudulent scheme alleged herein.

122.     In particular, as set forth above, Dolan authorized Bodnar and Chesler to negotiate the publicly undisclosed terms of the original and Amended Apotex Settlements; was made aware of all of those terms by Bodnar, Chesler, and his own review of the agreements; approved the Company's materially incomplete and misleading public disclosures regarding the terms of the original and Amended Apotex Settlements; personally made materially incomplete and misleading statements about the status of the regulatory antitrust review of the proposed

settlement after the regulators rejected the original Apotex Settlement; authorized Bodnar and

Chesler to negotiate the secret, unlawful oral side agreements to the Amended Apotex

Settlement; and approved the Company's materially false and misleading submissions and

certification to the FTC and state attorneys general and its public disclosures regarding the

Amended Apotex Settlement, which all concealed the side agreements.  Dolan knew that these

matters were of the highest importance to investors because, as Dolan stated at the May 31, 2006

analysts conference, Plavix was "the biggest product in the Company" and was "critical to our

future," and "maintaining Plavix exclusivity" was "key to revenue growth."

123.    Despite the importance of the agreements between Bristol-Myers and Apotex to

Bristol-Myers, Dolan and Bodnar did not inform the Bristol-Myers Board of Directors about the

agreements.  In fact, the Associated Press reported on August 16, 2006 that Dolan "told the

board that the Justice Department investigation is a wild goose chase that was likely triggered by

false statements Dr. Sherman made to the Federal Trade Commission, according to a person

familiar with the matter."  Similarly, Dow Jones reported on September 23, 2006 that Chairman

Robinson and the other members of the Company's Board of Directors were not told that Dolan

negotiated away the Company's right to seek treble damages from Apotex.  Dow Jones quoted

U.S. Attorney Christie as saying that Robinson "asked the right questions at the right time, but he

didn't get answers."  Nor did Dolan and Bodnar inform the Monitor (former U.S. District Judge

Lacey) or the Chief Compliance Officer, both of whom had been appointed in accordance with

the Company's deferred prosecution agreement, about the oral side agreements.  The failure to

inform the Board of Directors, Monitor, and Chief Compliance Officer about the agreements is

evidence that Dolan and Bodnar knew that they were improper and unlawful.

124.    Dolan's scienter is also evidenced by his involuntary termination as CEO by the

Company's Board on September 11, 2006, as disclosed in a press release on September 12:

> The Board of Directors of Bristol-Myers Squibb Company (NYSE: BMY) announced today that Peter R. Dolan will leave the position of chief executive officer, effective immediately.
>
> * * *
>
> At a previously scheduled meeting of the company's Board yesterday, the Board received reports from the company's outside counsel on issues relating to the PLAVIX® patent litigation with Apotex Inc. and Apotex Corp. These reports were prepared and delivered at the request of the Board as part of its ongoing assessment of this matter. During the Board's deliberations, the Board also heard from former Federal Judge Frederick B. Lacey, the Monitor under the company's deferred prosecution agreement with the office of the U.S. Attorney for the District of New Jersey, who made his own preliminary recommendation to the Board that the employment of both Mr. Dolan and Mr. Willard be terminated. The U. S. Attorney for New Jersey, Christopher J. Christie, also attended a portion of the Board meeting.
>
> Judge Lacey's recommendation followed an inquiry by the Monitor and the U.S. Attorney into issues related to corporate governance in connection with the negotiation of a settlement agreement of the pending PLAVIX patent litigation with Apotex Inc. and Apotex Corp.

125.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Dolan and Bodnar.

126.     Defendants also had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because Dolan was the most senior officer of Bristol-Myers and issued statements and press releases on behalf of the Company, and Bodnar was the Company's principal negotiator with Apotex, reporting directly to Dolan, and personally executed the original Apotex Settlement and Amended Apotex Settlement on behalf of the Company. Dolan and Bodnar therefore had the opportunity to commit the fraud alleged herein.

Defendants' motive was to protect the exclusivity of their Plavix product, literally at all costs. As Apotex Chairman Sherman noted in his May 14, 2006 internal e-mail: "While Bodnar is clearly an intelligent man, it appears to me that he is very naïve and/or blinded by the eagerness to preserve the monopoly . . . . [H]e should recognize that what he has proposed would be a fraud upon FTC and/or a fraud on us, which would expose BMS, Dolan and him to serious consequences."  (Ex. G to Sherman Decl.)

127.    Because Dolan was the Company's CEO, a Director, and Chairman of the Executive Committee, and Bodnar was its Senior Vice President and a member of its Executive Committee, their scienter is attributable to the Company.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

128.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false or misleading herein relate to then-existing facts and conditions and were not "forward-looking statements" when made.  To the extent any of the statements alleged to be false or misleading may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements as set forth above. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants had actual knowledge that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Bristol-Myers who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF

**For Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against Defendants Bristol-Myers and Dolan**

129.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully

herein.  This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder, on behalf of Plaintiffs and all other members of the Class, against

Defendants Bristol-Myers and Dolan.

130.    Throughout the Class Period, Bristol-Myers and Dolan individually, and in

concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce,

the mails and the facilities of a national securities exchange, employed devices, schemes and

artifices to defraud, made untrue statements of material fact and/or omitted to state material facts

necessary to make statements made not misleading, and engaged in acts, practices and a course

of business which operated as a fraud and deceit upon Class members, in violation of Section

10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  Bristol-Myers' and

Dolan's false and misleading statements and omissions were made with scienter and were

intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and

the other members of the Class; (ii) artificially create, inflate and maintain the market for and

market price of the Company's stock; and (iii) cause Plaintiffs and the other members of the

Class to purchase the Company's stock at inflated prices.

131.    Specifically, Bristol-Myers and Dolan initiated or pursued a scheme and course of

conduct which: (i) concealed the fact that the Company had entered into disadvantageous and

unlawful agreements with Apotex and concealed portions of the agreement from the FTC and

state attorneys general and (ii) deceived the investing public, including purchasers of Company

common stock, regarding the agreements in an effort to maintain an artificially high price for

Company common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder.  Bristol-Myers and Dolan are sued as primary participants in the

wrongful and illegal course of conduct charged herein.

132.    By misrepresenting the Company's agreements with Apotex, failing to inform the

market of the terms of those agreements, and making other false statements, Bristol-Myers and

Dolan presented a misleading picture of Bristol-Myers' business and prospects.  This caused and

maintained artificial inflation in the trading prices of the Company's publicly traded stock

throughout the Class Period and until the truth came out.

133.    Bristol-Myers and Dolan were individually and collectively responsible for

making the statements and omissions alleged herein, by virtue of having prepared, approved,

signed and/or disseminated documents which contained untrue statements of material fact and/or

omitted facts necessary to make the statements therein not misleading and/or making direct

statements to the investing public on the conference calls detailed herein.

134.    During the Class Period, Dolan occupied the highest executive position at Bristol-

Myers and was privy to non-public information concerning the Company.  He knew or recklessly

disregarded the adverse facts specified herein and omitted to disclose those facts.

135.    As described herein, Bristol-Myers and Dolan made the false statements and

omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute

willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Bristol-

Myers stock during the Class Period.  Throughout the Class Period, Bristol-Myers and Dolan had

a duty to disclose new information that came to their attention, which rendered their prior

statements to the market materially false and misleading.

136.    Bristol-Myers' and Dolan's false statements and omissions were made in

connection with the purchase or sale of the Company's stock.

137.    In ignorance of the false and misleading nature of Bristol-Myers' and Dolan's statements and/or in reliance upon the integrity of the market price for Bristol-Myers stock, Plaintiffs and the other members of the Class purchased or otherwise acquired Bristol-Myers stock at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased or otherwise acquired the stock at artificially inflated prices.

138.    The market price for Bristol-Myers stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by Bristol-Myers and Dolan, as described above.

139.    Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Bristol-Myers stock at artificially inflated prices and the subsequent decline in the price of the stock when the truth was disclosed.

140.    Bristol-Myers and Dolan acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Dolan was the CEO of the Company, and was therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, statements to the news media, filings with the SEC, and conference calls.

141.    In committing the wrongful acts alleged herein, Bristol-Myers and Dolan have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.  This course of conduct or scheme was designed to and did: (i) conceal the terms of the agreements with Apotex, including the fact that the

Company had entered into improper side agreements with Apotex, and concealed the improper terms of the agreement from the FTC and state attorneys general; (ii) maintain Dolan's executive and directorial positions at Bristol-Myers and the profits, power and prestige that Dolan enjoyed as a result of those positions; and (iii) deceive the investing public, including the shareholders of Bristol-Myers, regarding the Company's business and prospects.

142.    Bristol-Myers and Dolan accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly enter into the agreements with Apotex, conceal the terms of the agreement from the investors, and make the false statements and omissions about the Apotex agreements, all as alleged herein.  Each of these Defendants was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, Bristol-Myers and Dolan each acted with knowledge of the primary wrongdoing, and was aware of its or his overall contribution to and furtherance of the wrongdoing.

143.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false, incomplete, and misleading.

144.    By virtue of the foregoing, Bristol-Myers and Dolan have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiffs and the other members of the Class, each of whom has been damaged as a result of such violation.

## <u>SECOND CLAIM FOR RELIEF</u>

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and (c) Promulgated Thereunder Against Defendant Bodnar

145.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully

herein. This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, on behalf of Plaintiffs and all other members of the Class, against Defendant Bodnar.

146.   During the Class Period, Bodnar carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did (a) deceive the investing public, including the Plaintiffs and other members of the Class, as alleged herein, and (b) cause Plaintiffs and other members of the Class to purchase Bristol-Myers common stock at artificially inflated prices.

147.   Bodnar employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Bristol-Myers common stock in an effort to maintain artificially high market prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiffs sue Bodnar as a primary participant in the wrongful and illegal conduct charged herein.

148.   Bodnar directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Bristol-Myers as specified herein.

149.   Bodnar engaged in transactions, practices and a course of conduct that operated as a fraud and deceit upon the purchasers of Bristol-Myers common stock. Bodnar employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct in an effort to assure investors of Bristol-Myers' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts

to the FTC and state attorneys general, and omitting to state material facts necessary to make the statements not misleading.

150.     Bodnar acted with the requisite scienter in that he had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were available to him.  Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing the adverse terms of the Apotex Settlement, Amended Apotex Settlement, and unlawful, secret oral side agreements with Apotex from the investing public.

151.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Bristol-Myers common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Bristol-Myers common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or upon the integrity of the market in which the stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Bodnar and the other Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Bristol-Myers common stock during the Class Period at artificially high prices and were damaged thereby.

152.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the members of the Class known the truth regarding the material undisclosed facts alleged herein, which was not disclosed by Defendants, Plaintiffs and members of the Class would not

have purchased or otherwise acquired Bristol-Myers stock at artificially inflated prices.

153.    By virtue of the foregoing, Bodnar has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

154.    As a direct and proximate result of Bodnar's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Bristol-Myers common stock.

155.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading and of the occurrence of the conduct alleged herein to violate Section 10(b) and Rule 10b-5.

### THIRD CLAIM FOR RELIEF

**For Violation of Section 20(a) of the Exchange Act
Against Defendant Dolan**

156.    Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.  This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendant Dolan, on behalf of Plaintiffs and all other members of the Class.

157.    As alleged herein, Bristol-Myers is liable to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bristol-Myers stock based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

158.    Throughout the Class Period, Dolan was a controlling person of Bristol-Myers within the meaning of Section 20(a) of the Exchange Act, and a culpable participant in the Bristol-Myers fraud, as detailed herein.

159.    Dolan exercised control over Bristol-Myers during the Class Period by virtue of,

among other things, his position as CEO and a Director of the Company, the key role he played in the Company's management, and his direct involvement in its day-to-day operations, including its negotiations with Apotex and with the FTC and state attorneys general and its communications with news media, analysts, investors, and the public about Bristol-Myers' business and prospects.

160.    In addition to the allegations set forth above, the following allegations demonstrate Dolan's control over Bristol-Myers during the Class Period.

161.    Defendant Dolan was a controlling person of Bristol-Myers during the Class Period as demonstrated by the facts alleged herein, including:

(a)    Defendant Dolan served as the Company's Chief Executive Officer, a Director of the Company, and Chairman of the Company's Executive Committee from before the start of the Class Period until after the end of the Class Period.

(b)    Defendant Dolan was ultimately responsible for ensuring that the Company's internal disclosure procedures were effective and required no changes and that its public disclosures were complete and accurate.  Consistent with that responsibility, he signed each of Bristol-Myers' Forms 10-Q during the Class Period.  Pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act, Dolan also certified the accuracy of the Company's Forms 10-Q and the effectiveness of the Company's disclosure and internal control procedures.

(c)    Defendant Dolan led each of the Company's conference calls with analysts and investors during the Class Period, where he responded to questions relating to all aspects of the Company's business, strategic direction and financial performance, including the terms and financial impact of the Apotex agreements.

162.    Given his individual responsibilities for managing Bristol-Myers throughout the

Class Period, Dolan was regularly presented to the market as the individual who was most responsible for the Company's day-to-day business, operations, and strategic direction. Dolan accepted responsibility for presenting quarterly and annual results, setting guidance for future periods and assuring the market about the state of, and prospects for, Bristol-Myers' business. No one else at the Company exercised the same degree of responsibility for, or control over, the Company's activities and public statements as Dolan.

163.    As a result of the false and misleading statements and omissions alleged herein, the market price of Bristol-Myers stock was artificially inflated during the Class Period. Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above. Plaintiffs and the other members of the Class relied upon either the integrity of the market or upon Dolan's statements and reports in purchasing Bristol-Myers stock at artificially inflated prices.

164.    As a direct and proximate result of Dolan's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Bristol-Myers stock during the Class Period. Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind their material misstatements, they would not have purchased the securities at artificially inflated prices.

165.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

166.    By virtue of the forgoing, Dolan is liable to Plaintiffs and the Class, each of whom has been damaged as a result of the Company's underlying violations.

## FOURTH CLAIM FOR RELIEF

### For Violation of Section 20(a) of the Exchange Act
### Against Defendant Bodnar

167.     Plaintiffs repeat and reallege each and every allegation above as if set forth fully

herein.  This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendant

Bodnar, on behalf of Plaintiffs and all other members of the Class.

168.     As alleged herein, Bristol-Myers is liable to Plaintiffs and the other members of

the Class who purchased or otherwise acquired Bristol-Myers stock based on the materially false

and misleading statements and omissions set forth above, pursuant to Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

169.     Throughout the Class Period, Bodnar was a controlling person of Bristol-Myers

within the meaning of Section 20(a) of the Exchange Act, and a culpable participant in the

Bristol-Myers fraud, as detailed herein.

170.     Bodnar exercised control over Bristol-Myers during the Class Period by virtue of,

among other things, his position as Senior Vice President for Strategy and Medical and External

Affairs and a member of the Executive Committee of the Company, the key role he played in the

Company's management, and his direct involvement in its day-to-day operations, including its

negotiations with Apotex and with the FTC and state attorneys general.  Bodnar negotiated and

signed the Apotex Settlement and Amended Apotex Settlement on behalf of Bristol-Myers and

made the unlawful, secret oral side agreements with Apotex that were at the heart of the fraud

alleged herein.  In doing so, Bodnar reported directly to the Company's CEO, Dolan, and acted

as a senior executive officer with authority to bind the Company in matters of vital importance to

it relating to its largest-selling drug.

171.     Given his individual responsibilities for managing Bristol-Myers throughout the

Class Period, Bodnar was regularly presented to the market as an individual who was responsible for the Company's day-to-day business, operations, and strategic direction.

172.    As a result of the false and misleading statements and omissions alleged herein, the market price of Bristol-Myers stock was artificially inflated during the Class Period.  Under such circumstances, the presumption of reliance available under the "fraud on the market" theory applies, as more particularly set forth above.  Plaintiffs and the other members of the Class relied upon either the integrity of the market or upon Defendants' statements and reports in purchasing Bristol-Myers stock at artificially inflated prices.

173.    As a direct and proximate result of Bodnar's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Bristol-Myers stock during the Class Period.  Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, they would not have purchased the securities at artificially inflated prices.

174.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

175.    By virtue of the forgoing, Bodnar is liable to Plaintiffs and the Class, each of whom has been damaged as a result of the Company's underlying violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      Awarding Plaintiffs and the members of the Class compensatory damages and/or rescission;

C.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

D.      Awarding Plaintiffs and the Class the costs, fees, and expenses incurred in this action, including expert witness fees and attorneys fees; and

E.      Awarding such other relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury in this action for all issues so triable.

Dated:  October 15, 2007

BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

By: _____

Salvatore J. Graziano (SG-6854)
Jai K. Chandrasekhar (JC-3789)
1285 Avenue of the Americas
New York, NY 10019
Tel.:  212-554-1400
Fax:  212-554-1444

*Attorneys for Lead Plaintiff Ontario Teachers' Pension Plan Board and Lead Counsel for the Class*

KAPLAN FOX & KILSHEIMER LLP
Frederic S. Fox (FF-9102)
Joel B. Strauss (JS-6585)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7714

-and-

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Richard A. Lockridge
Karen H. Riebel
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900
Fax: (612) 399-0981

*Attorneys for Plaintiff Minneapolis Firefighters' Relief Association*

## CERTIFICATION

Michael Padfield, Senior Legal Counsel, Investments for the Ontario Teachers' Pension Plan Board ("Ontario Teachers") declares, as to the claims asserted under the federal securities laws, that:

1.      He has reviewed the complaints filed in this matter. Ontario Teachers has retained Bernstein Litowitz Berger & Grossmann LLP to serve as counsel in this matter.

2.      Ontario Teachers did not purchase the securities that are the subject of this action at the direction of its counsel or to participate in this private action.

3.      Ontario Teachers is willing to serve as a Lead Plaintiff and class representative on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.      Ontario Teachers' transactions in Bristol-Myers Squibb Company securities that are the subject of this action are set forth in the chart attached hereto.

5.      Ontario Teachers has not sought to serve as a representative party on behalf of a class in any action filed during the three years preceding the date of this Certification.

6.      Ontario Teachers served as Lead Plaintiff in *In re Williams Companies Securities Litigation,* which was filed in 2002, but Ontario Teachers moved to be appointed Lead Plaintiff in the action in 2004 pursuant to an order by the court seeking a new Lead Plaintiff. The action has been fully settled.

7.      Ontario Teachers will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 24th day of August 2007.

Michael Padfield
Senior Legal Counsel, Investments
*Ontario Teachers' Pension Plan Board*

**Ontario Teachers' Pension Plan Board**
**Transactions in Bristol-Myers Squibb Company**
Class Period: 3/22/2006-8/8/2006

| Transaction | Trade Date | Shares | | Price |
|---|---|---|---|---|
| Purchase | 4/7/2006 | 8,200 | $ | 24.6311 |
| Purchase | 4/10/2006 | 201,400 | $ | 24.2533 |
| Purchase | 4/11/2006 | 10,600 | $ | 24.1016 |
| Purchase | 4/18/2006 | 190,300 | $ | 24.7375 |
| Purchase | 4/19/2006 | 12,900 | $ | 24.6773 |
| Purchase | 4/20/2006 | 8,400 | $ | 24.8350 |
| Purchase | 4/21/2006 | 178,400 | $ | 24.8627 |
| Sale | 5/11/2006 | -6,600 | $ | 24.6712 |
| Purchase | 6/1/2006 | 256,200 | $ | 24.9832 |
| Purchase | 6/8/2006 | 210,100 | $ | 25.1398 |
| Purchase | 6/9/2006 | 30,100 | $ | 25.1037 |
| Purchase | 6/15/2006 | 219,800 | $ | 24.9963 |
| Purchase | 6/16/2006 | 24,400 | $ | 25.1701 |
| Sale | 7/21/2006 | -10,000 | $ | 25.4543 |

## PLAINTIFF CERTIFICATION

I, Walter C. Schirmer, hereby state:

1.      I, Walter C. Schirmer, on behalf of the Minneapolis Firefighters' Relief Association ("MFRA"), have reviewed a Complaint against Bristol-Myers Squibb Company, Peter R. Dolan, and Andrew R.J. Bonfield, and have authorized the filing of the same or a similar complaint on MFRA's behalf.

2.      MFRA did not purchase any Bristol-Myers Squibb Company securities at the direction of counsel or in order to participate in this private action.

3.      MFRA is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The following includes all of MFRA's transactions in Bristol-Myers Squibb Company securities during the Class Period (March 22, 2006 through August 8, 2006) as defined in the Complaint:

| TRANSACTION (PURCHASE, SALE, EXCHANGE, CALL, PUT, ETC.) | TRADE DATE | PRICE | QUANTITY |
|---|---|---|---|
| Purchase | 4/3/06 | $24.8287 | 1,908 |
| Sale | 4/11/06 | $23.9716 | 399 |
| Sale | 4/18/06 | $24.7041 | 301 |
| Purchase | 7/3/06 | $25.7492 | 1,472 |
| Purchase | 7/5/06 | $25.3258 | 1,121 |

5.      MFRA has filed the following civil actions as a representative party on behalf of a class under the federal securities laws during the last three years.

MFRA v. Ceridian Corp. et al (Del. Ch. 2996)

6.      MFRA will not accept any payment for serving as a representative party on behalf of a class except to receive its pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of JUNE , 2007.

Walter C. Schirmer, Executive Secretary
Minneapolis Firefighters' Relief Association

Hennepin County

370548-1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| IN RE BRISTOL-MYERS SQUIBB CO. SECURITIES LITIGATION | Case No. 07-CV-5867 (PAC) |
|---|---|

## CERTIFICATE OF SERVICE

I, Jai Chandrasekhar, hereby certify that on October 15, 2007 the Amended Complaint in this action was delivered by hand to the Clerk of the Court for filing, the [Proposed] Order Dismissing All Claims Against Andrew R.J. Bonfield Without Prejudice was e-mailed to the Clerk of the Court in accordance with the Southern District of New York's Guidelines for Electronic Case Filing, and copies of the Amended Complaint and [Proposed] Order were delivered by hand to:

Counsel for Defendants Bristol-Myers Squibb Co. and Andrew R.J. Bonfield:
Lorin L. Reisner, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Counsel for Defendant Peter A. Dolan:
Richard J. Davis, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Date: October 15, 2007

Jai Chandrasekhar (JC-3789)