**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BRISTOL-MYERS SQUIBB CO. SECURITIES LITIGATION | X   NO. 07-CV-5867 (PAC) |
| | : |
| | :   Electronically Filed |
| | : |
| | : |
| | : |
| | : |
| | : |
| | X |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

SUMMARY OF FACTS ................................................................................. 4

ARGUMENT ............................................................................................... 10

I.      THE COMPLAINT'S ALLEGATIONS MUST BE PRESUMED TRUE .......... 10

II.     THE COMPLAINT ALLEGES ACTIONABLE
        MISREPRESENTATIONS AND OMISSIONS .................................... 11

III.    THE COMPLAINT ALLEGES NUMEROUS FACTS GIVING RISE TO
        A STRONG INFERENCE THAT DEFENDANTS ACTED WITH
        SCIENTER ................................................................................. 20

IV.     THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY
        AGAINST DOLAN AND BODNAR ................................................ 24

V.      THE COMPLAINT ALLEGES THAT BODNAR ENGAGED IN A
        SCHEME THAT DECEIVED INVESTORS ....................................... 28

VI.     THE COMPLAINT ALLEGES LOSS CAUSATION ......................... 32

CONCLUSION ........................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972)........................................................................................................28

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007)........................................................................................10, 27

*Backman v. Polaroid Corp.,*
910 F.2d 10 (1st Cir. 1990)...........................................................................................12

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988).......................................................................................................11

*Boguslavsky v. Kaplan,*
159 F.3d 715 (2d Cir. 1998)..........................................................................................26

*Brumbaugh v. Wave Sys. Corp.,*
416 F. Supp. 2d 239 (D. Mass. 2006)......................................................................16, 35

*Caiola v. Citibank, N.A.,*
295 F.3d 312 (2d Cir. 2002).....................................................................................11, 12

*Catton v. Def. Tech. Sys., Inc.,*
457 F. Supp. 2d 374 (S.D.N.Y. 2006)...........................................................................26

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994).......................................................................................................31

*Compudyne Corp. v. Shane,*
453 F. Supp. 2d 807 (S.D.N.Y. 2006)......................................................................24, 33

*Dietrich v. Bauer,*
126 F. Supp. 2d 759 (S.D.N.Y. 2001)...........................................................................25

*Donohoe v. Consol. Operating & Prod. Corp.,*
736 F. Supp. 845 (N.D. Ill. 1990).................................................................................15

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005).................................................................................................32, 35

*Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.,*
343 F.3d 189 (2d Cir. 2003)..........................................................................................39

*Fogarazzo v. Lehman Bros., Inc.*,
  341 F. Supp. 2d 274 (S.D.N.Y. 2004) .................................................................17

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) .........................................12

*Glazer v. Formica Corp.*,
  964 F.2d 149 (2d Cir. 1992) ..............................................................................11

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................................15

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) ...................................................................24

*In re Apollo Group Inc. Sec. Litig.*,
  509 F. Supp. 2d 837 (D. Ariz. 2007) ...................................................................20

*In re Avista Corp. Sec. Litig.*,
  415 F. Supp. 2d 1214 (E.D. Wash. 2005) ............................................................37

*In re Bradley Parms., Inc. Sec. Litig.*,
  421 F. Supp. 2d 239 (D.N.J. 2006) .....................................................................35

*In re Bristol-Myers Squibb Sec. Litig.*,
  Civ. A. No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17,
  2005) ...........................................................................................................35, 36

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) .....................................................................11

*In re Charter Commc'ns, Inc.*,
  443 F.3d 987 (8th Cir. 2006) .............................................................................32

*In re Converium Holding AG Sec. Litig.*,
  No. 04 Civ. 7897(DLC), 2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007) ....................... passim

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) .................................................................30

*In re Global Crossing, Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004) .........................................................28, 29, 32

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  725 F. Supp. 712 (S.D.N.Y. 1989) ......................................................................13

*In re Immucor Inc. Sec. Litig.*,
  No. 1:05-cv-2276-WSD, 2006 U.S. Dist. LEXIS 72335 (N.D. Ga. Oct. 4,
  2006) ............................................................................................................35

*In re Independent Energy Holdings PLC Sec Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)...................................................................................19

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)...................................................................20, 26, 27, 28

*In re Interpublic Sec. Litig.*,
   No. 02 Civ. 6527 (DLC), 2003 WL 21250682 (S.D.N.Y. May 29, 2003) ............................26

*In re Labranche Sec. Litig.*,
   405 F. Supp. 2d 333 (S.D.N.Y. 2005)..............................................................................25, 27

*In re Lernout & Hauspie Sec. Litig.*,
   236 F. Supp. 2d 161 (D. Mass. 2003) ...................................................................................30

*In re Marsh & McLennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................................................27

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   No. 03-CV-4080 (MP), 2004 U.S. Dist. LEXIS 2247 (S.D.N.Y. Feb. 18,
   2004) ......................................................................................................................................37

*In re NPS Pharms., Inc. Sec. Litig.*,
   No. 2:06-CV-00570, 2007 WL 1976589 (D. Utah July 3, 2007) ...........................................10

*In re Openwave Sys. Sec. Litig.*,
   No. 07 Civ. 1309, 2007 WL 3224584 (S.D.N.Y. Oct. 31, 2007) ..........................................39

*In re Par Pharm., Inc. Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990).................................................................................12, 19

*In re Parmalat Sec. Litig.*,
   414 F. Supp. 2d 428 (S.D.N.Y. 2006)....................................................................................26

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005)............................................................................ passim

*In re Quintel Entm't Inc. Sec. Litig.*,
   72 F. Supp. 2d 283 (S.D.N.Y. 1999)......................................................................................26

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................................................11, 22

*In re Scottish Re Group Sec. Litig.*,
   No. 06 Civ. 5853(SAS), 2007 U.S. Dist. LEXIS 81565 (S.D.N.Y. Nov. 2,
   2007) .................................................................................................................22, 24, 25, 33

*In re SeaChange International, Inc.*,
   No. 02-12116 (DPW), 2004 U.S. Dist. LEXIS 1687 (D. Mass. Feb. 6, 2004)........................14

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   No. 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504 (S.D.N.Y. Aug. 31,
   2000) ..................................................................................................................12, 19, 27

*In re Tellium, Inc. Sec. Litig.*,
   No. 02-cv-5878 (FLW), 2005 U.S. Dist. LEXIS 26332 (D.N.J. Aug. 26, 2005) ...................37

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ...................................................................................................16

*In re Tommy Hilfiger Sec. Litig.*,
   No. 04 Civ. 7678, 2007 U.S. Dist. LEXIS 55088 (S.D.N.Y. July 20, 2007)..........................35

*In re Tower Auto. Sec. Litig.*,
   483 F. Supp. 2d 327 (S.D.N.Y. 2007)......................................................................24, 27, 33

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)...............................................................................18, 19

*In re Vivendi Universal, S.A., Sec. Litig.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)...............................................................................24, 27

*In re Winstar Commc'ns*,
   No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 27,
   2006) ...................................................................................................................................35

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)........................................................................... passim

*Klein v. PDG Remediation, Inc.*,
   937 F. Supp. 323 (S.D.N.Y. 1996)......................................................................................20

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006)..............................................................................14, 35

*Lasker v. N.Y. State Electric & Gas Corp.*,
   85 F.3d 55 (2d Cir. 1996) ....................................................................................................14

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).............................................................................................33, 36

*Libon v. Infineon Techs. AG*,
   No. 3:04CV929, 2006 U.S. Dist. LEXIS 76430 (E.D. Va. Aug. 7, 2006) .............................23

*McMahon v. Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990)....................................................................................17

*Menkes v. Stolt-Nielsen S.A.*,
  No. 3:03CV409(DJS), 2005 U.S. Dist. LEXIS 28208 (D. Conn. Nov. 10,
  2005) ...........................................................................................................................18

*Mishkin v. Ageloff*,
  No. 97 Civ. 2690 LAP, 1998 WL 651065 (S.D.N.Y. Sept. 23, 1998) ............................29, 32

*Montalvo v. Tripos, Inc.*,
  No. 4:03CV995SNL, 2005 WL 2453964 (E.D. Mo. Sept. 30, 2005) ....................................36

*Myzel v. Fields*,
  386 F.2d 718 (2d Cir. 1967).......................................................................................25

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .......................................................................................21

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,
  LLP*, 322 F.3d 147 (2d Cir. 2003)..............................................................................23

*Rich v. Maidstone Fin., Inc.*,
  No. 98 Civ. 2569(DAB), 2002 WL 31867724 (S.D.N.Y. Dec. 20, 2002).............................32

*Rubinstein v. Collins*,
  20 F.3d 160 (5th Cir. 1994) .......................................................................................12

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996)...............................................................................25, 26, 32

*SEC v. PIMCO Advisors Fund Mgmt. LLC*,
  341 F. Supp. 2d 454 (S.D.N.Y. 2004)............................................................................32

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  No. 06-43 (S.Ct. argued Oct. 9, 2007) ..........................................................................32

*SEC v. U.S. Envtl., Inc.*,
  155 F.3d 107 (2d Cir. 1998).......................................................................................32

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001)...................................................................................26, 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499 (2007)........................................................................................10, 20

## STATUTES

15 U.S.C. 78u-4 ..........................................................................................................20

**RULES**

17 C.F.R. § 240.12b-2.................................................................................................24

Fed. R. Civ. P. 8...........................................................................................24, 27, 32

Fed. R. Civ. P. 9(b)..............................................................................................32, 33

Fed. R. Civ. P. 12(b)(6).......................................................................................10, 32

Plaintiffs respectfully submit this memorandum opposing the motions of Bristol-Myers Squibb Co. ("BMS" or the "Company"), Peter Dolan ("Dolan"), and Andrew Bodnar ("Bodnar") to dismiss the Amended Class Action Complaint ("Complaint").

## PRELIMINARY STATEMENT

During the Class Period, Defendants materially deceived BMS investors by repeatedly stating that if the regulators disapproved their proposed patent infringement settlement with Apotex, a generic drug company, BMS would "vigorously" enforce its patents in Plavix, its largest-selling drug, and that any generic Plavix launch by Apotex would be "at risk."  Only at the end of the Class Period was it revealed that BMS had agreed that it could seek only reduced, not treble, damages and could not seek an injunction against any generic Plavix launch until after 5 business days.

Securities analysts who covered BMS during the Class Period and opined that Apotex would not launch generic Plavix "at risk" given the potential of treble damages were shocked to learn that BMS had given up those rights and could not even seek injunctive relief until one week after Apotex's generic launch.  This news caused the price of BMS stock to fall in heavy trading, and analysts and the media immediately questioned Defendants' credibility.  Reuters summed up the story as follows:

> Before the details of the settlement were disclosed analysts expected the odds of Apotex introducing a Plavix copy at risk – before a court ruling – to be slim due to high costs Apotex could face if the court put [BMS] in the right.  ***But the details showed that for Apotex damages would be much more limited than usual if a U.S. court ruled against its Plavix generic after its launch***.  [Emphasis added.]

¶ 98.[1]  Analysts who had seriously doubted an "at risk" launch, now fully expected Apotex to flood the market with its generic product in light of the newly disclosed terms.

---

[1] Citations to "¶__" are to paragraphs of the Complaint.

In the middle of the Class Period, Defendants also stated that BMS had modified its agreement with Apotex in response to "concerns" raised by the Federal Trade Commission ("FTC") and state attorneys general. Yet they misleadingly reported only one amended term and did not disclose other material concessions to Apotex. Moreover, rather than addressing the regulators' concerns as Defendants publicly stated, Defendants actually moved the objectionable parts of the original agreement into secret oral side agreements. Rather than addressing the regulators' concerns, the side agreements made regulatory rejection much more likely and (when Apotex's counsel reported them confidentially to the FTC) led to a criminal investigation by the Department of Justice ("DOJ") and felony guilty pleas by BMS for making false statements to the FTC. BMS fired its CEO Dolan and its General Counsel for their roles in this matter, and Bodnar left BMS around the time the Company agreed to plead guilty to two federal crimes.

Instead of squarely confronting the Complaint, Defendants argue that BMS disclosed that the regulators might not approve the proposed settlement. However, there is no dispute that the Company disclosed the possibility of regulatory disapproval of the settlement, and the Complaint does not allege otherwise. Contrary to Defendants' mischaracterization of Plaintiffs' allegations, the Complaint specifically alleges that Defendants – in repeatedly describing the settlement to the public – failed to disclose that the proposed settlement gave up critical legal rights that BMS would otherwise have had against Apotex in enforcing BMS' patents, *if the regulators disapproved the settlement*. As the Complaint alleges, in detail, Defendants misled the market into believing that, like any other patent holder, BMS would be able to seek immediate injunctive relief against any generic launch and that Apotex risked treble damages measured by BMS' lost profits.

Even in their "risk disclosures," Defendants did not disclose to the market that BMS had agreed to allow Apotex to market generic Plavix for at least a week before BMS could seek any injunction, and also agreed to limit damages to a fraction of Apotex's sales, instead of BMS' lost profits and treble damages. Defendants also concealed the improper oral side agreements that Bodnar, acting on behalf of BMS under Dolan's supervision, made with Apotex, which made regulatory disapproval of the settlement and devastating financial and legal consequences for BMS much more likely.

Fairly read, the Complaint alleges that Defendants made repeated material misstatements and omissions in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5(b). The Complaint's numerous factual allegations, when accepted as true (as they must be at this stage) and read collectively, give rise to an inference of scienter against all Defendants that is at least as strong as any opposing inference. In fact, it is far stronger.

Dolan and Bodnar, a Senior Vice President and member of the Company's Executive Committee who reported directly to Dolan, participated directly in the wrongdoing relating to the proposed Apotex settlement. As BMS' CEO and one of its top officers, respectively, and as the individuals who committed the wrongful acts about which BMS made misstatements and omissions, Dolan and Bodnar are liable under §20(a) of the Exchange Act as control persons for BMS' liability under § 10(b).

Bodnar, who acted deceptively by entering into the oral side agreements with Apotex and unlawfully concealing them from the regulators and the public, is also liable under Rule 10b-5(a) and (c) for employing a scheme to defraud and engaging in a course of business which operated as a fraud or deceit upon investors.

Defendants argue that the mere fact of generic competition, not disclosure of the previously concealed facts, caused the sharp declines in the price of BMS stock at the end of the Class Period. However, the Complaint quotes numerous analysts and news articles specifically linking the stock price drop to the very facts that were concealed. In addition, the stock price drop that followed news of the DOJ investigation that ultimately led to BMS' felony guilty pleas directly related to the improper side agreements.

## SUMMARY OF FACTS

BMS is one of the world's largest drug companies, and its blood-thinning medicine, Plavix, is its biggest seller. ¶30. Apotex is a generic drug company. ¶1. Apotex filed the first Abbreviated New Drug Application ("ANDA") for generic Plavix with the FDA in 2001. ¶31. BMS sued Apotex in 2002 in the Southern District of New York, alleging that Apotex's ANDA infringed its Plavix patents. ¶32.

From January to August 2006, while the patent case was pending, Apotex manufactured large quantities of generic Plavix and contracted with customers in preparation for its generic launch. ¶32. BMS learned of these preparations and sought to settle its patent case against Apotex to delay Apotex's generic launch until shortly before BMS' patent would expire in 2011. *Id.* BMS announced its proposed settlement with Apotex in a press release issued after the close of trading on March 21, 2006, the first day of the Class Period. ¶¶58, 63-65. This news caused the price of BMS stock to close up 11% the next trading day on heavy trading volume, and analysts opined that the proposed settlement eliminated "the key risk in owning BMS shares." ¶59.

However, Defendants omitted critical facts from their public announcement of the proposed settlement with Apotex necessary to make their statements not misleading when made, including no mention of significant limits on BMS' damages and patent

-4-

enforcement rights if regulators disapproved the settlement.  ¶¶36-37, 60, 66.  Indeed, while the press release referred to the significant risk of regulatory denial of the proposed agreement, Defendants failed to disclose that if the regulators rejected the settlement:  (1) BMS' damages for any infringement by Apotex would be limited to 70% of Apotex's net sales of generic Plavix if BMS had not launched an authorized generic and 60% of Apotex's net sales if BMS had done so; (2) BMS agreed not to seek increased (up to treble) damages; (3) the parties would jointly ask the court hearing the patent case to set a trial date not earlier than 2 ½ months after the request; and (4) BMS would not seek a temporary restraining order ("TRO") or preliminary injunction against Apotex's generic Plavix sales until five business days after either BMS gave notice it intended to do so, or Apotex launched generic Plavix (which would allow Apotex to flood the market with generic Plavix).  *Id.*  These material omissions made BMS' public statements on March 21, 2006 and repeatedly during the Class Period that it would "vigorously" enforce its Plavix patents if the regulators rejected the settlement and that a generic Plavix launch by Apotex would be "at risk," materially misleading when made.  *Id.*[2]

Defendants' materially misleading statements and omissions continued in connection with the reporting of BMS' first quarter results on April 27, 2006 and at the Company's annual stockholders meeting on May 2, 2006.  ¶¶67, 70-72.  Defendants repeatedly stated that, in case of non-approval, BMS would "vigorously" enforce its patents and that any generic launch by Apotex would be "at risk," without disclosing that BMS had agreed to significant limitations on its damages and enforcement rights that

---

[2]  The risk of non-approval was real.  BMS was required to submit the Apotex Settlement for review and consent by the FTC and the attorneys general of the 50 states under prior consent decrees entered into by BMS resulting from prior anti-competitive behavior by BMS, and the Company was also subject to a deferred prosecution agreement.  ¶¶34-35.  Nonetheless, because investors did not know about the rights BMS had forfeited in case of non-approval, they reacted favorably to Defendants' announcement.  ¶59.

made a launch by Apotex far more likely.  ¶¶60, 68-69, 72, 73, 75.

On May 5, 2006, the state attorneys general notified BMS that they would not approve the settlement.  ¶38.  Defendants did not disclose this fact either in BMS' Form 10-Q filed on May 8, 2006, or at a May 31, 2006 conference when Dolan spoke about the prospects for regulatory approval of the settlement.  ¶¶38, 75-78.  Defendants instead renegotiated the settlement, which now included secret oral terms that Defendants disclosed neither to investors, nor to the regulators.  ¶¶39, 41-46.  By using the secret side agreements, Defendants hoped to keep Apotex on board with even more concessions and to secure regulatory approval of the settlement, by criminally deceiving the regulators. *Id.*  Indeed, the very terms that the regulators objected to were now moved to the undisclosed side agreements, including a $60 million fee.  *Id.*

Nearly a month after amending the proposed Apotex agreement, BMS issued a press release on June 25, 2006, reporting that the agreement was amended in response to regulators' "concerns."  ¶¶40, 79.  Misleadingly, Defendants disclosed only one substantive term of the amended agreement on June 25, 2006 or in any other public statement before the end of the Class Period, that Apotex's license to manufacture and sell generic Plavix in the U.S. would be effective several months earlier than in the original agreement.  *Id.*  In addition, Defendants continued to repeatedly assure investors that BMS would "vigorously" enforce its patents in case of non-approval and that any generic launch by Apotex would be "at risk."  ¶¶82, 84, 87.  Yet, the Amended Apotex Settlement further reduced BMS' ability to "vigorously" enforce its patents and made a launch by Apotex in case of non-approval even more likely.  *Id.*

Defendants failed to publicly disclose at any time before the end of the Class

Period that the Amended Apotex Settlement provided that if the regulators rejected the settlement:  (1) BMS' damages for any infringement by Apotex would be limited to 50% of Apotex's net sales of generic Plavix if BMS had not launched an authorized generic and 40% of Apotex's net sales if BMS had done so (reduced from 70% and 60%, respectively, in the original Apotex Settlement); (2) BMS agreed not to seek increased (up to treble) damages; (3) the parties would jointly ask the court hearing the patent case to set a trial date not earlier than 2 ½ months after the request; and (4) BMS would not seek a TRO against Apotex's generic Plavix sales (as the original Apotex Settlement permitted BMS to do after five business days), and would not seek a preliminary injunction until five business days after Apotex's generic Plavix launch (which would allow Apotex to flood the market with generic Plavix).  ¶¶41, 80.  These material omissions made BMS' public statements during the remainder of the Class Period that it would "vigorously" enforce its Plavix patents if the regulators rejected the settlement and that any Apotex launch would be "at risk" materially misleading.  *Id.*

In addition to the undisclosed terms of the Amended Apotex Settlement, Defendants also made oral side agreements with Apotex, which they concealed from the regulators and the public.  ¶¶42, 81.  Defendants insisted that the side agreements be oral and not in writing because the FTC would not approve the amended agreement if it knew about the side agreements.  *Id.*  The side agreements included that (1) if the regulators approved the amended agreement, BMS would not launch an authorized generic during Apotex's period of exclusivity, and (2) Apotex's signing the new agreement would not waive its vested right to a $60 million break-up fee under the original Apotex Settlement.

Apotex's CEO Bernard Sherman reported these oral terms to two other Apotex

executives in contemporaneous emails, describing them on May 14, 2006, as "a fraud upon FTC . . . which would expose [BMS], Dolan and [Bodnar] to serious consequences" and on May 24, 2006, as "once again . . . extraordinary." ¶¶43, 45.  Sherman also had his secretary listen to BMS' outside counsel describe one of the key oral side commitments and instructed her to prepare and sign notes memorializing what the attorney said.  ¶46.  Sherman later told his own counsel of the side agreements.  ¶49. Unbeknownst to Defendants, Robert S. Silver, Esq., counsel to Apotex, then reported the side agreements to the FTC and DOJ on June 5, 2006, and, as a result, the DOJ immediately opened a criminal investigation into BMS.  ¶¶42, 49.

Thus, while Defendants encouragingly stated on June 25, 2006 that they amended the Apotex Settlement in response to the regulators' "concerns," in fact, rather than making meaningful amendments to address those concerns, Defendants actually moved the objectionable parts of the original Apotex Settlement into oral side agreements.  ¶¶79-81.  Rather than improving the chances of approval, these side agreements greatly increased the risk of rejection by the regulators, and also led to a criminal investigation by the DOJ and eventual felony guilty pleas by BMS for making false statements to the FTC about the Amended Apotex Settlement.  *Id.*

The true facts began to be revealed to investors on July 27, 2006, when Defendants were forced to confirm news of an FBI search of BMS' headquarters in New York City and a criminal investigation by the DOJ relating to the Apotex agreement. ¶82.  The price of BMS stock declined by approximately 7.5% immediately following this news on unusually heavy trading.  ¶85.  Nonetheless, Defendants stated that the Company's conduct was "entirely appropriate . . . coordinated throughout with senior

outside counsel" and that the Company would "vigorously" enforce BMS' patents in response to any Apotex launch of generic Plavix. ¶¶82-84. Analysts, in response, began to *upgrade* their ratings for BMS stock. ¶86.

On July 28, 2006, Defendants announced that the Amended Apotex Settlement had not received regulatory approval and that Apotex could launch generic Plavix "at risk," in which case BMS would "vigorously" enforce its patents. ¶¶87-88. Importantly, securities analysts continued to report that they seriously doubted that Apotex would launch generic Plavix at the risk of what they believed to be treble damages. ¶¶89-93.

On August 8, 2006, the last day of the Class Period, investors finally learned the previously undisclosed material terms of the Apotex Settlement that significantly weakened BMS' damages and enforcement rights in case of non-approval (which now had occurred) and greatly increased the risk of a generic launch by Apotex (which now had begun). ¶95. The price of BMS stock declined by 7% immediately upon disclosure of these terms, on unusually heavy trading volume, with numerous analysts and news reports highlighting the importance of the specific settlement terms that Defendants had previously omitted in all of their Class Period disclosures to investors. ¶¶96-104.

Analysts went from seriously doubting an "at risk" launch by Apotex to fully expecting one given the newly disclosed terms. *Id.* JP Morgan opined that "[t]he settlement appears to be so favorable to Apotex that ***one would have to assume they would launch at risk.***" ¶98. "Only a week ago, many of the same experts predicted a generic Plavix launch was unlikely." ¶102. Analysts now expected Apotex to "flood the market with cheaper generic Plavix" during its five-business-day window. ¶104.

Shortly after the end of the Class Period, BMS announced the involuntary

termination of Dolan and its General Counsel, effective immediately, because of their conduct relating to the Apotex settlement. ¶¶55, 105. Several months later, BMS agreed to plead guilty to two felonies for making false statements to a government agency, admitting that it had not disclosed important facts to the FTC regarding the proposed Apotex agreement. ¶¶56, 107-08. Bodnar left BMS at around the same time. ¶107.

Even though BMS obtained a preliminary injunction against Apotex, because of the rights it waived (including having to wait five business days to go to court), BMS lost approximately $563 million in sales to generic Plavix. ¶106.

## ARGUMENT

## I.     THE COMPLAINT'S ALLEGATIONS MUST BE PRESUMED TRUE

In considering the motions to dismiss the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the Complaint as true and draw all reasonable inferences in Plaintiffs' favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

In reviewing a 12(b)(6) motion to dismiss under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Supreme Court has reiterated that "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). Thus, a motion to dismiss is not a place to challenge the credibility of Plaintiffs' witnesses or alleged facts or to make evidentiary objections, including those based on hearsay. *See id.* at 2513; *see also In re NPS Pharms., Inc. Sec. Litig.*, No. 2:06-CV-00570, 2007 WL 1976589, at *5 (D. Utah July 3, 2007) (applying *Tellabs* and holding that a court may not weigh evidence or "entertain a challenge to the credibility of confidential witnesses" on a motion to dismiss); *In re*

*Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897(DLC), 2007 WL 2684069, at *3

(S.D.N.Y. Sept. 14, 2007); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 623

(S.D.N.Y. 2007).[3]

## II.    THE COMPLAINT ALLEGES ACTIONABLE MISREPRESENTATIONS AND OMISSIONS

Defendants are liable under § 10(b) and Rule 10b-5(b) for affirmative

misstatements and material omissions.  The Supreme Court has repeatedly stated that the

fundamental policy of the federal securities laws is complete and accurate disclosure.  For

example, in *Basic Inc. v. Levinson*, the Court held:

> There cannot be honest markets without honest publicity.  Manipulation
> and dishonest practices of the market place thrive upon mystery and
> secrecy . . . This Court repeatedly has described the fundamental purpose
> of the Act as implementing a philosophy of full disclosure.

485 U.S. 224, 230 (1988) (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78

(1977)).  Thus, courts recognize that a duty to disclose material facts arises when a

corporation has made inaccurate, incomplete, or misleading disclosures.  *Glazer v.*

*Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) ("'[W]hen a corporation does make a

disclosure – whether it be voluntary or required – there is a duty to make it complete and

accurate.'") (citations omitted); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574,

583 (D.N.J. 2001).

"'To fulfill the materiality requirement there must be a substantial likelihood that

the disclosure of the omitted fact would have been viewed by the reasonable investor as

having significantly altered the 'total mix' of information made available.'"  *Caiola v.*

---

[3]  In any event, Defendants' effort to raise questions about the credibility of the sworn declaration of Apotex's CEO Sherman (BMS Br. at 15 n.10) fails, because the declaration is corroborated by, *inter alia*, attorney Robert S. Silver's June 5, 2006 letter to the FTC and DOJ (¶42); the FBI raid on BMS' headquarters on July 26, 2006 (¶82); BMS' guilty plea to two felonies on June 11, 2007 (¶108); and the termination of Dolan and the Company's General Counsel on September 12, 2006 (¶105).

*Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002) (quoting *Basic*, 485 U.S. at 231-32

(internal quotation marks omitted)). "At the pleading stage, a plaintiff satisfies the

materiality requirement . . . by alleging a statement or omission that a reasonable investor

would have considered significant in making investment decisions." *Ganino v. Citizens*

*Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000). A "complaint may not properly be dismissed

. . . on the ground that the alleged misstatements or omissions are not material unless they

are so obviously unimportant to a reasonable investor that reasonable minds could not

differ on the question of their importance." *Id.* at 162 (internal citations omitted).[4]

        The Complaint details numerous instances where Defendants chose to speak, but

did not speak fully and truthfully concerning the Apotex Settlement. On March 21, 2006,

the first day of the Class Period, BMS disclosed the original Apotex Settlement and

stated that "[i]f the litigation were reinstated, sanofi-aventis and Bristol-Myers Squibb

intend to ***vigorously pursue*** enforcement of their patent rights in PLAVIX." ¶58

(emphasis added). On numerous occasions throughout the Class Period, BMS and Dolan

repeated their statements that the Company would "vigorously" or "aggressively" enforce

its patents if the regulators rejected the Apotex Settlement and Apotex launched generic

Plavix. ¶¶61, 63, 65, 67, 68, 71, 73, 77, 82, 84, 87. They also misleadingly stated on

---

[4] The Second Circuit has long followed the well-settled rule that a duty to speak the full truth arises when a defendant undertakes to speak. *Caiola v. Citibank, N.A.*, 295 F.3d at 331 ("[U]pon choosing to speak, one must speak truthfully about material issues. Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.") (citations omitted); *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *13 (S.D.N.Y. Aug. 31, 2000) ("[W]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate. This duty to disclose exists even where the omitted information relates to allegedly illegal conduct.") (citation omitted); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) (same); *see also Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) ("'a duty to speak the full truth arises when a defendant undertakes a duty to say anything'") (citation omitted). Indeed, it is well established that even if a defendant is not otherwise obliged to disclose information, but voluntarily chooses to make a statement that is reasonably calculated to influence the investing public, the defendant then has a duty to disclose sufficient information so that the statement made is not "so incomplete as to mislead." *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (citing *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968)).

numerous occasions that any Apotex launch would be "at risk."  ¶¶58, 61, 63, 73, 87.

However, Defendants failed to disclose at any time before the end of the Class Period that the Apotex Settlement waived many of BMS' enforcement and damages rights.  Thus, the March 21, 2006 announcement of the settlement and Defendants' other statements were materially incomplete and misleading when made, because the Company had actually abandoned many of its most important legal rights as a patent holder, greatly reducing the risk to Apotex of any generic launch.

On June 25, 2006, Defendants disclosed that there was an Amended Apotex Settlement in response to the regulators' "concerns" and misleadingly disclosed only one amended term of the agreement.  Again, Defendants failed to disclose material terms of the agreement which now further reduced BMS' ability to "vigorously" enforce its patents and greatly reduced the risk to Apotex of a generic launch.  These undisclosed facts made Defendants' continued public statements that BMS would "vigorously" enforce its Plavix patents if the regulators rejected the settlement, and that any generic launch by Apotex would be "at risk," materially misleading when made.

In a similar case, Judge Mukasey held that a company's statement that it would "vigorously contest" any FTC effort to block a proposed merger on antitrust grounds was materially misleading because plaintiffs adduced evidence that the company in fact did not plan to vigorously oppose the FTC's action.  *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 750 (S.D.N.Y. 1989).  Likewise in this case, the Complaint alleges specific legal rights that BMS already abandoned in the Apotex Settlements, which meant that the Company would not be able to "vigorously" enforce its patents in

the normally understood manner in a patent infringement action.[5]

The Complaint also alleges numerous specific statements by securities analysts demonstrating that Defendants' misleading statements and omissions succeeded in leading investors to believe that the Company retained all the normal, expected rights of a patent holder.  For example, J.P. Morgan wrote on July 28, 2006 that launching "at risk" would be a "bet-the-company" endeavor for Apotex because it would face the possibility of treble damages.  ¶89.  Reuters reported on July 31, 2006 that industry analysts said that Apotex was unlikely to launch its generic Plavix "because of huge financial risks to the generic drug maker" and noted the availability of treble damages.  ¶90.  J.P. Morgan again wrote on August 4, 2006 that Apotex would be subject to treble damages if it launched at risk (¶91); Citigroup made a similar statement on the same date, noting that an "at risk" launch could "potentially bankrupt Apotex (3x damages with a loss in court)" (¶92); and the *New York Times* reported on August 5, 2006, that "an 'at-risk launch' . . . means Apotex could be responsible for repaying the brand-name companies three times their sales losses if they end up successfully defending their patent in court" (¶93).

---

[5]  Defendants argue that statements that the Company would "vigorously" enforce its patents were mere "puffery" and not actionable.  BMS Br. at 12 n.7.  However, even "optimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (*i.e.*, the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements) . . ." *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006). In this case, the Complaint alleges specific facts about the Company's undisclosed abandonment of a number of its legal rights to enforce the Plavix patents, which made Defendants' public statements materially misleading.  Moreover, the cases on "puffery" cited by Defendants do not apply here.  *Lasker v. N.Y. State Electric & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996), involved only statements that defendant's "business strategies [would] lead to continued prosperity," *id.* at 59, unlike Defendants' specific statements of purportedly present intention in this case that they would "vigorously" enforce legal rights, many of which Defendants had actually waived.  In *In re SeaChange International, Inc.*, No. 02-12116 (DPW), 2004 U.S. Dist. LEXIS 1687 (D. Mass. Feb. 6, 2004), the court held that defendant's statement that it would "oppose the [patent] allegations against [it] and assert [its] claims against the other parties vigorously" was not actionable because "[t]he only factual allegation plaintiffs offer to support their contention that SeaChange knew the statements to be false or misleading is the jury verdict [against SeaChange], *subsequent to the Offering*." *Id.* at *23 (emphasis added).  Thus, unlike this case, there was no allegation of specific undisclosed facts at the time of the allegedly false statement.

Moreover, after the terms of the Apotex Settlements were finally disclosed on the last day of the Class Period, analysts confirmed that the previously concealed terms described above were important and surprising to them.  J.P. Morgan highlighted the Company's relinquishment of its right to seek treble damages and an immediate TRO or preliminary injunction against Apotex (¶97), and Reuters reported that "settlement details surprised analysts" and "[t]he settlement appears to be so favorable to Apotex that one would have to assume they would launch at risk" (¶98).  Similarly, Dow Jones reported the previously undisclosed terms to have been "a rather disadvantageous patent settlement with Apotex" (¶99); the *New York Times* reported that "at least two significant disadvantageous" terms "raised doubts about the leadership of BMS," would give Apotex "an opportunity to potentially flood the market," and "removed one of the major deterrents" to Apotex entering the market (¶100); and the *Newark Star-Ledger* reported that "only a week ago [before the terms were disclosed], many of the same experts predicted a generic Plavix launch was unlikely" (¶102).[6]

Thus, Defendants' argument that the concealed terms of the Apotex Settlement were immaterial must fail in light of the importance that the market, itself, attributed to those terms.  Analysts' expressions of surprise after a corrective disclosure are strong evidence that the information was material and was not previously disclosed adequately.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005).

---

[6] Defendants make much of Judge Stein's observation, while reciting the patent case's background, that Apotex made "an at-risk launch" of generic Plavix.  BMS Br. at 13.  Judge Stein was simply noting the history of the patent case, not interpreting the phrase "at risk" to assess the accuracy of BMS' disclosures under the securities laws.  Moreover, as discussed above, the risk Apotex faced in its launch was far less than a normal "at risk" launch because of the previously undisclosed terms.  *See Donohoe v. Consol. Operating & Prod. Corp.*, 736 F. Supp. 845, 870 (N.D. Ill. 1990) (holding on motion to dismiss that oil company's claims of "successful prior drilling" were materially misleading in light of "common usage" of "successful"), *aff'd in relevant part*, 982 F.2d 1130 (7th Cir. 1992).  At most, these arguments raise issues of fact about the meaning of Defendants' statements, which should not be decided as a matter of law.

Defendants argue that they had no duty to disclose every term of the Apotex Settlement. BMS Br. at 9-11. However, Defendants' voluntary statements obligated them to disclose the terms described above, because those terms were material in light of Defendants' specific repeated statements and significantly altered the total mix of information available to investors. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267-68 (2d Cir. 1993) ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 428 (S.D.N.Y. 2003) ("When a person speaks, but chooses to omit information, the liability for that omission will be judged by its materiality.") (citing *Halperin v. eBankerUSA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).

It is well settled that incomplete statements about corporate agreements are actionable when the undisclosed terms are material. For example, in *Brumbaugh v. Wave Systems Corp.*, 416 F. Supp. 2d 239 (D. Mass. 2006), Wave Systems, a small, money-losing company, announced that it had entered into agreements with Intel Corp. and IBM, but failed to disclose that the agreements required no minimum payments to Wave. *Id.* at 246. The court held that "[b]y volunteering 'relevant, material information' regarding the lucrative nature of impending agreements, Defendants assumed an obligation, in announcing Wave's new relationship with Intel, to convey 'the whole truth.'" *Id.* at 250 (citing *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)). Similarly in this case, Defendants chose to emphasize that, in case of a regulatory denial, the Company would "vigorously" enforce its patents against Apotex. In making those repeated statements, Defendants undertook a duty to disclose the legal rights that BMS had given

up in the settlement so as to make their statements to investors accurate and not materially misleading when made and not conceal facts that, when finally disclosed, were immediately described by analysts as completely changing their views.

Defendants also argue that their statements that the Company would "vigorously" enforce its Plavix patents were literally true, because BMS ultimately did obtain an injunction and a finding of patent infringement against Apotex. BMS Br. at 11-14. However, Defendants ignore the Complaint's allegation that "[s]ignificantly, BMS first attempted to enjoin Apotex's generic launch without giving 5 business days' notice as it had agreed with Apotex, but the Court required BMS to comply with that contractual term and renew its preliminary injunction motion after 5 business days." ¶ 106. As a result of BMS' undisclosed abandonment of its right to seek an immediate injunction against Apotex, Apotex was able to flood the market with generic Plavix between its launch on August 8, 2006 and the issuance of the preliminary injunction on August 31, 2006, costing BMS $563 million in sales. *Id.* Thus, BMS' litigation efforts against Apotex cannot accurately be described as "vigorous" when compared with the normally understood drug patent holder's rights to secure immediate injunctive relief against launch of an unauthorized generic even before it happens and treble damages if it does.

Even if Defendants' statements were "literally accurate, . . . the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead" investors. *McMahon v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Defendants' statements in this case "bec[a]me, through their context and manner of presentation, devices which misle[]d investors." *Id.*; *see also Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294

(S.D.N.Y. 2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact.").

The June 25, 2006 press release was also materially false, incomplete and misleading when issued because while Defendants publicly stated that they amended the Apotex Settlement in response to "concerns" raised by the regulators, in fact, rather than making meaningful amendments to address the regulators' concerns, Defendants actually moved the objectionable parts of the original Apotex Settlement into oral side agreements which only increased the chance of a regulatory denial. ¶¶79-81. Thus, the concealment of the unlawful oral side agreements made BMS' description of the terms of the Amended Apotex Settlement (¶¶40, 79) materially incomplete and misleading.

Defendants argue that they had no obligation to disclose these facts because "the 'federal securities laws do not require a company to accuse itself of wrongdoing.'" BMS Br. at 16 (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)). However, "management may be compelled to disclose uncharged illegal conduct when . . . disclosure is necessary to prevent another statement from misleading the public." *Menkes v. Stolt-Nielsen S.A.*, No. 3:03CV409(DJS), 2005 U.S. Dist. LEXIS 28208, at *20 (D. Conn. Nov. 10, 2005). In *Stolt-Nielsen*, the court held that disclosure of an illegal price-fixing conspiracy was required, because the concealed facts rendered defendant's statements about its competitive market and one of its major contracts misleading. *Id.* at *23-24. Similarly, in *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), the court held that a NYSE specialist brokerage had a duty to disclose that its traders engaged in unlawful practices that accounted for much of its revenue, because the undisclosed facts made the company's statements that

its revenue came from legitimate sources misleading.  *Id.* at 400-01.

"The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose."  *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990).  The *Par Pharmaceutical* court held that defendants had a duty to disclose that they won FDA approval of their drugs by paying bribes, because the undisclosed facts made their statements about Par's supposed particular expertise in obtaining FDA approvals materially misleading.  *Id.* at 675, 677-78; *see also In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 CIV. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *10-13 (S.D.N.Y. Aug. 31, 2000), *aff'd*, 31 Fed. Appx. 762 (2d Cir. 2002) (holding that defendants had duty to disclose price-rigging conspiracy because undisclosed facts made their statements about Sotheby's supposed competition with Christie's misleading).

The facts that Defendants concealed in this case regarding their illegal conduct in connection with the oral side agreements made their statements about the Amended Apotex Settlement materially false and misleading, and they had a duty to disclose those facts when they voluntarily chose (1) to announce that they had reached an amended Apotex Agreement to address "concerns" raised by the regulators, and (2) to comment on the risk of non-approval by the regulators, a risk which unbeknownst to investors greatly increased as a result of the undisclosed oral side agreements.[7]

---

[7]  Defendants' argument that they had no duty to disclose the regulators' rejection of the initial Apotex Settlement in May 2006 (BMS Br. at 14 n.9) fails, because the undisclosed rejection made BMS's statements before *and after* the rejection materially misleading.  ¶¶38, 73-78.  In *In re Independent Energy Holdings PLC Sec Litig.*, 154 F. Supp. 2d 741 (S.D.N.Y. 2001), the court held that an electric company's failure to disclose a regulatory investigation into customer service problems was materially misleading, notwithstanding the company's general disclosure that it was subject to regulation: "While defendants correctly note that the securities laws may not require disclosure of possible future sanctions, . . . they certainly require disclosure of information that would permit an investor to appreciate the risk that the future sanction may arise."  *Id.* at 760.  (The court later abrogated *Independent Energy*'s holding that §

III.   **THE COMPLAINT ALLEGES NUMEROUS FACTS GIVING RISE TO A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER**

The PSLRA requires the Complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In *Tellabs*, the Supreme Court addressed this requirement and held that courts must "accept all factual allegations in the complaint as true," and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  127 S. Ct. at 2509.  Importantly, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible' of competing inferences," and personal stock sales by senior executives are not required.  *Id.* at 2510.

The Supreme Court cautioned that a "court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and determine whether the allegations "accepted as true and taken collectively, would [allow] a reasonable person [to] deem the inference of scienter at least as strong as any opposing inference."  *Id.*  The Court may consider only those "plausible opposing inferences" that may be "rationally drawn *from the facts alleged*."  *Id.* at 2504 (emphasis added).  If the inference of scienter is *at least as compelling* as any plausible opposing inference, the Complaint must be sustained.  *Id.* at 2509.  Thus, it is Defendants' burden to show that the Complaint's allegations give rise to innocent inferences that are *stronger* than the inference of scienter.  *Id.* at 2504-05.  They cannot meet that showing in this case.

---

20(a) requires scienter in *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281, 397 & n.187 (S.D.N.Y. 2003).)  *See also In re Apollo Group Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 842-43 (D. Ariz. 2007) (rejecting argument that defendants did not have duty to disclose negative interim regulatory findings where those findings made public statements regarding regulatory process false or misleading); *Klein v. PDG Remediation, Inc.*, 937 F. Supp. 323, 325, 328 (S.D.N.Y. 1996) (rejecting argument that environmental company had no duty to disclose state grand jury, agency, and legislative investigations and reports that threatened its future state reimbursements, which governor later suspended).

The Second Circuit has given further guidance for the analysis of recklessness by specifically highlighting cases in which plaintiffs' allegations demonstrate that defendants (1) possessed knowledge of facts or had access to information contradicting their public statements, or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000).  This is precisely what is alleged in this case.

The Complaint alleges specifically that Dolan authorized Bodnar (a person he worked closely with and personally promoted within BMS) and the Company's outside counsel to negotiate the publicly undisclosed terms of the original and Amended Apotex Settlements; was made aware of all of those terms by Bodnar, outside counsel, and his own review of the written agreements; approved the Company's materially incomplete and misleading public disclosures; personally made materially incomplete and misleading statements about the status of the regulatory review of the proposed settlement after the regulators rejected the original Apotex Settlement; authorized Bodnar and outside counsel to negotiate the secret, unlawful oral side agreements to the Amended Apotex Settlement; and approved the Company's materially false and misleading submissions to the FTC and state attorneys general and its public disclosures about the Amended Apotex Settlement, which all concealed the side agreements.  ¶122; *see also* ¶¶39, 42-46, 57.

Moreover, Dolan knew that these matters were of the highest importance to investors because, as he stated at the May 31, 2006 analysts conference, Plavix was "the largest product in the Company" and was "critical to our future," and "maintaining Plavix exclusivity" was "key to revenue growth."  ¶76.

While Defendants argue that "any duty to disclose was unclear" (BMS Br. at 21;

*see also* Dolan Br. at 7), that argument fails because in this case, unlike any of the cases cited by BMS, Defendants' repeated statements were designed to and did give investors a false and misleading portrayal of the true facts.  Indeed, the Complaint further alleges that Dolan did not inform *his own Board* about the true facts and was involuntarily terminated because of his conduct in relation to the Apotex Settlements.  ¶¶123-24.  The Complaint quotes U.S. Attorney Christie as stating that BMS' Chairman of the Board "asked the right questions at the right time, but he didn't get answers" from Dolan.  *Id.*  A board's request for a corporate executive to resign at the same time that the corporation makes adverse disclosure supports a strong inference of scienter.  *Refco*, 503 F. Supp. 2d at 649-50. The Complaint also alleges that Bodnar left BMS around the time of BMS' criminal plea agreement.  ¶107.  "[T]he resignations of [corporate officers at the same time as adverse disclosure] although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud."  *In re Scottish Re Group Sec. Litig.*, No. 06 Civ. 5853(SAS), 2007 U.S. Dist. LEXIS 81565, at \*57 n.176 (S.D.N.Y. Nov. 2, 2007).

Although a showing of motive and opportunity is not required at this stage, both Dolan and Bodnar had the opportunity to perpetrate the fraudulent scheme described herein, because Dolan was BMS' most senior officer and issued statements and press releases on behalf of the Company, and Bodnar was the Company's principal negotiator with Apotex, reporting directly to Dolan, and personally executed the original and Amended Apotex Settlements on behalf of BMS.  As recognized by Apotex's CEO, these Defendants' motive was to protect Plavix's exclusivity at all costs.[8]

---

[8]  Sherman noted in a May 14, 2006 internal e-mail: "While Bodnar is clearly an intelligent man, it appears to me that he is very naïve and/or ***blinded by the eagerness to preserve the monopoly*** . . . . [H]e should recognize that what he has proposed would be a fraud upon FTC and/or a fraud on us, which would expose BMS, Dolan and him to serious consequences."  ¶126 (emphasis added).

The Court also should give substantial weight to BMS' guilty plea to two felonies for making false statements to the FTC about the improper oral side agreements that Bodnar, acting on behalf of BMS under Dolan's supervision, made with Apotex. ¶¶107-08. Indeed, this should be nearly dispositive at this stage. *Libon v. Infineon Techs. AG*, No. 3:04CV929, 2006 U.S. Dist. LEXIS 76430, at *30 n.6 (E.D. Va. Aug. 7, 2006) (finding scienter of company that issued false statements concealing illegal price-fixing, where "the corporation itself[] pled guilty to price-fixing, thereby establishing a strong inference that the corporate defendant had knowledge of the illegal activity").[9]

Thus, the Complaint's detailed allegations create a strong inference that Dolan and Bodnar actually knew that BMS' disclosures about the Apotex Settlements during the Class Period were materially misleading, or were at least reckless. *Cf. WorldCom*, 294 F. Supp. 2d at 402 (CEO's "position . . ., his statements, his close relationship with [CFO], his reputation for acting as a 'hands on' manager, the size of the fraud, and certain decisions he made . . . provide evidence that [he] was aware of WorldCom's fraudulent accounting practices."); *id.* at 417 ("The inference of [his] scienter arises from the combined force of the allegations; the weighing of each piece of evidence and the impeachment of each source must await trial.").

Of course, because Dolan was BMS' CEO, a Director, and Chairman of the Executive Committee, and Bodnar its SVP and a member of its Executive Committee, their scienter is attributable to BMS. ¶127. *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 165 (2d Cir. 2003) ("where . .

---

[9] Defendants' denial of the existence of any unlawful side agreements (BMS Br. at 22-23; Bodnar Br. at 3 n.5) improperly disputes the facts alleged in the Complaint (notwithstanding the Company's guilty pleas). At this stage, the sworn Sherman declaration and other corroborating facts demonstrating false statements to the FTC cannot be dismissed merely as "speculative" or "conclusory" allegations under *Tellabs*.

. 'the persons dominating and controlling the corporation orchestrated the fraudulent conduct, their knowledge is imputed to the corporation as principal'"); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 445 (S.D.N.Y. 2000).

## IV.    THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY AGAINST DOLAN AND BODNAR

A § 20(a) claim is subject to the liberal notice pleading requirements of Rule 8(a). *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 350-51 (S.D.N.Y. 2007); *In re Vivendi Universal, S.A.*, *Sec. Litig.*, 381 F. Supp. 2d 158, 189-90 (S.D.N.Y. 2003).  Furthermore, "[i]n the Second Circuit, the 'control person' provisions are broadly construed as they 'were meant to expand the scope of liability under the securities laws.'" *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).

Moreover, control person liability is necessarily fact intensive and generally cannot be resolved on motions to dismiss.  *Scottish Re*, 2007 U.S. Dist. LEXIS 81565, at *75; *see also Compudyne*, 453 F. Supp. 2d at 829 (citing *In re Oxford Health Plans Inc. Sec. Litig.*, 187 F.R.D. 133, 143 (S.D.N.Y 1999)).  Nonetheless, Defendants challenge Plaintiffs' § 20(a) claims.  As illustrated above, Plaintiffs adequately plead primary violations of § 10(b) by BMS.  As set forth herein, Plaintiffs also properly plead Dolan's and Bodnar's control-person liability for BMS' violations.

Dolan, as CEO, does not contest his control over BMS.  Bodnar, however, claims that even though he negotiated and signed the original and Amended Apotex Settlements and negotiated the secret side agreements, he did not control BMS.  Bodnar Br. at 10-11. The SEC defines "control" as "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2; *see*

*also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (adopting this standard for § 20(a) claims).  Section 20(a) requires "only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Myzel v. Fields*, 386 F.2d 718, 738 (2d Cir. 1967).  In this Circuit, "control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof."  *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001).

      The Complaint adequately pleads that Bodnar exercised control over BMS. Bodnar was the SVP for Strategy and Medical and External Affairs, a member of the Executive Committee, and was presented to the market and Apotex as responsible for BMS' day-to-day business, operations, and strategic direction.  ¶¶170-71.  Bodnar was BMS' negotiator in the Apotex Settlement, and he signed the original and Amended Apotex Settlements for BMS.  ¶57.  Bodnar also negotiated and committed BMS to the secret side agreements with Apotex that were at the heart of the fraud.  ¶¶42-46.  Thus, Bodnar possessed "'the power to direct or cause the direction of the management and policies'" of BMS.  *In re Labranche Sec. Litig.*, 405 F. Supp. 2d 333, 363 n.18 (S.D.N.Y. 2005) (quoting 17 C.F.R. § 240.12b-2); *see also Scottish Re*, 2007 U.S. Dist. LEXIS 81565, at *75-76 (finding "control" where individual "held a 'senior executive position[],' was direct[ly] involve[d] in [the Company's] day-to-day operations" and was involved in the allegedly fraudulent decisions); *In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897(DLC), 2006 U.S. Dist. LEXIS 93413, at *46 (S.D.N.Y. Dec. 28, 2006).

      To state a claim under § 20(a), Plaintiffs must allege (a) an underlying primary violation of the securities laws by the controlled person and (b) control over the controlled person.  *WorldCom*, 294 F. Supp. 2d at 415.  Defendants, however, argue that

a third element is required at the pleading stage, namely, culpable participation by the

controlling person.  Bodnar Br. at 11; Dolan Br. at 12-13.  Courts have repeatedly held

that there is no such requirement at this stage.  *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d

428, 439 (S.D.N.Y. 2006) (Kaplan, J.) (to assert claim under § 20(a), "this Court

repeatedly has held that plaintiffs need not allege culpable participation"); *Converium*,

2006 U.S. Dist. LEXIS 93413, at *45-46; *Catton v. Def. Tech. Sys.*, *Inc.*, 457 F. Supp. 2d

374, 382 (S.D.N.Y. 2006); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003

WL 21250682, at *15 (S.D.N.Y. May 29, 2003); *WorldCom*, 294 F. Supp. 2d at 415; *In

re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003); *In re

Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 297-98 (S.D.N.Y. 1999).[10]

   Nonetheless, if the Court concludes that culpable participation must be pled, the

Complaint fully satisfies such requirement.  As shown above in Section III, both

individual Defendants were directly involved in the alleged fraud.[11]

   Dolan argues that the PSLRA's heightened pleading standard applies to culpable

---

[10]  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998), cited by Dolan, does not require pleading
culpable participation for a § 20(a) claim.  *Boguslavsky* is a summary judgment decision decided on a
complete evidentiary record.  At summary judgment, the court was required under *SEC v. First Jersey*, 101
F.3d at 1472, to rule on the sufficiency of the evidence that plaintiff must prove at trial.  Thus, while both
*Boguslavsky* and *First Jersey* held that culpable participation is an element of a § 20(a) claim that must be
*proven* at trial, those cases did not decide how a § 20(a) claim must be *pled.*  Indeed, one court noted that
whenever the Second Circuit has evaluated § 20(a) claims, "it has essentially rendered the 'culpable
participation' requirement meaningless."  *IPO*, 241 F. Supp. 2d at 395.  In *First Jersey*, the Second Circuit
*upheld* § 20(a) claims based on allegations of control coupled with an underlying violation, without any
allegations of culpable participation.  *First Jersey*, 101 F.3d at 1473 (finding evidence of primary violation
and control, and then turning to issue of whether defendant had satisfied his affirmative defense, without
discussing whether plaintiff had established culpable participation).  The Second Circuit reached a similar
result in *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 101 (2d Cir. 2001) (allegation
that "DeRoziere was an officer of the Bank and that he had primary responsibility for the dealings of that
Bank and the other corporate defendants with SAM Group . . . [w]hile somewhat broad, [were] sufficient to
plead controlling-person liability for the Bank derived from DeRoziere, the purported primary violator").

[11] Indeed, Bodnar does not contest Plaintiffs' claims on this basis beyond a conclusory statement that
Plaintiffs have not sufficiently alleged Bodnar's culpable participation.  Bodnar Br. at 11.  The Complaint
alleges his culpable direct involvement in the Apotex negotiations and secret side deals in detail.  ¶¶42-46.

participation under § 20(a).  Dolan Br. at 12-13.  However, as the court explained in *IPO*, "culpable participation" does not require scienter, and the PSLRA's requirements do not apply to § 20(a).  241 F. Supp. 2d at 395.  Instead, in accordance with the Second Circuit holding that "somewhat broad" allegations of control suffice to plead control-person liability, *Suez Equity Investors*, 250 F.3d at 101, Rule 8(a) applies.  *IPO*, 241 F. Supp. 2d at 396; *see also In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 350-51 (S.D.N.Y. 2007) ("Section 20(a) violations are governed by Rule 8's pleading standard."); *Vivendi*, 381 F. Supp. 2d at 189-90; *WorldCom*, 294 F. Supp. 2d at 415-16.[12]

In any event, the Complaint's well-pled allegations refute Dolan's argument that he did not culpably participate in the fraud.  Dolan was responsible for ensuring that BMS' public disclosures were complete and accurate and certified the accuracy of BMS' Forms 10-Q during the Class Period.  ¶¶73-74, 161.  He led BMS' conference calls with the investment community and publicly discussed the Apotex Settlement.  ¶¶71-72, 76-78, 83-84, 86, 161.  He oversaw the negotiations with Apotex that led to the secret side deals, concealed the side agreements from BMS' Board, and was terminated for his role in the matter.  ¶¶122-24.  *See Labranche*, 405 F. Supp. 2d at 363-64 (denying motion to dismiss § 20(a) claims where defendants "exercised direct day-to-day management of [the primary violators], and . . . had responsibility for their statements to the public"); *Sotheby's*, 2000 U.S. Dist. LEXIS 12504, at *23-24 (control adequately alleged against Chairman and CEO who participated in price-fixing).[13]

---

[12]  *ATSI*, 493 F.3d at 99, cited by Dolan (Dolan Br. at 12), is not to the contrary.  In *ATSI*, the Second Circuit did not analyze control-person liability at all, except to note that because the Court had already found that the plaintiff had failed to allege a primary violation, there could be no control-person liability.

[13]  *See also In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 494 (S.D.N.Y. 2006) (upholding § 20(a) claims under heightened pleading standard where plaintiffs had shown scienter with

## V.     THE COMPLAINT ALLEGES THAT BODNAR ENGAGED IN A SCHEME THAT DECEIVED INVESTORS

As discussed above, the Complaint alleges that Bodnar negotiated the original and Amended Apotex Settlements and the improper side agreements, whose material terms were concealed from investors until the end of the Class Period.  The Complaint also alleges that Bodnar was a senior BMS executive, acted with scienter, and exercised control over the Company.  Together, these allegations adequately plead that Bodnar "employed [a] device, scheme, or artifice to defraud" and "engage[d] in [an] act, practice, or course of business which operate[d] or would operate as a fraud or deceit upon any person," in violation of Rule 10b-5(a) and (c).

Bodnar argues that the 10b-5 claim against him fails because he made no false statements.  Bodnar Br. at 1-2, 5-6.  "But in attempting to reduce plaintiffs' arguments to a mere theory of 'fraudulent statement by another name,' [Defendant] conflates the distinct elements of a claim for false statements under subsection (b) of Rule 10b-5 with those of a claim for engaging in a fraudulent scheme under subsections (a) or (c)."  *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004).  As Judge Lynch held in *Global Crossing*, and as Judge Kaplan held in *In re Parmalat Securities Litigation*, 376 F. Supp. 2d 472, 491 (S.D.N.Y. 2005), the elements of a claim for misstatements under Rule 10b-5(b) are different from the elements of a claim based on a fraudulent device, scheme, artifice, act, practice, or course of business under Rule 10b-5(a) and (c).  The latter does not require any misrepresentation or omission by Defendant. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972); *Parmalat*,

regard to § 10(b) claims against each § 20(a) defendant); *IPO*, 241 F. Supp. 2d at 395, n.183 (denying motion to dismiss § 20(a) claim when defendants themselves made false and misleading statements).

376 F. Supp. 2d at 491-92; *Global Crossing*, 322 F. Supp. 2d at 328-29, 335; *Mishkin v. Ageloff*, No. 97 Civ. 2690 LAP, 1998 WL 651065, at *17 (S.D.N.Y. Sept. 23, 1998). Rather, the elements of a claim under Rule 10b-5(a) and (c) are that Defendant:

> (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries.

*Parmalat*, 376 F. Supp. 2d at 492; *see also Global Crossing*, 322 F. Supp. 2d at 336 ("All that is required in order to state a claim for a primary violation under Rule 10b-5(a) or (c) is an allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance.") (citing *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998)).

The Complaint alleges with specificity that Bodnar negotiated secret oral side agreements with Apotex that BMS would, among other things, pay a $60 million break-up fee and not introduce an authorized generic competitor to Apotex's generic Plavix, both terms that were known to be particularly objectionable to the antitrust regulators. ¶¶42, 45, 47. The Complaint further alleges that Bodnar directly participated in concealing these secret side agreements from the regulators and investors. ¶¶42-43, 45-46, 57. Indeed, the FBI raided Bodnar's (and Dolan's) office at BMS headquarters on July 26, 2006, and BMS' plea agreement preserved the Government's right to file criminal charges against Bodnar (and Dolan). ¶¶51, 56. Together, these facts demonstrate that Bodnar's conduct was inherently deceitful and therefore satisfies the first element of a claim under Rule 10b-5(a) and (c). *Parmalat*, 376 F. Supp. 2d at 505-06 (banks' "factoring and securitization of worthless invoices were deceptive devices or contrivances for purposes of Section 10(b)" and were actionable under 10b-5(a) and (c)

because "[t]he transactions in which the defendants engaged were by nature deceptive").

Contrary to Bodnar's argument (Bodnar Br. at 8), the Complaint easily satisfies the "in connection with the purchase or sale of any security" element of a 10b-5 claim. "A plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendants' deceptive conduct affects a market for securities." *Parmalat*, 376 F. Supp. 2d at 506. By entering into the secret side agreements and concealing them from the regulators and the market, Bodnar misled investors about the true terms of the Amended Apotex Settlement and its prospects for regulatory approval. The market's adverse reaction when the truth was revealed confirms that Bodnar's deceptive conduct artificially inflated the market price of BMS stock by creating false appearances about important facts affecting the Company's most important product.

Bodnar also wrongly argues that Plaintiffs do not adequately allege that they and the other Class members relied on his conduct. Bodnar Br. at 6-7. This argument echoes the argument that only misrepresentations or omissions under Rule 10b-5(b) can give rise to liability. To the contrary, under Rule 10b-5(a) and (c), Plaintiffs need not "have relied on particular actions of the defendants," but may instead rely on the "fraud on the market" presumption. *Parmalat*, 376 F. Supp. 2d at 508; *see also In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 174 (D. Mass. 2003); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002). Bodnar "knew that the very purpose of certain of [his] transactions was to allow [BMS] to make such misrepresentations" and thus caused Plaintiffs' losses. *Parmalat*, 376 F. Supp. 2d at 509.

Loss causation, the final element of the 10b-5 claim against Bodnar, is discussed in detail in Point VI. Briefly, loss causation as it applies to "claims [] based on deceptive

or manipulative conduct in violation of Rule 10b-5(a) and (c)" is satisfied where a defendant's deceptive conduct created false appearances about an issuer's business and concealed the risk of adverse consequences of the defendant's conduct for the issuer, and "that risk materialized" when the adverse consequences occurred and the harm to the issuer was disclosed. *Parmalat*, 376 F. Supp. 2d at 510.

The Complaint's scheme liability claim against Bodnar is not, as he asserts, contrary to the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), that there is no private cause of action for "aiding and abetting" a violation of Rule 10b-5. Bodnar Br. at 5-6. Simply put, the Complaint seeks to hold Bodnar liable for his *own* deceptive conduct in entering into and concealing the improper oral side agreements, which created false appearances about BMS' business, upon which investors relied, and which caused enormous losses to BMS stockholders. The Complaint does not seek to hold Bodnar liable for merely assisting the other Defendants in making false statements, in the absence of deceptive conduct by Bodnar that satisfies every element of Rule 10b-5. As Judge Kaplan has held:

> This analysis is not an end run around *Central Bank*. If a defendant has committed no act within the scope of Section 10(b) and Rule 10b-5 – as in fact was the case in *Central Bank* – then liability will not arise on the theory that that defendant assisted another in violating the statute and rule. But where, as alleged here, a [defendant] enters into deceptive transactions as part of a scheme in violation of Rule 10b-5(a) and (c) that causes foreseeable losses in the securities markets, that [defendant] is subject to private liability under Section 10(b) and Rule 10b-5.

*Parmalat*, 376 F. Supp. 2d at 509-10.

Finally, Bodnar erroneously argues that the 10b-5 claim against him fails because he did not engage in manipulative trading in BMS stock. Bodnar Br. at 6 n.7. Subsections (a) and (c) are not limited to manipulative trading such as wash sales,

matched orders, or rigged prices.  *Global Crossing*, 322 F. Supp. 2d at 336-37.  Rather,

"subsections (a) and (c) encompass much more than illegal trading activity: they

encompass the use of '*any* device, scheme or artifice, or *any* act, practice, or course of

business' used to perpetrate a fraud on investors," *id.* at 336 (emphasis in original), and

"courts including this country's highest court have held that a cause of action lies for

claims that involve allegations of manipulative schemes used in connection with

securities markets," *id.* at 337; *see also Parmalat*, 376 F. Supp. 2d at 492 (same).[14]

## VI.    THE COMPLAINT ALLEGES LOSS CAUSATION

Loss causation is the causal link between the alleged fraudulent misconduct and

the Class's losses.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Analogizing loss causation to "proximate cause" in tort, the Second Circuit has held that

---

[14]  The Supreme Court is currently considering the parameters of scheme liability under § 10(b) and Rule 10b-5(a) and (c) in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, No. 06-43 (on appeal from *In re Charter Commc'ns, Inc.*, 443 F.3d 987 (8th Cir. 2006)).  Under current Second Circuit law, Plaintiffs' scheme liability claim against Bodnar is clearly viable.  Notably, *Stoneridge* concerns scheme liability claims not against corporate insiders like Bodnar, but rather against outside companies that did business with a publicly traded company, which misrepresented the financial impact of its transactions with the defendants in its own public statements.  Current Second Circuit law validates scheme liability claims not only against outside business counterparties like those in *Stoneridge*, *Global Crossing*, and *Parmalat*, but *a fortiori* against insiders.  *SEC v. U.S. Environmental, Inc.*, 155 F.3d at 112 (upholding 10b-5 claims against stock trader who did not make false statements, but participated in his company's manipulative trading); *SEC v. First Jersey Sec., Inc.*, 101 F.3d at 1471-72 (upholding 10b-5 claims against corporate insider who did not make false statements, but planned and orchestrated his company's program of fraudulent securities trading); *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 469 (S.D.N.Y. 2004) ("If the SEC were able to charge [insider defendants] with knowledge of the inherently fraudulent selective disclosures, [defendants'] activities would fit squarely into the rule articulated in *U.S. Environmental* . . . in which 'participat[ion] in a fraudulent scheme or other activity proscribed by the securities laws,' 155 F.3d at 111, gives rise to primary 10b-5 liability."); *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569(DAB), 2002 WL 31867724, at *9 (S.D.N.Y. Dec. 20, 2002) (upholding 10b-5 claim against brokerage insider who made no misstatement but carried out fraudulent scheme); *Mishkin v. Ageloff*, 1998 WL 651065, at *18-19 (same).  *U.S. Environmental*, *First Jersey*, and *PIMCO* were SEC enforcement actions, but the cited sections of those cases address primary liability under Rule 10b-5, not aiding and abetting.  Thus, these cases' reasoning and holdings are applicable to private actions under 10b-5, and it is irrelevant that the PSLRA authorized 10b-5 aiding and abetting claims by the SEC but not by private plaintiffs.  The complaints in *Rich* and *Mishkin* were dismissed for failure to plead defendants' participation in the fraudulent schemes with sufficient particularity under Fed. R. Civ. P. 9(b).  *Rich*, 2002 WL 31867724, at *10; *Mishkin*, 1998 WL 651065, at *21.  This in no way weakens these decisions' reasoning regarding the ability to state scheme liability claims under Rule 10b-5(a) and (c) and Fed. R. Civ. P. 12(b)(6).  The Complaint here is replete with details about Bodnar's fraudulent conduct.

"a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor.'"  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original).  Plaintiffs must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Id.* at 174.  Plaintiffs' "damages must be a foreseeable consequence of the misrepresentation."  *Id.* at 172.  "This does not mean that the misrepresentation itself must cause the drop in value of the security, but rather that 'the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged.'"  *Scottish Re*, 2007 U.S. Dist. LEXIS 81565, at *59 (quoting *Lentell*, 39 F.3d at 172-73).

Following *Dura,* plaintiffs need only satisfy Rule 8 notice pleading for loss causation.  *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 348 ("[N]early all courts addressing [loss causation] since [*Dura*] have also applied Rule 8, rather than the heightened pleading standard of Rule 9."); *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 827 (S.D.N.Y. 2006).

Defendants argue that (1) the BMS stock price declines resulted from disclosed risks; (2) the July 27, 2006 announcement was not a corrective disclosure; and (3) the August 8, 2006 stock price decline after the disclosure that day was due to Apotex's generic launch, not Defendants' alleged fraud.  These arguments fail at this stage.

Defendants argue, with little explanation, that the BMS stock price declines resulted from already disclosed risks:  the risks of a generic launch and of regulatory disapproval.  BMS Br. at 17-18; Bodnar Br. at 7.  But Defendants misinterpret the

Complaint by arguing that these risks were "accurately disclosed." BMS Br. at 17. Indeed, at the same time that Defendants represented to the public that BMS would "vigorously" enforce its patents if Apotex launched generic Plavix and that any Apotex launch would be "at risk," Defendants concealed that the settlement agreements limited BMS' damages and patent enforcement rights, thereby encouraging Apotex's generic launch and allowing it to be more profitable at BMS' cost. ¶¶3, 41. And while BMS announced to the public that it had negotiated the Amended Apotex Settlement in response to the regulators' "concerns," BMS concealed from both the public and the regulators that the parties had entered into oral side agreements that Defendants knew would cause the regulators, if they became aware of these terms, to reject the Amended Apotex Settlement and subject them to criminal investigation. ¶¶4, 42. These risks – the risk that BMS' agreement would actually aid Apotex in its generic launch in case of regulatory denial and the increased risk that BMS's unlawful side agreements would result in regulatory denial and other adverse consequences for BMS – were not publicly disclosed before the end of the Class Period, and fundamentally differ from Defendants' characterization of the risks as the mere risks of regulatory denial and an "at risk" launch.

Defendants assert that the July 27, 2006 announcement of the DOJ's investigation is not a corrective disclosure because it "does not discuss the subject matter of any of the non-disclosures alleged in the Amended Complaint." BMS Br. at 18. This assertion is factually incorrect, as the July 27 announcement was specifically linked to the Apotex Settlement. ¶82 ("The Company learned yesterday that the Antitrust Division of the United States Department of Justice is conducting a criminal investigation *regarding the proposed settlement of the Apotex litigation described above*.") (emphasis added).

Furthermore, Defendants' theory that only a detailed revelation of all the previously misrepresented or concealed facts supports loss causation is contrary to law.

There is no specific requirement as to the type of disclosures that may reveal the truth, how specific a disclosure should be, or that the disclosure take a particular form. *See Dura*, 544 U.S. at 347; *In re Tommy Hilfiger Sec. Litig.*, No. 04 Civ. 7678, 2007 U.S. Dist. LEXIS 55088, at *7-8 (S.D.N.Y. July 20, 2007); *In re Winstar Commc'ns*, No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *45 (S.D.N.Y. Feb. 27, 2006). A corrective disclosure need not be the "linguistic mirror image" of the alleged fraud. *In re Bristol-Myers Squibb Sec. Litig.*, Civ. A. No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448, at *57 (D.N.J. Aug. 17, 2005).

Moreover, courts commonly treat announcements of government investigations into the subject matter of the fraud as corrective disclosures. *See, e.g., Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 243 (S.D.N.Y. 2006); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006); *In re Immucor Inc. Sec. Litig.*, No. 1:05-cv-2276, 2006 U.S. Dist. LEXIS 72335, at *59-60 (N.D. Ga. Oct. 4, 2006); *Brumbaugh*, 416 F. Supp. 2d at 256. For example, in *Bradley Pharmaceuticals*, the court held that plaintiffs sufficiently alleged loss causation where defendants announced that the SEC was conducting an informal inquiry to determine whether there had been violations of securities laws. 421 F. Supp. 2d at 829. The court rejected defendants' "rigid and dogmatic" interpretation of *Dura* and held that plaintiffs sufficiently alleged loss causation since the "truth" about the transaction did not take the form of a single disclosure, but occurred through a series of disclosing events. *Id*. at 828-29.[15]

---

[15] As in this case (BMS Br. at 19), defendants in *Bradley* unsuccessfully argued that when a post-class period restatement revealed the full extent of the fraud, the stock price rose, disproving loss causation. 421

Plaintiffs in this case have sufficiently alleged that the July 27, 2006 statement was a partial disclosure. ¶¶52, 82-86. On that date, BMS revealed, in a press release before the market opened, that "the Antitrust Division of the [DOJ] is conducting a criminal investigation regarding the proposed settlement of the Apotex litigation described above." ¶82. As a result of the disclosure, the stock price fell almost $2, or by approximately 7.5%, on heavy trading volume. ¶¶ 52, 85, 111(a). The disclosure that the DOJ was investigating criminal conduct relating to the Amended Apotex Settlement is "perfectly congruent" to the alleged fraud, *Bristol-Myers Squibb*, 2005 U.S. Dist. LEXIS 18448, at *57, and within the zone of risk of the facts withheld from investors – that Defendants criminally concealed the side agreements with Apotex from the regulators, knowing that they would not approve the Amended Apotex Settlement if they became aware of the side agreements. ¶81. Disclosure of the criminal investigation does not merely "suggest" that regulatory approval of the settlement would not be forthcoming, as Defendants suggest. BMS Br. at 18. Such an "unprecedented" probe (¶85) into the settlement suggested to the public the possibility that BMS acted *criminally* in negotiating the Amended Apotex Settlement. "[T]he risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173 (emphasis in original).

---

F. Supp. 2d at 828. However, the court compared the stock price's significant drop on large trading volume after the initial disclosure of the investigation to the price's slight increase on low volume after the company's post-class period admissions, and held that "by the time [the company] announced its restatement of earnings [after the class period], the market had already incorporated that the previously released financial statements could not be relied upon." *Id.* at 829. Defendants here point to trading in BMS long after the Class Period, but this argument is premature and ignores other factors at those later dates that also affected BMS stock price. This question should be addressed in discovery and with expert witnesses. *See also Montalvo v. Tripos, Inc.*, No. 4:03CV995SNL, 2005 WL 2453964, at *9 (E.D. Mo. Sept. 30, 2005) (rejecting argument "that the plaintiffs have failed to adequately plead loss causation because the 2004 restatements were not announced until after the end of the Class Period, and moreover, little if any significant decline in the stock price occurred following these restatements," where stock price fell significantly at end of class period after disclosure of failure to meet important contract milestone).

In *In re Merrill Lynch Tyco Research Securities Litigation*, No. 03-CV-4080

(MP), 2004 U.S. Dist. LEXIS 2247 (S.D.N.Y. Feb. 18, 2004), cited by Defendants (BMS

Br. at 18), plaintiffs alleged fraud based on statements by Merrill Lynch that Tyco's

financial subsidiary could be sold or spun off for a certain amount of money. *Id.* at *6.

The "corrective disclosure" was alleged to be reports about Tyco's former CEO's misuse

of company funds. *Id.* at *7. The court held that plaintiffs did not assert any causal

relationship between the alleged fraud and the decline in trading price because the

"corrective disclosure" did not discuss anything about the financial subsidiary, any

improper relationship between Tyco and Merrill Lynch, or anything related to the subject

matter of the fraud. *Id.* at *7-8. In this case, disclosure of the DOJ's criminal

investigation was closely related to an important part of the alleged fraud, BMS' criminal

conduct in concealing the side agreements from regulators and investors.[16]

Defendants' argument that the August 8, 2006 stock price decline resulted from

the Apotex launch rather than the disclosure, on the same day, of the disadvantageous

settlement terms of the original and Amended Apotex Settlements is likewise unavailing.

BMS Br. at 19. Defendants' argument assumes that the generic launch and the revelation

of the settlement terms can be separated as causal factors, but they cannot at the pleading

stage. Moreover, this argument overlooks the allegation that news of the regulatory

denial of the Amended Apotex Agreement on July 28, 2006 caused a far smaller decline

in the price of BMS stock, because, until the additional terms were disclosed on August

---

[16] Defendants' reliance on *In re Tellium, Inc. Securities Litigation* fails for the same reason – unlike the present case, in *Tellium*, there was an insufficient connection between the fraud and the alleged "corrective disclosure." No. 02-cv-5878 (FLW), 2005 U.S. Dist. LEXIS 26332, at *10-13 (D.N.J. Aug. 26, 2005). Moreover, in *In re Avista Corporation Securities Litigation*, 415 F. Supp. 2d 1214 (E.D. Wash. 2005), plaintiffs *admitted* that defendant's misrepresentations had not been disclosed to the public. *Id.* at 1219-20.

8, 2006, analysts, investors and the media still did not expect a truly "at risk" launch by Apotex given the risks such a launch would have normally entailed. ¶¶87-104.

Indeed, as analysts and the media immediately noted, it was the undisclosed settlement terms, themselves, that made a generic launch not only possible, but far more advantageous to Apotex. Thus, on August 8, 2006, Defendants – contrary to their often repeated statements that BMS would "vigorously" enforce its patents and any Apotex launch would be "at risk" – revealed that BMS had agreed to give Apotex a five-business-day window after its generic launch before BMS was permitted to seek a preliminary injunction, and the Company had relinquished its right to seek treble damages. ¶¶53, 58, 61, 63, 65, 67, 73, 77, 82, 95. These previously undisclosed terms not only increased the risk of a generic launch, but increased the risk that the launch would be successful and much more financially disadvantageous to BMS than if these terms had not existed.

Defendants point to three articles quoted in the Complaint, which they assert link the stock price decline on August 8, 2006 to the generic launch, and contend that these statements contradict Plaintiffs' theory that the revelation of the previously concealed settlement terms caused the decline. BMS Br. at 19. However, the Complaint contains specific quotations from media reports and analysts that emphasized the highly disadvantageous settlement terms agreed to by BMS and confirmed that the stock price drop was in reaction to the disclosure of those previously undisclosed terms. ¶¶37, 97-104. The fact that Defendants' selected excerpts of only three of the eight sources quoted in the Complaint mention some causal link between the generic launch and the stock price decline does not support Defendants' contention that the generic launch *solely* caused the stock price decline. Indeed, the news articles themselves highlight the

interdependence of the generic launch and the settlement terms.  The facts are before the

terms were disclosed, Apotex was not expected to launch a generic at risk due to the

danger of treble damages, but, after the disclosure, analysts assumed that Apotex would

launch a generic during the five-business-day window, at great financial cost to BMS.  ¶98.[17]

     Where Plaintiffs show that the corrective disclosures were related to the subject

matter of the fraud and defendants argue that some other event caused the stock drop, the

disputed facts are inappropriate for resolution at the pleading stage, and the motion to

dismiss should be denied.  *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*,

343 F.3d 189, 197 (2d Cir. 2003); *In re Openwave Sys. Sec. Litig.*, No. 07 Civ. 1309

(DLC), 2007 WL 3224584, at *14 (S.D.N.Y. Oct. 31, 2007); *Converium*, 2007 WL

2684069, at *4; *WorldCom*, 294 F. Supp. 2d at 428-29.

---

[17] *See also* ¶100 ("[t]he companies must wait five business days before seeking a federal injunction against Apotex's shipments, giving the generic company an opportunity to potentially flood the market with its generic drug. . . [The waiver of treble damages] removed one of the major deterrents to a generic competitor's entering the market while a drug is still under patent."); ¶102 ("Only a week ago, many of the same experts predicted a generic Plavix launch was unlikely); ¶104 ("the five-day window . . . is likely to have lasting effects on the market for Plavix . . . [T]he five-day window has opened the market to Apotex, which could flood the market with cheaper generic Plavix . . .").

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss.

Dated:  December 17, 2007

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP

By: /s/ Salvatore J. Graziano
Salvatore J. Graziano (SG-6854)
Jai K. Chandrasekhar (JC-3789)
Katherine M. Sinderson
1285 Avenue of the Americas
New York, NY 10019
Tel.:  212-554-1400
Fax:  212-554-1444

*Attorneys for Lead Plaintiff Ontario
Teachers' Pension Plan Board and
Lead Counsel for the Class*

KAPLAN FOX & KILSHEIMER
LLP
Frederic S. Fox (FF-9102)
Joel B. Strauss (JS-6585)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7714

-and-

LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
Richard A. Lockridge
Karen H. Riebel
100 Washington Avenue South,
Suite 2200
Minneapolis, MN 55401
Tel.: (612) 339-6900
Fax: (612) 399-0981

*Attorneys for Plaintiff Minneapolis
Firefighters' Relief Association*