# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BRISTOL-MYERS SQUIBB CO. SECURITIES LITIGATION | File No. 07-CV-5867 (PAC) |

## MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Max W. Berger
Salvatore J. Graziano
Jai Chandrasekhar
Boaz A. Weinstein
Katherine M. Sinderson
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 554-1400
Facsimile:   (212) 554-1444

Counsel for Lead Plaintiff and the Class

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   DESCRIPTION OF THE LITIGATION ......................................................... 3

      A.    Nature Of The Action ........................................................................... 3

      B.    Procedural History ............................................................................... 3

III.  ARGUMENT ................................................................................................... 4

      A.    The Settlement Warrants Final Approval ............................................. 4

            1.    Application Of The *Grinnell* Factors Supports Approval Of
                  The Settlement .......................................................................... 5

                  a)    The Complexity, Expense And Likely Duration Of
                        The Litigation Support Approval Of The Settlement ...... 5

                  b)    The Stage Of The Proceedings And The Amount Of
                        Discovery Completed  Support Approval Of The
                        Settlement ...................................................................... 6

                  c)    The Risks Of Establishing Liability And Damages
                        And In Maintaining The Class Action Through
                        Trial Support Approval Of The Settlement .................... 9

                  d)    The Range Of Reasonableness Of The  Settlement
                        Amount In Light Of The Best Possible Recovery
                        And All The Attendant Risks Of Litigation Support
                        Approval Of The Settlement .......................................... 12

                  e)    The Reaction Of The Class To The Settlement
                        Supports Its Approval ................................................... 17

            2.    The Arms'-Length Negotiations And Support By Lead
                  Plaintiff And Experienced Counsel Also Supports Approval
                  Of The Settlement .................................................................... 18

      B.    The Plan Of Allocation Is Fair And  Reasonable And Should Be
            Approved ............................................................................................ 20

      C.    The Notice To The Class Satisfied Due Process ................................ 23

IV.   CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                              **Page(s)**

*Am. Bank Note Holographics, Inc.,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)..............................................................................13, 20

*In re EVCI Career Colleges Holding Corp. Sec. Litig.,*
    2007 WL 2230177 (S.D.N.Y. July 27, 2007) ..........................................................................19

*City of Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974).............................................................................. passim

*D'Amato v. Deutsche Bank,*
    236 F.3d 78 (2d Cir. 2001)...............................................................................................18

*Feder v. Electronic Data Systems Corp.,*
    248 Fed. Appx. 579 (5th Cir. Sept. 25, 2007) (unpubl.)........................................................2

*Goldberger v. Integrated Res., Inc.,*
    209 F.3d 43 (2d Cir. 2000)..................................................................................................4

*Gordon v. Hunt,*
    117 F.R.D. 58 (S.D.N.Y. 1987) .........................................................................................24

*In re Austrian & German Bank Holocaust Litig.,*
    80 F. Supp. 2d 164 (S.D.N.Y. 2000).................................................................................18

*In re Bayer AG Sec. Litig.,*
    2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) .................................................................17, 21

*In re Crazy Eddie Sec. Litig.,*
    824 F. Supp. 320 (E.D.N.Y. 1993) ...................................................................................16

*In re Currency Conversion Fee Antitrust Litig.,*
    2006 WL 3253037 (S.D.N.Y. Nov. 8, 2006).....................................................................24

*In re Gilat Satellite Networks, Ltd.,*
    2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .................................................................5, 22

*In re Global Crossing Sec. & ERISA Litig.,*
    225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................................5, 21, 22

*In re Indep. Energy Holdings PLC Sec. Litig.,*
    2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003)..................................................................19

*In re Initial Public Offering Sec. Litig.,*
    2009 WL 1649704 (S.D.N.Y. June 10, 2009) ......................................................................4

*In re Lernout & Hauspie Sec. Litig.*,
    138 F. Supp. 2d 39 (D. Mass. 2001) .................................................19

*In re Luxottica Group S.P.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) ...................................................4

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) ................................................4, 5

*In re Nat'l Student Mktg. Litig.*,
    68 F.R.D. 151 (D.D.C. 1974)...........................................................6

*In re Nortel Networks Corp. Sec. Litig.*,
    2006 WL 3802198 (S.D.N.Y. Dec. 26, 2006) ...........................7

*In re PaineWebber P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 2007) ...................................13, 17, 20, 21

*In re Renaissance Holdings Ltd. Sec. Litig.*,
    2008 WL 236684 (S.D.N.Y. Jan. 18, 2008) ...............................20

*In re Sprint Corp. ERISA Litig.*,
    443 F. Supp. 2d 1249 (D. Kan. 2006)..........................................22

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ..............................................4, 6

*In re Telik Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)........................................5, 18

*In re Top Tankers, Inc. Sec. Litig.*,
    2008 WL 2944620 (S.D.N.Y. July 31, 2008) ...............................5

*In re Veeco Instruments, Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)..............................18, 20

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................17, 19, 20

*Mirfasihi v. Fleet Mortgage Corp.*,
    356 F.3d 781 (7th Cir. 2004) .......................................................22

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972).........................................................13

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
    237 F.R.D. 26 (E.D.N.Y. 2006) ...................................................9

*Sanofi-Synthelabo v. Apotex Inc.*,
    488 F. Supp. 2d 317 (S.D.N.Y. 2006) ................................................................10

*Strube v. American Equity Inv. Life Ins. Co.*,
    226 F.R.D. 688 (M.D. Fla. 2005) .........................................................................5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) .................................................................................18

*Warner Chilcott, Ltd. Sec. Litig.*,
    2009 WL 2025160 (S.D.N.Y. July 10, 2009) ............................................18, 20, 22

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982) .................................................................................18

*White v. First Am. Registry, Inc.*,
    2007 WL 703926 (S.D.N.Y. Mar. 7, 2007) ..........................................................5

## STATUTES, RULES & OTHER AUTHORITIES

15 U.S.C. § 78u-4(e)(1) .............................................................................................14

Federal Rules of Civil Procedure, Rule 23 ........................................................4, 24

H.R. Conf. Rep. No. 104-369 (1995) (reprinted in 1995 U.S.C.C.A.N. 730, 731, 1995
    WL 709276 (1995)) .........................................................................................19

# I.    INTRODUCTION

Lead Plaintiff, the Ontario Teachers' Pension Plan Board ("Lead Plaintiff" or "Ontario Teachers"), and Lead Counsel, on behalf of the Class, have succeeded in achieving a settlement with Defendants for $125 million in cash (the "Settlement Amount"), subject to final Court approval.[1]  Defendant Bristol-Myers Squibb Co. ("Bristol-Myers" or the "Company") deposited the Settlement Amount into an interest-bearing escrow account on August 31, 2009, and it has been earning interest for the benefit of the Class.

The Settlement was reached only after extensive litigation and negotiations overseen by an experienced mediator, Michael D. Young, Esq., and with the active participation of the Court-appointed Lead Plaintiff Ontario Teachers through its Senior Legal Counsel, Jeffrey M. Davis, who personally attended the mediation.  The proposed Settlement is an outstanding result for the Class, particularly in light of the risks that the Class faced if the case continued – including establishing scienter, the falsity of Defendants' statements, and the Class's full amount of damages at summary judgment or trial.[2]  In addition, litigating this complex securities fraud class action to completion would have resulted in significant expense and delay.

Following a hearing, on August 18, 2009, the Court granted preliminary approval of the Settlement, certified the Class, and approved of the proposed Notice to be sent to Class Members.[3]  Pursuant to the Court's Preliminary Approval Order, Lead Plaintiff, through the

---

[1]  The terms of the Settlement are set forth in the Stipulation and Agreement of Settlement dated July 21, 2009 (the "Stipulation"), previously submitted to the Court as Docket No. 69-1.  Unless otherwise indicated, all capitalized terms, not otherwise defined herein, are used as defined in the Stipulation.  A copy of the confidential Supplemental Agreement to the Stipulation was submitted to the Court *in camera* on August 19, 2009.

[2]  As set forth below, assuming all eligible Class Members file proofs of claim, the Settlement Amount represents 22% of the maximum recoverable Class damages, as estimated by Lead Plaintiff's damages expert, and an even higher recovery for the Class if Plaintiffs' aggregate estimated damages were reduced before or at trial based on arguments concerning loss causation.

[3]  *See* Order Preliminarily Approving Settlement And Providing For Notice ("Preliminary Approval Order," Docket No. 69).  The Court certified the following Class:

Claims Administrator, sent the Court-approved Notice to over 242,000 potential Class Members. The deadline for opting out of the Settlement, or objecting to the Settlement or Plan of Allocation, expired on November 17, 2009.

Notably, there are **no objections** to the Settlement or Plan of Allocation.[4]  In addition, there are only 70 individual requests for exclusion, representing fewer than 2,800 shares (only 0.001% of the estimated damaged shares), and no requests for exclusion by any institutional investors.  By comparison, while the deadline for submitting claim forms will not expire until December 30, 2009, approximately 8,100 claim forms have been submitted, representing approximately 72 million shares (already 24% of the estimated damaged shares).  Thus, the overwhelmingly favorable reaction of the Class further supports approval of the Settlement.

As set forth below, Lead Plaintiff and Lead Counsel, based upon their evaluation of the facts and applicable law and their recognition of the substantial risks and expense of continued

---

all persons and entities who purchased or acquired Bristol-Myers common stock during the period from after the close of the market on March 21, 2006, through August 8, 2006, inclusive, and suffered damages as a result. Excluded from the Class are (i) Defendants; (ii) members of the immediate families of individual defendants Dolan and Bodnar; (iii) any person who was an executive officer or director of Bristol-Myers during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant; (v) any person who actively participated in the alleged wrongdoing at issue; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.  Also excluded from the Class are any persons who exclude themselves by filing a request for exclusion in accordance with the requirements set forth in the Notice.

The Court also appointed Lead Plaintiff Ontario Teachers and named plaintiff Minneapolis Firefighters' Relief Association ("Minneapolis Firefighters") as the Class Representatives.  *Id.*

[4]  There is only one letter by an individual purporting to object to the attorneys' fees request. However, this letter fails to comply with the Notice requirements or even confirm that it is on behalf of a member of the Class, and thus lacks standing, as set forth in the accompanying Memorandum of Law In Support Of Lead Counsel's Motion For An Award Of Attorneys' Fees And Reimbursement Of Expenses.  *See, e.g., Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579, at *2 (5th Cir. Sept. 25, 2007) (unpubl.) ("[T]he right to object to settlement in a securities class action must rest on something more than the sort of bare assertions of stock ownership made by [the objector]"; finding lack of standing to object).

litigation, submit that the proposed Settlement is in the best interests of the Class, providing an outstanding recovery for the Class now. Accordingly, Lead Plaintiff respectfully moves for final approval of the Settlement, and approval of the Plan of Allocation for distribution of the net settlement proceeds.

## II.    DESCRIPTION OF THE LITIGATION

### A.    Nature Of The Action

This action arises out of Bristol-Myers' public disclosures about its attempts to settle patent litigation with a Canadian generic pharmaceutical company, Apotex, Inc., and its U.S. subsidiary, Apotex Corp. (collectively, "Apotex"). Under the proposed Apotex settlement, which required regulatory approval, Apotex agreed not to introduce an allegedly infringing generic equivalent of Bristol-Myers' largest-selling drug, Plavix, prior to the period established in the agreement. Lead Plaintiff alleges that Defendants failed to disclose to investors in connection with their public statements during the Class Period that Bristol-Myers had agreed to significant limitations on its damages and patent enforcement rights (including the availability of injunctive relief) against Apotex if the regulators rejected the settlement; that regulators had rejected the initial proposed settlement in a timely manner; and that the renegotiated settlement agreement contained certain alleged secret and unlawful oral representations that were not disclosed to investors or regulators.

Lead Plaintiff alleges that when this information was disclosed to the public – in a partial corrective disclosure on July 27, 2006, and a subsequent corrective disclosure on August 8, 2006 – the stock price of Bristol-Myers fell and investors suffered damages.

### B.    Procedural History

Lead Plaintiff respectfully refers the Court to the accompanying Graziano Declaration, which contains a detailed description of the procedural history of the litigation, the claims

3

asserted, the investigation and discovery undertaken, the negotiation and substance of the

Settlement, and the substantial risks and uncertainties of the litigation.[5]

## III.    ARGUMENT

### A.    The Settlement Warrants Final Approval

Under Fed. R. Civ. P. 23(e), a class action settlement should be approved if the Court

finds it "fair, reasonable, and adequate."  *See* Fed. R. Civ. P. 23(e)(2); *In re Merrill Lynch Tyco*

*Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008); *In re Luxottica Group S.P.A. Sec.*

*Litig.,* 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

The standards governing approval of class action settlements are well established in this

Circuit.   Pursuant to *City of Detroit v. Grinnell Corp.*, they include consideration of the

following factors:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction
> of the class to the settlement, (3) the stage of the proceedings and the amount of
> discovery completed, (4) the risks of establishing liability, (5) the risks of
> establishing damages, (6) the risks of maintaining the class action through the
> trial, (7) the ability of the defendants to withstand a greater judgment, (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery, [and] (9) the range of reasonableness of the settlement fund to a
> possible recovery in light of all the attendant risks of the litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds*, *Goldberger v.*

*Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also In re Initial Public Offering Sec. Litig.*,

2009 WL 1649704, at *27-*29 (S.D.N.Y. June 10, 2009); *In re Sumitomo Copper Litig.*, 189

---

[5] *See* Declaration of Salvatore J. Graziano In Support Of Lead Plaintiff's Motion For Final
Approval Of Settlement And Plan Of Allocation Of Settlement Proceeds And Lead Counsel's
Motion For An Award Of Attorneys' Fees And Reimbursement Of Expenses ("Graziano
Declaration" or "Graziano Decl."). The Graziano Declaration also attaches the following
supporting declarations and affidavits relevant to this Motion: (1) the mediator's declaration,
Declaration of Michael Young ("Young Decl.," Exh. A); (2) Lead Plaintiff's declaration,
Declaration of Jeffrey Davis ("Davis Decl.," Exh. B); (3) the declaration of Lead Plaintiff's
damages expert, Declaration of Keith A. Bockus ("Bockus Decl.," Exh. C); (4) the declaration of
Lead Plaintiffs' expert on settlements of patent litigation between brand-name and generic drug
manufacturers, C. Scott Hemphill ("Hemphill Decl.," Exh. D); and (5) the claims administrator's
affidavit, Affidavit of Stephen J. Cirami ("Cirami Aff.," Exh. E).

4

F.R.D. 274, 281 (S.D.N.Y. 1999).

"In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'"[6]  In deciding whether to approve a settlement, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another."  *White v. First Am. Registry, Inc.*, 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007).

### 1.    The *Grinnell* Factors Support Approval Of The Settlement

#### a)    The Complexity, Expense And Likely Duration Of The Litigation Support Approval Of The Settlement

The established policy favoring settlement of disputed claims is even stronger for class actions due to the associated expense, complexity, and delays.  *See In re Top Tankers, Inc. Sec. Litig.*, 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008).  Indeed, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *Id.*

In this particular area of law, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute."  *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).  Thus, "in evaluating the settlement of a securities class action, federal courts . . . 'have long recognized that such litigation is notably difficult and notoriously

---

[6]  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 134 (S.D.N.Y. 2008). For example, here the Defendants' ability to withstand a greater judgment is not at issue.  Most importantly, "this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied." *In re Telik Sec. Litig.*, 576 F. Supp. 2d 570, 581 (S.D.N.Y. 2008).  Here, as discussed below, in the totality of the circumstances, the remaining *Grinnell* factors, which support final approval of the Settlement for this Action, should be given greater consideration.

uncertain.'" *Sumitomo*, 189 F.R.D. at 281 (citations omitted).

There is no doubt that this securities class action involves complex factual and legal issues. As detailed in the Graziano Declaration, the various risks and obstacles confronting the Class – including, for example, establishing scienter, falsity, loss causation and damages – would necessarily "flow from the complexities and difficulties inherently involved in shareholder securities fraud litigation." *In re Nat'l Student Mktg. Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974). *See* Graziano Decl. ¶¶83-93.

As set forth in the Graziano Declaration, Defendants were prepared to offer numerous defenses in this action, including an affirmative defense of reliance on counsel; a defense asserting that all of their Class Period statements were true and complete when made; and a defense based on loss causation challenging Plaintiffs' ability to recover damages from the two corrective disclosure dates identified by Plaintiffs' damages expert. *See* Graziano Decl. ¶¶84-92. Lead Plaintiff and Lead Counsel have carefully considered the difficulties in establishing liability and damages, and the risk that some or all of the Class claims could be dismissed at the summary judgment phase, that an unpredictable jury could find in Defendants' favor, or that an appellate court might overturn any decision in the Class's favor. Lead Plaintiff and Lead Counsel also carefully considered the expense and length of continued proceedings necessary to pursue the Class claims against Defendants through trial and appeal, and the certainty of payment now as opposed to having to wait years for a final resolution after a jury trial and the appeals that would inevitably follow. Settlement at this juncture unequivocally avoids substantial, continued and uncertain litigation through further discovery, summary judgment, a protracted trial, and post-trial proceedings.

> **b)** **The Stage Of The Proceedings And The Amount Of
> Discovery Completed Support Approval Of The Settlement**

The stage of the proceedings and extent of discovery factors are benchmarks used by

court to determine if plaintiffs have "sufficient information to make an informed judgment on the reasonableness of the settlement proposal." *In re Nortel Networks Corp. Sec. Litig.*, 2006 WL 3802198, at *5 (S.D.N.Y. Dec. 26, 2006).

Lead Counsel expended significant time and money analyzing and litigating the key legal and factual issues in this case. As detailed in the Graziano Declaration, at the outset of this litigation, Lead Counsel conducted an extensive investigation into Defendants' alleged wrongful conduct, including among other things, reviewing statements made by Defendants (including those made in regulatory filings, press releases, conference calls, news articles and analysts' reports), researching patent law and the Company's prior business practices, reviewing in depth the Apotex patent litigation filings and hearing transcripts, analyzing the Company's guilty plea and executive terminations, researching the law related to Defendants' anticipated motions to dismiss, and obtaining the assistance of experts in loss causation and damages. Lead Counsel's investigation uncovered substantial information about the events discussed above, which formed the basis of Lead Plaintiff's detailed and particularized 72-page Amended Complaint. Graziano Decl. ¶¶36-37.

Each Defendant then separately moved to dismiss. Following extensive briefing and a hearing, the Court issued an Opinion and Order denying Defendants' motions to dismiss, and sustaining the Amended Complaint under the heightened pleading standards of the Private Securities Litigation Act of 1995 ("PSLRA"). Graziano Decl. ¶48.

Following the Court's denial of Defendants' motions to dismiss, Lead Plaintiff actively pursued discovery. Beginning in September 2008, Lead Plaintiff issued 46 subpoenas to non-parties, (with the Court's assistance) served letters rogatory on Canadian corporation Apotex Inc. and its officers; and served document requests on all Defendants. Graziano Decl. ¶¶55-64.

Ultimately, Defendants and non-parties produced more than 740,000 pages of documents

in response to Lead Plaintiff's document requests, subpoenas and Freedom of Information law requests. At the time the parties agreed to settle – only seven weeks prior to the fact discovery cut-off – Lead Plaintiff had noticed and was scheduling, and was fully prepared to take, the depositions of sixteen (16) witnesses. *See* Graziano Decl. ¶71.

The time expended and the facts gathered by Lead Counsel were extensive and provided a more than sufficient basis for Lead Counsel and Lead Plaintiff to conduct settlement negotiations and make an informed judgment regarding the reasonableness of the Settlement.

On April 16, 2009, Lead Plaintiff and Bristol-Myers, through counsel, participated in a mediation session before Michael D. Young, Esq. at JAMS in New York City. Lead Plaintiff, through its Senior General Counsel, Jeffrey M. Davis, attended in person and actively participated in the mediation session. In advance of the mediation session, the parties prepared detailed mediation statements. At the mediation session, the parties presented their respective views regarding the merits of the action, as well as their views concerning available defenses, potential sources of recovery, the evidence and damage analyses. *See* Young Decl., ¶¶3-9. Although there was no settlement reached at the conclusion of that session, after additional discussions and with the continued assistance of Mr. Young, the parties reached an agreement in principle to settle this action on the terms set forth in the Stipulation. *Id.* Before entering into the Stipulation, however, Lead Counsel conducted additional discovery to confirm the fairness of the Settlement, taking the depositions of Sandra Leung, Bristol-Myers' General Counsel, and Susan Webster, a corporate partner at Cravath, Swaine & Moore LLP who provided advice to Bristol-Myers on disclosure issues. As a result, Lead Plaintiff and Lead Counsel received further validation of the reasonableness and adequacy of the Settlement. Graziano Decl. ¶¶75-80.

In sum, Lead Plaintiff actively prosecuted this case for the benefit of the Class for over two years. Thus, the parties reached an agreement to settle the litigation at a point when they

were "well informed as to the operative facts" and "considerable risks" of the action.  *Reade-*

*Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006).

c)      **The Risks Of Establishing Liability And
Damages And In Maintaining The Class Action
<u>Through Trial Support Approval Of The Settlement</u>**

*Grinnell* teaches that, in assessing the fairness, reasonableness and adequacy of a

settlement, courts should consider such factors as the "risks of establishing liability," "the risks

of establishing damages," and "the risks of maintaining the class action through the trial." 495

F.2d at 463 (citations omitted).

Based on their extensive prosecution of the case, Lead Plaintiff and Lead Counsel

understood that there were very real obstacles that Lead Plaintiff faced in establishing, among

other things, that the statements by Defendants were, in fact, false; that Defendants acted with

scienter; and that Plaintiffs' view of loss causation and damages would prevail.

With regard to scienter, Defendants would have argued that they relied on the advice of

their outside counsel, Cravath, Swaine & Moore LLP ("Cravath"), in making the disclosures at

issue in this case.  Indeed, the Company's outside counsel testified that she had advised Bristol-

Myers that its disclosures were appropriate.  Moreover, Defendants would have argued that the

decisions were approved by a special disclosure committee at Bristol-Myers, the Exceptional

Circumstances Disclosure Committee ("ECDC"), which reviewed the disclosures with outside

counsel; and that the challenged disclosures were also reviewed by Frederick B. Lacey, Bristol's

federally-appointed monitor and a former U.S. District Court Judge.[7]

---

[7]  Graziano Decl. ¶84.  As part of the Settlement, Bristol-Myers has represented that, notwithstanding the fact that it has no continuing legal obligation to maintain its ECDC or its Disclosure Policy and Review Committee ("DPRC"), it intends to maintain in place both the ECDC and the DPRC in the same or similar manner as they presently function and that it has no current plan or intention to discontinue these committees or their roles in the Company's disclosure processes.

With regard to falsity, Defendants would have contended that there were no material misstatements or omissions because the Company's statements during the Class Period were all literally true and/or the Company repeatedly warned investors of the risk that the Apotex settlement would not be approved. As Lead Plaintiff learned in discovery, Defendants had previously commissioned a report by outside counsel, which they presented to the Securities and Exchange Commission, addressing whether Bristol-Myers had violated any federal securities laws in connection with the Apotex settlement. This report, which was based on interviews of fifteen witnesses and "extensive documentary records" concluded that the omitted information was not material, that Defendants' disclosures were appropriate, and that Defendants did not violate the federal securities laws. Graziano Decl. ¶86.

Events subsequent to the Class Period could lend some superficial support to the Company's claims that its promise to "vigorously pursue" the litigation against Apotex were accurate. Bristol-Myers did go on to prevail at trial against Apotex, successfully defended that judgment on appeal to the Second Circuit, and recently the Supreme Court declined Apotex's request for a writ of *certiorari* to appeal the Second Circuit's ruling. Defendants also would have continued to claim that the use of the phrase "at risk" was appropriate for the circumstances in which it was used, and that the phrase does not have the strict meaning ascribed to it that Lead Plaintiff alleged. In this regard, Defendants could cite to the observation of the trial court in the Apotex litigation that the Apotex launch was "at risk." *Sanofi-Synthelabo v. Apotex Inc*., 488 F. Supp. 2d 317, 321 (S.D.N.Y. 2006) (Stein, J.). Furthermore, Defendants could continue to argue that the rejection by the state attorneys general of the original settlement was immaterial, because, rather than stymieing settlement efforts altogether, the rejection resulted in a renegotiated settlement and was thus not necessary to disclose as a mere delay. Graziano Decl. ¶87. Similarly, Defendants would argue that the undisclosed settlement terms were not material

because Bristol's counsel had not planned on seeking injunctive relief at the time the disclosure decisions were made.

Defendants also would argue that contrary to the allegations in the Amended Complaint, the Company did not enter into any oral side agreements with Apotex. Although the Company and Defendant Bodnar pled guilty in separate actions to making false statements to the government related to the alleged oral side agreements, they never admitted to the existence of the oral side agreements as alleged in the Amended Complaint. Indeed, the recent Sentencing Memorandum filed in support of Bodnar in connection with his guilty misdemeanor plea for filing a false document with the FTC, asserts that Bodnar was unaware of the inaccuracy at the time he signed a certification on behalf of his employer, Bristol-Myers. The Sentencing Memorandum paints a picture of a distinguished physician devoted to the service of others, which was supported by numerous supporting letters, including by the Presiding Partner at Cravath, Evan Chesler, and Retired Judge Lacey.[8] In addition, Defendant Bodnar would have continued to argue that he could not be held liable under Section 10(b) of the Exchange Act because he did not make any of the alleged false statements.

While Lead Plaintiff believed that it had gathered sufficient evidence to counter each of these defenses, there was significant uncertainty as to whether it would do so. For example, with regard to scienter, Lead Plaintiff had identified contemporaneous documents indicating that outside counsel deferred to the Company, which had its own investor relations divisions, with regard to materiality determinations. However, there was significant uncertainty as to whether Plaintiffs could establish scienter at trial given the testimony of distinguished outside counsel, including the heads of Cravath's corporate and litigation departments, Susan Webster and Evan

---

[8] *See United States v. Bodnar*, 08-CR-115 (RMU) (D.D.C.), Sentencing Memorandum On Behalf Of Dr. Andrew G. Bodnar, filed May 28, 2009, Docket No. 44.

Chesler, and a former federal judge, Judge Lacey.  *See* Graziano Decl. ¶84.

Lead Plaintiff and Lead Counsel also considered that, even if Lead Plaintiff were to prevail on the merits, the ability to recover as much as the Settlement Amount on a judgment, much less *more* than the Settlement Amount, was far from certain.  As explained below, Lead Plaintiffs have achieved a recovery of 22% of the maximum recoverable class damages alleged in this case assuming a full claims response by the Class.  Significantly, Defendants would have argued that the declines in the share price of Bristol-Myers common stock were only partially related to the alleged fraud, if at all, and thus neither loss causation nor damages would be established.  Graziano Decl. ¶¶91-92.

Finally, even if Lead Plaintiff achieved a favorable jury verdict after trial, there is no doubt Defendants would have appealed in a case of this magnitude.  Any appeal would significantly delay any distribution of funds to the Class and raised *de novo* the issues of Defendants' statements being actionable, reliance on counsel and loss causation and damages in the appellate courts.  In light of these risks, Lead Plaintiff and Lead Counsel believe that the immediate and certain recovery of a $125 million cash settlement – rather than recovery of an uncertain amount, or possibly no recovery, after years of costly litigation – represents an excellent result for the Class.

**d)     The Range Of Reasonableness Of The
Settlement Amount In Light Of The Best
Possible Recovery And All The Attendant Risks
<u>Of Litigation Support Approval Of The Settlement</u>**

Courts also consider the range of reasonableness of the settlement amount in light of (i) the best possible recovery and (ii) litigation risks.  In analyzing these factors, the issue for the Court is not whether the settlement represents the "best possible recovery," but how the settlement relates to the strengths and weaknesses of the case.  *Grinnell*, 495 F.2d at 463.  The court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the

12

parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Id.* at 462 (citations omitted). Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *PaineWebber*, 171 F.R.D. at 130 (citations omitted). Instead, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

In this action, Lead Plaintiff retained a damages expert, Keith Bockus, who would have opined at trial on what the "true value" of Bristol-Myers common stock would have been during the Class Period had there been no fraud, and the damages expert would have explained how stock movements in response to subsequent disclosures confirmed the extent of fraud-induced price inflation. Defendants likewise retained their own experts. Ultimately, proving damages could come down to "a battle of the experts," and it is impossible to predict which expert and theory of damages the jury would accept. *See Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001) ("[i]n such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses"); *PaineWebber*, 171 F.R.D. at 129 ("damages are a matter for the jury, whose determinations can never be predicted with certainty").

As explained in the Bockus Declaration, in calculating potential recoverable aggregate damages, Lead Plaintiff's damages expert calculated the artificial inflation in Bristol-Myers common stock. Bockus Decl. ¶¶9-27. Specifically, as explained in the Notice, the estimated artificial inflation in Bristol-Myers common stock for the period from March 21, 2006, through July 26, 2006, was $3.68 per share. $3.68 per share was the maximum amount of alleged artificial inflation per share that existed during the Class Period. Following a July 27, 2006 partial corrective disclosure, the artificial inflation decreased to $1.59 per share until

August 8, 2006.

The artificial inflation was calculated based on an event study methodology, a standard statistical methodology to measure company-specific stock price movements independent of other market forces. Based on, *inter alia,* the event study, Lead Plaintiff's damages expert identified two corrective disclosure dates of July 27, 2006 (when Bristol-Myers disclosed that the U.S. Department of Justice's anti-trust division had launched a criminal investigation regarding the proposed settlement between Bristol-Myers and Apotex), and August 8, 2006 (when Bristol-Myers revealed the previously undisclosed Apotex settlement terms). Bockus Decl. ¶13.

All of the alleged artificial inflation, however, was not legally recoverable in this case. The PSLRA expressly limits recoverable damages based on the average trading price per share during the 90-day look-back period (the "90-Day Look-Back Cap").[9]    As discussed in the Bockus Declaration (¶¶26-27) and demonstrated in Exhibits 5 and 6 thereto, because the price of Bristol-Myers common stock rebounded within the 90 days following the end of the Class

---

[9]  Specifically, Section 21D(e) of the PSLRA, 15 U.S.C. § 78u-4(e)(1), entitled "Limitation on Damages," provides as follows:

(1) In general. – Except as provided in paragraph (2), in any private action arising under this Chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."

(2) Exception. – In any private action arising under this Chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

(3) Definition – For purposes of this subsection, the 'mean trading price' of a security shall be an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period referred to in paragraph (1).

Period, the amount of aggregate recoverable damages was reduced.[10]

Calculated in light of the PSLRA 90-day Lookback Cap and based on the event study analysis, Lead Plaintiff's damages expert estimated that the Class's maximum aggregate recoverable damages are $566 million, with an estimated 296 million shares of Bristol-Myers stock potentially damaged. *See* Bockus Decl. ¶27. The Settlement Amount ($125 million) is thus approximately 22% of the maximum estimated aggregate damages. Critically, this damages estimate assumes that Lead Plaintiff would have been successful on all its claims against all Defendants for the entire Class Period, and based on both corrective disclosures, and full claims participation by the Class.

With regard to the alleged July 27, 2006 corrective disclosure, however, Defendants would have continued to argue that the mere disclosure of the federal investigation did not reveal the subject matter of the non-disclosures alleged in the Amended Complaint, and thus, according to Defendants, cannot constitute a "corrective" disclosure because it does not correct any previous omissions or false or misleading statements. Graziano Decl. ¶92. If the Court or jury agreed with this argument, maximum recoverable damages would be reduced to $375 million. Under that measurement, the Settlement that Lead Plaintiff achieved represents a recovery of 33% of the estimated recoverable damages (assuming all Class Members file proofs of claim).

With regard to the alleged August 8, 2006 corrective disclosure, Defendants would have argued that the fall in the share price of Bristol-Myers stock was reflective of the news that Apotex actually had launched its generic version of Plavix on that date, and not the disclosure of the previously undisclosed terms of the settlements with Apotex. If Defendants prevailed on this

---

[10] Bockus Decl. ¶27. Pursuant to Section 21D(e)(1), the 90-day look-back period begins "on the date on which the information correcting the misstatement or omission that is the basis of the action is disseminated to the market." In this case, that date is August 8, 2006. The ninetieth day of the look-back period is November 5, 2006, which is a Sunday. Thus, the last day of the look-back period is November 3, 2006, because it was the final trading day within the 90-day period.

contention, the Class would have maximum recoverable damages of $462 million based on the July 27, 2006 stock price decline.  Under that measurement, the Settlement that Lead Plaintiff achieved represents a recovery of 27% of the estimated recoverable damages (assuming all Class Members file proofs of claim).  *See* Graziano Decl. ¶ 92; Bockus Decl. ¶30.

Thus, the percentage of recovery would be significantly higher if certain defense arguments regarding other potential damages limitations were to be accepted by the time of trial. Furthermore, if Defendants prevailed on their contentions with respect to both corrective disclosure dates, there would be no damages as a matter of law.  Graziano Decl. ¶92.  Even though Lead Plaintiff and its expert have valid responses to these arguments, a jury may have ultimately been persuaded by Defendants' arguments and found in Defendants' favor as to one or both of these corrective disclosure dates.

In addition, these percentage of aggregate damages estimates assume a full claims response by the Class.  However, as explained by Plaintiffs' damages expert, studies indicate that a substantial percentage of class members may elect not to file claims.  Bockus Decl. ¶28.

Lead Plaintiff therefore submits that the Settlement is well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation, especially when compared to other class action settlements.  *See, e.g., Grinnell,* 495 F.2d at 455 (affirming approval of settlement that was between 3.2% and 12% of recoverable damages; "[i]n fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery") (affirming in part *City of Detroit v. Grinnell Corp.,* 356 F. Supp. 1380, 1386 (S.D.N.Y. 1972) (approving settlement valued at 3.2% to 3.7% as "'well within the ball park'")); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (settlement of between 6% and 10% of damages).

### e)    <u>The Reaction Of The Class Supports Approval</u>

The reaction of the Class to the Settlement is a significant factor in determining the adequacy of the Settlement.  *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (citation omitted).  "[T]he absence of objections may itself be taken as evidence of the fairness of a settlement."  *In re Bayer AG Sec. Litig.*, 2008 WL 5336691, at *3 (S.D.N.Y. Dec. 15, 2008) (citing *In re PaineWebber P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 2007)).

In this case, pursuant to the Court's Preliminary Approval Order, Lead Plaintiff, through the Claims Administrator, sent the Court-approved Notice to over 242,000 potential Class Members.  *See* Cirami Aff., ¶¶3-6, attached as Exh. E to Graziano Decl.  The deadline for opting out of the Settlement, or objecting to the Settlement or the plan of allocation, expired on November 17, 2009.

Notably, there are ***no objections*** to the proposed Settlement or Plan of Allocation.  In addition, there are only 70 individual requests for exclusion, representing fewer than 2,800 shares (only 0.001% of the estimated damaged shares), and no requests for exclusion by any institutional investors.[11]  By comparison, while the deadline for submitting claim forms will not expire until December 30, 2009, approximately 8,100 claim forms have been submitted, representing approximately 72 million shares (already 24% of the estimated damaged shares). *See* Cirami Aff. ¶11.  Thus, the overwhelmingly favorable reaction of the Class further supports approval of the Settlement.  *See In re Warner Chilcott, Ltd. S*ec. Litig., 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (citation omitted); *In re Bayer AG,* 2008 WL 5336691, at *3 (citation omitted).

---

[11] *Id.*  Many of the requests for exclusion fail to contain the information required by the Court-approved Notice.

2.     **The Arm's-Length Negotiations And Support By Lead Plaintiff And Experienced Counsel Also Supports Approval Of The Settlement**

In assessing whether a settlement is fair, reasonable and adequate, courts often examine "the negotiating process by which the settlement was reached" to determine whether the settlement was the result of "arm's-length negotiations" between counsel "with the experience and ability . . . necessary [for] effective representation of the class's interests." *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). Where, as here, the settlement is the product of "arm's length negotiations conducted by experienced, counsel" the negotiations enjoy a presumption of fairness. *Warner Chilcott*, 2009 WL 2025160, at *1 (citing *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000)); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008); *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Throughout the litigation and settlement negotiations, Defendants have been represented by experienced counsel from prominent law firms. Bristol-Myers was represented by Debevoise & Plimpton LLP; Defendant Dolan was represented by Weil, Gotshal & Manges LLP; and Defendant Bodnar was represented by Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., all firms having substantial experience in this type of litigation. Counsel for Defendants were well-informed and their representation of the Defendants was no less rigorous than Lead Counsel's representation of the Class.

As a result, the parties' settlement negotiations were extensive and hard-fought. As discussed in the Graziano and Young Declarations, the parties' mediation at first failed to result in a settlement, but the mediator, Michael D. Young, Esq., continued additional discussions with

the parties, assessing the strengths and weaknesses of each party's position in the litigation. Young Decl. ¶¶3-9. Even after entering into the Stipulation, Lead Plaintiff conducted additional discovery to confirm the fairness, adequacy and reasonableness of the Settlement. Graziano Decl. ¶¶75-80.

There is no doubt that the Settlement was reached without collusion and after good-faith bargaining between the parties. The arm's-length negotiations support approval of the Settlement. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("the fact that the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable").

Furthermore, in enacting the PSLRA, Congress sought to encourage sophisticated institutional investors to play an active role in prosecuting cases under the securities laws. *See In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d 39, 43 (D. Mass. 2001) (citing H.R. Conf. Rep. No. 104-369, at 32 (1995) (reprinted in 1995 U.S.C.C.A.N. 730, 731)). Congress believed that increasing the role of institutional investors would "ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions." H.R. Conf. Rep. No. 104-369, at 34. Thus, a settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness." *Veeco*, 2007 WL 4115809, at *5; *see In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007) (same). Here, as detailed in the Davis Declaration, Lead Plaintiff, the Ontario Teachers' Pension Plan Board, a sophisticated institutional investor with experience litigating securities fraud class actions on behalf of investors, took an active role in the litigation, as envisioned by the PSLRA. Indeed, Lead Plaintiff personally participated through its Senior General Counsel in the

mediation, and has approved the Settlement.  *See* Davis Decl. ¶¶9-11.

Likewise, Lead Counsel, who has extensive experience prosecuting complex securities class actions and is intimately familiar with the facts of this case, believes that the Settlement is not just fair and adequate, but is an excellent result for the Class.  Graziano Decl. ¶¶6, 117.  This opinion is entitled to "great weight."  *PaineWebber*, 171 F.R.D. at 125; *see also Veeco*, 2007 WL 4115809, at *12; *Am. Bank Note Holographics*, 127 F. Supp. 2d at 430.

### B.     The Plan of Allocation is Fair and <u>Reasonable and Should Be Approved</u>

A plan for allocating the net settlement proceeds "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *Warner Chilcott*, 2009 WL 2025160, at *2 (citing *Maley,* 186 F. Supp. 2d at 367); *In re Renaissance Holdings Ltd. Sec. Litig.*, 2008 WL 236684, at *2 (S.D.N.Y. Jan. 18, 2008).  Because it is impossible in a large class to calculate each member's claim with mathematical precision, courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information."  *PaineWebber*, 171 F.R.D. at 133.

Here, pursuant to the Stipulation, the entire net settlement fund will be distributed to Class Members who submit valid claim forms; there will be no reversion of any monies to Defendants.  The Plan of Allocation, which was prepared with the assistance of Lead Plaintiff's damages expert, provides for the distribution of the net settlement fund on a fully *pro rata* basis based on a formula consistent with Lead Plaintiff's allegations and tied to the expert's damages analysis.  *See* Bockus Decl. ¶¶2, 9-22.  Specifically, the Plan provides for distribution based on the Recognized Loss Amount calculated according to the date the common stock was purchased and subsequently sold.  As explained in the Court-approved Notice, the Claims Administrator's calculation of the Recognized Loss Amount will depend upon several factors, including:  (i)

when the Bristol-Myers common stock was purchased or acquired; and (ii) whether they were held past the corrective disclosures on July 27, 2006, and/or August 8, 2006, or the conclusion of the 90-day look-back period, or sold during the Class Period or during the 90-day look-back period, and if so, when they were sold.

As further explained in the Notice, in order to have recoverable damages, disclosure of the alleged misrepresentations must be the cause of the decline in the price of the security.  As discussed above, alleged corrective disclosures that removed the alleged artificial inflation from the price of Bristol-Myers common stock occurred on July 27, 2006, and August 8, 2006 (the "Corrective Disclosure Dates").  Accordingly, in order to have been damaged by the alleged fraud (and thus potentially receive a recovery under the Plan of Allocation), a Class Member must have purchased during the Class Period and held past at least one of these disclosures.  If the shares were not held over a Corrective Disclosure Date, then the Recognized Loss Amount is $0 because Lead Plaintiff's damages expert determined that the alleged artificial inflation between the time the shares were purchased and the time the shares were sold remained constant, and thus any loss suffered is not compensable under the federal securities laws.  The Recognized Loss Amount is calculated using the artificial inflation as calculated by Lead Plaintiff's damages expert pursuant to an event study, and takes into account the 90-day Lookback Cap, as discussed above.

Courts in this District have approved of plans of allocation, like the one proposed here, that "takes into account when individual class members purchased and sold their common stock," where there is "no objection to the plan of allocation," and where "its features are consistent with other plans that have been approved in this district."  *Warner Chilcott*, 2009 WL 2025160, at *2 (citations omitted); *Bayer*, 2008 WL 5336691, at *3 (citing *Global Crossing*, 225 F.R.D. at 463 and *PaineWebber*, 171 F.R.D. at 135).  Here, the proposed Plan of Allocation is

consistent with other plans approved in this district, and is virtually identical in all relevant aspects to the plan of allocation approved by Judge Scheindlin less than one year ago in *In re Scottish Re Group Sec. Litig.*, Master File No. 06-CV-5853 (S.D.N.Y.).[12]

The Court-approved Notice further explains the minimum claim amount of $10.00, *i.e.,* that a payment to any Authorized Claimant that would amount to less than $10.00 in total will not be distributed, but the amount will remain in the fund and be distributed to other Class Members receiving larger amounts. Courts routinely approve settlements that require a class member's payment to exceed a minimum threshold in order to recover from a settlement fund. *See, e.g., In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1268 (D. Kan. 2006) ($25 minimum allowed); *Global Crossing*, 225 F.R.D. at, 463 ($10 minimum allowed); *see also Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 783 (7th Cir. 2004) (Posner, J.) (stating that a settlement may give nothing to people with claims "worth too little to justify a distribution").

As explained in the affidavit of the Claims Administrator, this is necessary given the costs involved in the claims administration process and the need to prevent depletion of the settlement fund to pay *de minimis* claims at the expense of claimants who suffered more substantial losses. *See* Cirami Aff. ¶12. A ten dollar minimum is frequently selected and approved as the threshold amount. *See Gilat Satellite Networks*, 2007 WL 1191048, at *9 ("*de minimus* thresholds for payable claims are beneficial to the class as a whole since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs and courts have frequently approved such thresholds, often at $10."). Indeed, in *Global Crossing Sec. & ERISA Litig.*, Judge Lynch expressly held that a $10

---

[12] *See* Final Judgment And Order dated December 10, 2008, Docket No. 133 in 06-CV-5853, ¶5, approving proposed plan of allocation described in class notice, attached as Exh. A to Docket No. 131-2. In *Scottish Re*, like here, a stock price bounce-back following the final corrective disclosure resulted in the plan of allocation accounting for the 90-day Lookback Cap. The types of securities other than common stock that were at issue in *Scottish Re*, and the "Offset Per Share" in that case, however, are not at issue in this case.

minimum claim threshold was reasonable, stating "Securities Lead Counsel acted reasonably in including a $10 de minimis threshold in the allocation plan, in order to preserve the settlement fund from excessive and unnecessary expenses in the overall interests of the class as a whole." 225 F.R.D. at 463.

The Court-approved Notice was sent to over 242,000 potential Class Members, and there have been no objections to the Plan of Allocation.  Accordingly, for all of the reasons set forth herein and in the Graziano and Bockus Declarations, the Plan of Allocation is fair and reasonable, and should be approved.

### C.    The Notice to the Class Satisfied Due Process

The Court's Preliminary Approval Order appointed the firm of The Garden City Group, Inc. ("Garden City"), as the Claims Administrator to supervise and administer the notice procedure as well as the processing of claims pursuant to the Plan of Allocation.  *See* Preliminary Approval Order ¶6.  Following a competitive bidding process with three claims administrators, and with the approval of the Lead Plaintiff, Lead Counsel selected Garden City.  *See* Graziano Decl. ¶101; Cirami Aff. ¶13.

As required by the Court's Preliminary Approval Order, Garden City notified potential Class Members of the Settlement by mailing a copy of the Notice and the Proof of Claim Form and Release (the "Claim Form"), by first-class mail, postage prepaid, to all members of the Class at the address of such Class member as set forth in the records of Bristol-Myers or its transfer agent, or who were identified by further reasonable efforts.  Cirami Aff. ¶¶3-6.  In addition, the Court-approved Publication Notice or "Summary Notice" was published once each in the national edition of *The Wall Street Journal* and over the PR Newswire on September 11, 2009. *Id.* ¶7.  The Notice and the Summary Notice also referenced the Internet websites for Lead Counsel and the Claims Administrator where Class Members could view and download the

Notice and Proof of Claim form. *Id.* ¶9; Graziano Decl. ¶104. This method of giving notice, previously approved by the Court, is appropriate because it directs notice in a "reasonable manner to all class members who would be bound by the propos[ed judgment]." Fed. R. Civ. P. 23(e) (1).

Courts have found that notice substantially equivalent to that provided for in the instant Settlement constituted the "best notice that is practicable under the circumstances," satisfying the requirements of Fed. R. Civ. P. 23(c)(2)(B), due process and the PSLRA. *See In re Currency Conversion Fee Antitrust Litig.*, 2006 WL 3253037, at *2 (S.D.N.Y. Nov. 8, 2006) (finding notice given to members of the plaintiff class by publication and by mail, complied with all the requirements of due process, all requirements of Rule 23 of the Federal Rules of Civil Procedure, and constituted the best practicable notice under the circumstances); *Gordon v. Hunt*, 117 F.R.D. 58, 63 (S.D.N.Y. 1987) (combination of mailed and published notice is "long-accepted norm in large class actions").

The Court-approved Notice was sent to over 242,000 potential Class Members, informing them of the Settlement. *See* Cirami Aff. ¶6. In addition to other pertinent information regarding the Settlement, the Notice included all of the information required by Federal Rule of Civil Procedure 23(c)(2) and the PSLRA, including the following: (a) the amount of the Settlement proposed to be distributed to the parties to the action; (b) an explanation regarding the attorneys' fees and costs sought; (c) the name, telephone number, and address of Lead Counsel who will be reasonably available to answer questions from Class Members concerning any matter contained in the Notice; (d) a statement explaining the reasons why the parties propose the Settlement; (e) a description of the proposed Plan of Allocation; and (f) the rights of every Class Member, including their right to opt-out or object to the Settlement, the requested attorneys' fees and expenses, and/or the Plan of Allocation. *Id.* at Exh. A.

Further, pursuant to PSLRA requirements, the Notice also stated the estimated average gross recovery per damaged share, $0.42. This number is calculated by dividing the gross settlement amount ($125 million) by the number of estimated damages shares (296 million). As explained in the Bockus Declaration, this assumes that 100% of the damages shares submit valid claim forms. Studies indicate that, in reality however, a substantial percentage of class members may elect to not file claims. To the extent that Class Members do not file claims, the recovery per share for valid claims filed will increase.[13]

In sum, because the Notice fairly apprised the potential Class Members of the Settlement and their individual rights with respect thereto, and satisfied due process, Rule 23 and the PSLRA, it should be approved.

## IV. <u>CONCLUSION</u>

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement as fair, reasonable and adequate; approve the Plan of Allocation as fair

---

[13] *See* Bockus Decl. ¶28 (citing James D. Cox & Randall S. Thomas, "Leaving Money on the Table: Do Institutional Investors Fail to File Claims in Securities Class Actions?" 80 Wash. U. L. Q. 855 (2002); James D. Cox and Randall S. Thomas, "Letting Billions Slip Through Your Fingers: Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements," DUKE L. Sch. Legal Stud. Res. Paper Series, Research Paper No. 95 (January 2006); Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions," 41 UCLA L. REV., 1421 (1994); Christiane Bird, "Pension Plans Miss Out on Much Cash By Failing to File in Class-Action Cases," Wall St. J. (Sept. 4, 2001)).

and reasonable; and enter the accompanying proposed Order and Final Judgment.

Dated:  November 20, 2009                    Respectfully submitted,

                                             **BERNSTEIN LITOWITZ BERGER**
                                                **& GROSSMANN LLP**

                                             By:___*/s/ Salvatore Graziano*___
                                                    Max W. Berger
                                                    max@blbglaw.com
                                                    Salvatore J. Graziano
                                                    sgraziano@blbglaw.com
                                                    Jai Chandrasekhar
                                                    jai@blbglaw.com
                                                    Boaz A. Weinstein
                                                    boaz@blbglaw.com
                                                    Katherine M. Sinderson
                                                    Katiem@blbglaw.com
                                                    1285 Avenue of the Americas
                                                    New York, New York 10019
                                                    Telephone:  (212) 554-1400
                                                    Facsimile:   (212) 554-1444

                                             *Attorneys for Lead Plaintiff Ontario Teachers'*
                                             *Pension Plan Board and Lead Counsel for the*
                                             *Class*

                                             **KAPLAN FOX & KILSHEIMER LLP**
                                             Frederic S. Fox (FF-9102)
                                             Joel B. Strauss (JS-6585)
                                             850 Third Avenue
                                             New York, NY 10022
                                             Telephone: (212) 687-1980
                                             Facsimile: (212) 687-7714

                                                    -and-

                                             **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
                                             Richard A. Lockridge
                                             Karen H. Riebel
                                             100 Washington Avenue South, Suite 2200
                                             Minneapolis, MN 55401
                                             Telephone: (612) 339-6900
                                             Facsimile: (612) 399-0981

                                             *Attorneys for Plaintiff Minneapolis Firefighters'*
                                             *Relief Association*