**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| IN RE BRISTOL-MYERS SQUIBB CO. SECURITIES LITIGATION | File No. 07-CV-5867 (PAC) |

---

**DECLARATION OF SALVATORE J. GRAZIANO**
**IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL**
**OF SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT**
**PROCEEDS AND LEAD COUNSEL'S MOTION FOR AN AWARD**
**OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

I, SALVATORE J. GRAZIANO, under the penalties of perjury, declare as follows:

1.       I am a member of the law firm of Bernstein Litowitz Berger & Grossmann LLP

("Bernstein Litowitz" or "Lead Counsel"), counsel to Lead Plaintiff Ontario Teachers' Pension

Plan Board ("Ontario Teachers" or "Lead Plaintiff").       Bernstein Litowitz is the Court-

appointed Lead Counsel[1] for Lead Plaintiff and the Class in the above-captioned class action

(the "Action").       I have personal knowledge of the matters set forth herein based on my active

participation in all aspects of the prosecution and settlement of this Action.       I submit this

declaration in support of the proposed Settlement that will resolve all the claims in this Action

as against defendants Bristol-Myers Squibb Company ("Bristol-Myers" or the "Company"),

Peter R. Dolan ("Dolan") and Andrew G. Bodnar ("Bodnar") (the "Individual Defendants";

and together with Bristol-Myers, the "Defendants").       The Settlement was made on behalf of the

Class of all persons and entities who purchased or acquired Bristol-Myers common stock

---

[1]       Unless otherwise indicated, all initial capitalized terms are used as defined in the Stipulation and Agreement of Settlement (the "Stipulation"), filed with the Court on August 18, 2009 as Exhibit 1 to Lead Plaintiff's Notice of Motion and Unopposed Motion for Preliminary Approval of Settlement, Certification of the Class and Approval of Notice to the Class ("Motion for Preliminary Settlement Approval") (Dkt. #70).

during the period from after the close of the market on March 21, 2006, through August 8, 2006, inclusive (the "Class Period"), and suffered damages as a result.[2] This declaration is also submitted in support of the proposed Plan of Allocation of the Settlement Fund to the Class Members (the "Plan of Allocation") and in support of Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses.

## I.    INTRODUCTION AND OVERVIEW

2.    After more than two years of litigation, Lead Plaintiff's efforts have achieved an outstanding recovery for the Class.  The Settlement provides for the payment of $125,000,000 in cash (the "Settlement Amount") plus interest earned thereon.  In addition, as part of the Settlement, Bristol-Myers has represented that, notwithstanding the fact that it has no continuing legal obligation to maintain its Disclosure Policy and Review Committee ("DPRC") or its Exceptional Circumstance Disclosure Committee ("ECDC"), discussed in greater detail below, it intends to maintain in place both the DPRC and the ECDC in the same or similar manner as they presently function and that it has no current plan or intention to discontinue these committees or their roles in the Company's disclosure processes.  The Settlement Amount is a recovery of approximately 22% of Plaintiffs' highest damages estimate for the Class and a recovery of 33% of the Class's maximum damages attributable to the adverse disclosure on August 8, 2006 (assuming a full claims response by the Class), as set forth below.  Given the significant risks Plaintiffs faced in establishing liability and damages

---

[2]    Excluded from the Class are (i) Defendants; (ii) members of the immediate families of individual defendants Dolan and Bodnar; (iii) any person who was an executive officer or director of Bristol-Myers during the Class Period; (iv) any person, firm, trust, corporation, officer, director, or any other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant; (v) any person who actively participated in the alleged wrongdoing at issue; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.  Also excluded from the Class are any persons who exclude themselves by filing a request for exclusion in accordance with the requirements set forth in the Notice.

discussed herein and the size of the proposed settlement, it is clear that the Settlement at this time is in the best interests of the Class. Rather than proceed with this litigation and risk obtaining little or nothing from Defendants, the Settlement provides the Class with the very substantial recovery of $125,000,000 in cash – an amount which was deposited into escrow on August 31, 2009 and, since that date, has been earning interest for the benefit of the Class.

3.    As demonstrated herein and in the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation of Settlement Proceeds and Final Certification of the Class for Settlement Purposes (the "Settlement Memorandum"), the proposed Settlement is fair, reasonable, and adequate, and should be approved by this Court. Additionally, the proposed Plan of Allocation is a fair and reasonable method for distributing the proceeds of the Settlement to the members of the Class, and, therefore, also should be approved.

4.    Lead Plaintiff has entered into the Settlement with a thorough understanding of the strengths and weaknesses of the claims asserted in the action. As explained in greater detail below, this understanding is based on Lead Counsel's prosecution of the action, which has included, *inter alia,* (i) drafting a detailed amended complaint after review and analysis of the Company's SEC filings, press releases, other public statements issued by Defendants, media and news reports about the Company, publicly available trading data relating to the price and volume of Bristol-Myers common stock, and other information regarding the guilty plea of Bristol-Myers to two felony counts for deceiving governmental regulators and the termination of senior officers of the Company including Defendant Dolan and General Counsel Richard Willard and the resignation of Defendant Bodnar; (ii) thoroughly researching the law pertinent to the claims against Defendants and potential defenses thereto; (iii) extensive briefing on

3

Defendants' three separate motions to dismiss; (iv) review and analysis of approximately 740,000 pages of documents produced by Defendants and third-parties in discovery; (v) depositions of Bristol-Myers' in-house and external counsel; (vi) consulting with experts on issues relating to liability, damages, and materiality; (vii) exchanging confidential mediation statements with Defendants; and (viii) participating in mediation before an experienced mediator and extensive negotiations thereafter.

5.    The Settlement was reached only after arduous and protracted settlement negotiations, including mediation under the auspices of an experienced mediator (which at first failed to yield an agreement) and extensive discussions thereafter, which were conducted with the mediator's assistance. *See* Declaration of Michael D. Young, attached hereto as Exhibit A ("Young Decl."). Lead Plaintiff believes that the $125,000,000 cash recovery for the Class is an outstanding result, particularly when viewed in connection with the total potential damages as well as the risks Plaintiffs faced going forward in this action, including those relating to establishing liability and damages. *See* Declaration of Jeffrey M. Davis, Senior Legal Counsel for the Ontario Teachers' Pension Plan Board, attached hereto as Exhibit B ("Davis Decl."), at ¶11.

6.    As discussed in more detail in ¶¶83-93 below, Lead Plaintiff faced significant risks going forward, including, among others, that Defendants would ultimately be successful in showing that (i) no misrepresentation had been made because the Company's statements during the Class Period were literally true or the Company had warned investors of the risk that the Apotex settlement would not be approved; (ii) the alleged omissions were not material; and (iii) Defendants did not act with scienter because they relied on the advice of counsel. In addition, even if Plaintiffs were to prevail on the merits, there was a risk that the damages

4

determined to be attributable to the alleged misrepresentations and omissions would be even less than the Settlement Amount based on arguments discussed below. Accordingly, while Lead Plaintiff believes that all of its claims have merit, one or more of these arguments or issues may have ultimately proved insurmountable and the Class may have ended up with little or no recovery. In light of these risks, the Settlement provides the Class with an excellent result.

7.    The Settlement is the product of a comprehensive investigation, extensive litigation, and protracted negotiations by experienced counsel. For creating this substantial benefit, Lead Counsel seeks a fee of 17% of the Settlement Amount and reimbursement of Plaintiffs' Counsel's litigation expenses, with interest on such fees and expenses at the same rate as earned by the Settlement Fund. This requested fee was negotiated by Lead Plaintiff, Ontario Teachers, which is a sophisticated institutional investor with extensive experience in securities class actions, and its counsel, Bernstein Litowitz, after the Settlement was reached and its precise terms were known to them and notice was provided to the Class. *See* Davis Decl. at ¶12. As set forth below and in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, Lead Counsel's request is justified by the work performed and the result obtained.

8.    The favorable reaction of the members of the Class further supports the reasonableness of the Settlement, Plan of Allocation, and the fee and expense request. The Notice of Pendency Of Class Action And Proposed Settlement, Settlement Fairness Hearing, And Motion For Attorney's Fees And Reimbursement Of Litigation Expenses (the "Notice") was mailed to over 242,000 potential Class Members or their nominees. *See* Affidavit of Stephen J. Cirami (the "Cirami Aff."), attached hereto as Exhibit E, ¶6. The Notice (attached

as Exhibit A to the Cirami Affidavit) advised Class Members of the proposed Settlement, the proposed Plan of Allocation and the request for an award of attorneys' fees and reimbursement of expenses.   The Notice further advised Class Members of their right to object or seek exclusion from the Class, and explained that this right needed to be exercised by November 17, 2009.   Additionally, a summary notice was published in the national edition of *The Wall Street Journal* and over the *PR Newswire* on September 11, 2009.   *See* Cirami Aff. ¶7.   Finally, Lead Counsel posted the Notice and Proof of Claim form on its website, as did the Court-appointed Claims Administrator.

9.    No Class Member objected to the Settlement or Plan of Allocation and only seventy individual investors, but no institutional investors, have requested exclusion from the Class.   *See* Cirami Aff. ¶10.   As discussed below, one individual mailed a letter to the Claims Administrator purporting to object to counsel's fees, but failed to demonstrate his status as a Class Member, and thus lacks standing to object.   By contrast, while the deadline for submitting claims will not expire until December 30, 2009, approximately 8,100 claims have already been submitted, representing approximately 72 million shares.   *See* Cirami Aff. ¶11.

## II.    THE ALLEGATIONS OF THE ACTION

10.    During the Class Period, Bristol-Myers was one of the world's largest drug companies, and its blood-thinning medicine, Plavix, was its biggest selling drug.   Amended Class Action Complaint ("AC") ¶30.   In November 2001, Apotex Inc., a large Canadian generic drug manufacturer, and Apotex Corp., its American subsidiary, (collectively, "Apotex") applied for Food and Drug Administration ("FDA") approval of a generic form of Plavix.   AC ¶31.   In March 2002, Bristol-Myers (along with its marketing partner Sanofi Aventis) sued Apotex, alleging that Apotex had infringed its patent rights in Plavix.   AC ¶32.

This litigation triggered a statutory 30-month stay of FDA approval of Apotex's application for FDA approval of generic Plavix. AC ¶32.

11.    In January 2006, following the expiration of the statutory stay, the FDA approved Apotex's generic Plavix for marketing. From that time onwards, Apotex was able to begin selling or "launch" its generic version of Plavix. AC ¶32. However, if Apotex launched generic Plavix, it ran the risk that (1) Bristol-Myers would obtain injunctive relief (on grounds of patent infringement) preventing sales of generic Plavix and causing Apotex to lose its substantial up-front investment in manufacturing a large inventory of generic Plavix; and (2) Apotex might be found to have infringed BMS's Plavix patents, and be subject to pay Bristol-Myers' lost profits, or even treble damages. *See* Declaration of C. Scott Hemphill ("Hemphill Decl."), attached hereto as Exhibit D. Such damages could have bankrupted Apotex. This type of generic launch before a court ruling on the validity of the brand-name drug's patent and at full risk of patent infringement rights and remedies is referred to as an "at risk" launch in the industry because of the very significant financial harm to the infringer (as a result of damages and injunctive relief) if the challenged patent is found to be valid. *Id.* ¶¶11-25.

12.    After the close of trading on March 21, 2006, the first day of the Class Period, Bristol-Myers issued a press release announcing that it, along with Sanofi Aventis, had entered into a settlement agreement with Apotex to resolve the patent infringement lawsuit. AC ¶¶33-34. The settlement agreement was subject to certain conditions, including approval by the Federal Trade Commission ("FTC") and state attorneys general under the terms of a consent decree in prior antitrust litigation by the regulators against Bristol-Myers relating to previous allegations of anticompetitive agreements to delay generic competition with other Bristol-Myers drugs. AC ¶34.

13.  Under the publicly-disclosed terms of the settlement with Apotex, (1) Apotex would receive a royalty-bearing license to manufacture and sell generic Plavix in the United States; (2) Apotex would agree not to sell its version of generic Plavix in the United States until September 17, 2011 (or an earlier date in 2011 if Bristol-Myers did not receive an extension of exclusivity for pediatric use under the patent); and (3) Bristol-Myers and Sanofi would make payments (in equal amounts from each company) in undisclosed amounts to Apotex in the event of either finalization of the proposed settlement or termination of the agreement. AC ¶33.

14.  The press release also stated that, in the event that the required regulatory approvals of the settlement were not obtained, the settlement would be terminated and the patent litigation would be reinstated. AC ¶36. Significantly, Bristol-Myers stated in the press release (and repeatedly thereafter) that if the litigation were reinstated, it would "vigorously pursue enforcement of [its] patent rights in Plavix" and that any launch of generic Plavix by Apotex would be "at risk." AC ¶36.

15.  Bristol-Myers filed the March 21, 2006 press release with the SEC as an exhibit to a Current Report on Form 8-K after the close of the market on March 21, 2006. AC ¶63. The Form 8-K similarly stated that in the event that regulatory approval were not obtained and the litigation were reinstated, Bristol-Myers and Sanofi Aventis intended to "vigorously pursue patent enforcement of their patent rights in Plavix," and that any launch of generic Plavix by Apotex would be "at risk." AC ¶63.

16.  Bristol-Myers also posted "Questions and Answers" about the agreement with Apotex on its website on March 21, 2006, and filed them as an exhibit to the Form 8-K discussed above. Among other things, the Questions and Answers stated:

Q8:   What happens if the antitrust review and clearance is not obtained?

A8:   As discussed in the press release, if antitrust review and clearance is not obtained, the agreement would be terminated, Apotex would receive a payment, the litigation would be reinstated and Apotex could launch a generic [version of Plavix] at risk.  If the litigation is reinstated, we would vigorously pursue enforcement of our patent rights in Plavix.

AC ¶65.

17.   Investors and analysts reacted favorably to the announcement of the Apotex settlement.  In trading the next day, the price of Bristol-Myers stock rose more than 11%, climbing from a closing price of $22.83 on March 21, 2006, to close at $25.24 on March 22, 2006 on above-average volume of approximately 50 million shares.  AC ¶59. Securities analysts, including analysts at UBS, Morgan Stanley, Merrill Lynch, and Citigroup upgraded Bristol-Myers in response to the announcement of the settlement.  AC ¶59.  The Associated Press reported that UBS "said the news eliminates the key risk in owning [Bristol-Myers] shares."  AC ¶59.

18.   Lead Plaintiff alleges that Defendants made materially false and misleading statements in, and omitted material facts from, their March 21, 2006 statements about the proposed settlement with Apotex.  Plaintiffs allege that Defendants failed to disclose that Bristol-Myers, as part of its agreement with Apotex, had agreed to significantly limit its ability to seek damages in the event that Apotex launched its generic version of Plavix following regulatory rejection of the settlement.  As part of the settlement, Bristol-Myers, undisclosed to investors, had agreed (1) to limit its maximum recoverable damages for any infringement by Apotex to 70% of Apotex's net sales of generic Plavix (and only 60% if Bristol-Myers had launched an authorized generic); (2) to waive its right to seek increased (up to treble) damages; and (3) to not seek a temporary restraining order or preliminary injunction against Apotex's

generic Plavix sales until five business days after either Bristol-Myers gave notice of its intention to do so, or Apotex launched its generic Plavix (which would allow Apotex to flood the market with its version of generic Plavix). AC ¶37. The Complaint alleges that these material omissions made Bristol-Myers' public statements on March 21, 2006 (and repeatedly thereafter during the Class Period) that it would "vigorously" enforce its Plavix patent if the regulators rejected the settlement and that a generic Plavix launch by Apotex would be "at risk," materially misleading when made. AC ¶37. *See also* Opinion & Order [Docket #48] at 18-20 (finding use of phrases "vigorously pursue" and "at risk launch" actionable).

19. Lead Plaintiff further alleges that Defendants continued to make similar materially false and misleading statements thereafter. On April 27, 2006, Bristol-Myers issued a press release reporting its first quarter 2006 financial results and filed the press release with the SEC as an exhibit to a Current Report on Form 8-K. AC ¶67. The press release referenced the settlement agreement with Apotex and once again stated that in the event that required regulatory approvals were not obtained, the litigation would be reinstated and that Bristol-Myers and Sanofi Aventis intended "vigorously to pursue enforcement of their patent rights in Plavix." AC ¶67. Similarly, on May 2, 2006, Defendant Dolan stated at Bristol-Myers' annual stockholders meeting that in the event that regulatory approvals for the Apotex settlement were not obtained, Bristol-Myers and Sanofi Aventis would resume litigation and "continue to defend our patent vigorously." AC ¶¶70-71.

20. On May 5, 2006, the state attorneys general notified Bristol-Myers that they would not approve the Apotex settlement. AC ¶38. The Complaint alleges that Defendants failed to disclose this rejection. AC ¶38; *see also* Opinion & Order [Docket #48] at 17-20 (finding omission of state attorneys general's rejection actionable). To the contrary, on

May 8, 2006 – three days after learning of the state attorneys general's rejection of the proposed settlement – Bristol-Myers filed its Quarterly Report on Form 10-Q with the SEC, which stated that "there is a significant risk that the required antitrust clearance will not be obtained," that in such event the litigation would be reinstated and Bristol-Myers and Sanofi "intend to vigorously pursue enforcement of their patent rights in Plavix," and that any launch of generic Plavix by Apotex following reinstatement of the litigation would be "at risk." AC ¶73.

21.    Instead of disclosing the state attorneys general's rejection of the settlement agreement, Defendant sought to negotiate a new settlement with Apotex, with Defendant Bodnar personally traveling to Canada to meet with senior Apotex representatives.  AC ¶39. On May 26, 2006, Bristol-Myers and Apotex executed an amended settlement agreement. AC ¶39.  In the amended settlement agreement, Bristol-Myers, undisclosed to investors, agreed to (1) limit its maximum recoverable damages for any infringement by Apotex to 50% of Apotex's net sales of generic Plavix (40% if Bristol-Myers launched an authorized generic); (2) waive its right to seek increased (up to treble) damages; (3) waive its right to seek a temporary restraining order; and (4) not seek a preliminary injunction against Apotex's generic Plavix sales until Apotex had five business days to flood the market with generic Plavix. AC ¶41.  The Complaint alleges that Bristol-Myers failed to disclose these further material limitations on its ability to recover damages in the event of regulatory non-approval of the settlement, and that these omissions made Bristol-Myers' continued public statements that it would "vigorously" enforce its Plavix patent if the regulators rejected the settlement and that a generic Plavix launch by Apotex would be "at risk," materially misleading when made. AC ¶41; *see also* Opinion & Order [Docket #48] at 18-20.

22.     Furthermore, the Complaint alleges that the written amended settlement agreement did not contain all of the terms of the agreement with Apotex, and that the parties also had undisclosed oral side agreements that (1) if the regulators approved the amended agreement, Bristol Myers would not launch an authorized generic during Apotex's period of exclusivity, and (2) Apotex's signing the new agreement would not waive its vested right to a $60 million break-up fee under the original settlement agreement.  AC ¶42.  The Complaint alleges that Defendants failed to disclose these improper side agreements which significantly raised the risk of regulatory rejection of the proposed settlement.  AC ¶42; *see also* Opinion & Order [Docket #48] at 18-20 (discussing Lead Plaintiff's allegations).

23.     On May 31, 2006, Defendant Dolan spoke to securities analysts at the Sanford C. Bernstein & Co. Strategic Decisions Conference.  Responding to a question about the timing of the FTC's and state attorneys general's reviews of the settlement with Apotex and what would happen if the regulators rejected it, Dolan stated that "we would, with our partner Sanofi, continue to aggressively defend [the patent] and litigate if necessary."  AC ¶77.  This statement was materially false and misleading for the reasons discussed above, as well as because Dolan did not disclose the state attorneys general's rejection of the settlement on May 5, 2006 or that Bristol-Myers had entered into an amended settlement agreement and that that amended settlement agreement was at even greater risk of rejection given the secret oral side terms.  AC ¶78.

24.     On June 5, 2006, unbeknownst to Defendants, counsel to Apotex reported the existence of undisclosed side agreements to the FTC and Department of Justice ("DOJ").  As a result, the DOJ immediately opened a criminal investigation into Bristol-Myers.

25.  On June 25, 2006, Bristol-Myers (prompted by news that a *Wall Street Journal* reporter had learned that the state attorneys general had rejected the initial settlement agreement with Apotex and were now considering a revised settlement agreement) issued a press release disclosing that they had entered into an amended settlement agreement with Apotex to address "concerns raised by" the FTC and state attorneys general.  AC ¶79.  The Complaint alleges that the June 25, 2006 press release was materially false and misleading because it did not disclose the further material limitations on damages and injunctive relief Bristol-Myers had agreed to in the event that the amended settlement agreement did not receive regulatory approval or that rather than address the regulators' "concerns," the amended settlement included unlawful oral side agreements, which only increased the risk of a regulatory rejection.  AC ¶80.

26.  On July 26, 2006, the FBI executed a criminal search warrant at Bristol-Myers' headquarters in New York City.  AC ¶51.  The next day, Bristol-Myers issued its second quarter 2006 press release, in which it stated that it had "learned yesterday that the Antitrust Division of the United States Department of Justice is conducting a criminal investigation regarding the proposed settlement of the Apotex litigation."  AC ¶82.  On a conference call that day, Defendant Dolan stated that if the settlement agreement were not approved by regulators, Bristol-Myers "would continue to defend it vigorously."   AC ¶84.   In response to the disclosure of the government's criminal investigation, Bristol-Myers' stock price declined by approximately 7.5% on unusually heavy volume.  AC ¶85.

27.  On July 28, 2006, Bristol-Myers issued a press release stating that the state attorneys general had not approved the amended settlement agreement.  AC ¶87.  The press release stated that Bristol-Myers and its partner Sanofi Aventis "intend to vigorously pursue

enforcement of their patent rights in Plavix." AC ¶87. The Complaint alleges that the July 28, 2006 press release was false and misleading because it failed to disclose the material undisclosed terms of the written amended settlement agreement or the oral side agreements to that agreement. AC ¶88.

28. On August 8, 2006, the last day of the Class Period, investors finally learned the previously undisclosed material terms of the Apotex settlement that significantly weakened Bristol Myers' damages and enforcement rights in case of non-approval and greatly increased the risk of a generic launch by Apotex. Specifically, before the opening of the market, Bristol-Myers filed its quarterly report on Form 10-Q. AC ¶95. In that Form 10-Q, Bristol-Myers attached a copy of the amended settlement agreement, revealing for the first time the undisclosed material terms of the settlement agreement, including that Bristol-Myers had waived its right to seek a temporary restraining order in the event that Apotex launched its version of generic Plavix; that Bristol-Myers could not move for a preliminary injunction against Apotex until at least five business days after Apotex launched its generic version of Plavix (thus allowing Apotex to flood the market with generic Plavix); that Bristol-Myers had waived its right to seek increased damages in the event it were to prevail in the patent litigation; and that Bristol-Myers had agreed to cap its damages to just 50% of Apotex's net sales. AC ¶95.

29. The price of Bristol Myers stock declined by 7% immediately upon disclosure of these terms, on unusually heavy trading volume. AC ¶96. Numerous analysts and news reports highlighted the importance of the undisclosed settlement terms that Defendants had omitted from their prior Class Period disclosures to investors. AC ¶¶97-104. For example, Reuters reported on August 9, 2006: "Before the details of the settlement were disclosed

14

analysts expected the odds of Apotex introducing a Plavix copy at risk – before a court ruling – to be slim due to high costs Apotex could face if the court put Sanofi and BMS in the right. But the details showed that for Apotex damages would be much more limited than usual if a U.S. court ruled against its Plavix generic after its launch. 'The settlement appears to be so favorable to Apotex that one would have to assume they would launch at risk,' JP Morgan analyst Craig Maxwell said. 'It's a surprise … and does seem to signal a very low confidence Sanofi had in the intellectual property position of Plavix.'" AC ¶98. Similarly, the Newark Star-Ledger reported the same day that "The announcement [of Apotex's launch of generic Plavix] prompted a mutiny by Wall Street analysts, who speculated Bristol-Myers may be forced to slash its dividend. Only a week ago, many of the same experts predicted a generic Plavix launch was unlikely." AC ¶102.

30.    On September 12, 2006, after the Class Period, the Company announced the termination of Defendant Dolan and General Counsel Richard Willard in a decision related to the Apotex settlement. AC ¶105.

31.    On May 10, 2007, Bristol-Myers announced that the Company had agreed to plead guilty to two felony counts of making false statements to the FTC in connection with the Apotex litigation and on June 11, 2007, the court entered the Company's plea. AC ¶107.

## III.    HISTORY OF THE ACTION

32.    Beginning on June 20, 2007, two class action complaints were filed in the United States District Court for the Southern District of New York, styled *Minneapolis Firefighters' Relief Association v. Bristol-Myers Squibb Company, et al.*, Case No. 07-CV-5867 (PAC), and *Lai v. Bristol-Myers Squibb Company, et al.*, Case No. 07-CV-6259 (PAC). As required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), notice to shareholders of the pendency of those actions began the 60-day period for interested shareholders to move the

Court to be appointed Lead Plaintiff on behalf of Bristol-Myers' investors. Based on the information that Bernstein Litowitz's investigation had yielded over the preceding months, Ontario Teachers determined to move for Lead Plaintiff, and did so on August 27, 2007. Under the PSLRA, Ontario Teachers was presumptively the "most adequate" Lead Plaintiff movant because it had the greatest loss among the movants from its investments in Bristol-Myers during the proposed class period. In its motion for Lead Plaintiff, Ontario Teachers submitted its choice of Bernstein Litowitz as Lead Counsel to the Court.

33.  On September 5, 2007, the plaintiff in *Lai v. Bristol-Myers Squibb Company, et al.*, Case No. 07-CV-6259 (PAC), filed a Notice of Voluntary Dismissal without prejudice. In a Scheduling Order dated September 20, 2007, the Court dismissed that case without prejudice. In that same Scheduling Order, the Court ordered that the remaining action, *Minneapolis Firefighters' Relief Association v. Bristol-Myers Squibb Company, et al.*, Case No. 07-CV-5867 (PAC), be recaptioned as "*In re Bristol-Myers Squibb Co. Securities Litigation*." In a separate Order, also dated September 20, 2007, the Court appointed Ontario Teachers as Lead Plaintiff and approved its selection of Bernstein Litowitz as Lead Counsel for the Class. Order Appointing Ontario Teachers' Pension Plan Board As Lead Plaintiff And Approving Its Selection Of Counsel As Lead Counsel For The Class [Docket #16].

34.  Even prior to its appointment as Lead Counsel, Bernstein Litowitz had embarked upon an intensive investigation into the facts of this case. Bernstein Litowitz reviewed all publicly-available documents submitted in the Apotex patent litigation, all publicly-available news on the Apotex settlement, the applicable patent and antitrust law, past patent settlements, and other facts related to Bristol-Myers' guilty plea.

35.  Upon its appointment as Lead Counsel, Bernstein Litowitz, with the assistance of other Plaintiffs' Counsel who worked at its direction,[3] undertook a hard-fought prosecution that lasted until the Settlement was reached.  Thus, as described more fully below, Lead Counsel vigorously litigated this action by, among other things: (i) conducting an extensive investigation into Defendants' alleged wrongful conduct; (ii) drafting a detailed, particularized amended complaint; (iii) successfully contesting Defendants' motions to dismiss the Amended Complaint; (iv) engaging in extensive discovery which entailed obtaining and analyzing more than 740,000 pages of documents, including otherwise privileged documents relevant to Defendants' claimed reliance on counsel; (v) moving to compel Apotex's subsidiary's compliance with an extensive document subpoena; (vi) proceeding in Canadian court to enforce a request for international assistance in obtaining document discovery and deposition testimony from Apotex; (vii) preparing to embark on an intensive program of depositions; and (viii) participating in hard fought arm's-length settlement negotiations, including mediation before an experienced mediator and extended direct negotiations with counsel for Defendants.

A.    **Lead Plaintiff's Investigation And The Amended Complaint**

36.  In preparation for the filing of the Amended Complaint, Lead Counsel conducted a thorough investigation into the matter, which included, among other things, reviewing statements made by Defendants (including those made in regulatory filings, press releases, conference calls, news articles and analysts' reports), researching patent law and the Company's business practices, reviewing in depth the Apotex patent litigation filings and hearing transcripts, analyzing the Company's guilty plea and executive terminations, researching the law related to Defendants' anticipated motions to dismiss, and obtaining the

---

[3]  In addition to Lead Counsel, the law firms of Kaplan Fox & Kilsheimer LLP, Murray Frank & Sailer LLP, Lockridge Grindal Nauen P.L.L.P., and Bennett Jones LLP served as additional Plaintiffs' Counsel.

assistance of an expert in loss causation and damages. Lead Counsel's investigation uncovered substantial information about the events discussed above, which formed the basis of Lead Plaintiff's detailed and particularized complaint.

37. On October 15, 2007, Lead Plaintiff filed the seventy-two page Amended Complaint, asserting claims under Sections 10(b) and 20(a) of the Exchange Act against Defendants Bristol-Myers, Dolan, and Bodnar on behalf of all persons or entities who purchased or acquired Bristol-Myers common stock during the period from after the close of the market on March 21, 2006, through August 8, 2006, inclusive, and suffered damages as a result.

38. Based on Lead Plaintiff's thorough investigation, Lead Plaintiff had identified Defendant Bodnar (who had not yet been charged with any wrongdoing) as a key figure in the alleged fraud. Although Bodnar was not named as a Defendant in the initial complaints and did not make any public statements during the Class Period, Lead Plaintiff named him as a Defendant in the Amended Complaint under Rule 10b-5(a) and (c), which do not require a misrepresentation or omission and instead require a "manipulative or deceptive act." Six months after Lead Plaintiff filed the Amended Complaint, Bodnar was indicted on April 23, 2008, by the Department of Justice for making false statements to the FTC in connection with the Apotex settlement. While Lead Plaintiff did not anticipate these charges, they further confirmed counsel's decision to name him as a Defendant in this action.

39. By contrast, although the Company's Chief Financial Officer, Andrew Bonfield, had been named as Defendant in an initial complaint, on review of the facts of the case, Lead Plaintiff determined to dismiss him as a Defendant in the Amended Complaint. Accordingly,

Lead Plaintiff requested that the Court voluntarily dismiss all claims against Mr. Bonfield. Order Dismissing All Claims Against Andrew R.J. Bonfield Without Prejudice, [Docket #19].

40.    Beginning on November 12, 2007, each Defendant separately moved to dismiss the Amended Complaint. Among other things, Bristol-Myers argued that their Class Period statements to investors were accurate and complete when made and gave adequate warning of the risks that later materialized. The Company argued that Bristol-Myers had disclosed that there was a "significant risk" that regulatory approval of the Plavix settlement would not be obtained, that Apotex could launch a generic Plavix product at any time, and that there might be serious financial repercussions to the Company if Apotex did launch a generic Plavix product. Defendants argued that the alleged omissions did not render their affirmative statements misleading, and thus they were under no legal duty to disclose the allegedly material omitted information. In response to Lead Plaintiff's allegations that Defendants' claims they would "vigorously pursue" enforcement of their patent rights against Apotex were misleading in the absence of disclosures related to the Apotex settlement provisions, Defendants argued that the Company did, in fact, pursue its patent rights against Apotex, obtaining a preliminary injunction against Apotex 23 days after the generic launch and later successfully defending its patent against Apotex. The Company further argued that its use of the phrase "at risk" to describe any generic launch by Apotex was not misleading, because the launch was at risk of being enjoined and the Company, in fact, did obtain a permanent injunction.

41.    Bristol-Myers also argued that Plaintiffs could not establish loss causation as a matter of law because the stock price declines alleged in the Amended Complaint were linked to risks that had been disclosed, including the risk of regulatory disapproval and the risk of a

19

generic launch, and that the disclosure of the FBI investigation did not mention the subject matter of the non-disclosures alleged in the Amended Complaint, and thus could not serve as a corrective disclosure for loss causation purposes. Defendants claimed that the stock price fell on August 8, 2006, not because the alleged fraud was disclosed, but because Apotex had launched its generic Plavix, a risk that has been warned of from the very start of the Class Period. Finally, the Company argued that the allegations of scienter in the Amended Complaint were inadequate, given the absence of any clear duty to disclose the omitted information.

42. The Individual Defendants each joined Bristol-Myers' motion, as well as submitting their own separate motions to dismiss. In his individual motion to dismiss, Dolan principally argued that the allegations of scienter were insufficient against him because they did not give rise to a strong inference that he acted with a fraudulent intent. Dolan claimed that the Amended Complaint contained neither allegations of motive (including any unusual stock sales) nor facts demonstrating that he intended to defraud investors in connection with the alleged false and misleading statements and omissions. In his individual motion to dismiss, Bodnar argued that he could not be held liable under Section 10(b) because he was not alleged to have made any public statements and the public could not have relied on his conduct in negotiating the Plavix settlement. Specifically, Bodnar argued that under Supreme Court precedent prohibiting liability for aiding and abetting securities fraud, Section 10(b) liability could not be extended to persons who do not make statements to the public. Bodnar further argued that the "fraud on the market" theory of reliance was unavailable to Plaintiffs, because he did not make any public statements that could cause the market to rely upon him. Both

Dolan and Bodnar also argued that they could not be held liable as control persons under Section 20(a).

43.    On December 17, 2007, Lead Plaintiff filed its forty-page opposition to Defendants' motions.    Lead Plaintiff argued that the Company was obligated to provide complete and accurate disclosures to its shareholders and that, when the Company chose to speak in a positive manner regarding the Apotex settlement, it did not fulfill this obligation.   In its opposition, Lead Plaintiff tracked down the key cases and marshaled its strongest arguments in support of this contention.   Lead Plaintiff presented extensive citations to securities analysts who were astonished when the full terms of the Apotex settlement were disclosed and immediately changed their predictions concerning the likelihood of a generic Plavix launch, demonstrating the materiality of those previously undisclosed terms.    Lead Plaintiff explained that, although Defendants may not have had an independent duty to disclose all of the terms of the Apotex settlement or the non-approval by state regulators, because Defendants chose to speak on these topics, they had a duty to speak completely and disclose all material facts on the chosen topic.   Lead Plaintiff also refuted each of Defendants' arguments in support of their motions to dismiss and demonstrated that the precedent Defendants offered in support of their positions was distinguishable from the facts alleged in the Amended Complaint.   For example, Lead Plaintiffs argued that the facts alleged in the Amended Complaint strongly supported a finding of Defendant Dolan's scienter as they demonstrated that Dolan was personally involved in the negotiation of the Plavix settlement (through his proxy Defendant Bodnar), personally reviewed and approved all of the Company's allegedly misleading disclosures, and was involuntarily terminated by the Company's Board for his role in the Apotex settlement. Lead Plaintiff also argued that Bodnar engaged in a scheme that deceived investors and,

notwithstanding the fact that he did not make a public statement to investors, should be held liable under Rule 10b-5(a) or (c), which do not require a misrepresentation or omission by a defendant. Lead Plaintiff further argued that the Amended Complaint supported a finding of loss causation, because the risks that materialized on July 27 and August 8, 2006, were proximately caused by Defendants Class Period statements and omissions.[4]

44.     Defendants filed their reply briefs in support of their respective motions to dismiss beginning on January 7, 2008. In its reply, Bristol-Myers reiterated its arguments that it did not have a duty to disclose the omitted information related to the terms of the Apotex settlement and that the Company's disclosures were accurate. The Company also continued to argue that Lead Plaintiff had not adequately alleged loss causation and scienter. Separately, Dolan continued to argue that Lead Plaintiff had failed to demonstrate his knowledge of the alleged fraud and thus had not demonstrated his scienter in connection with the Company's disclosures. Bodnar repeated his assertion that, in the absence of a public statement to shareholders during the Class Period, the Section 10(b) claim should be dismissed against him. Both Dolan and Bodnar also continued to argue that Lead Plaintiff's Section 20(a) control person claims should be dismissed as against them.

45.     On January 15, 2008, the United States Supreme Court issued its decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008), which

---

[4] Arguably, the 2% drop in Bristol-Myers stock price on July 31, 2006 also was linked to the alleged fraud and could constitute another corrective disclosure. Immediately before that stock price decline, Bristol-Myers announced that regulators had rejected the amended Apotex settlement. However, given Defendants' strong argument that this risk of rejection was fully disclosed from the very start of the Class Period and the relatively small percentage decline following that specific disclosure, Lead Plaintiff did not argue that this announcement constituted an independent corrective disclosure in its opposition to Defendants' motion to dismiss. In addition, through discovery, Lead Plaintiff determined that because the regulators did not specifically link their rejection of the amended Apotex settlement agreement to the existence of the undisclosed oral side terms (which Defendants continue to deny), Plaintiffs determined that it would be difficult to meet their burden of proof that this disclosure was, in fact, "corrective," or supports additional recoverable damages for the Class.

Defendant Bodnar believed provided further support for his position that he was not liable for his conduct because he did not make public statements during the Class Period. In *Stoneridge*, the Supreme Court held that a defendant cannot be held liable for behavior that was never communicated to the marketplace, because investors could not have relied upon that conduct. Lead Plaintiff immediately informed the Court of the Supreme Court's decision by letter dated January 15, 2008. In that letter, Lead Plaintiff explained that the *Stoneridge* decision did not impact the analysis of the Amended Complaint, because the Supreme Court had in fact held that a public statement by a defendant was not necessary for Section 10(b) liability and had emphasized that conduct alone could be deceptive. Because Defendant Bodnar had been identified to investors as a senior executive officer who had a significant role in the Apotex settlement, Lead Plaintiff argued that investors justifiably relied on the Company's omissions about Bodnar's conduct. Defendant Bodnar responded to Lead Plaintiff's letter on January 17, 2008, arguing that his conduct was never communicated to investors, that they could not have relied upon that conduct, and thus he could not be held primarily liable under Section 10(b).

46.    On March 12, 2008, the Court heard oral argument on the motions to dismiss. Michael Padfield, Senior Legal Counsel for Lead Plaintiff, attended the argument. I, Salvatore J. Graziano, argued on behalf of Lead Plaintiff and the proposed Class. Three attorneys argued for Defendants, from the law firms of Debevoise & Plimpton, LLP; Weil Gotshal & Manges LLP; and Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C.

47.    On April 23, 2008, Defendant Bodnar was indicted for making false statements to the FTC regarding the Plavix settlement. The next day, Lead Plaintiff notified the Court of the indictment. On April 25, 2008, counsel for Bristol-Myers responded to Lead Plaintiff's letter,

arguing that Bodnar's indictment was "legally irrelevant" to the Court's determination. That same day, counsel for Bodnar also responded to Lead Plaintiff's letter, arguing that the indictment was merely an accusation and did not support the allegations in the Amended Complaint. Furthermore, in conjunction with notifying the Court of Bodnar's indictment, on April 24, Lead Plaintiff provided the Court with the decision issued on April 16, 2008, by the First Circuit in *Mississippi Public Employees' Retirement System v. Boston Scientific Corporation*, 2008 U.S. App. LEXIS 8140. In *Boston Scientific*, the First Circuit reversed the dismissal of a securities class action under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).

48.    On August 19, 2008, the Court issued an Opinion and Order denying Defendants' motions to dismiss. In its Order, the Court sustained all of Lead Plaintiffs' allegations against all Defendants. Specifically, the Court determined that Lead Plaintiff had adequately alleged that Defendants' statements during the Class Period were rendered misleading by the omission of material information, including that it would "vigorously pursue" its remedies against Apotex and that any generic launch by Apotex would be "at risk." The Court also reviewed the Complaint's allegations of corrective disclosures, and found that those allegations were sufficient, at the pleadings stage, to allege loss causation. Similarly, the Court found Lead Plaintiff's scienter allegations were sufficient to survive a motion to dismiss.

49.    Defendants thereafter filed their Answers to the Amended Complaint on September 29 and October 6, 2008. In their Answers, Defendants each raised, for the first time, the affirmative defense of reliance on the advice of counsel in support of their denial of the intent to defraud investors. Moreover, Defendants each entirely denied the oral side agreements with Apotex alleged in the Amended Complaint. Defendants also continued to

deny that the omitted information regarding the provisions of the Plavix settlement were material and rendered their statements misleading.

**B.    Discovery**

50.    Pursuant to the PSLRA, until the Court decided the motions to dismiss, Lead Plaintiff was unable to pursue any discovery in this Action.  However, following the Court's decision, the parties promptly met and conferred several times to discuss a pre-trial schedule for the Action.  During these telephonic meetings, the parties discussed anticipated document discovery, the number of depositions that would be required, and a number of other issues that would affect the scheduling of the Action.  On October 17, 2008, the parties jointly submitted a proposed Civil Case Management Plan, utilizing the form provided by the Court for this purpose.  The proposed Civil Case Management Plan provided for the following schedule:

| Civil Case Management Plan Requirement | Date |
|---|---|
| Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1), to be served no later than: | November 5, 2008 |
| Discovery – initial requests for production of documents to be served no later than: | November 24, 2008 |
| Discovery – substantial completion of document production no later than: | January 30, 2009 |
| Discovery – interrogatories to be served no later than: | March 15, 2009 |
| Discovery – requests to admit to be served no later than: | March 15, 2009 |
| Parties to meet to confer on schedule for expert disclosures no later than: | March 22, 2009 |
| Motion to amend or to join additional parties to be filed no later than: | April 15, 2009 |
| Discovery – depositions to be completed no later than: | April 22, 2009 |
| All fact discovery to be completed no later than: | April 22, 2009 |
| All expert discovery to be completed no later than: | July 22, 2009 |

51.    On October 22, 2008, the parties appeared before the Court for a status conference and to present the Civil Case Management Plan.  At the hearing, the Court

approved the proposed plan and, that same day, endorsed the proposed Civil Case Management Plan.

52.    At the request of the Assistant United States Attorney involved in the criminal case against Bodnar, Lead Plaintiff agreed to delay deposition of certain key witnesses who would have testimony relevant to both this action and the government's criminal case.  Lead Counsel closely monitored the Bodnar criminal action and traveled to Washington D.C. for each of the criminal hearings.  The presentations and discussions at those hearings informed Lead Counsel's knowledge of the criminal prosecution of that case and the procedural barriers to completing discovery in this action.

53.    At the next status conference before the Court on January 27, 2009, the parties informed the Court that, due to anticipated delays in Bodnar's ongoing criminal action, it might be necessary to extend the schedule.  As the parties had anticipated, shortly thereafter, the trial in the Bodnar action was delayed until April 20, 2009, due to concerns about Bodnar's health.  Following this development, the parties met and conferred to agree upon a schedule that would not unreasonably delay the resolution of the Action, but would allow Lead Plaintiff to depose the witnesses necessary to prove its case.  On February 26, 2009, Lead Plaintiff submitted to the Court a revised scheduling order that, in addition to extending the previous scheduling order, also instituted deadlines for Lead Plaintiff's motion for class certification and for summary judgment motions.  The revised Civil Case Management Plan was approved on February 27, 2009.  Under the amended Civil Case Management Plan, fact discovery was scheduled to conclude no later than June 22, 2009 and expert discovery to conclude no later than September 21, 2009.

54.    At the same time, Lead Plaintiff was actively pursuing discovery.

(1)    Document Discovery

55.    Beginning in September 2008, Lead Plaintiff issued 46 document subpoenas to nonparties. The nonparties subpoenaed were:

| Subpoenaed Entity | Relevance |
|---|---|
| A.G. Edwards & Sons | Securities analyst who published coverage of Bristol-Myers during the Class Period and whose documents could potentially provide insight into the market's understanding of Defendants' Class Period announcements regarding the Apotex settlement ("Securities Analyst") |
| Timothy Anderson | Securities Analyst |
| Apotex Corporation | Defendant in Apotex patent litigation; party to Apotex settlement and negotiations thereto |
| Barclays Capital | Securities Analyst |
| Bear, Stearns & Co., Inc. | Securities Analyst |
| Bernstein Research | Securities Analyst |
| Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd. | Counsel to Apotex in the patent litigation |
| Charles A. Butler | Securities Analyst |
| Citigroup Inc. | Securities Analyst |
| Corporate Technology Information Services, Inc. | Securities Analyst |
| Cravath, Swaine & Moore LLP | Co-Counsel for Bristol-Myers in Apotex patent litigation; Disclosure counsel for Bristol-Myers in connection with Apotex settlement |
| Credit Suisse, North America | Securities Analyst |
| Datamonitor | Securities Analyst |
| Deutsche Bank Securities, Inc. | Securities Analyst |
| Dewey & LeBoeuf LLP | Counsel to F. Lacey, court-appointed independent monitor |
| Joseph F. Dooley | Securities Analyst |
| Dresdner Kleinwort Securites LLC | Securities Analyst |
| Fitch, IBCA | Securities Analyst |
| Fitzpatrick, Cella, Harper & Scinto | Co-Counsel for Bristol-Myers in Apotex patent litigation |
| Friedman, Billings, Ramsey & Co. | Securities Analyst |
| The Goldman Sachs Group, Inc. | Securities Analyst |
| Governance Metrics | Securities Analyst |
| HSBC Global Research | Securities Analyst |
| Husch Blackwell Sanders Welsh & Katz | Counsel for Apotex in Apotex patent |

| LLP | litigation |
|---|---|
| ISS CGQ Reports | Securities Analyst |
| J.J.B. Hilliard, W.L. Lyons, Inc. | Securities Analyst |
| J.P. Morgan Securities Inc. | Securities Analyst |
| King & Spalding | Counsel to Sanofi in the DOJ's investigation of the Apotex settlement |
| Frederick B. Lacey | Court appointed independent monitor |
| Life Science Analytics, Inc. | Securities Analyst |
| Merrill Lynch Research | Securities Analyst |
| Morgan Stanley | Securities Analyst |
| David S. Moskowitz | Securities Analyst |
| Natexis Bleichroeder | Securities Analyst |
| New Constructs | Securities Analyst |
| Oppenheimer & Co. | Securities Analyst |
| Pricetarget Research Inc. | Securities Analyst |
| Prudential Equity Group, LLC | Securities Analyst |
| Jamilu E. Rubin | Securities Analyst |
| Sanofi Aventis U.S. LLC | Co-plaintiff in Apotex patent litigation |
| SG Cowen Securities | Securities Analyst |
| Sun Trust Robinson Humphrey | Securities Analyst |
| Thomson Street Events – Thomson Reuters | Securities Analyst |
| UBS Equity Research | Securities Analyst |
| Wachtell, Lipton, Rosen & Katz | Counsel for Sanofi Aventis in Apotex patent litigation |
| Stephen Williams | Securities Analyst |

After extensive negotiations between Lead Counsel and counsel for each of these non-parties over the course of almost six months, nearly all of these non-parties provided responsive documents in their possession. This included Apotex Corp., which did so only after Lead Plaintiff moved to compel, as discussed below, following numerous meet-and-confer telephone calls, negotiation of an individualized confidentiality order, and extensive correspondence.

56. Lead Plaintiff also pursued a Freedom of Information Act request to the FTC and a Maryland Public Information Act request to the Maryland Attorney General's office (who represented the fifty state attorneys general in reviewing the Plavix settlement) in order to obtain relevant documents maintained by those agencies. As a result of this request, Lead Plaintiff obtained, among other things, the amended certification dated June 12, 2006, signed

by Defendant Bodnar and Evan Chesler of Cravath, Swaine & Moore LLP ("Cravath") that served as the basis for the indictment of Bodnar on charges of making a knowingly false and fraudulent statement to the Federal Trade Commission.

57.     Beginning on November 5, 2008, the parties exchanged initial disclosures.  Lead Plaintiff disclosed information related to its investment advisors and the individuals Lead Plaintiff believed to have relevant information (including individuals whom Lead Plaintiff had uncovered in its pre-discovery investigation).   Similarly, Defendants disclosed information related to the individuals who were likely to possess discoverable information, including many of the individuals Lead Plaintiff later determined to depose.  Further, Bristol-Myers disclosed what categories of documents were in its possession that were relevant to its claims and defenses.

58.     To facilitate the production of documents in a timely fashion while protecting their confidentiality as appropriate, Lead Plaintiff negotiated with Defendants a protective order that the parties submitted to the Court and that the Court entered on November 6, 2008.

59.     Following the parties' exchange of initial disclosures, Lead Plaintiff served document requests on each of the Defendants.  Lead Plaintiff served 34 document requests on Bristol-Myers, including requests for documents relating to: efforts to settle or otherwise resolve the patent infringement litigation with Apotex; its public statements relating to the patent infringement litigation with Apotex; Board meetings (including subcommittees) and Exceptional Circumstances Disclosure Committee ("ECDC") meetings relating to the Plavix patent litigation; lost sales attributable to Apotex's launch of a generic version of Plavix in August 2006; the terminations of Defendant Dolan and former General Counsel Richard Willard; Defendant Bodnar's resignation; the review of the Apotex settlement agreement by

the FTC and state attorneys general; the drop in Bristol-Myers' share price on select dates; and the advice of counsel received in connection with any public statements concerning the Plavix patent litigation with Apotex. Lead Plaintiff also served nine document requests on each of Defendants Dolan and Bodnar, including requests for documents relating to: communications with one another; their respective termination and resignation from Bristol-Myers; their employment agreements with Bristol-Myers; compensation; and purchases or sales of Bristol-Myers securities. On April 2, 2009, Lead Plaintiff served five additional requests on Bristol-Myers relating to its attorney-client relationship with Cravath, including requests for documents sufficient to show the aggregate fees paid by Bristol-Myers to Cravath during the relevant period and the matters for which Cravath served as counsel for Bristol-Myers.

60.    Defendants each asserted the affirmative defense of reliance on advice of counsel in their answers to the Amended Complaint. Lead Counsel extensively researched the case law concerning this defense, including the scope of waiver of the attorney-client and/or work product privileges resulting from invocation of the defense. Utilizing that research, Lead Counsel extensively negotiated with Defendants' counsel to obtain otherwise privileged documents related to advice provided by their counsel in order to test this defense. Over the course of more than four months, the parties regularly met-and-conferred by telephone concerning the otherwise privileged documents to be produced by Defendants. Specifically, Lead Counsel conducted meet-and-confer sessions with counsel for Bristol-Myers on January 14, 2009, February 3, 2009, February 23, 2009 and April 13, 2009. In addition, correspondence concerning the parties' respective positions on the scope of waiver (as well as

other objections)[5] was exchanged on January 16, 2009; January 26, 2009; February 3, 2009; February 4, 2009; February 6, 2009; February 10, 2009; February 19, 2009; February 22, 2009; February 23, 2009; March 23, 2009; April 13, 2009; April 15, 2009; April 17, 2009; April 20, 2009; and April 29, 2009.    Bristol-Myers ultimately agreed to produce (1) communications between Bristol-Myers personnel and counsel regarding the discussions with Apotex about settlement of the Plavix patent litigation; (2) communications between Bristol-Myers personnel and counsel concerning the certification requested by the FTC on June 8, 2006 and provided on June 12, 2006; and (3) communications with counsel regarding public disclosures concerning the proposed settlement of the Plavix patent litigation.    Bristol-Myers agreed to interpret this latter category to include documents concerning (a) whether or not provisional relief (*i.e.*, a preliminary injunction against Apotex) should be pursued and the likelihood of obtaining provisional relief; (b) whether or not damages or particular types of damages (*i.e.*, treble or enhanced damages) were likely to be recovered from Apotex; (c) whether or not Apotex was preparing to launch or likely to launch a generic product prior to an adjudication on the merits; and (d) the likelihood of obtaining regulatory approval of the settlement.    In connection with these negotiations, Lead Counsel also carefully reviewed Bristol-Myers' sixty-seven page privilege log and ten page redaction log, successfully obtaining numerous individual documents that Bristol-Myers initially sought to withhold on grounds of privilege.    Separate meet-and-confer sessions were held with counsel for Defendant Bodnar on March 11, 2009, March 24, 2009 and April 3, 2009.

61.    To ensure that Lead Plaintiff thoroughly explored all avenues of discovery related to Defendants' affirmative defense of reliance on counsel, in addition to pursuing otherwise

---

[5] Other areas of discussion included the relevant time period for document production, objections to particular requests, and the protocols and search terms that would be used in this case, since the vast majority of the production was in electronic format.

privileged documents from Defendants, Lead Plaintiff issued document subpoenas to Bristol-Myers' outside counsel Cravath and Fitzpatrick, Cella, Harper & Scinto ("Fitzpatrick Cella"), as well as King & Spalding LLP, outside counsel to Bristol-Myers' business partner Sanofi-Aventis. Because Cravath served as disclosure counsel to Bristol-Myers, their documents were a major focus of Lead Counsel's efforts. Lead Counsel extensively conferred with and exchanged correspondence with Cravath concerning the production of otherwise privileged documents in its possession. Specifically, Lead Counsel formally met-and-conferred with Cravath on April 17, 2009, and had informal discussions with Cravath concerning its production of otherwise privileged documents and two privilege logs totaling one hundred eighty-four pages on February 10, 2009; February 11, 2009; March 6, 2009; April 27, 2009 and April 29, 2009. In addition, correspondence (including email correspondence) concerning the parties' respective positions on the scope of waiver and privilege log to be produced was exchanged on February 10, 2009; February 11, 2009; February 16, 2009; February 19, 2009; February 25, 2009; February 26, 2009; March 2, 2009; March 6, 2009; March 18, 2009; March 23, 2009; March 26, 2009; April 3, 2009; April 4, 2009; April 6, 2009; and May 1, 2009. As a result of these efforts, in addition to producing documents within the scope of Bristol-Myers' privilege waiver referred to in the preceding paragraph, Cravath agreed to produce otherwise-privileged documents upon which Susan Webster, primary disclosure counsel to Bristol-Myers, relied in providing advice to Bristol-Myers upon Lead Plaintiff's entry into a stipulation that it would not use such production to argue for a broader waiver of work product protection.

62.    Lead Plaintiff also pursued document discovery against Apotex, including through subpoenas to Apotex Corp. (the U.S. subsidiary) and the U.S. law firms that represented Apotex in the DOJ investigation. Lead Counsel engaged in numerous discussions

with counsel for Apotex Corp. concerning the subpoenas and the possibility of obtaining documents from Apotex Inc., the Canadian parent corporation, that were unavailable from the American entities without the need for motion practice, including on November 3, 2008; November 10, 2008, November 12, 2008; November 13, 2008; November 25, 2008; December 5, 2008; December 13, 2008; and December 15, 2008.   During these discussions, counsel for Apotex Corp. demanded a protective order specific to its production that would limit Defendants' access to the produced documents.   Lead Counsel negotiated a protective order that was responsive to Apotex's concerns while still respectful of Defendants' rights in the litigation and Lead Plaintiff's rights to the documents.   Notwithstanding Lead Plaintiff's efforts, Apotex eventually refused to comply with Lead Plaintiffs' document subpoenas or produce any documents voluntarily.   On December 18, 2008, Lead Plaintiff filed a letter requesting a pre-motion conference with the Court concerning its intent to move to compel production against the subpoenaed entities and requesting the issuance of letters rogatory for purposes of seeking document discovery and deposition testimony from Apotex Inc.   In its letter, Lead Plaintiff discussed the history of negotiations between the parties, the importance of the discovery at issue to its case, and that there was virtually no burden on the subpoenaed entities to produce the requested discovery because they had already produced it to the government in connection with the DOJ's investigation of Bristol-Myers.   In a letter dated December 23, 2008, the subpoenaed entities argued (for the first time) that the subpoenas were overbroad, that it would be burdensome for them to produce the requested discovery, and that they would be prejudiced if Bristol-Myers received the requested discovery because Apotex and Bristol-Myers were engaged in litigation relating to Plavix in other forums.   On January 27, 2009, the Court heard Lead Counsel and counsel for the subpoenaed entities on

this issue. The Court ordered the subpoenaed entities to comply with Lead Plaintiff's requests in full and signed Lead Plaintiff's request for international assistance (letters rogatory) so that Lead Plaintiff could seek to obtain document discovery and deposition testimony from Apotex Inc. On February 4, 2009, the Court entered the Apotex-specific protective order.

63.    Lead Plaintiff retained Canadian counsel, Bennett Jones LLP, to enforce the letters rogatory. With Canadian counsel's assistance, Lead Plaintiff filed an application in the Commercial List of the Ontario Superior Court of Justice to enforce the letters rogatory. This application included both legal support for the application and an affidavit from Lead Counsel concerning the need for the discovery sought. On April 28, 2008, counsel for Apotex submitted opposition papers, including an expert declaration from Professor Geoffrey C. Hazard, Jr. Apotex also requested depositions in connection with the motion, including of Lead Counsel concerning the need for the discovery sought. In light of Apotex Corp.'s substantial document production in response to the Lead Plaintiff's subpoena (after the Court compelled production of documents), Lead Plaintiff determined to attempt to consensually resolve the discovery dispute with Apotex Inc. by arranging for the testimony of Apotex's CEO Bernard Sherman. Negotiations concerning this resolution were ongoing at the time the parties agreed to settle.

64.    Ultimately, Defendants and non-parties produced more than 740,000 pages of documents in response to Lead Plaintiff's document requests, subpoenas and Freedom of Information law requests. Given the substantial volume of documents, the bulk of which were received in November 2008, and the relatively tight discovery schedule provided for under the case management plan negotiated by the parties and ordered by the Court on October 22, 2008 (which initially provided for fact discovery to close by April 22, 2009 and was later amended

to provide for fact discovery to close by June 22, 2009), Lead Counsel had numerous attorneys and professionals dedicated to reviewing these documents on an expedited basis.[6]  To review, organize and analyze this information, at Lead Counsel's cost, the documents were all placed in an electronic database that allowed counsel to search the documents through 'Boolean' searches as well as by other categories, such as by author and/or recipients, type of document (i.e., emails, spreadsheets), date, producing party, etc.  Lead Counsel held team meetings every Friday morning with Plaintiffs' counsel to discuss the document review and the status of the litigation.  In one meeting, Plaintiffs' expert in patent settlements provided counsel with his guidance, as discussed below.

65.    Defendant Bristol-Myers served requests for documents on Lead Plaintiff and named plaintiff Minneapolis Firefighters' Relief Association ("Minneapolis Firefighters"). Plaintiffs produced approximately 2,000 pages of documents in response to these requests, including Plaintiffs' trading records in Bristol-Myers stock during the relevant period, analyst reports, and public documents relied on in the complaint.

(2)    Experts

66.    To assist it in the prosecution of the Action, Lead Counsel retained two experts, Columbia Law School Professor Scott Hemphill and Keith A. Bockus, a Principal of Chicago Partners, a subsidiary of Navigant Consulting, Inc.  Lead Counsel negotiated competitive fee rates for these experts, each of whom played a significant part in the prosecution of this Action.

67.    Professor Hemphill is an expert on the settlement of patent litigation between brand name patent-holders and generic drug manufacturers.  *See* Hemphill Decl. attached as Exhibit D.  Lead Counsel asked Professor Hemphill to, among other things, analyze the term

---

[6] This schedule was later extended to accommodate Defendant Bodnar's criminal trial, as discussed above.

"at risk" launch, including how that term would have been understood by analysts and other market participants during the Class Period, and, based on that analysis, to opine on how market participants would have understood Bristol-Myers' statements at issue. Lead Plaintiff intended to use Professor Hemphill to help establish that Bristol-Myers' use of the term "at risk" in its statements at issue was misleading and that the misleading statements were highly material. On February 20, 2009, Professor Hemphill made a presentation concerning settlements between brand-name patentholders and generic drug manufacturers generally, "at risk" launches in particular, and things to look for in document review.

68.    Dr. Bockus is an economist and professor specializing in the areas of accounting, economics, and finance as they relate to financial analysis, security analysis, and valuation. Lead Counsel asked Dr. Bockus to help identify all potential corrective disclosure dates, assist with loss causation determinations, and calculate potential damages. Dr. Bockus also assisted in the creation of the Plan of Allocation in connection with the proposed Settlement. *See* Declaration of Keith A. Bockus ("Bockus Decl.") attached as Exhibit C.

69.    Lead Plaintiff was prepared to proceed with expert reports and discovery when settlement was reached.

(3)    Depositions

70.    Given the complexity of the case, Lead Plaintiff negotiated with Defendants to increase the number of depositions it could take from the presumptive ten depositions set forth in Federal Rule of Civil Procedure 30 to eighteen depositions. Even at that higher total number, Lead Plaintiff had to limit depositions to only the most relevant witnesses.

71.    At the time the parties agreed to settle, Lead Plaintiff had noticed and scheduled, or was in the process of scheduling, the depositions of sixteen (16) witnesses to be taken between May 5, 2009 and June 23, 2009, and was in the process of identifying additional

potential deponents. The witnesses included Defendants Dolan and Bodnar, as well as many other key current and former employees of Bristol-Myers, including Chief Financial Officer Andrew Bonfield, General Counsel Richard Willard, Deputy General Counsel Frank Zarb, Vice President and Corporate Secretary Sandra Leung, Executive Vice President and President of Worldwide Pharmaceuticals Lamberto Andreotti, Vice President of Investor Relations John Elicker, and Board member James Robinson III.[7]  Non-party witnesses included Bristol-Myers' external legal counsel, including Cravath partners Susan Webster, Evan Chesler, and Richard Stark and Fitzpatrick Cella partner Robert Baechtold, as well as Apotex CEO Bernard Sherman and Bristol-Myers' Independent Court-Appointed Monitor Frederick B. Lacey.

72.    Lead Counsel also engaged in discussions with Sanofi Aventis concerning deposing relevant witnesses from that company, which, as noted above, was Bristol-Myers' partner in marketing Plavix worldwide. These witnesses included Jean-Pierre Kerjouan, who was Sanofi Aventis' chief representative in negotiating the Apotex settlement. Because Mr. Kerjouan, who was retired and living in France, objected to having his deposition taken (as did the other potential Sanofi Aventis witnesses located in France) and French law places high barriers to involuntary civil depositions, Lead Plaintiff negotiated an agreement that would allow Lead Plaintiff to obtain the information necessary to its case while avoiding the expense and delay of extraterritorial proceedings.

73.    The agreed-to deposition schedule, which was the result of numerous discussions between the parties and non-parties, at the time of Settlement was as follows:

| Name | Title | Date | Subject Matter |
|------|-------|------|----------------|
| John Elicker | Vice President of Investor Relations, | May 5, 2009 | • Company's awareness of what information |

[7] The job titles given are those the individuals had during the Class Period.

| | Bristol-Myers | | investors and analysts considered important, including concern about possibility of a launch of generic Plavix by Apotex |
|---|---|---|---|
| Thomas McKenna | Senior Vice President, Strategy & Operations, Bristol-Myers | May 6, 2009 | • Contingency plans developed in event of loss of patent protection on Plavix<br>• Likelihood of a competitive launch by Apotex pre- and post-settlements |
| Frank Zarb | Vice President and Deputy General Counsel/Chief Securities Counsel, Bristol-Myers | Week of May 11 or May 18, 2009 | • Involvement in disclosure decisions<br>• Disclosure process generally and divergences therefrom |
| Robert Baechtold | Partner, Fitzpatrick, Cella, Harper & Scinto | May 12, 2009 | • Effect of limitations on damages and injunctive relief on likelihood of Apotex launch<br>• Decision whether to pursue injunctive relief |
| Richard Stark | Partner, Cravath, Swaine & Moore LLP | May 20, 2009 | • Effect of limitations on damages and injunctive relief on likelihood of Apotex launch<br>• Decision whether to pursue injunctive relief<br>• Discussions with the FTC, state attorneys general |
| Evan Chesler | Partner, Cravath, Swaine & Moore LLP | May 21, 2009 | • Involvement in disclosure decisions<br>• Effect of limitations on damages and injunctive relief on likelihood of Apotex launch<br>• Decision whether to pursue injunctive relief<br>• Discussions with the FTC and state attorneys general |

| Susan Webster | Partner, Cravath, Swaine & Moore LLP | May 27, 2009 | • Involvement in disclosure decisions<br>• Effect of limitations on damages and injunctive relief on likelihood of Apotex launch<br>• Decision whether to pursue injunctive relief |
|---|---|---|---|
| Sandra Leung | Vice President, Corporate Secretary, Bristol-Myers | June 4, 2009 | • Involvement in disclosure decisions<br>• Disclosure process generally and divergences therefrom<br>• Involvement in Board meetings |
| Richard Willard | General Counsel, Bristol-Myers | June 8, 2009 | • Involvement in disclosure decisions<br>• Involvement in Board meetings<br>• Circumstances leading to his termination |
| Peter Dolan | CEO, Bristol-Myers | June 16, 2009 | • Involvement in negotiations with Apotex<br>• Involvement in disclosure decisions<br>• Involvement in Board meetings<br>• Circumstances leading to his termination<br>• Scienter |
| Frederick Lacey | Independent Monitor, Special Counsel, Dewey & LeBoeuf | June 17-18, 2009 | • Involvement in disclosure decisions;<br>• Disclosure process generally and divergences therefrom |
| Andrew Bodnar | Senior Vice President of Strategy and Medical and External Affairs, Bristol-Myers | June 19, 2009 | • Involvement in negotiations with Apotex<br>• Effect of limitations on damages and injunctive relief on likelihood of Apotex launch<br>• Decision whether to pursue injunctive relief<br>• Involvement in disclosure decisions |

| | | | |
|---|---|---|---|
| | | | • Involvement in Board meetings<br>• Circumstances leading to his resignation<br>• Scienter |
| Andrew Bonfield | Chief Financial Officer, Bristol-Myers | June 23, 2009 | • The market's concerns about the possibility of an at risk launch by Apotex<br>• Effect of limitations on damages and injunctive relief on likelihood of Apotex launch<br>• Decision whether to pursue injunctive relief |
| Bernard Sherman | Chairman and CEO, Apotex Inc. | Unscheduled | • Negotiation of settlement agreements, including undisclosed oral side agreements<br>• Effect of damages limitations on decision to launch generic version of Plavix |
| James Robinson III | Non-executive Chairman of the Board, Bristol-Myers | Unscheduled | • Importance of undisclosed terms<br>• Information that was and was not provided to the Board of Directors<br>• Terminations or resignations of Dolan, Bodnar, Willard |
| Lamberto Andreotti | Executive Vice President, President of Worldwide Pharmaceuticals, Bristol-Myers | Unscheduled | • Involvement in disclosure decisions<br>• Importance of Plavix |

74.    The day before the first deposition was originally scheduled to take place, the parties agreed to a settlement in principle. Prior to that agreement, Lead Counsel had prepared extensively for the witnesses scheduled to be deposed. Had the Settlement not been reached, Lead Counsel was fully prepared to proceed with the scheduled depositions.

75.    Prior to entering into a final settlement agreement, Lead Counsel took the depositions of Bristol-Myers in-house counsel Sandra Leung and Cravath partner Susan Webster.  Ms. Leung, who is currently Bristol-Myers' General Counsel, was Vice President and Corporate Secretary during the Class Period.  In that role, she had responsibility for disclosures in Bristol-Myers SEC filings and press releases, including the specific public statements and disclosures at issue in this case.  Susan Webster is a senior partner at Cravath with many years of experience advising companies on disclosure obligations.  She is currently the practice leader of the General Corporate Group at Cravath, a group which encompasses the practice area of advice with respect to required disclosures under the securities laws.  Ms. Webster has provided counsel to Bristol-Myers with respect to required disclosures under the securities laws since 1993 and advised Bristol-Myers with respect to the specific public statements and disclosures at issue in this litigation.  These witnesses, each of whom played a central role in the creation of the public statements and disclosures at issue, were selected for purposes of further examining Defendants' asserted reliance on counsel defense – which, in the estimation of Lead Counsel and Lead Plaintiff, was Defendants' strongest potential defense against liability.

76.    Ms. Leung and Ms. Webster each provided testimony that was supportive of Defendants' asserted reliance on counsel defense.  With regard to the damages limitations contained in both the initial and amended settlement agreements with Apotex, Ms. Webster and Ms. Leung each testified that Evan Chesler, the Cravath lawyer representing Bristol-Myers in the Plavix patent litigation with Apotex, informed them that, in his estimation, (1) Bristol-Myers was unlikely to ever recover damages in excess of the damages caps agreed to in the Apotex settlement agreement or to be awarded enhanced (up to treble) damages; and (2) that

one could not predict whether Apotex would launch generic Plavix given the damages limitations in the settlement agreement. Ms. Webster testified that, based on Mr. Chesler's assessment, she advised Bristol-Myers that the damages caps and waiver of the right to seek enhanced damages (including treble damages) were not material terms of the Apotex settlement agreement. Ms. Leung testified that she and others at Bristol-Myers relied on Ms. Webster's advice in omitting discussion of these provisions in their public statements concerning the Apotex settlement.

77.    Ms. Webster also testified that, in her view, a "launch at risk" is the manufacture and sale of a pharmaceutical product at risk of infringing a third party's intellectual property rights, and that a launch by Apotex would have been (and ultimately was) a launch "at risk" notwithstanding the damages limitations contained in the settlement agreement because Bristol-Myers and Sanofi still had the right to seek to enforce their patent rights against Apotex. Ms. Leung testified to a similar understanding of the term "launch at risk."

78.    Ms. Webster also testified that Mr. Chesler had informed her that Bristol-Myers did not intend to seek injunctive relief in the event of a launch of generic Plavix by Apotex and that, based on this understanding, she advised Ms. Leung and others at Bristol-Myers that she did not believe the restrictions on injunctive relief in the initial and amended settlement agreements were material terms of the Apotex settlement. Ms. Leung testified that Bristol-Myers relied on Cravath's advice in crafting its disclosures concerning the settlement agreement.

79.    Ms. Webster also testified that she determined that Bristol-Myers did not have to disclose the May 5, 2006 decision by the state attorneys general to not approve the initial Apotex settlement agreement. Ms. Webster testified that her understanding, after speaking

with Mr. Chesler, was that (1) the regulators had a fairly discrete set of issues they were objecting to; (2) the initial settlement agreement contemplated that there would be an iterative process with respect to approval by the regulators, and contained clauses requiring the parties to continue to meet in good faith to try to resolve any objections raised by the regulators, and (3) Apotex's CEO had indicated a willingness to engage in further negotiations to resolve the regulators' objections. Accordingly, Ms. Webster testified that she informed Ms. Leung and Bristol-Myers in-house attorney Frank Zarb that her view was that Bristol-Myers did not have to disclose the state attorneys general's decision. Ms. Leung testified that she and others at Bristol-Myers relied on Ms. Webster's advice in formulating their disclosures.

80.    Ms. Leung also testified that she was unaware of the representations made by Defendant Bodnar to Apotex, which resulted in both Bristol-Myers and Defendant Bodnar pleading guilty to crimes of making a false and fraudulent statement to the FTC, during the Class Period.

81.    Lead Counsel had a thorough understanding of the facts of this case and was fully prepared to challenge this testimony at trial with numerous facts. However, counsel also took this testimony into consideration in evaluating the settlement, as discussed below.

## C.    Class Certification

82.    Pursuant to the terms of the operative Scheduling Order, Lead Plaintiff's motion for class certification was not scheduled to be filed until August 14, 2009. In connection with its motion for the preliminary approval of the Settlement, Lead Plaintiff requested, and the Court granted, preliminary certification of the Class for settlement purposes.

## D.    The Risks Faced by Plaintiffs

83.    At the time the agreement in principle to settle the action was reached, Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and weaknesses of

the case.  While we believe that all of the claims asserted against Defendants have merit, we also recognize that there were serious risks as to whether Lead Plaintiff would ultimately prevail on the merits, including as a result of Defendants' affirmative defense of reliance on the advice on counsel.  In addition to the risk that Lead Plaintiff might not succeed on the merits before a jury, there was a very substantial risk that, even if Lead Plaintiff were to prevail, the Class might not recover as much as the Settlement Amount on a judgment, much less more than the Settlement Amount.  As discussed further below, Defendants could persuade a jury that the allegations related to stock price drops on the two alleged corrective disclosure dates are actually only partially recoverable on one of those days, or not at all.

84.  As discussed above, Defendants would have continued to dispute whether Lead Plaintiff could establish Defendants' scienter.  Defendants would have argued that they relied on the advice of their outside counsel, Cravath, in making the disclosures at issue in this case. Indeed, as discussed *supra*, the Company's outside counsel testified that she had advised Bristol-Myers that its disclosures were appropriate.  Moreover, Defendants would have argued that the decisions were approved by a special disclosure committee at Bristol-Myers, the Exceptional Circumstances Disclosure Committee, which reviewed the disclosures with outside counsel; and that the challenged disclosures were also reviewed by Frederick B. Lacey, Bristol's federally-appointed monitor and a former U.S. District Court Judge.

85.  Lead Plaintiff believes that it had sufficient evidence to establish scienter and impeach the testimony of its in-house and outside counsel.  Contemporaneous documents, including emails and other memoranda, demonstrated that Bristol-Myers, which had its own investor relations division, closely monitored what information was considered material by the market.  Each of the Individual Defendants, as well as other senior management, received and

discussed regular email updates on the market's reaction to Bristol-Myers announcements.  In recognition of Defendants' greater knowledge of what was important to shareholders, emails indicate that outside counsel deferred to Bristol-Myers on determinations of materiality.  For example, in a June 2, 2006 email exchange between Ms. Webster, Ms. Leung, and Bristol-Myers' in-house securities counsel Frank Zarb regarding whether the damages limitations contained in the amended Apotex settlement agreement needed to be disclosed, Ms. Webster wrote:

> This obviously depends on the facts.  Based on discussions at the time of the earlier release and earlier this week my understanding is that the Company's view is that these provisions are not material.  Among other things, I understand that Apotex was already likely to launch at risk before this agreement was executed and it is unlikely that BMS would seek a preliminary injunction in any event for strategic reasons.  Also the recovery of any damages from a Canadian company that has said it will file for bankruptcy if it loses this case seems uncertain at best.  I would be happy to discuss this in more detail if you like.  And of course the views of Andy Bodnar and others closer to the facts than I are important.

Based on this and similar documents, Lead Plaintiff was confident a jury could determine that Bristol-Myers, rather than Cravath, was ultimately responsible for the Company's disclosure decisions.  Furthermore, Lead Plaintiff believes it had sufficient evidence to establish that the ECDC never considered the importance of the damages and other enforcement limitations contained in the amended settlement agreement, and that former Judge Lacey did not have significant involvement in the disclosure decisions.  While Lead Plaintiff was confident a jury could determine that the Defendants acted with scienter, Lead Plaintiff recognized that there was significant uncertainty as to whether it would do so given the testimony of distinguished outside counsel, including the heads of Cravath's corporate and litigation departments, Webster and Chesler, and a former federal judge, Judge Lacey.

86.    Defendants also would have contended that there were no material misstatements or omissions; that the Company's statements during the Class Period were all literally true when made; that the Company repeatedly warned investors of the risk that the Apotex settlement would not be approved; that Apotex could launch "at risk" in the event of such rejection; and that Defendants adequately disclosed the risks that eventually materialized, rendering the alleged omissions non-material.    As Lead Plaintiff learned in discovery, Defendants had previously commissioned a report by outside counsel, which they presented to the Securities and Exchange Commission, addressing whether Bristol-Myers had violated any federal securities laws in connection with the Apotex settlement.    This report, which was allegedly based on interviews of fifteen witnesses and "extensive documentary records" concluded that the omitted information was not material, that Defendants' disclosures were appropriate, and that Defendants did not violate the federal securities laws.    Moreover, Judge Lacey, the Company's independent monitor, reached the same conclusions in a separate report provided to the United States' Attorneys' Office for the District of New Jersey.    While Lead Plaintiff disputes these arguments and findings, it was aware of the risk that they could be introduced at trial and ultimately persuade the jury.

87.    Lead Counsel was cognizant of the fact that events subsequent to the Class Period could lend some superficial support to the Company's claims that its promise to "vigorously pursue" the litigation against Apotex were accurate.    Bristol-Myers did go on to obtain a preliminary injunction against Apotex twenty-three days after it launched generic Plavix, prevailed at trial against Apotex, successfully defended that judgment on appeal to the Second Circuit, and recently the Supreme Court declined Apotex's request for a writ of *certiorari* to appeal the Second Circuit's ruling.    Defendants also would have continued to claim that the use

of the phrase "at risk" was appropriate for the circumstances in which it was used, and that the phrase does not have the strict industry meaning ascribed to it that Lead Plaintiff alleged. In this regard, Defendants could cite to the observation of the trial court in the Apotex litigation that the Apotex launch was "at risk." *Sanofi-Synthelabo v. Apotex Inc.*, 488 F. Supp. 2d 317, 321 (S.D.N.Y. 2006) (Stein, J.). Furthermore, Defendants could continue to argue that the rejection by the state attorneys general of the original settlement was immaterial, because, rather than stymieing settlement efforts altogether, the rejection resulted in a renegotiated settlement and was thus not necessary to disclose as a mere delay.

88. In response, Lead Plaintiff was prepared to offer significant evidence that industry participants understood Defendants' public statements in the manner that Lead Plaintiff alleged rendered those statements misleading. Lead Plaintiff had assembled significant facts demonstrating that before the terms of the Apotex settlement were disclosed, the market did not expect Apotex to launch a generic Plavix product; after the terms were disclosed, securities analysts almost uniformly revised their opinions and expected an imminent launch. For example, in cutting its fair value on Bristol-Myers stock from $22 to $17, Natexis Bleichroeder specifically noted that the damages limitations gave Apotex "an incentive to launch its own version" of Plavix. Moreover, Bristol-Myers was forced by the Court to wait 5 business days before seeking injunctive relief, in accordance with the previously undisclosed settlement term with Apotex, thereby allowing Apotex to flood the market with generic Plavix. Indeed, Bristol-Myers has admitted that it lost sales of $1.75 billion as a result of Apotex's launch of its version of generic Plavix and its inability to seek injunctive relief for the 5 business day time period. Lead Plaintiff also intended to introduce the testimony of Professor Hemphill concerning the market's understanding of "at risk" launches during the Class Period.

However, Lead Plaintiff recognized that there were real risks to its ability to establish such material misrepresentations, including the risk that a jury would not adequately understand the patent law statutory scheme or the "at risk" terminology. These risks were exacerbated by the resistance Apotex was putting up to discovery in Canada.

89.    Defendants also would argue that contrary to the allegations in the Amended Complaint, the Company did not enter into oral side agreements with Apotex. Although the Company and Bodnar pled guilty in separate actions to making false statements to the government related to the alleged oral side representations, they never admitted the existence of any oral side agreements as alleged in the Amended Complaint. However, Lead Plaintiff had adduced significant evidence in support of these allegations (including contemporaneous records of the secret conversations as set forth in the declaration of Bernard Sherman submitted in the Plavix patent infringement litigation) and was pursuing additional supporting evidence, including through the proceedings in Canada. Lead Plaintiff intended to seek to introduce the guilty pleas of Bristol-Myers and Bodnar in connection with making false statements to the FTC concerning the existence of such side agreements.

90.    In addition, Bodnar would have continued to argue that he could not be held liable under Section 10(b) of the Exchange Act because he did not make any of the alleged false statements, and both Individual Defendants would have continued to argue that they did not have the requisite scienter. Indeed, the recent Sentencing Memorandum filed in support of Bodnar in connection with his guilty misdemeanor plea for filing a false document with the FTC, asserts that Bodnar was unaware of the inaccuracy at the time he signed a certification on behalf of his employer, Bristol-Myers. The Sentencing Memorandum paints a picture of a distinguished physician devoted to the service of others, which was supported by numerous

supporting letters, including by the Presiding Partner at Cravath, Evan Chesler, and former federal judge Lacey, who served as a monitor at Bristol-Myers.[8]   However, Lead Plaintiff was prepared to demonstrate that Bodnar had a key role in crafting and approving Bristol-Myers' disclosures during the Class Period.

91.    Lead Plaintiff and Lead Counsel also considered that, even if Lead Plaintiff were to prevail on the merits, the ability to recover as much as the Settlement Amount on a judgment, much less more than the Settlement Amount, was far from certain.  As noted above, Lead Plaintiffs have achieved a recovery of 22% of the maximum aggregate damages alleged in this case (assuming that all Class members file proofs of claim).  However, it is important to note that Defendants would have argued that the declines in the share price of Bristol-Myers common stock on July 27, 2006 and on August 8, 2006 were only partially related to the alleged fraud, if at all.  With regard to July 27, 2006, Defendants would have continued to argue that that the disclosure of the FBI investigation did not reveal the subject matter of the non-disclosures alleged in the Amended Complaint, and thus cannot constitute a corrective disclosure because it does not correct any previous omissions or false or misleading statements. While Lead Plaintiff would have vigorously contested this point, there is case law supporting Defendants' contention.  Thus, we faced the risk of no recovery for this drop, which would have reduced maximum aggregate damages to $375 million.  *See* Bockus Decl. ¶30. With regard to August 8, 2006, Defendants would have argued that the fall in the share price of Bristol-Myers stock was reflective of the news that Apotex actually had launched its generic version of Plavix that day, and not the disclosure of the previously undisclosed terms of the settlement with Apotex.   If the price of Bristol-Myers stock had dropped only because of

---

[8] *See United States v. Bodnar*, 08-CR-115 (RMU) (D.D.C.), Sentencing Memorandum On Behalf Of Dr. Andrew G. Bodnar, filed May 28, 2009, Docket No. 44.

Apotex's launch rather than disclosure of the previously undisclosed terms of the Apotex settlement agreement, Defendants would have contended that the decline was attributable to a disclosed risk (that Apotex could launch at risk) and not in response to the failure to disclose material information regarding the previous agreements to investors. Defendants would have argued, as they did on their motion to dismiss, that there were no loss causation and thus there were no materially misleading statements or omissions as a matter of law. Lead Plaintiff was confident, however, that it could show that the disclosure of the settlement terms on August 8, 2006 was what drove the fall in Bristol-Myers share price as the share price reached its lowest point at 9:28 a.m. on August 8, 2006, before news of Apotex's launch came out. Bockus Decl. ¶¶17-19. Moreover, numerous analyst reports and news articles from August 8, 2006 and thereafter highlighted the importance of the settlement terms. AC ¶¶97-110.

92.    If Defendants persuaded a jury that even one of those dates was not a corrective disclosure related to the alleged fraud, the maximum damages due to the Class could be reduced by hundreds of millions of dollars. For example, as explained in the Bockus Declaration, attached hereto as Exhibit C, if Defendants persuaded a jury that the stock price decline on August 8, 2006 was not attributable to disclosure of the alleged fraud, because in addition to the settlement terms becoming public that day the fact that Apotex actually launched its generic Plavix was also disclosed, the Class would have maximum recoverable damages of $462 million based on the July 27, 2006 stock price decline. Bockus Decl. ¶30. Under that measurement, Lead Plaintiff has already achieved a recovery of 27% of the partial damages recovery (assuming full claims participation by the Class). Similarly, if the jury was persuaded that only the August 8, 2006 stock price drop was recoverable as damages (and not the July 27, 2006 announcement of the FBI raid because that news provided no "corrective"

disclosure of the undisclosed facts to the market), maximum recoverable damages would be $375 million, and the proposed Settlement would constitute 33% of that amount (assuming full participation by the Class). *Id.* Of course, if Defendants persuaded a jury that there was no corrective disclosure on either date, the Class would receive no recovery. Furthermore, each of the aggregate damages figures above assume a 100% claims rate by members of the Class; in other words, that following a trial each and every member of the Class would file a proof of claim. The percentage of claims actually submitted in securities actions is typically significantly lower. A less than 100% claims rate would have the effect of reducing the maximum aggregate damages available. For example, if 50% of Class Members filed claim forms following a trial in which Plaintiffs prevailed and the jury determined that only August 8, 2006 was a corrective disclosure date, the total damages would be $187.5 million. In addition, Lead Plaintiff and Lead Counsel also considered the certainty of payment now as opposed to having to wait years for a final resolution after a jury trial and the appeals that would inevitably follow.

93. In sum, Lead Plaintiff was able to carefully weigh the risks and benefits to settlement in a fully informed manner before finally agreeing to a settlement on behalf of the Class.

F. **The Negotiation of the Settlement**

94. The Settlement is the result of intensive, arm's-length negotiations between informed parties, and involved a formal mediation session with all parties present, as well as extensive direct negotiations between counsel for the parties that occurred before and after those mediations. All settlement negotiations occurred while discovery was ongoing and, as described above, Lead Plaintiff was in the process of, among other things, completing the review of hundreds of thousands of pages of documents and preparing for depositions.

95. On April 16, 2009, Lead Plaintiff and Bristol-Myers, through counsel, participated in a mediation session before Michael D. Young at JAMS in New York City. Lead Plaintiff, through its Senior Legal Counsel, Jeffrey M. Davis, attended in person and actively participated in the mediation session. In connection with this mediation, Lead Plaintiff prepared a detailed mediation statement that included documentary evidence in support of its claims that had been identified as of that date. In that mediation statement, Lead Plaintiff provided its strongest affirmative case, as well as rebuttals to Defendants' expected arguments, each of which are discussed above. Lead Plaintiff also reviewed the mediation statement submitted by Defendants, which provided Defendants' arguments as discussed above. After a full day of mediation, the parties reached an impasse because of significant differences in their respective views concerning the merits of Lead Plaintiff's claims, the amount of recoverable damages, the likelihood of success at trial, and the appropriate amount at which to settle.

96. With the continued assistance of Mr. Young and the participation of Lead Plaintiff, the parties continued discussions over the next several weeks, while continuing to prepare for depositions. In early May 2009, the Parties reached an agreement in principle to settle this action on the terms set forth in the Stipulation.

97. Before Lead Plaintiff entered into the Stipulation, however, Lead Counsel conducted additional discovery to confirm the fairness of the proposed Settlement. This additional discovery consisted of Lead Plaintiff taking the depositions of Sandra Leung, Bristol-Myers' current General Counsel, who played a key role in advising the Company on disclosures throughout the Class Period, on June 4, 2009; and Susan Webster, a corporate partner at Cravath, who was Bristol-Myers' principal outside disclosure counsel, on June 15, 2009. As discussed above, during these depositions, Lead Counsel fully explored the

information provided to Defendants' counsel, the disclosure advice provided to Defendants, and the reasonableness of Defendants' reliance on that advice. As discussed above, these witnesses supported the Company's account that it had relied on Cravath's assessment of the materiality of the undisclosed information and determined that the information did not need to be disclosed to the public.[9] At the conclusion of these depositions, Lead Counsel was confident that its previous assessment of the strengths and weaknesses of its case had been correct and the settlement was fair to the Class.

98. In advance of the mediation, Lead Counsel had consulted with a damages expert (Dr. Bockus) to quantify the damages allegedly suffered by the Class and to ensure that any negotiated settlement would confer a substantial benefit to the Class. As noted above, Lead Counsel also had the benefit of its work with its other expert, Professor Hemphill, which gave it an objective evaluation of the strengths and weaknesses of the claims. Consultation with these experts helped provide Lead Plaintiff with sufficient information to make an informed decision about whether to settle this Action and on what terms.

99. Lead Plaintiff's damages expert estimated that the Class's maximum aggregate losses are $566 million, with an estimated 296 million shares of Bristol-Myers stock potentially damaged. The Settlement Amount ($125 million) is approximately 22% of the maximum estimated aggregate damages. This damages estimate assumes that Lead Plaintiff would have been successful on all its claims against all Defendants for the entire Class Period and that all damaged Class members would have filed claims after trial. As discussed above,

---

[9] The report of outside counsel addressing whether Bristol-Myers had violated any federal securities laws in connection with the Apotex settlement, commissioned by Bristol-Myers and presented to the Securities and Exchange Commission, also concluded that Bristol-Myers had relied on the advice of counsel in making the disclosures at issue. Former Judge Lacey reached a similar conclusion in a report issued to the United States Attorney's office in New Jersey.

however, Defendants have substantial arguments as to why damages were actually significantly lower than Lead Plaintiff's damages expert's estimates.

## IV.    CLASS NOTICE

100.  Pursuant to the Order, dated August 18, 2009 (the "Preliminary Approval Order"), this Court granted preliminary approval of the Settlement, preliminarily certified the Class, ordered that notice be disseminated to the Class, and set November 17, 2009, as the date by which all objections to the Settlement, the Plan of Allocation and/or the request for attorneys' fees and reimbursement of expenses, or requests for exclusion from the Class, must be received.

101.  Lead Plaintiff, with the Court's approval, retained The Garden City Group, Inc. ("GCG") as the Claims Administrator for the Settlement.  GCG was selected through a competitive bidding process, and approved by Lead Plaintiff Ontario Teachers.

102.  Pursuant to the Preliminary Approval Order, Lead Plaintiff, through GCG, disseminated copies of the Notice and the Proof of Claim and Release (the "Notice Packet") to potential Class Members.  A copy of the Notice Packet is attached as Exhibit A to the Cirami Affidavit, Exhibit E hereto.  The Notice contains a thorough description of the Settlement, the Plan of Allocation and Class Members' rights to participate in and object to the Settlement, or to exclude themselves from the Class.  *Id.*  As detailed in the Cirami Affidavit, GCG obtained the names and addresses of potential Class Members from the Company's transfer agent, and used GCG's proprietary database of names of brokerage firms, banks, institutions and other nominees that it maintains, as well as names provided by banks, brokers and nominees pursuant to the Preliminary Approval Order for purposes of its initial mailing.  *Id.* at ¶¶3-4.

103. GCG began disseminating the Notice Packet to potential Class Members on September 1, 2009. In total over 242,000 copies of the Notice Packet have been disseminated to potential Class Members. *Id.* at ¶¶3-6.

104. In addition, the Summary Notice ("Publication Notice") was published once each in the national edition of *The Wall Street Journal* and over the *PR Newswire* on September 11, 2009. *Id.* ¶7. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was posted on the website established by the Claims Administrator for this action (www.bristolmyerssecuritieslitigation.com), *id.* ¶9, as well as on Lead Counsel's website (www.blbglaw.com).

105. As ordered by the Court and stated in the Notice, all objections to the Settlement, Plan of Allocation, or request for attorneys' fees and reimbursement of expenses and/or requests for exclusion from the Settlement were to be received by no later than November 17, 2009. There are no objections to the Settlement or the Plan of Allocation. As discussed below, only one individual (and no institutional investor) has voiced a purported objection to the attorneys' fee request, but his letter fails to demonstrate membership in the Class as required by the Notice, and he therefore lacks standing.

106. GCG has received only 70 requests for exclusion, all from individuals, *see* Cirami Aff. ¶10, representing fewer than 2,800 shares (or .001% of the estimated damaged shares). A list of those seeking exclusion (none of which are institutional investors) is attached as Exhibit 1 to the [Proposed] Final Judgment And Order Of Dismissal With Prejudice, submitted herewith. By comparison, while the deadline for submitting claims will not expire until December 30, 2009, approximately 8,100 claims have already been submitted, representing approximately 72 million shares. *See* Cirami Aff. ¶11.

## V.    PLAN OF ALLOCATION

107. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a Claim Form no later than December 30, 2009. As provided in the Notice, after deducting all appropriate taxes, administrative costs, attorneys' fees, and reimbursement of litigation expenses, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation.

108. If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit valid Claim Forms. The Plan of Allocation is designed to achieve an equitable distribution of the Net Settlement Fund.

109. The Plan of Allocation is the product of Lead Counsel's investigation and analysis in this Action, as well as its consultation with Lead Plaintiff's damages expert. As discussed in the Declaration of Keith A. Bockus, the plan of allocation was based on an initial identification of "corrective disclosure" dates. Using an "event study" methodology, Lead Plaintiff's expert performed a statistical test to assess the statistical significance of the alleged corrective disclosure dates to estimate the actual impact of the corrective disclosures on Bristol-Myers' stock price. Lead Plaintiff's expert calculated the daily inflation per share for each trading day during the Class Period based upon the effect of the corrective disclosures on the price of Bristol-Myers stock. *See* Bockus Decl. ¶¶9-22. Having identified the daily inflation per share for each trading day during the Class Period, Lead Plaintiff's expert was able to isolate those losses which are due to the alleged fraud from those which were caused by market and industry factors or Company-specific factors not related to the fraud. The plan of allocation uses a formula for Recognized Loss Amounts which will fairly and reasonably

distribute the Settlement proceeds to those Class Members who suffered economic losses as a result of the alleged fraud on a fully *pro rata* basis.  As set forth in the Notice, for shares either (a) purchased or acquired between after the close of the market on March 21, 2006 and August 7, 2006, and held until August 8, 2006; or (b) purchased or acquired on August 8, 2006, the Recognized Loss Amount is equal to the lesser of (i) the purchase price minus the ninety-day look-back price on the date of sale or (ii) the amount of alleged artificial inflation per share on the date of purchase or acquisition.  For shares purchased or acquired between after the close of the market on March 21, 2006 and July 26, 2006, inclusive, and sold at a loss between July 27, 2006 and August 7, 2006, inclusive, the Recognized Loss Amount is the lesser of: (a) the purchase price minus the sales price; or (b) the amount of alleged artificial inflation per share on the date of purchase or acquisition minus the amount of alleged artificial inflation on the date of sale.  An authorized claimant's Recognized Loss Amounts are the basis for his, her or its *pro rata* portion of the Net Settlement Fund.  Lead Counsel worked closely with Lead Plaintiff's damages expert in establishing the Plan of Allocation, and believes that the Plan of Allocation is a fair and reasonable method to allocate the Net Settlement Fund among Class Members.

110. GCG, as the Claims Administrator for the Settlement, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Claim, calculated in accordance with the Plan of Allocation. Calculation of the Recognized Claim will depend upon several factors, including when the shares were purchased or acquired, and whether they were held until the conclusion of the Class Period or sold during the Class Period, and if so, when they were sold.

111. The Plan of Allocation, developed in consultation with Lead Plaintiff's independent damages expert, was designed to fairly and rationally allocate the proceeds of the Settlement among Class Members based on the corrective disclosures and resulting estimated damages throughout the Class Period. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved. Approval of the Plan of Allocation is also supported by Lead Plaintiff.

## VI.     THE FEE APPLICATION

112. The Notice informed Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Amount (a percentage greater than that now sought by Lead Counsel), and for reimbursement of litigation expenses in an amount not to exceed $500,000, plus interest on such fees and expenses from the date of funding at the same rate as earned by the Settlement Fund.

113. The requested fee of 17% of the Settlement Amount was subsequently negotiated by Lead Plaintiff Ontario Teachers' Pension Plan Board, a sophisticated institutional investor with experience prosecuting securities violations on behalf of investors and serving as the lead plaintiff in actions governed by the PSLRA, and its counsel, Bernstein Litowitz. Lead Plaintiff agrees that the fee requested is consistent with attorneys' fees awarded in contingent class actions of this size and complexity, and believes that the fees and expenses sought are fair, adequate and reasonable. *See* Davis Decl. ¶12.

114. Fee awards greater than the requested award of 17% of the Settlement Amount are common in this District. *See, e.g.*, *ML Tech*, 246 F.R.D. at 178 (awarding 24% of $133 million settlement fund); *In re Am. Express Fin. Advisors Sec. Litig.*, No. 04 Civ. 1773 (DAB), Order and Final Judgment at 8 (S.D.N.Y. July 18, 2007) (Dkt. No. 170) (awarding 27% of $100 million settlement fund); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 2006 WL

3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (awarding 21.4% of $455 million settlement fund), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008); *In re Deutsche Telekom AG Sec. Litig.*, 2005 U.S. Dist. LEXIS 45798, at *12-13 (S.D.N.Y. June 9, 2005) (awarding 28% of $120 million settlement fund); *Kurzweil v. Philip Morris Cos.*, 1999 WL 1076105, at *1 (S.D.N.Y. Nov. 30, 1999) (awarding 30% of $123.8 million settlement fund); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 400  (S.D.N.Y. 1999) (awarding 27.5% of $116.6 million settlement fund); *In re Prudential Sec. Inc. Limited P'ships Litig.*, 912 F. Supp. 97, 103-04 (S.D.N.Y. 1996) (awarding 27% of $110 million settlement fund).

115. An examination of fee decisions in securities class actions with settlements between $100 and $200 million in other federal jurisdictions also shows that an award of 17% is on the low end of the range of awards.  For example, in *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 298 (3d Cir. 2005), the Third Circuit noted the District Court's reliance on an expert declaration of Professor John C. Coffee, which found that "percentage recoveries between 25% to 30% were 'fairly standard' in … class actions involving settlements between $100 and $250 million."

116. Further, the fee requested is fair, adequate and reasonable because of the significant risks faced by Lead Plaintiff in pursuing this action.  As discussed above, liability here was far from assured and there were significant risks concerning the damages recoverable even if it were established.

117. The fee requested is also fair, adequate and reasonable because this outstanding Settlement was in large part the result of Plaintiffs' Counsel's hard work, persistence and skill. The challenges posed by the size and complexity of the case and the underlying subject matter were enormous.  Counsel for Defendants consisted of top-tier national firms and mounted a

formidable defense.   The tight discovery schedule, combined with the need for extensive negotiations with Defendants concerning the proper scope of the privilege waiver as well as with third parties (Apotex, Sanofi) that were not in the United States, created tremendous pressure on counsel.   Only because of the skill, experience and dedication of Plaintiffs' counsel was Lead Plaintiff able to mount a strong and vigorous prosecution, which ultimately led to an outstanding recovery of $125 million in cash for the Class.   Indeed, Plaintiffs' Counsel expended over 24,600 hours in the prosecution and investigation of this litigation.   The hours invested by counsel are a testament not only to the large scale of the case, but to Plaintiffs' counsel's commitment and professional sacrifice to obtain the best possible result for the Class. Having demonstrated exceptional commitment, perseverance and skill, coupled with an outstanding recovery, Lead Counsel respectfully submits that Plaintiffs' counsel performed a great service to the Class.   Thus, the fee requested fairly and reasonably rewards Plaintiffs' counsel's performance.

118.   The fee is also fair, adequate and reasonable when measured based on a lodestar multiplier.   The lodestar multiplier is calculated by (i) dividing the fee requested by (ii) the number of hours counsel billed to the case multiplied by the counsel's standard hourly rate. The lodestar for the services performed by all Plaintiffs' Counsel here was $8,405,375.   This represents a multiplier of only 2.5.   Courts have recognized that multipliers in the range of 3 to 4.5 are common.   *See In re NASDAQ Market-Makers Anti-Trust Litigation*, 187 F.R.D. 465, 489 (S.D.N.Y. 1999) (awarding a 3.97 mulitiplier on a $1.0 billion settlement and finding fee awards of 3 to 4.5 to be "common"); *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319 (S.D.N.Y. 2005) (awarding a 4.0 multiplier on a $6.1 billion settlement).   This case was

prosecuted on a fully contingent basis, with no assurance of success, and litigated for two years without any compensation at all.

119. In addition, in response to over 242,000 Notices being mailed, only one purported Class Member (and no institutional investor) has voiced any objection to the fee request. Despite the express requirements in the Court-approved Notice that an objection must be filed with the Court and demonstrate membership in the Class, including the number of shares of Bristol-Myers common stock transacted during the Class Period, the letter, which was sent only to the Claims Administrator, fails to establish that it is by a Class Member or how many, if any, shares of Bristol-Myers common stock it represents. *See* Exhibit F hereto. The objection must be overruled on this ground alone. *See Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579, at *2 (5th Cir. Sept. 25, 2007) (unpubl.). In addition, the individual has failed to respond to Lead Plaintiff's letter offering to discuss the objection. *See* Exhibit F hereto. As provided for in the Settlement, Lead Counsel will allocate any awarded fee amongst Plaintiffs' Counsel in a manner that it believes reflects the contributions of such counsel to the prosecution and settlement of this action. There are no pre-existing percentage fee or other fee agreements between Lead Counsel and Plaintiffs' other counsel as previously represented to the Court. Lead Counsel has already advanced the fees and expenses of Canadian counsel (Bennett Jones LLP) in connection with the work they incurred in assisting Lead Counsel in Canada.

## VII.  REIMBURSEMENT OF THE REQUESTED EXPENSES AND COSTS IS FAIR AND REASONABLE

120. Lead Counsel seeks reimbursement of $377,407.75 in litigation expenses reasonably and actually incurred by Lead Counsel and Plaintiffs' Counsel in connection with

commencing and prosecuting the claims against the Defendants with interest thereon at the same rate as earned by the Settlement Fund.

121.  From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the action was successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of the funds advanced by it to prosecute this action.  Therefore, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

122.  As set forth in the Schedule attached to the beginning of Exhibit G hereto, Lead Counsel requests a total of $377,407.75 in unreimbursed litigation expenses in connection with the prosecution of this action.  The declarations of Lead Counsel and Plaintiffs' Counsel detailing the expenses for which reimbursement is sought are attached hereto following the Schedule.  As set forth in the declarations, these expenses are reflected on the books and records maintained by Lead Counsel and Plaintiffs' Counsel which are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.  The expenses of Lead Counsel and Plaintiffs' Counsel for which reimbursement is sought are set forth in detail in the respective firms' declarations, which identify the specific category of expense, *e.g.*, experts' fees, travel costs, photocopying, telephone, fax and postage expenses, and other costs actually incurred.

123.  The litigation expenses for which reimbursement is sought were largely incurred for professional expert fees.  Of the total amount of expenses, more than $230,000, or over 60%, was expended on experts in the areas of liability, damages, materiality, and to assist with

the Plan of Allocation. As discussed more fully below, the expertise and assistance provided by these experts was critical to the prosecution and successful resolution of this action. The chart below sets forth those expenses incurred by Plaintiffs' Counsel that total amounts greater than $10,000:

| Expense Category | Amount |
| --- | --- |
| Experts | $230,358.54 |
| On-Line Legal Research | $37,725.06 |
| Copying (Internal and External) | $31,312.67 |
| On-Line Factual Research | $10,214.22 |
| Out-of-Town Travel | $27,717.55 |

124. As noted above, Lead Counsel retained Professor Hemphill to analyze the allegations that Bristol-Myers failed to disclose certain material information related to its attempts to settle patent litigation with Apotex. Professor Hemphill provided substantial assistance to Lead Counsel in the prosecution of this action by, among other things, assisting Lead Counsel in understanding the disclosure and materiality issues, and assisting in reviewing and understanding the discovery in this case. *See* Hemphill Decl., attached hereto as Exhibit D.

125. Similarly, the damages expert provided substantial assistance to Lead Counsel in the prosecution and resolution of this Action. Lead Plaintiff's damages expert worked closely with Lead Counsel in connection with analyzing the damages suffered by the Class in advance of mediation and in developing a fair and reasonable Plan of Allocation. *See* Bockus Decl, attached hereto as Exhibit C.

126. The other expenses for which reimbursement is sought are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.

These expenses include, among others, long distance telephone and facsimile charges, postage and delivery expenses, filing fees, photocopying, and document management.

127.  All of Lead Counsel's and Plaintiffs' Counsel's litigation expenses incurred for which reimbursement is being sought were necessary to the successful prosecution and resolution of the claims against Defendants.  Lead Plaintiff Ontario Teachers has approved of Lead Counsel's request for reimbursement of expenses.  In addition, the Notice apprised potential Class Members that Lead Counsel would seek reimbursement of expenses in an amount not to exceed $500,000.  The amount now sought – $377,407.75 (or $397,088.22 including the Lead Plaintiff's expenses as discussed below) – is less than the amount stated in the Notice.  There are no objections to the request for reimbursement of expenses.

128.  Also included in the expense request is a request for $19,680.47 to Lead Plaintiff Ontario Teachers' Pension Plan Board, for its reasonable costs and expenses (including lost wages) directly related to their representation of the Class, pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The Court-approved Notice notified Class Members that Lead Counsel's expense request may include a request for an award to Lead Plaintiff.  There is no objection.

129.  In view of the complex nature of the action, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Class.  Accordingly, Lead Counsel respectfully submits that the expenses are reasonable in amount and should be reimbursed in full.

## VIII.  CONCLUSION

130.  In view of the substantial recovery to the Class, the risks of this action, the enormous efforts of Lead Plaintiff and Lead Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case and the standing and experience of Lead Counsel, Lead Counsel respectfully submits that the Settlement of $125,000,000 should

be approved as fair, reasonable and adequate; that the Plan of Allocation should be approved as fair and reasonable; that a fee in the amount of 17% of the Settlement Amount, and expenses in the amount of $377,407.75, with interest thereon at the same rate as earned by the Settlement Fund, should be awarded to Lead Counsel; and expenses of $19,680.47 should be awarded to Lead Plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2009

Salvatore J. Graziano