# EXHIBIT C

Declaration of

# Keith A. Bockus

in the matter of

## *In re Bristol-Myers Squibb Co. Securities Litigation*

## *File No. 07-CV-5867 (PAC)*

November 17, 2009

CHICAGO PARTNERS
A Subsidiary of Navigant Consulting, Inc.

30 S. Wacker Dr., Suite 3400
Chicago, Illinois 60606

## I.     Introduction

1.     I am Keith A. Bockus, a Principal at Chicago Partners, a subsidiary of Navigant Consulting, Inc.  This declaration concerns the Bristol-Myers Squibb Co. ("Bristol-Myers") Securities Litigation (File No. 07-CV-5867 (PAC)).  This class action was brought by Lead Plaintiff Ontario Teachers' Pension Plan Board and named plaintiff the Minneapolis Firefighters' Relief Association, on behalf of themselves and all other persons or entities ("Bristol-Myers Class") who purchased common stock at inflated prices during the period from after trading hours on March 21, 2006 through August 8, 2006, inclusive ("Class Period"); collectively, I refer to these parties as "Plaintiffs."[1]  The defendants in this litigation are Bristol-Myers Squibb Co. and certain members of its management (i.e., Peter A. Dolan and Andrew Bodnar); collectively, I refer to these parties as "Defendants."

2.     I have been asked by counsel for Plaintiffs in this litigation to measure the daily inflation in the price of Bristol-Myers common stock during the Class Period using certain assumptions of proof at trial and expert methodologies.  A summary of those assumptions and methodologies appear below.  Based on these assumptions and methodologies, a reasonable and appropriate measure of daily inflation appears in Paragraph 33 in the Plan of

---

[1] United States District Court No. 07-CV-5867 (PAC) *In re Bristol-Myers Squibb Co. Securities Litigation, Amended Class Action Complaint,* dated October 15, 2007.

Allocation.[2]  I have also been asked to estimate aggregate damages that result from the daily inflation per share based on certain assumptions and methodologies.

3.     A summary of Plaintiffs' allegations appears in Paragraph 12 of the Notice:

> Beginning on June 20, 2007, two class action complaints were filed for federal securities laws violations challenging the adequacy of Bristol-Myers' public disclosures concerning its attempts to settle patent litigation with generic pharmaceutical drug company Apotex, Inc. ("Apotex") over its patented blood-thinning medication, Plavix. The complaints named as defendants Bristol-Myers, Dolan and Andrew R.J. Bonfield. The complaints allege that Defendants failed to disclose that the Company had agreed to significant limitations on its damages and patent enforcement rights against Apotex if the regulators rejected the settlement between the companies; that regulators had rejected the initial proposed settlement; and that the renegotiated settlement agreement contained certain alleged secret and unlawful oral representations that were not disclosed to investors or regulators. The complaints allege that, when this information was subsequently disclosed, the price of Bristol-Myers common stock fell and investors suffered damages.

4.     The calculations contained in this declaration are based on the information currently available to me.  To the extent additional relevant information becomes available, I reserve the right to amend or supplement my analysis and opinions in this matter.

---

[2] United States District Court No. 07-CV-5867 (PAC) *In re Bristol-Myers Squibb Co. Securities Litigation, Notice of Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing, and Motion for Attorneys Fees and Reimbursement of Litigation Expenses,* dated September 1, 2009 at ¶33.

5.      In Section II of this declaration, I summarize my qualifications.  In Section III, I describe the methodologies and assumptions underlying the daily inflation.  In Section IV, I describe the aggregate damages calculation.

## II.    Summary of Qualifications

6.      I am a Principal of Chicago Partners, a subsidiary of Navigant Consulting, an economics consulting firm that specializes in the application of accounting, economics, and finance to business consulting, legal, and regulatory issues.  I am also an Adjunct Associate Professor of Accounting at The University of Chicago Booth School of Business, where I teach Financial Accounting and Financial Statement Analysis.  I earned my Ph.D. in 1998 and an M.B.A. in 1995, both from The University of Chicago Booth School of Business, as well as a B.A. in Political Economy (Economics) in 1984 from The Johns Hopkins University.

7.      I specialize in the areas of accounting, economics, and finance as they relate to financial analysis, security analysis, and valuation.  In my consulting and teaching activities, I focus on (among other things) securities litigation, financial distress, financial accounting, and valuation.  I and other principals at Chicago Partners often work for both plaintiffs and defendants in securities litigation.

8.      My qualifications, including my publications and my testimonial experience within the last four years, are detailed in my *curriculum vita,* which I have attached to this declaration.

4

### III.    Calculation of Inflation per Share for Plan of Allocation

9.    The inflation in Bristol-Myers common equity reported in Paragraph 33 of the Plan of Allocation is based on an event study methodology. The event study methodology is a standard statistical methodology to measure "abnormal" stock price movements. These "abnormal" stock price movements may be used to document loss causation and to measure the changes in stock price inflation. The event study methodology is a standard, widely-used statistical methodology that is well founded in financial economics and has been used for more than 40 years to analyze the reaction of stock prices to information disclosures.

10.    I begin this analysis by identifying Bristol-Myers related information that became known on each day during the Class Period.   I use this process to identify "corrective disclosure" dates.  A corrective disclosure date is a date on which, according to the Plaintiffs' theory, information that had previously been misstated or omitted by Defendants became known to the market. As part of this step in the methodology, I assess what, if any, other information, not related to Plaintiffs' allegations, became available on each corrective disclosure date ("confounding information").

11.    The event study methodology uses an economic pricing model to partition a company's stock price movement on each trading day in the Class Period into two parts – market-wide factors or the "Market Effect" and "Firm-

5

Specific" effects. I estimate the coefficients and other parameters of the economic pricing model using regression analysis and data available prior to the Class Period. These coefficients of the model measure the average impact of market-wide factors on Bristol-Myers' stock price.[3] Using the estimated coefficients and the observed market movements during the Class Period, I measure the Market Effect and the Firm Specific effect on each day during the Class Period. I then perform a statistical test to assess the statistical significance of the Firm Specific effect for each corrective disclosure date.[4]

12.     Exhibit 1 summarizes the results of the event study methodology for each day during the Class Period. The horizontal lines in this exhibit represent the threshold for statistical (economic) significance, which in this case is approximately ±1.54%. Each bar in Exhibit 1 represents the firm specific effect on that day. Thus, if the Firm Specific effect (return) on any day is either greater than 1.54% or less than -1.54%, I conclude that the Firm Specific effect is statistically significant; in other words, the company experienced a statistically significant stock price movement. During the Class Period, 10 trading days have statistically significant stock price movements.

13.     I use the event study results to assess, which, if any, of the corrective disclosures occurred on dates on which the company experienced

---

[3] A one-year period prior to the Class Period was used to estimate the regression model.

[4] In this report, a statistically significant price change is one that is sufficiently large, after controlling for market factors, that it would occur by chance only five percent of the time. In this case, the NAN index (NASDAQ/AMEX/NYSE) as well as a peer index of firms identified in Bristol-Myers' Proxy filing dated March 22, 2006 are used to measure market and sector effects.

statistically significant stock price movements.  Based on a review of the

Complaint and other case documents, discussions with counsel regarding

Plaintiffs' theory of the case, my review of the information released on each day

during the Class Period, and the event study I discuss above, I identified two

dates with corrective disclosures and associated statistically significant negative

stock returns, which I summarize in Exhibit 2.  The first such corrective

disclosure occurred on July 27, 2006, when Bristol-Myers disclosed that the U.S.

Department of Justice's ("USDOJ") anti-trust division had launched a criminal

investigation regarding the proposed settlement between Bristol-Myers and

Apotex.[5]  The second such corrective disclosure occurred on August 8, 2006,

when Bristol-Myers disclosed, before the start of trading, the previously

undisclosed terms of its settlement with Apotex and that it expected a generic

version of Plavix to be available soon.[6, 7]

14.     As I discuss below, I use the entire abnormal return on each of

these dates to calculate share price inflation during the Class Period.  If this

matter were to go to trial, however, Defendants may present arguments that

some or all of investor losses from the share price declines on these dates were

---

[5] See *Dow Jones News Service* dated July 27, 2006 at 8:52 a.m. – "Bristol-Myers: DOJ Launches Criminal Probe of Plavix Pact."

[6] Bristol-Myers 10-Q, dated August 8, 2006 at 6:09 a.m.  Also, *Dow Jones Service* dated August 8, 2006 at 7:46 a.m. – "Bristol-Myers Sees Generic Plavix Shortly From Apotex."

[7] Apotex announced later that day that they intended to immediately launch a generic version of Plavix (Source *Reuters News,* dated August 8, 2006 at 11:03 a.m. – "Apotex Launches Generic Form of Plavix in the U.S."

not caused by Bristol-Myers' omissions regarding the terms of its Apotex settlement.

15.    Specifically, Defendants argue that the July 27, 2006 disclosure of the USDOJ investigation "cannot be the basis for any claimed loss because it did not discuss the subject matter of the non-disclosures alleged in the Amended Complaint and therefore cannot have corrected any prior, allegedly misleading disclosure."[8]

16.    Plaintiffs dispute Defendants' interpretation of this date, arguing that, "the July 27 announcement was specifically linked to the Apotex Settlement."[9]  Plaintiffs further argue that, "The disclosure that the DOJ was investigating criminal conduct relating to the Amended Apotex Settlement is 'perfectly congruent' to the alleged fraud…and within the zone of risk of the facts withheld from investors."[10]  Nevertheless, if Defendants prevail in their contention that  investors' losses on July 27, 2006 were not caused by Bristol-Myers' omissions, then Plaintiffs would recover less in aggregate than I show in Exhibit 8 (discussed below).

17.    Similarly, on August 8, 2006, at 11:03 a.m., Apotex announced the immediate launch of a generic version of Plavix.  Defendants argue that, "It is plain that these declines were linked to the risk of regulatory disapproval and the

---

[8] *Memorandum of Law of Bristol-Myers Squibb Company in Support of Motion to Dismiss*, p. 18.

[9] *Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss*, p. 34.

[10] *Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss*, p. 36.

risk of a generic launch, both of which were clearly and repeatedly disclosed by BMS. Because the alleged losses resulted from the occurrence of disclosed risks, plaintiffs cannot establish loss causation…"[11]

18.    Plaintiffs counter that, "Defendants' argument that the August 8, 2006 stock price decline resulted from the Apotex launch rather than the disclosure, on the same day, of the disadvantageous settlement terms of the original and Amended Apotex Settlements is likewise unavailing."[12] Among other things, Plaintiffs argue that, "The facts are before the terms were disclosed, Apotex was not expected to launch a generic at risk due to the danger of treble damages, but, after the disclosure, analysts assumed that Apotex would launch a generic during the five-business-day window, at great financial cost to BMS."[13]

19.    Plaintiffs' argument with respect to August 8, 2006, is bolstered by intra-day trading on that date. The full terms of the Apotex settlement were disclosed to the market before the opening of trading on August 8, 2006. As seen in Exhibit 3, the market reacted immediately to that news, as Bristol-Myers' share price fell upon the opening of trading. By the time Apotex announced its launch of generic Plavix at 11:03 a.m., investors had already experienced almost all of

---

[11] *Memorandum of Law of Bristol-Myers Squibb Company in Support of Motion to Dismiss*, pp. 17-18.

[12] *Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss*, p. 37.

[13] *Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss*, p. 39.

the loss that they would experience on that date. Indeed, the lowest price of the day occurred before the Apotex announcement at 9:28 a.m. Plaintiffs would thus have arguments that the omission of the terms of the Apotex settlement caused investors' losses on this date. Nevertheless, if Defendants prevail in their contention that investors' losses on August 8, 2006 were not caused by Bristol-Myers' omissions, then Plaintiffs would recover less in aggregate than I show in Exhibit 8 (discussed below).

20.    I calculated daily inflation per share for each trading day during the Class Period as follows. I assumed that the stock price contains no inflation as of the end of the Class Period, which is, in this case, the date of the last corrective disclosure. Working backwards through the Class Period, the inflation in the price on a trading day is equal to the sum of the net price effects of the corrective disclosures that occurred after that date. For example, if the Class Period ends on Friday with a corrective disclosure price effect of $5 on that date, then the inflation on the preceding Thursday is $5. Inflation is equal to $5 for each previous day in the Class Period until the date of another corrective disclosure or inflation-creating event.

21.    To continue the example, assume ten days before the end of the Class Period, we also observe a corrective disclosure with a price effect of $2. Then the inflation in the stock price is $7 ($5 + $2) on all previous dates during the Class Period, assuming no other corrective disclosures during the Class Period and the alleged omitted or misstated information was withheld or

10

misstated as of the first day of the Class Period (which is the case in this matter). Based on the assumptions I use in my analysis, this is an appropriate and reasonable method for identifying inflation per share on each day during the Class Period.

22.     Exhibit 4 presents the calculation of inflation based on the two corrective disclosures.  As the exhibit illustrates, to measure the change in inflation on a day, I use the stock price on the day immediately prior to the corrective disclosure and multiply it by the percentage abnormal return on the corrective disclosure date.  This calculation results in a corresponding decrease in inflation of $2.09 and $1.59 for the July 27, 2006 and August 8, 2006 corrective disclosures, respectively.[14]   In Exhibit 5, I plot this inflation for each day during the Class Period.  Finally, in Exhibit 6, I plot Bristol-Myers' stock price and resulting "clean" or "un-inflated" stock price for each day during the Class Period.  Based on the assumptions I use in my analysis, the information in these exhibits provides an appropriate and reasonable measure of inflation per share and un-inflated stock price on each day during the Class Period.

## IV.    <u>Aggregate Damages Calculation</u>

23.     I was asked by counsel to estimate aggregate damages based on certain assumptions and methodologies using the inflation shown in Exhibits 4

---

[14] The corrective disclosure on August 8, 2006, occurred before the opening of trading. Accordingly, inflation on that date is set to the greater of: (a) purchase price *minus* $21.21 per share (the closing price on that date), or (b) $0.00 per share.  This measure reflects inflation in the stock price on that date as the market incorporated the corrective disclosure into the stock price.

and 5.  I separately measure aggregate damages for Bristol-Myers common stock for institutions and non-institutions (individuals).

24.     For institutions, I obtained quarterly holdings data and estimated damages for each institution separately.   To obtain daily purchase and sale information, I interpolated the quarterly holdings weighting each day by total reported volume, using a First In, First Out inventory assumption.

25.     For all other investors (non-institutions or individuals), I applied what I refer to as the "actual trader model."[15,16]  This model uses empirical trading data from brokerage accounts of individual traders to estimate a propensity to sell that varies based on length of holding.[17]  I use this empirical trading propensity information along with the total non-institutional volume observed on each day to measure non-institutional trading.[18]

26.     Both the institutional model and actual trader model incorporate the 90-Day Lookback provision of the Private Securities Litigation Reform Act of

---

[15] My calculations adjust for any insider holdings as identified in Bristol-Myers' annual proxy statement.

[16] Working paper, "Using the Actual-Trader Model in Federal Securities Cases to Meet Daubert Standards and to Offset Inflationary Gains against Inflationary Losses," by Chad Coffman, Ricardo Cossa, Ran Wei, and Mark Zmijewski, revised on March 2009.

[17] Because I did not have access to brokerage data for trading of Bristol-Myers' equity, I applied the propensities to trade from data on another stock.

[18] Bristol-Myers traded on the NYSE.  Empirical evidence suggests that volume on the NYSE is over-reported by roughly 20% due to market specialists.  As such, I adjust daily volume by this amount. See John F. Gould, Ph.D. and Allan W. Kleidon, Ph.D., "Market Maker Activity on NASDAQ: Implications for Trading Volume," *Stanford Law Journal, Business & Finance*, 1994. Also, see Roman L. Weil et al., "Securities Act Violations: Estimation of Damages," in *Litigation Services Handbook: Role of the Accountant as Expert Witness*, 2d ed., 1995.

1995 ("PLSRA").  I calculated the "90-Day Lookback Price Per Share" for each

potential sale date during the 90 days following the end of the Class Period ("90-

Day Lookback Period") as the mean closing price of Bristol-Myers' stock from

the end of the Class Period through the potential sale date.  In my analysis, I

implement the 90-Day Lookback provision of the PSLRA by capping recoverable

damages per share on each purchase date as the difference between the purchase

price and the 90-Day Lookback Price Per Share ("90-Day Lookback Cap") for

shares held through the end of the Class Period.

27.    With regard to this litigation and as can be seen in Exhibit 6,

Bristol-Myers' share price recovered during the 90-Day Lookback Period and, as

a result, this adjustment reduces recoverable damages.  In Exhibit 7, I show the

share price inflation as seen in Exhibit 5 as well as the 90-Day Lookback Cap for

each purchase date for investors who held their shares through the 90-Day

Lookback Period.  As seen in this Exhibit, the 90-day Lookback provision of the

PSLRA reduces recoverable damages for purchases on every day of the Class

Period for these investors.  Table A of the Plan of Allocation presents the 90-Day

Lookback Price Per Share for sale dates during 90-Day Lookback Period.[19]

As seen in Exhibit 8, based on the inflation per share, the 90-Day Lookback Cap

from Exhibit 7, and the assumptions and methodologies described above, a

reasonable estimate of aggregate damages for Bristol-Myers equity is $566

---

[19] Accordingly, the 90-Day Lookback Cap shown in Exhibit 7 would differ for investors who sold
before the end of the 90-Day Lookback Period.  Additionally, investors who sold prior to August
8, 2006, are not affected by the 90-Day Lookback Cap.

million with an estimated 296 million damaged shares.  The proposed settlement

is thus approximately 22% of the total estimated damages.  As seen in Exhibit 8,

with an estimated 296 million damaged shares, the proposed settlement of $125

million yields an estimated recovery of $0.42 per damaged share.

28.    Empirical studies indicate that a substantial percentage of class

members may elect not to file claims.  See, e.g., Cox and Randall [2002] ("an

average filing percentage for eligible claims of 32.78%" and "the average

percentage of Form 13F filers perfecting their claims is 23.01%.")[20].  Similarly, see

Cox and Randall [2005] ( "… on average, roughly 28% of eligible institutional

investors file claims in these settlements. The median value is almost identical at

29.7%.  This value falls squarely within the 25% to 33% range that we found in

our earlier research.").[21]  Similar findings are reported by Alexander [1994] ("…a

substantial number of shares-perhaps 40% or more-do not file claims.")[22], and

Bird [2001] ("In 1999, the National Association of State Auditors, Comptrollers

and Treasurers mailed or e-mailed an informal survey titled 'Asset Recovery:

Securities Class Action Litigation' to its 183 members, 60 public pension-fund

managers and 57 members of the national state retirement administrators'

---

[20] James D. Cox & Randall S. Thomas, "Leaving Money on the Table: Do Institutional Investors Fail To File Claims in Securities Class Actions?" *Washington University Law Quarterly* v. 80: 855, 2002.

[21] James D. Cox and Randall S. Thomas. "Letting Billions Slip through your Fingers: Empirical Evidence and Legal Implications of the Failure of Financial Institutions to Participate in Securities Class Action Settlements," *Stanford Law Review* v. 58:411, November 2005.

[22] Janet Cooper Alexander, "The Value of Bad News in Securities Class Actions," 41 *UCLA Law Review*, 1421, 1994.

association. Of the 33 who responded, only 22 indicated that they had recovered some asset losses in a class-action suit in the prior five years. The other third reported no recovery, even though more than 700 securities class-action cases had been settled during that period.").[23]

29.    To the extent that class members do not file claims, the recovery per share for claims filed will increase.   For instance, if claims were filed for only half of the damaged shares, then the recovery per share would rise to an estimated $0.84 per share.

30.    As I discussed above, the damages figure assumes that Plaintiffs would be able to prove at trial that investor losses associated with the stock price drops on July 27, 2006 and August 8, 2006, were caused by Defendants' omissions regarding the terms of its Apotex agreements.  Defendants would likely dispute that investor losses on these dates were caused by Bristol-Myers' omissions.  If Defendants were to prevail at trial with these arguments, then the aggregate recovery would be less than the $566 million that I report above.  In fact, if the Court agreed with Defendants that July 27, 2006 was not a corrective disclosure, the recoverable damages would be reduced to $375 million. Similarly, if the Court agreed with Defendants that August 8, 2006 was not a corrective disclosure, the recoverable damages would be reduced to $462 million.

---

[23] Christiane Bird, "Pension Plans Miss Out on Much Cash By Failing to File in Class-Action Cases," *The Wall Street Journal.* September 4, 2001.

Accordingly, the proposed settlement of $125 million would represent 33% and 27% respectively of such an alternative damages figure.

*Keith A. Bockus*

Keith A. Bockus
November 17, 2009



Exhibit 1

Bristol-Myers Abnormal Stock Returns Not Explained by the NAN and Peer Indices
3/22/06 - 8/8/06 (Class Period)

# Exhibit 2

## Corrective Disclosures Identified Under Event Study Methodology [1]

| [1]<br>Event | [2]<br>Date | [3]<br>Stock Price | [4]<br>Volume | [5]<br>Market Cap (In Billions) | [6]<br>Return | [7]<br>Abnormal Return Percentage | [8]<br>Abnormal Return Dollar | [9]<br>T-stat | [10]<br>Sig | [11]<br>Event |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7/27/06 | $24.04 | 29,396,200 | $47.0 | -7.50% | -8.03% | -$2.09 | -10.20 | --- | 8:52 A.M. The U.S. Department of Justice's antitrust division has launched a criminal investigation of a proposed settlement of patent litigation over the heart drug Plavix among Bristol-Myers Squibb Co. (BMY), Sanofi-Aventis (SNY) and a generic-drug maker. Source – *Dow Jones News Service* dated 7/27/06 |
| 2 | 8/8/06 | $21.21 | 64,428,200 | $41.5 | -6.85% | -6.98% | -$1.59 | -8.88 | --- | 6:09 A.M. Bristol-Myers releases a 10-Q including full copies of both the original and revised copies of its agreements with Apotex.<br><br>11:03 A.M. Apotex launches generic form of Plavix in U.S. Source – *Reuters News* dated 8/8/06 |

Notes:
1) Regression model based on running the returns of Bristol-Myers Squibb against the NAN (Nasdaq / Amex / NYSE) as well as a peer index calibrated one year prior to the start of the class period. The NAN Value Weighted index is made up of all firms that trade on the NYSE/ AMEX/NASDAQ. The peer index is value-weighted and is made up of the following companies identified in Bristol-Myers Proxy filing dated March 22, 2006: Abbott Laboratories, AstraZeneca, Eli Lilly, GlaxoSmithKline, Johnson & Johnson, Merck & Co., Novartis, Pfizer, Sanofi-Aventis, Schering-Plough, and Wyeth.



Exhibit 3
Trades and Volume
August 7 - August 9, 2006

# Exhibit 4
## Calculation of Share Price Inflation

| [1] | [2] | [3] | [4] | [5] = [3] * [4] | [6] |
|-----|-----|-----|-----|-----|-----|
| Event # | Date | Closing Stock Price (T-1) | Abnormal Return (T) | Change in Share Price Inflation | Event |
| 1 | 7/27/2006 | $25.99 | -8.03% | -$2.09 | 8:52 A.M. The U.S. Department of Justice's antitrust division has launched a criminal investigation of a proposed settlement of patent litigation over the heart drug Plavix among Bristol-Myers Squibb Co. (BMY), Sanofi-Aventis (SNY) and a generic-drug maker. Source – *Dow Jones News Service* dated 7/27/06 |
| | | | | | 6:09 A.M. Bristol-Myers releases a 10-Q including full copies of both the original and revised copies of its agreements with Apotex. |
| 2 | 8/8/2006 | $22.77 | -6.98% | -$1.59 | 11:03 A.M. Apotex launches generic form of Plavix in U.S. Source – *Reuters News* dated 8/8/06 |

| Total Share Price Inflation | -$3.68 |
|-----|-----|



Exhibit 5
Share Price Inflation
3/22/06 - 8/8/06

8:52 A.M. The U.S. Department of Justice's antitrust division has launched a criminal investigation of a proposed settlement of patent litigation over the heart drug Plavix among Bristol-Myers Squibb Co. (BMY), Sanofi-Aventis (SNY) and a generic-drug maker. Source – *Dow Jones News Service* dated 7/27/06

6:09 A.M. Bristol-Myers releases a 10-Q including full copies of both the original and revised copies of its agreements with Apotex.

11:03 A.M. Apotex launches generic form of Plavix in U.S. Source – *Reuters News* dated 8/8/06



Exhibit 6
Stock Price and Clean "Uninflated" Price
3/22/06 - 12/29/06

10b-5 Class Period: 3/21/06 - 8/8/06

90-Day Lookback Period: 8/8/06 - 11/3/06

Closing Stock Values:
1) 3/22/06 = $25.24 (BMS enters into settlement agreement with Apotex)
2) 7/27/06 = $24.04 (BMS announces DOJ investigation)
3) 8/8/06 = $21.21 (BMS releases 10-Q)
4) 11/6/06 = $24.73 (End of 90-Day Lookback)

Bristol-Myers Squibb Stock Price          Clean "Un-inflated" Price



Exhibit 7
Share Price Inflation and 90-Day Lookback Cap
3/22/06 - 8/8/06

# Exhibit 8

## Estimated Damages and Estimated Number of Damaged Shares

### (figures in millions, except per share figures)

Class Period: March 21, 2006 - August 8, 2006

| | |
|---|---|
| **Estimated Damages** | $566 |
| **Estimated Number of Damaged Shares** | 296 |
| **Proposed Settlement** | $125 |
| **Estimated Recovery per share** | $0.42 |

Data Sources: Factset Quarterly 13F Filings, Bloomberg Financial Markets, Center for Research in Securities Prices, EDGAR Database SEC filings.



CHICAGO PARTNERS
A SUBSIDIARY OF NAVIGANT CONSULTING

# KEITH A. BOCKUS

Chicago Partners
140 South Dearborn Street, Suite 1500
Chicago, IL 60603
Telephone: (312) 251-5901
Facsimile: (312) 251-5201

## PRESENT POSITIONS

CHICAGO PARTNERS

Principal (2001- Present)
Vice President (1998 - 2000)
Senior Economist (1995 - 1998)

THE UNIVERSITY OF CHICAGO BOOTH SCHOOL OF BUSINESS, Chicago, Illinois

Adjunct Associate Professor of Accounting (2008-present)
Adjunct Assistant Professor of Accounting (2004 - 2008)

## EDUCATION

**Ph.D.**    The University of Chicago, Graduate School of Business, 1998

**M.B.A.**    The University of Chicago, Graduate School of Business, 1995

**B.A.**    The Johns Hopkins University, Political Economy (Economics), 1984

## PROFESSIONAL EXPERIENCE

THE UNIVERSITY OF CHICAGO GRAHAM SCHOOL OF GENERAL STUDIES, Chicago, Illinois
Lecturer in Accounting (2003-2004)

CP RISK MANAGEMENT
Principal (2001 - 2004)
Vice President (1998 - 2000)
Senior Risk Management Consultant (1998)

REARDON SECURITIES, LLC, Chicago, Illinois
Financial and Operations Principal (NASD Series 28) (2002)

BLUESUIT SECURITIES, INC., Chicago, Illinois
Financial and Operations Principal (NASD Series 28) (2001)

Keith A. Bockus
Page 2

**PROFESSIONAL EXPERIENCE (Continued)**

BLUESUIT, INC., Chicago, Illinois
<u>Treasurer and Chief Financial Officer</u> (2000-2001)

INDEPENDENT ECONOMIC CONSULTANT, Chicago, Illinois (1991 - 1995)

THE UNIVERSITY OF CHICAGO GRADUATE SCHOOL OF BUSINESS, Chicago, Illinois
<u>Research and Teaching Assistant</u> (1990 - 1996)

JAYCOR, INC., Vienna, Virginia
<u>Software Engineer</u> (1988 - 1989)

IRT CORPORATION, Vienna, Virginia
<u>Software Engineer</u> (1986 - 1988)

SYSTEMS RESEARCH AND APPLICATIONS CORPORATION, Arlington, Virginia
<u>Research Associate</u> (1984 - 1986)

**COURSES TAUGHT**

Financial Statement Analysis
Financial Accounting

**TESTIMONIAL EXPERIENCE WITHIN THE LAST FOUR YEARS**

<u>**In re: Parmalat Securities Litigation**</u>
United States District Court, Southern District of New York, No. 04-MD-1653 (LAK).
Deposition testimony (2007).
Testimony on 10b-5 damages.

<u>**Carri Johnson v. Siemens Building Technologies, Inc.**</u>
United States Department of Labor, Occupational Safety And Health Administration, No. 5-
4760-04-012. Expert Report (2006). Deposition testimony (2006). Trial Testimony (2006).
Testimony on revenue recognition issues in a Sarbanes-Oxley matter.

<u>**In re: Exide Technologies, et al., Debtors.**</u>
United States Bankruptcy Court for the District of Delaware, No. 02-11125 (KJC).
Expert report (2003). Deposition testimony (2003). Trial testimony (2003).
Testimony on solvency issues.

Keith A. Bockus
Page 3

**TESTIMONIAL EXPERIENCE WITHIN THE LAST FOUR YEARS (Continued)**

**Frank Marusiak v. Adjustable Clamp Company**
United States District Court, Northern District Of Illinois, Eastern Division, No. 01 C 6181.
Expert report (2002 and 2003). Deposition testimony (2003).
Testimony on breach of contract damages.

## PUBLICATIONS

Bockus, K, D. Northcut and M. Zmijewski, "Criteria for Cognizable Efficiencies in Antitrust
Litigation: Lessons from *United States v. Oracle Corporation*." Working Paper (2005).

Bockus, K, D. Northcut and M. Zmijewski, "Accounting and Disclosure Issues in Structured
Finance", appearing in Corporate Aftershock: The Public Policy Consequences of Enron
and Other Recent Disasters, edited by Christopher L. Culp and William A. Niskanen.
New York, N.Y.: John Wiley & Sons and the Cato Institute (2003).

Bockus, K., and F. Gigler, "A Theory of Auditor Resignation." *Journal of Accounting Research*
(Fall, 1998).

Bockus, K. "Auditor Resignation Disclosures." Unpublished Doctoral Dissertation (1998).

November, 2009