# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
                           :

IN RE BRISTOL-MYERS SQUIBB CO.    :     Case No. 07-CV-5867 (PAC)
SECURITIES LITIGATION          :

                           :

----------------------------------------------------------x

## Declaration of C. Scott Hemphill

     I, C. Scott Hemphill, declare and state as follows:

### I. Qualifications

     1.     I am an associate professor of law and the Milton Handler Fellow at Columbia University School of Law, where I also co-direct the Charles E. Gerber Transactional Studies Program and the Program on Law and Technology. Prior to joining Columbia's faculty, I served as a law clerk to Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit, and to Justice Antonin Scalia of the United States Supreme Court. I have a J.D. from Stanford Law School, where I was the Nathan Abbott Scholar, and have completed all requirements for a Ph.D. in economics from Stanford University, but for the dissertation. My scholarship has been published in the Columbia Law Review, New York University Law Review, Stanford Law Review, and Yale Journal on Regulation. My curriculum vitae is attached as Exhibit A.

     2.     My research and teaching examine questions of competition and innovation, particularly in regulated industries. The settlement of patent litigation between brand-name and generic drug makers is a particular focus of my current scholarship. I have recently published two articles that examine such settlements from economic, commercial, and legal perspectives. This academic work has been cited by the Second and Federal Circuits, by the Antitrust Division of

the Department of Justice, and by the chairman of the Federal Trade Commission (FTC), among others. It has also formed the basis, on two occasions, for congressional testimony on this subject.

3.      The first article, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 New York University Law Review 1553 (2006), explains why drug patent settlements arise and their economic effect. The article examines the incentives set up by the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act, which regulates competition between brand-name and generic drug makers. These incentives are discussed in Part III of this declaration.

4.      The second article, *An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition*, 109 Columbia Law Review 629 (2009), is an empirical examination of the specific terms of drug patent settlements. A major object of the analysis is to develop a comprehensive picture of what is known in the public domain about the frequency and terms of settlement, by identifying and synthesizing available public information about settlements. A second contribution of the study is to identify the extent to which particular agreements exhibit unusual features, compared to the dominant patterns of settlement.

5.      The analysis in the article draws upon a novel dataset containing public information about settlements entered into between 1984, when the Hatch-Waxman Act was enacted, and August 2008. To prepare the dataset, I studied a wide range of materials, including press releases and news accounts describing drug patent litigation and settlement, reports on these subjects written by equity analysts at financial institutions, transcripts of conference calls in which equity analysts discussed litigation and settlement with drug company executives, records of patent and antitrust litigation filed in federal district court, public disclosures to the Securities and Exchange Commission, public filings with the Food and Drug Administration (FDA), and reports about brand-generic settlements issued by the FTC. This work yielded information about

2

143 settlements involving 101 brand-name drugs.[1] The dataset includes the agreement and related disclosures at issue in this matter, reached in an effort to resolve patent infringement litigation between Bristol-Myers Squibb (BMS) and Apotex pertaining to Plavix, a brand-name drug marketed by BMS.

## II. Summary of Opinions

6.     I have been asked to examine BMS's public statements during the class period in this matter concerning a proposed settlement with Apotex, which was subject to approval from federal and state regulators. In its initial statements announcing the proposed settlement and thereafter, BMS stated that the proposed settlement might not win approval, and if litigation were reinstated, "Apotex could launch a generic clopidogrel product at risk." Press Release, Sanofi-Aventis and Bristol-Myers Squibb Announce Agreement to Settle U.S. Plavix Litigation with Apotex Subject to Certain Conditions (Mar. 21, 2006). I have been asked to offer an opinion about the commercial significance and meaning of the term "launch at risk," from the commercial perspective of market participants at the time the announcement was made, in order to assess whether that term accurately conveys the content of the March 2006 agreement between BMS and Apotex ("Agreement").

7.     In forming an opinion as to this question, I have relied on my own knowledge of commercial practices and usages in the pharmaceutical industry, including the academic research described in Part I. I also reviewed certain additional materials in my possession, gathered in the course of my academic research, about generic drug launches. These materials were drawn from the work on which the Columbia Law Review article is based, including reports by equity analysts, transcripts of analyst conference calls with drug company executives, and news accounts describing litigation. These materials provided additional insight into how market participants use

---

[1] For patent litigation involving 28 drugs, the brand-name drug maker settled with multiple generic firms.

3

the term "launch at risk" when they evaluate pharmaceutical patent litigation, and the likelihood
and profitability of a generic launch.

        8.      In forming an opinion, I also reviewed certain documents discovered in the files
of BMS and Apotex. On February 20, 2009, I visited the offices of plaintiffs' counsel to make an
oral presentation to attorneys involved in the processing of discovery materials. At that time, I
asked counsel to furnish me with any information found in discovery in the following categories:

        (a)      internal BMS or Apotex documents discussing "at-risk" launches;

        (b)      internal BMS analyses concerning the likelihood that Apotex would
        launch a generic version of Plavix prior to a judicial determination of patent
        validity and infringement, and possible responses by BMS;

        (c)      internal BMS documents showing its interaction with the investment
        community; and

        (d)      analyst reports that contained discussion of "at-risk" launches.

These materials provided additional data about how commercially sophisticated market
participants use the term "launch at risk." They also informed my analysis of how market
participants understood the effect of the Plavix agreement's unusual terms upon the profitability
and likelihood of a generic launch by Apotex.

        9.      To fully assess commercial use of the term "launch at risk" at the time BMS's
announcement was made, I initiated a more comprehensive analysis of publicly available
materials. I set up a research protocol to review and categorize an appropriately selected set of
public materials that discuss "launches at risk." I had not yet analyzed this larger set of materials
when plaintiffs' counsel directed me to cease work, in light of a possible settlement in this matter.

Thus, the opinions I express here are preliminary, and subject to revision upon a complete analysis.

10.    My preliminary conclusions, which are discussed in more detail later in this declaration, are as follows:

(a)    As a matter of commercial practice, a generic firm's "launch at risk" had a well-understood meaning at the time of the BMS announcement. The term referred to a generic firm's decision to launch a competing generic product before litigation is concluded, despite the prospect of large damages measured by the brand-name drug maker's lost profits, and subject to possible trebling.

(b)    At the time of the BMS announcement, a future Apotex launch was not "at risk" in the commercially relevant sense of the term. That is because the highly unusual terms of the Agreement, particularly the limitation on damages payable by Apotex if it launched and later lost the patent infringement suit, removed the risk ordinarily indicated by the term "launch at risk."

(c)    BMS's public statement that an Apotex launch, if it occurred, would be "at risk" was inaccurate, and left the incorrect impression that Apotex was restrained from a competitive generic launch by the large adverse consequences that ordinarily accompany a competitive generic launch prior to patent adjudication, when in fact Apotex no longer faced those constraints due to the unusual and undisclosed terms of the Agreement.

### III. How Market Participants Understood "At-Risk" Launches

11.    "Launches at risk" occur within the context of a unique regulatory scheme set up by the Hatch-Waxman Act. Under the Act, a brand-name firm must demonstrate that a new drug

5

is safe and effective before the FDA will approve it for marketing. Making that demonstration as part of a so-called New Drug Application (NDA) is a lengthy, expensive process, consuming years and many millions of dollars to conduct the necessary clinical trials.

12.    Once the brand-name firm places a patented drug on the market, a generic drug maker may seek to market a competing version of the same drug. To do so, the generic firm must first file an Abbreviated New Drug Application, or ANDA, with the FDA. An ANDA includes a number of demonstrations, the most important of which is "bioequivalence," essentially a showing that the rate and extent of absorption of the generic drug is the same as the brand-name drug. ANDA preparation is much less expensive than NDA preparation, in part because new safety and efficacy studies are not required.

13.    In many instances, the generic firm seeks to launch its product prior to the expiration of applicable patents of the brand-name firm. A generic drug maker seeking pre-expiration entry files an ANDA containing a so-called "Paragraph IV" certification.[2] The certification amounts to an assertion that the brand-name firm's applicable patents are invalid or not infringed by the proposed generic product. For certain brand-name drugs, such as Plavix, that qualify as "new chemical entities" (NCEs), the FDA may not accept such an ANDA during the first four years after NDA approval. In response to the ANDA filing, the brand-name drug maker may file a patent infringement suit seeking to establish that the proposed generic product infringes a valid patent of the brand-name firm.

14.    Patent litigation under the Act has several special features. If the brand-name drug maker files a timely patent infringement suit, a statutory stay blocks FDA approval for the first several years of the suit's pendency. The stay lasts for 30 months, measured from the brand-

---

[2] Except as otherwise noted, the ANDAs discussed in this declaration are ANDAs with Paragraph IV certifications.

6

name firm's receipt of notice of the ANDA, and is lengthened in certain circumstances.[3] In addition, under certain circumstances the generic applicant is entitled, upon FDA approval, to a 180-day exclusive right to market its product in competition with the brand-name firm, before other generic firms may enter.

15.    Once the statutory stay expires, the FDA is free to approve the ANDA, even if there has been no judicial determination that applicable patents are invalid or not infringed. Once the ANDA is approved, the generic drug maker must decide whether to launch its generic product. Whether a generic drug maker decides to launch depends upon several factors. Important factors in a decision to launch include the generic firm's estimated likelihood of winning the patent infringement suit, the additional profits earned from launching rather than waiting for the court to rule, and the damages to which the generic firm will be subject if it later loses the case after it has launched its product and sold many millions of dollars worth of the generic drug.[4]

16.    A generic firm's decision to launch, prior to an adjudication of patent infringement and validity, ordinarily carries a large commercial risk. If the brand-name firm wins the patent case after a generic product launch, its damages are measured by the brand-name firm's lost profits, which are trebled if the infringement by the generic firm is found to be willful. Even without trebling, this measure of damages exceeds the profits earned by the generic firm from the launch. Profits are smaller than payable damages because competition between the brand-name firm and the generic firm decreases the price, and hence the profitability, of generic drug sales, compared to the status quo in which only the brand-name firm sells the product. Moreover, the generic drug maker usually must offer its product at a discount to the brand-name product, further reducing the generic drug maker's profits.

---

[3] For NCEs, if an ANDA is filed less than five years after NDA approval, the stay is lengthened so that it expires seven-and-a-half years after NDA approval.

[4] In addition, a generic drug maker weighs the probability of a further negative consequence, that the brand-name drug maker may secure injunctive relief preventing sale of the generic product after the generic firm has incurred the expense of building up a supply of the generic drug.

17.    Market participants pay close attention to information about the likelihood and profitability of a competitive generic product launch, since such launches have large effects upon the profits of brand-name and generic firms. For example, equity analysts at financial firms produce studies and bulletins that evaluate the likelihood of competitive launch for a particular drug, and offer views about which generic drug challenges are most likely to provide the basis for a competitive launch.

18.    A generic firm's decision to "launch at risk," as the term was understood at the time of BMS's announcement, is a decision to launch a generic product before litigation is concluded, despite the prospect of damages described above: measured by the brand-name drug maker's lost profits, and subject to possible trebling. This understanding is confirmed by several types of evidence.

19.    One significant source of evidence is the characteristics of other generic product launches that were described as "at-risk" launches by market participants. One prominent example of a generic launch involved Allegra, an antihistamine used to treat seasonal allergies. Teva, Barr Join for At-Risk Launch of Generic Allegra, Drug Industry Daily, Sept. 7, 2005. At the time of the generic launch in September 2005, Allegra was a blockbuster drug with more than $1 billion in annual sales. Financial analysts and other market participants described this generic product launch, which occurred prior to a district court judgment in the patent infringement case, as an "at-risk" launch. In evaluating the probability of such a launch before it occurred, analysts focused upon the fact that such a launch would subject the generic drug maker to the risk of a large damages award.

20.    A second prominent example of a generic launch involved Paxil, an antidepressant. Paxil, like Allegra, was a blockbuster at the time of the generic launch. Reuters News, Early Generic Drug Launch to Depress Glaxo Sales (Sept. 9, 2003). Here, too, financial

analysts and other market participants described the generic product launch as an "at-risk" launch, and focused beforehand upon the likelihood of launch, given the prospect that the generic drug maker would be forced to pay a large damages award if it lost the patent suit. In the case of Paxil, unlike Allegra, the generic launch occurred following a favorable district court judgment, though prior to a decision in the Federal Circuit appeal. In such a case, the generic firm's position is somewhat stronger, compared to a launch prior to a district court judgment, provided that a favorable district court judgment is an indicator of success on appeal. The Paxil launch is a "launch at risk," just like the Allegra launch, because the nature of the risk remains the same: large damages measured by lost profits, subject to trebling if the court concludes that the infringement is willful.

21.    The same analysis applies where a generic drug maker ultimately decides not to "launch at risk." For example, Niaspan is a cholesterol-lowering drug marketed by Kos Pharmaceuticals. In 2005, market participants speculated that Barr, a generic drug maker that had filed an ANDA for a generic version of Niaspan, might pursue an "at-risk" launch. Here, such a launch was thought unlikely, in light of the risk of treble damages. As a Goldman Sachs analysis put it, "[t]he generic industry leaders that we have spoken with have uniformly maintained that all of the generic companies (Barr included) would only launch ahead of a court decision if they were nearly 100% certain that they would win." Goldman Sachs Investment Research, Kos Pharmaceuticals, Inc. (Mar. 7, 2005). Indeed, Barr eventually settled with Kos instead.

22.    Another source of evidence is BMS's own contemporaneous commercial understanding of the term. My review of internal documents prepared by BMS personnel indicates that BMS understood an "at-risk" launch to refer to a situation in which the generic firm launches a competing product prior to a judicial determination of patent infringement, and subject to large damages, measured by lost profits and subject to trebling.

23.    Market participants assiduously collected information bearing upon the likelihood of an "at-risk" launch by Apotex as to Plavix. A review of BMS's internal documents shows that BMS executives were acutely aware of the attention paid by market participants to this question, and kept close track of market participants' estimates of the likelihood that Apotex would pursue an "at-risk" generic launch as to Plavix.

24.    Market participants evaluated the likelihood of an Apotex "launch at risk" in the same way that they evaluated possible launches for other drugs. That is, analysts emphasized the large damages and possible trebling to which Apotex would be subject if it launched and then lost its suit. Analyst reports issued in January 2006, shortly after FDA approval of Apotex's generic product, are instructive. UBS Investment Research noted that Apotex, if it launched at risk, "would be at risk of incurring triple damages should the courts rule that [the relevant] patents are valid. We don't believe Apotex would likely take that risk this close to the court case" scheduled to start in April. UBS Investment Research, First Read: Sanofi-Aventis (Jan. 25, 2006) (UBS 000186). Credit Suisse similarly downplayed the likelihood of a launch at risk, given damages measured by *"triple* lost profits." Credit Suisse Equity Research United States, 2006 Events Portend Future Outlook (Jan. 25, 2006) (BMSP-E0311821) (emphasis in original).

25.    Bristol's announcement that if the settlement was not approved, any Apotex launch would be "at risk," left market participants with the impression that Apotex would continue to face the usual barriers to an "at-risk" launch. Here, the view expressed by UBS Investment Research is illustrative. On July 31, after a revised agreement was rejected by regulators, a UBS analyst took the view that, given the "considerable risks from an at-risk launch," the likeliest outcome was a resumption of litigation without a launch. UBS Investment Research, Global Daily Dose (July 31, 2006) (UBS 001864).

**IV. The Divergence Between the Plavix Agreement and BMS's Announcement**

26.     The March 2006 Agreement between BMS and Apotex was highly unusual, measured against the backdrop of public information about agreements settling patent litigation between brand-name and generic drug makers for other drugs. Three unusual features of the Agreement are particularly important.

(a)     If Apotex launched a generic product and then lost the patent suit, damages would be limited to 70 percent of Apotex's net sales, rather than BMS's lost profits.[5]

(b)     Potential damages were further reduced by BMS's promise not to seek treble damages for willful infringement.

(c)     BMS agreed not to seek injunctive relief during the first five days after an Apotex launch, permitting Apotex to flood the market with generic product.

Moreover, BMS and Apotex agreed that these terms took effect even if regulators rejected the proposed settlement.

27.     These terms created highly unusual incentives for Apotex. Apotex was no longer subject to the adverse consequences that attach to a "launch at risk," consequences that underpin the expectations of market participants that a generic firm is more or less likely to "launch at risk" in a particular case. The removal of these consequences made an Apotex launch much more likely. A review of internal documents of Apotex and BMS establishes that both firms understood the Agreement to greatly increase the probability of a competitive launch if regulators rejected the proposed settlement.

---

[5] Bristol-Myers Squibb Co., Quarterly Report (Form 10-Q) exh. 99-1, ¶ 18(iii) (Aug. 8, 2006). That measure would be reduced to 60 percent if Bristol launched its own, "authorized" generic product. In a subsequent round of negotiation, these measures were further reduced to 50 percent and 40 percent of net sales, respectively. *Id.* exh. 99-2, ¶ 14(ii).

11

28.    After the Agreement, an Apotex competitive launch was no longer "at risk" as that term was understood by market participants. Market participants would not have understood, by a statement that Apotex was free to launch "at risk," that it was highly likely to do so on account of the unusual and important undisclosed terms of the Agreement. Market participants would have understood the likelihood and profitability of an "at-risk" launch in accordance with previous uses of the term in connection with potential or actual launches for Allegra, Paxil, Niaspan, Plavix (prior to the Agreement), and many other drugs where this term was employed.

29.    Thus, BMS's announcement that any Apotex launch would be "at risk" was inaccurate, as that term was understood by market participants at the time it was made. It left the incorrect impression that if Apotex did so, it would be potentially subject to the risk of large damages that customarily attach to such a launch, and hence the incorrect impression that this launch was thereby less likely to occur. The reference to an "at-risk" launch, given the commercial understanding of the term, had a tendency to lead market participants away from the accurate conclusion that in fact, BMS had agreed to an unusual arrangement in which the nature of that risk to Apotex had been removed.

30.    My opinion is limited to the commercial meaning of the term "launch at risk" at the time BMS's public announcement was made. The subsequent usage of the term after Apotex launched a generic product is of only limited significance in answering this question. One such subsequent usage is that after Apotex launched a generic Plavix product and the unusual features of the BMS-Apotex Agreement were fully disclosed, some analysts continued to refer to the Apotex launch as an "at-risk" launch. That fact, however, provides no insight into how "at risk" was understood at the time of the March 2006 announcement and other points prior to the Apotex launch. Rather, this broader subsequent use of "at risk" is attributable to BMS's inaccurate description of the Plavix Agreement in the first place. During the period after the Agreement was reached but prior to its full disclosure, a potential Apotex launch was characterized (incorrectly)

12

as an "at-risk" launch because that was how BMS described it. Initial analysis suggests that this

label, once applied, simply stuck. This preliminary conclusion is subject to revision upon

employment of the full research protocol outlined in Part II.

      I declare under penalty of perjury that the foregoing is true and correct.


_____
C. Scott Hemphill
November 19, 2009

13

# Exhibit A

### C. SCOTT HEMPHILL
Columbia Law School
435 West 116th Street
New York, NY 10027
(212) 854-0593
hemphill@law.columbia.edu

## EXPERIENCE

**COLUMBIA LAW SCHOOL**
>   Associate Professor of Law, 2006-present
>   Milton Handler Fellow, 2007-present
>   John M. Olin Fellow, Center for Law and Economic Studies, 2004-2006
>   Research and teaching focus on the balance between innovation and competition
>   established by antitrust law, intellectual property, and sector-specific regulation.

**HON. ANTONIN SCALIA**, Supreme Court of the United States
>   Law Clerk, 2003-2004

**HON. RICHARD A. POSNER**, United States Court of Appeals for the Seventh Circuit
>   Law Clerk, 2002-2003

**OTHER**: McKinsey & Company, Palo Alto, CA, Summer Associate, 2000; U.S. Department of
>   Justice, Antitrust Division, Summer Clerk, 1999; Simpson Thacher & Bartlett, New York,
>   NY, Summer Associate, 1999; William Kent International, Arlington, VA, Consultant,
>   1994-1996 (devised strategy in Asia, Europe, and South America for corporate clients)

## EDUCATION

**STANFORD LAW SCHOOL**
>   J.D., 2001
>   Nathan Abbott Scholar (first in class) and Order of the Coif
>   Articles Editor, *Stanford Law Review*, 2000-2001; Editor, 1999-2000
>   Olin Student Fellow in Law and Economics, 1998-2001

**STANFORD UNIVERSITY**
>   M.A., Economics, 2001
>   Stanford Graduate Fellow (full scholarship), 1997-2000; Kapnick Fellow, 2000-2001

**LONDON SCHOOL OF ECONOMICS AND POLITICAL SCIENCE**
>   M.Sc., Economics, 1997
>   Fulbright Scholar

HARVARD COLLEGE
>     A.B. *magna cum laude* in Social Studies, 1994
>     Phi Beta Kappa

## TEACHING

Antitrust Law: Fall 2006, Fall 2007, Fall 2008, Spring 2010

Principles of Intellectual Property: Spring 2008, Spring 2009

Law and Economics Seminar: Fall 2007, Fall 2008

Intellectual Property Colloquium: Spring 2009

## PUBLICATIONS

**Articles:**     An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition, 109 *Columbia Law Review* 629 (2009)

The Law, Culture, and Economics of Fashion, 61 *Stanford Law Review* 1147 (2009) (with Jeannie Suk)

Reply, Remix and Cultural Production, 61 *Stanford Law Review* 1227 (2009) (with Jeannie Suk)

Network Neutrality and the False Promise of Zero-Price Regulation, 25 *Yale Journal on Regulation* 135 (2008)

Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem, 81 *New York University Law Review* 1553 (2006)

**In Progress:**     Deciding Who Decides Intellectual Property Appeals

Generic Drug Challenges Prior to Patent Expiration (with Bhaven Sampat)

Six Stylized Facts About the Hatch-Waxman Act (with Bhaven Sampat)

**Note:**     The Role of Recoupment in Predatory Pricing Analyses, 53 *Stanford Law Review* 1581 (2001)

**Popular**:  The Squint Test: How to Protect Fashion Designers like Jason Wu from Forever 21 Knockoffs, *Slate*, May 13, 2009 (with Jeannie Suk)

Antitrust and the Roberts Court, *Antitrust*, Winter 2007 (roundtable discussion of recent Supreme Court antitrust jurisprudence)

**Testimony**:  Protecting Consumer Access to Generic Drugs Act of 2009: Hearing Before the Subcommittee on Commerce, Trade, and Consumer Protection of the House Committee on Energy and Commerce, 111th Congress, March 31, 2009

Protecting Consumer Access to Generic Drugs Act of 2007: Hearing Before the Subcommittee on Commerce, Trade, and Consumer Protection of the House Committee on Energy and Commerce, 110th Congress, May 2, 2007

**Other**:  Drug Patent Settlements Between Rivals: A Survey (working paper 2007)

Brief of George A. Akerlof *et al.* as Amici Curiae in Support of Petitioners, *Eldred v. Ashcroft*, 537 U.S. 186 (2003)

## INVITED PRESENTATIONS

*The Law, Culture, and Economics of Fashion*
  American Law and Economics Association (ALEA) Annual Meeting, University of San Diego Law School, May 2009
  Stanford Law School, Law and Economics Seminar, March 2009
  Harvard Law School, Law and Economics Seminar, February 2009
  Harvard Law School, Advanced Intellectual Property Seminar, February 2009
  Columbia Law School Faculty Lunch, December 2008
  Columbia Law School Global Reunion, October 2008
  University of Tokyo Law School, May 2008

*An Aggregate Approach to Antitrust*
  DOJ (Antitrust Division)/FTC Seminar Series, September 2009
  University of Bonn, Law and Economics Workshop, March 2009
  University of St. Gallen, March 2009
  Columbia Law School Faculty Lunch, March 2009
  University of Pennsylvania Law School, Technology, Innovation, and Competition Workshop, January 2009
  Law and Economics Consulting Group (New York, NY), December 2008
  Harvard Law School, Health Law Policy Workshop, November 2008
  Law and Economics of Drug Development Symposium, University of Michigan Law School, November 2008

Boston University Law School, Intellectual Property Workshop, November 2008
University of Minnesota Law School, IP/Antitrust Workshop, September 2008
National Association of Attorneys General, Antitrust Litigation Training (Salt Lake
    City, UT), September 2008
Intellectual Property Scholars Conference, Stanford Law School, August 2008
Property Works in Progress Conference, University of Colorado, June 2008
ALEA Annual Meeting, Columbia Law School, May 2008
Triangle Law and Economics Conference, University of North Carolina, April 2008

*Zero-Price Regulation*
Institute of Economic, Financial & Tax Law Conference (Lisbon, Portugal), June 2008
Intellectual Property Law Scholars Annual Workshop, Michigan State University
    College of Law, January 2008
Workshop on Commons Theory, Max Planck Institute for Research on Collective Goods
    (Bonn, Germany), April 2007
Silicon Flatirons Annual Conference, University of Colorado, February 2007

*Drug Patent Settlements Survey*
Patent Law and Pharmaceuticals Symposium, Rutgers School of Law, September 2008
Centre for Competition Policy Conference, University of East Anglia, June 2007
UCLA Pharmaceutical Economics Seminar, May 2007
American Bar Association Antitrust Section Annual Meeting (Washington, DC), May
    2007

*Paying for Delay*
New York University Law School, February 2006
Harvard Law School, January 2006
University of Michigan Law School, January 2006
University of Chicago Law School, January 2006
Georgetown University Law Center, January 2006
University of Southern California Gould School of Law, January 2006
University of Virginia School of Law, January 2006
Columbia Law School, December 2005
University of Pennsylvania Law School, December 2005
Duke University School of Law, December 2005

*Future Presentations*
Minnesota State Bar Association Antitrust Section, November 2009
ETH Zurich and University of Zurich, Workshop and Lecture Series, December 2009
University of Toronto Faculty of Law, Law and Economics Workshop, February 2010
Yale Law School, Law, Economics, and Organization Workshop, March 2010
Milton Handler Lecture, Association of the Bar of the City of New York, April 2010
American Bar Association Symposium on Antitrust Policy and Innovation, Stanford
    Law School, May 2010

## CONFERENCES

**Keynote**:        University of San Francisco Law School, Symposium on Antitrust
                    Enforcement in the Pharmaceutical Industry, September 2009

**Commentator**:    Barak Richman, *Static and Dynamic Costs and Benefits of Pharmaceutical
                    Blockbuster Acquisitions*, and Richard Frank & Raymond Hartman, *The
                    Nature of Pharmaceutical Competition and the Implications for Antitrust
                    Analysis under the Hatch-Waxman Act*, Pharmaceutical Research,
                    Development, and Markets Conference, Harvard Law School, June 2009

                    Mariagiovanna Bacarra, *Curb Your Innovation*, Business Law and
                    Innovation Conference, Columbia Law School, November 2008

**Panelist**:       The Filed Rate Doctrine and Immunities Law, DOJ/FTC Federal-State
                    Workshop on Competition and Energy Markets, November 2009

                    Acceptable Settlement Strategies for Paragraph IV Disputes, Center for
                    Business Intelligence Pharmaceutical Congress on Paragraph IV Disputes
                    (Philadelphia, PA), October 2008 and October 2009

                    Discussion of Jonathan Zittrain, *The Future of the Internet*,
                    Telecommunications Policy Research Conference (Arlington, VA),
                    September 2008

                    The Increasing Role of Antitrust Principles in Defining Patent Rights,
                    Intellectual Property Owners Association Conference (Washington, DC),
                    June 2008

                    The Knockoff Economy, *New Yorker* Annual Conference, May 2008

                    Intellectual Property and Antitrust, Conference Board Annual Antitrust
                    Conference, March 2007

**Moderator**:      Why Antitrust?, ABA Section of Antitrust Law, Columbia Law School,
                    March 2009

                    Secondary Liability in Copyright, Kernochan Center Symposium on
                    Copyright Intermediaries, Columbia Law School, January 2009

                    Legal Issues in New Media Platforms, Columbia Law School Reunion, May
                    2007

## COLUMBIA SERVICE

Co-Chair, Clerkships and Judicial Relations Committee, 2008-present; Member, 2006-present

Co-Director, Charles E. Gerber Transactional Studies Program, 2009-present

Co-Founder, Program on Law and Technology, 2007-present

Guest Instructor, Columbia University Graduate School of Journalism, M.A. seminar in business journalism (James Stewart and Sylvia Nasar, instructors), Spring 2008 and Spring 2009

Member, Admissions and Financial Aid Committee, 2006-2009

Member, Faculty Curricular Advisory Group, 2006-present

Member, Kernochan Center for Law, Media and the Arts, 2006-present

Member, Center for Contract and Economic Organization, 2006-present

JSD committee or defense: Yonatan Even (Spring 2009); Guy Sagi (Spring 2007)

Toastmaster, *Columbia Law Review* Annual Banquet, May 2009


## SELECTED ACTIVITIES

Term Member, Council on Foreign Relations, 2007-present

Secretary, Law and Economics Section, Association of American Law Schools, 2009-present

Referee or Outside Reader: *International Review of Law and Economics, Journal of Law and Economics, Jurimetrics,* Oxford University Press, *Yale Law Journal*

Member, American Law and Economics Association, 2004-present

November 8, 2009