# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE BRISTOL-MYERS SQUIBB CO. SECURITIES LITIGATION | File No. 07-CV-5867 (PAC) |

## DECLARATION OF STEPHEN J. CIRAMI IN SUPPORT OF
## LEAD PLAINTIFF'S MOTION FOR APPROVAL OF DISTRIBUTION PLAN

STEPHEN J. CIRAMI declares as follows:

1. I am the Senior Vice President of Operations for The Garden City Group, Inc. ("GCG"). GCG was retained by Lead Counsel to serve as the Claims Administrator in connection with the Settlement (the "Settlement") of the above-captioned action (the "Action"). By the August 18, 2009 Order Preliminarily Approving Settlement and Providing for Notice (the "Preliminary Approval Order"), the Court approved the retention of GCG as Claims Administrator. As Claims Administrator, GCG has implemented the terms of the Settlement, by, among other things: (i) mailing the Notice of Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing, and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and the Proof of Claim and Release form (the "Proof of Claim" and, together with the Notice, the "Claim Packet"); (ii) creating and maintaining a toll-free hotline and case-specific website, and monitoring both of them during the course of the administration; (iii) providing to brokers and nominees, upon request, additional copies of the Claim Packet; (iv) receiving any requests for exclusion; and (v) receiving and processing Proofs of Claim. I have personal knowledge of the facts stated herein.

2. In July 2009, as set forth in the Stipulation and Agreement of Settlement dated as of July 12, 2009 (the "Stipulation"), Lead Plaintiffs reached a complete Settlement of this Action for $125 million in cash. The Court approved the Settlement in its December 8, 2009 Final

Judgment and Order of Dismissal with Prejudice (the "Judgment"). GCG has completed processing Proofs of Claim in accordance with the terms of the Stipulation and of the Court-approved Plan of Allocation, and, in preparation for a distribution of the Net Settlement Fund to Authorized Claimants, hereby submits its administrative determinations accepting and rejecting Proofs of Claim. GCG also presents this Declaration in support of Lead Plaintiffs' Motion for Approval of Distribution Plan.

## DISSEMINATION OF THE NOTICE

3.      As more fully described in the November 19, 2009 "Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion," on August 20, 2009, pursuant to the Preliminarily Approval Order, GCG mailed Claim Packets to potential Class Members identified by the transfer agent records provided by Bristol-Myers Squibb Co. ("Bristol-Myers"), and to brokerage firms, banks, institutions and other nominees listed in GCG's proprietary database of nominees. To date, GCG has mailed over 245,000 Claim Packets.

## PROCEDURES FOLLOWED IN PROCESSING PROOFS OF CLAIM

4.      Under the terms of the Stipulation and as set forth in the Notice, each Class Member who wished to receive a distribution from the Net Settlement Fund was required to complete and submit to GCG a properly executed Proof of Claim postmarked no later than December 30, 2009, together with adequate supporting documentation for the transactions and holdings reported therein. To date, GCG has received and processed 60,719 Proofs of Claim.

5.      In preparation for receiving and processing Proofs of Claim, GCG: (i) conferred with Lead Counsel to define the project guidelines for processing Proofs of Claim; (ii) created a unique database to store Proof of Claim detail and images of Proofs of Claim and supporting documentation; (iii) trained staff in the specifics of the project so that Proofs of Claim would be

properly processed; (iv) formulated a system to assure timely responses to telephone and email inquiries; (v) developed various computer programs and screens for entry of Class Members' identifying information, as well as their transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Loss Amounts pursuant to the Court-approved Plan of Allocation set forth in the Notice.

6.    The Notice directed Class Members seeking to share in the Net Settlement Fund to submit their Proofs of Claim to a post office box address specifically designated for the Settlement.  GCG sorted incoming mail into Proofs of Claim and administrative mail.[1]  Claim Packets that were returned by the Post Office as undeliverable were reviewed for better addresses and, where available, new addresses were entered into the database and new Claim Packets were mailed to the updated addresses.  Administrative mail was reviewed and, where necessary, appropriate responses were provided to the senders.

**Processing Paper Proofs of Claims**

7.    Once received, paper Proofs of Claim were opened and prepared for scanning. This process included unfolding documents, removing staples, copying non-conforming sized documents, sorting documents, and, where claimant identification information was not provided on the Proof of Claim, copying and sorting the envelope with the return address.  This manual task of preparing the paper Proofs of Claim is very laborious and time-intensive.  Once prepared, paper Proofs of Claim were scanned into a database together with all submitted documentation. Thereafter, each Proof of Claim was assigned a unique Proof of Claim number if it did not already have a pre-assigned Proof of Claim number.  Once scanned, the information from each Proof of Claim, including the name, address, and last four digits of the taxpayer identification

---

[1] Administrative mail includes all mail other than Proofs of Claim and supporting documentation and responses to notices of partial or entire rejection of the Proof of Claim (*e.g.*, requests for Proofs of Claim, requests for change of address, questions regarding the administration process, or status of the administration).

number or the social security number of the claimant, and the claimant's purchase transactions, sale transactions and holdings listed on the Proof of Claim, was entered into a database developed by GCG to process Proofs of Claim submitted for the Settlement.

8.     In order to process the transactions detailed on the Proofs of Claim, GCG utilized dozens of internal Proof of Claim codes (also known as "message codes") to identify and classify types of Proofs of Claim and any deficiency or ineligibility conditions that existed within those Proofs of Claim.  The appropriate message codes were assigned to the Proofs of Claim as they were processed.  For example, where a Proof of Claim was submitted by a claimant who did not have *any* eligible purchases of Bristol-Myers common stock during the Class Period (*e.g.*, the claimant only purchased Bristol-Myers common stock before or after the Class Period), that Proof of Claim would receive a Proof of Claim-level message code that denoted ineligibility. Similar "Proof of Claim-level" ineligible message codes were used to denote other ineligible conditions, such as duplicate Proofs of Claim.  Those message codes indicated to GCG that the claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Proof of Claim unless the deficiency was cured.  Examples of "Proof of Claim-level" message codes are as follows:

| | |
|---|---|
| 037 | Inadequate Documentation Submitted to Support Entire Proof of Claim |
| 038 | No Documentation Submitted for the Entire Proof of Claim |
| BLK | Blank Proof of Claim Submitted with No Documentation |
| 202 | No Class Period Purchases |

9.     Because a Proof of Claim may be deficient only in part, but otherwise acceptable, GCG also utilized message codes that were applied only to specific transactions within a Proof of Claim.  For example, if a claimant submitted a Proof of Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a "transaction-level" message code.  That message code indicated that one transaction was deficient, but that the Proof

4

of Claim was otherwise eligible for payment if other transactions in the Proof of Claim calculated to a Recognized Loss Amount according to the Court approved Plan of Allocation. Thus, even if the transaction-level deficiency was never cured, the Proof of Claim would still be paid in part.  A few examples of transaction-level message codes are:

| | |
|---|---|
| 101 | No Supporting Documentation for a Purchase |
| 102 | No Supporting Documentation for a Sale |
| 103 | No Supporting Documentation for Unsold Holdings |

**Processing Electronically Filed Proofs of Claims**

10.     Of the approximately 60,719 Proofs of Claim received and processed by GCG, more than 49,000 were filed electronically ("Electronic Claims").  Electronic Claims typically are submitted by institutional investors which may have hundreds or thousands of transactions during the Class Period.  Rather than provide reams of paper requiring data entry, institutional investors filing Electronic Claims either mail a computer disc or email a file to GCG so that we may electronically upload all transactions to our proprietary database developed for the Settlement.

11.     GCG maintains an electronic filing operations team (the "Electronic Filing Team") to coordinate and supervise the receipt and handling of all Electronic Claims.  In this administration, as in all other claims administrations, the Electronic Filing Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with GCG's required format, and to identify any potential data issues or inconsistencies within the file.  If any issues or inconsistencies arose, we immediately notified the sender.  If the electronic file was deemed to be in an acceptable format, it together with detailed loading instructions, including the number of claims and/or transaction totals the institution provided when it sent the electronic file, was then forwarded to GCG's programming staff.

12.     Once the electronic file was loaded, GCG's Quality Assurance personnel reviewed the electronic file to confirm that the number of Proofs of Claim and transactions matched the information provided by the filer.  The Electronic Filing Team then sent an email notification to the filer that included a spreadsheet with the Proof of Claim numbers and respective account and address information for each Proof of Claim.  In that email, the filer was also notified of any discrepancies in the data.

13.     Once all counts were confirmed, the Electronic Claims, as were manually processed Proofs of Claim, were coded with messages to identify and classify types of Electronic Claims and any deficiency or ineligibility conditions that existed within them.  Those message codes were the same as those applied to manually filed Proofs of Claim; however, the process in applying codes differed from the process used for paper Proofs of Claim.  In lieu of manually applying message codes, the Electronic Filing Team performed programmatic audits on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the Class Period).  The appropriate message codes were then assigned programmatically once the output of the audits were thoroughly reviewed and confirmed as accurate.

14.     The audit process also included flagging any Electronic Claims that were not accompanied by the following: (i) a signed Proof of Claim and Release, which serves as a "Master Claim Form" for all accounts referenced on the electronic file submitted; (ii) an electronic filing summary sheet; (iii) supporting documentation, such as a signed or notarized letter on company letterhead attesting to the truth and accuracy of the data on the electronic file, trade confirmations, and/or brokerage account statements; and (iv) a notarized affidavit, corporate resolution or corporate by-laws verifying that the individual who executed the Proof of Claim and submitted the electronic file is an authorized signatory of his/her company with the

6

authority to file such information.  This portion of the audit process was also reviewed by our Quality Assurance personnel, who worked in conjunction with the Electronic Filing Team to contact institutional filers for which electronic files were missing information.  This process ensures that only fully completed Proofs of Claim, submitted by properly authorized representatives of the claimants, are considered eligible for payment from the Net Settlement Fund.  As fully discussed in Stephen J. Cirami's affidavit dated November 19, 2009, GCG incurred fees and expenses totaling $622,263.01.  GCG also assumed it would receive no more than 20,000 claims forms.  To date, GCG has received 60,719 Proof of Claim forms. Based on the additional claims received, GCG incurred additional costs in processing this case.

15.     Finally, at the end of the process, GCG performed various additional audits of Electronic Claims.  Specifically, GCG reached out to a number of electronic filers who, in lieu of providing specific trade confirmations, provided another form of supporting documentation than set forth in ¶14(iii) above, and requested that various sample transactions selected by GCG be documented by providing confirmation slips or other transaction-specific supporting documentation for particular transactions.  This random sampling helps to ensure that electronic data supplied by claimants did not accidentally contain inaccurate information.  GCG performed this final check on a variety of electronic files randomly selected, as well as the electronic files with the largest losses by transaction.  As referenced below in ¶33 below, GCG also performed additional auditing services in connection with the largest claims.

**Excluded Persons**

16.     GCG also reviewed all Proofs of Claim to ensure that they were not submitted by, or on behalf of, "Excluded Persons," to the extent that the identities of such persons or entities were known to GCG through the list of defendants and other excluded persons and entities set forth in the Stipulation and the Notice and through claimants' certifications on the Proofs of

Claim.  GCG also customarily reviews all Proofs of Claim against the list of persons and/or entities who or which submitted a valid request for exclusion from the Class.

**Additional Complexities Encountered in Claims Processing**

17.     A total of 22,377 or about 37%, of the 60,719  Proofs of Claim GCG received were deficient for one or more reasons, and, therefore, were subjected to the additional processing, correspondence and telephonic communications described in the Section below entitled "The Deficiency Process."  Notwithstanding the large number of deficient Proofs of Claim received, only 69 claimants, or just 0.3 % of the deficient and rejected Proofs of Claim, contested GCG's administrative rejection of their Proofs of Claim.  And, as set forth in the Section below entitled "Claimants Seeking Judicial Review of Their Proofs of Claim," GCG resolved all of those disputed Proofs of Claim without the need for the participation of Lead Counsel or judicial intervention.

18.     During the processing of Proofs of Claim, GCG encountered "non-conforming" Proofs of Claim, which, in general, require significantly more work than ordinary Proofs of Claim because of the information contained in or missing from the Proofs of Claim or the manner in which the Proofs of Claim were completed.  Non-conforming claims include, among other conditions, missing pages, no name or address, Proofs of Claim that are blank but submitted with documentation for GCG to complete, and Proofs of Claim that are so materially deficient as to make what is being claimed unrecognizable.  One prevalent example of a non-conforming claim is the submission of multiple Proofs of Claim using the same Proof of Claim number – a product of claimants using copies of the same blank form – resulting in multiple Proofs of Claim having the same barcode rather than each having a unique barcode, and causing Proofs of Claim from unrelated claimants to be scanned as part of the same Proof of Claim.  A significant amount of time and resources were required to manually review each of those Proofs

of Claim.  We also needed to reassign Proof of Claim images to new Proofs of Claim that were required to be created.

## THE DEFICIENCY PROCESS

19.     Much of GCG's efforts in handling an administration involve claimant communications so that all claimants have sufficient opportunity to cure any deficiencies and file a complete Proof of Claim.  The "Deficiency Process," which involved letters and emails to claimants, and inbound and outbound calls to claimants, was intended to assist claimants in properly completing their otherwise deficient submissions.  The process also was designed to advise claimants of their rights to request this Court's review of their Proofs of Claim if they continued to dispute GCG's final determination.  As explained below, this process was extremely successful, as a very large percentage of claimants, excluding those who submitted Proofs of Claim with incurable deficiencies (*e.g.*, claims that lack any purchases during the Class Period or claims that have no Recognized Loss Amount according to the Plan of Allocation), are now eligible to participate in the Settlement, and only a relatively small percentage of claimants did not cure their deficiencies in their claims and, therefore, are being recommended for rejection.  Moreover, no claimants continue to dispute GCG's administrative determination to reject his, her or its Claim.

### The "Notice of Rejection of Your Entire Claim"

20.     As described above, GCG utilized internal Proof of Claim codes to identify and classify types of Proofs of Claim and conditions that existed within them.  Those Proof of Claim conditions included, among other things, notations about which Proofs of Claim were partially deficient and which were wholly deficient.  If a Proof of Claim was determined to be wholly deficient (for example, if the Proof of Claim was missing documentation for the entire Proof of Claim, if the claimant did not sign the Proof of Claim or did not provide enough information to

calculate the Proof of Claim, or if the Proof of Claim was determined to have no Recognized Loss Amount under the Court-approved Plan of Allocation), GCG mailed a letter entitled "Notice of Rejection of the Entire Claim." This letter described to the claimant the defects with his, her or its Proof of Claim and what, if anything, was necessary to cure the Proof of Claim. Pursuant to paragraph 23(e) of the Stipulation, the letter required a submission of the appropriate information and/or documentary evidence to complete the Proof of Claim within 20 days from the date of the letter, or the Proof of Claim would be recommended for rejection in its entirety. GCG mailed (or e-mailed in the case of Electronic Claims) a "Notice of Rejection of Your Entire Claim" in connection with 21,253 Proofs of Claim.

21.     Claimants' responses to those letters were scanned into GCG's database and associated with related Proofs of Claim. The responses were then carefully reviewed and evaluated by GCG's team of processors. If a claimant's response corrected the defect, GCG updated the database manually to reflect the changes in status of the Proof of Claim.

**The "Notice of Rejection of Part of Your Claim"**

22.     If a Proof of Claim was determined to be partially deficient (for example, if the claimant was missing documentation for part of the Proof of Claim, or did not supply some transactional information), GCG mailed a letter entitled "Notice of Rejection of Part of Your Claim." That letter described to the claimant the defect(s) in his, her or its Proof of Claim and what, if anything, was necessary to cure the defect(s) in the Proof of Claim. It also advised the claimant that, unless the defects were cured, the Proof of Claim would only be eligible to the extent it was complete and calculated to a Recognized Loss Amount. This letter also provided a 20-day period to cure the Proof of Claim. GCG mailed (or e-mailed in the case of Electronic Claims) a "Notice of Rejection of Part of Your Claim" in connection with 1,124 Proofs of Claim.

23.     Attached hereto as Exhibit A are exemplars of the types of letters sent to notify claimants of the deficiencies in or the ineligibility of their Proofs of Claim.  Both letters advised claimants that, if they disagreed with GCG's administrative determinations, they had the right to request the Court's review of their Proofs of Claim.  Each such letter also explained that this deficiency process was the claimant's only opportunity to cure the deficiencies in his, her or its Proof of Claim (to the extent that the deficiencies could be cured) and that claimants desiring to contest the administrative determination were required to submit a written statement to GCG requesting review of their Proof of Claim and setting forth the basis for their requests.

**Calling Campaign to Class Members Who Did Not Cure Deficiencies**

24.     After all responses to the "deficiency" letters were received and evaluated, and the Proofs of Claim updated, GCG called claimants with still-deficient Proofs of Claim to provide them with a final opportunity to cure the deficiencies in their Proofs of Claim.  Specifically, GCG made several attempts to contact all claimants, or the institutions that filed on their behalf, with potential Recognized Loss Amounts in excess of $5,000.

25.     During that calling campaign, when a GCG agent spoke with a claimant, he or she explained that the Proof of Claim was still deficient, and advised the claimant of the steps required to cure the deficiency.   GCG provided assistance to claimants where possible, depending on the nature of the deficiency.   For example, if a claimant needed additional documentation, GCG explained the kinds of documentation that would render the Proof of Claim eligible, and how the claimant could obtain the necessary documentation.  Also, GCG provided claimants with direct phone numbers and fax numbers so that claimants could receive continued personalized attention and assistance.

26.     If GCG could not get in touch with a claimant to speak one-on-one, GCG left a voice message, if possible, requesting a return call.  GCG explained in that voice message that we were calling to assist the claimant in remedying outstanding deficiencies.

27.     If, in response to a telephone call or email, a claimant cured the deficiency by providing the appropriate information and/or supporting documentation, GCG updated the database to reflect the change in the status of the Proof of Claim.

**LATE BUT OTHERWISE ELIGIBLE PROOFS OF CLAIM**

28.     Through September 30, 2010, GCG received 513 Proofs of Claim that were postmarked after the December 30, 2009 Proof of Claim submission deadline established by the Court.  GCG processed all late Proofs of Claim, determining that 209 of them were otherwise eligible (the "Late But Otherwise Eligible Claims").  The total Recognized Loss Amounts for the Late But Otherwise Eligible Claims represent approximately two percent (2%) of the total Recognized Loss Amounts of all Authorized Claimants.  GCG has not rejected any Proof of Claim solely based on its late submission, and GCG believes no delay has resulted thus far from the provisional acceptance of these Late But Otherwise Eligible Claims. GCG thus recommends that Late But Otherwise Eligible Claims be accepted, subject to paragraph 29 below.

29.     However, there must be a final cut-off date after which no more Proofs of Claim will be processed so that there may be a proportional distribution of the Net Settlement Fund. The processing of any Proof of Claim received after preparation of this application would necessarily require a delay in the distribution.  Accordingly, it is also respectfully requested that this Court order that no Proof of Claim received after September 30, 2010 be eligible for payment for any reason whatsoever.

## THERE ARE NO CLAIMANTS SEEKING JUDICIAL REVIEW OF THEIR PROOFS OF CLAIM

30.     As set forth above, both the Notice of Rejection of Your Entire Claim and the Notice of Rejection of Part of Your Claim advised claimants that, if they did not agree with GCG's administrative determination, they had the right to request judicial review of their Proofs of Claim.  GCG received letters from 69 claimants contesting the administrative rejection of their claims in whole or in part.  49 of those claimants simultaneously provided GCG with adequate documentation and/or information to complete their Proofs of Claim and cure any remaining deficiencies.  As a result, the letters requesting further review submitted by those claimants are now moot, and their Proofs of Claim are being recommended for payment.  Indeed, one of the main purposes of providing claimants with this opportunity is to obtain the material needed to complete the Proofs of Claim.  In addition, subsequent to receipt of all of the requests for judicial review, GCG attempted to contact each and every contesting claimant with uncured deficiencies either by telephone and/or by letter to advise him, her or it of the status of his, her or its Proof of Claim, and to explain the administrative determination.  As a result of those communications, *all* such contesting claimants have affirmatively withdrawn their requests for Court review.

## QUALITY ASSURANCE

31.     An integral part of all of GCG's Settlement administration projects is our Quality Assurance review.   GCG's Quality Assurance personnel worked throughout the entire administration process to ensure that Proofs of Claim were processed properly; that deficiency and ineligibility message codes were properly applied to Proofs of Claim; that deficiency letters were mailed to the appropriate claimants; and that GCG's computer programs were operating properly.

32.     GCG's Quality Assurance team performed a final project wrap-up once all of the Proofs of Claim were processed, deficiency letters were mailed, and deficiency responses were

reviewed and processed, to ensure the correctness and completeness of all of the Proofs of Claim processed before GCG prepared its final reports to counsel.  Here, in connection with this Quality Assurance wrap-up, GCG (i) confirmed that valid Proofs of Claim have no messages denoting ineligibility; (ii) confirmed that Proofs of Claim that are ineligible have messages denoting ineligibility; (iii) confirmed that Proofs of Claim that contained purchases that occurred before or after the Class Period contain appropriate ineligibility messages as to those transactions; (iv) confirmed that Proof of Claim detail (transaction) messages appear only on Proof of Claim detail records; (v) confirmed that all Proofs of Claim requiring "deficiency" letters were sent such letters; (vi) performed a sample review of deficient Proofs of Claim; (vii) reviewed Proofs of Claim with large dollar losses; (viii) sampled Proofs of Claim that had been determined to be ineligible, including those with no Recognized Loss Amount calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (ix) tested the accuracy of the calculation program.

33.    In support of the work described above, GCG's computer staff designed, implemented and tested (by our Quality Assurance Team), the following programs for this administration: (i) data entry screens that store Proof of Claim information (including all transactional data included on each Proof of Claim) and attach message codes and, where necessary, text to denote conditions existing within the Proof of Claim; (ii) programs to load and analyze transactional data submitted electronically for all Electronic Claims (the load program converts the data submitted into the format required by the calculation program, and the analysis program determines if the data is consistent and complete, and triggers a response to the electronic filer where appropriate); (iii) a program to compare the claimed transaction prices against the reported market prices to confirm that the claimed transactions were within an acceptable range of the reported market prices; (iv) a calculation program to analyze the

transactional data for all Proofs of Claim, and calculate the Recognized Loss Amount based on the Plan of Allocation; (v) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Proofs of Claim; and (vi) programs that calculate each Authorized Claimant's award amount by determining the proration factor for the Class, and applying it against the Recognized Loss Amount as calculated above.

## DISPOSITION OF PROOFS OF CLAIM

34.    GCG has completed the processing of 60,719 Proofs of Claim that were received in connection with the Settlement, and has determined that 39,363 are acceptable in whole or in part, and that 21,356 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss Amount when calculated in accordance with the Court-approved Plan of Allocation.  The 21,356 wholly rejected Proofs of Claim are recommended for rejection by the Court for the following reasons:

| Summary of Rejected Proofs of Claim | |
| --- | --- |
| **Reason for Rejection** | **Number of Proofs of Claim** |
| Proof of Claim Did Not Fit the Definition of the Class | 15,640 |
| Duplicate Proof of Claim | 49 |
| Deficient Proof of Claim Never Cured | 1,012 |
| Proof of Claim Did Not Result in a Recognized Loss Amount | 4,655 |
| **TOTAL** | 21,356 |

35.    A list of the Proofs of Claim submitted and their ultimate disposition is contained in the Administrator's Report (the "Report") attached hereto as Exhibit B.  Exhibit B-1, entitled "Timely Eligible Claims," lists all timely filed provisionally accepted Proofs of Claim, and states their Recognized Loss Amounts.  Exhibit B-2, entitled "Late But Otherwise Eligible Claims,"

lists all late filed provisionally accepted Proofs of Claim and states their Recognized Loss Amounts.  Exhibit B-3, entitled "Rejected or Ineligible Claims," lists all wholly rejected or ineligible Proofs of Claim and states the reason for their rejection or ineligibility.  For privacy reasons, Exhibit B provides only the claimant's Proof of Claim number and Recognized Loss Amount or Reason for Rejection or Ineligibility (no names, addresses or Taxpayer ID, Social Security or Social Insurance Numbers are disclosed).

36.    The sum total of Recognized Loss Amounts for all accepted Proofs of Claim calculated in accordance with the Court-approved Plan of Allocation is $258,232,012.17 (consisting of $252,731,023.65 for Timely Eligible Claims and $5,500,988.52 for Late But Otherwise Eligible Claims).  Further, these claims represent approximately 175 million damaged shares.  According to the Court-approved Plan of Allocation, each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her or its Recognized Loss Amount as compared to the total Recognized Loss Amounts of all Authorized Claimants; however, as set forth in the Plan of Allocation, if an Authorized Claimant's prorated payment calculates to less than $10.00, it will not be included in the calculation and the claimant will not receive any distribution.  Upon approval by the Court, GCG will prepare and mail drafts (or wire transfers where applicable) to Authorized Claimants for their *pro rata* share of the Net Settlement Fund, subject to the $10.00 threshold.  As explained in my prior affidavit, the $10 minimum is reasonable and fair given the time and cost associated with issuing small checks.

## FEES AND DISBURSEMENTS

37.    GCG agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses.  Lead Counsel were billed on a regular basis and received regular reports of all of the work GCG performed with respect to the administration of the Settlement, and authorized all of the claims administration work performed herein.  Attached hereto as

Exhibit C are copies of GCG's invoices for its work performed on behalf of the Class through September 30, 2010 as well as estimates for the work that will be performed and the costs that will be incurred in connection with the Initial Distribution (as defined below) and certain post-distribution following efforts in the total amount of $1,260,914.60.  GCG has not been paid for any of its fees or out-of-pocket expenses to date.  As set forth on those invoices, $684,302.11, or 54%, of GCG's total fees and expenses were for printing, postage, publishing notice and nominee charges.  Accordingly, there is an outstanding balance of $1,260,914.60 payable to GCG, which amount includes GCG's anticipated fees and expenses for the Initial Distribution. This amount is approximately $200,000 higher than the early "ballpark" estimate that was provided in the "Affidavit of Stephen J. Cirami Regarding (A) Mailing of the Notice and Proof of Claim; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion," dated November 19, 2009 (the "Notice Declaration") regarding notice to the Class. In paragraph 14 of the Notice Declaration, GCG reported that it had incurred fees and expenses totaling $622,263.01 at that time.  GCG was also asked by Lead Counsel to provide the Court with an early estimate of fees and expenses expected to be incurred throughout the life of the administration. As the Court is aware, and as more fully described in paragraph 15 of the Notice Declaration it is exceedingly difficult to estimate certain volumes and expenses such as the number of claims filed, amount of claimant correspondence, and total nominee charges. However, GCG assumed it would receive no more than 20,000 claims forms, and provided an early estimate of approximately $400,000 in additional administration expenses. In fact, however, GCG has received over 60,000 claims, more than three times what was anticipated at the time of the Notice Declaration.  However, total administration costs to date are only $200,000 higher than what was anticipated in November 2009.  As set forth below and pursuant to paragraph 14 of the Stipulation, GCG requests that in addition to the authority to pay the

amount of GCG's fees and expenses in connection with the Initial Distribution as set forth above, GCG requests that it be authorized to pay from the Settlement Fund such additional reasonable fees and expenses in connection with further distribution(s) without further Order of the Court.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

38.     Should the Court concur with GCG's determinations concerning the provisionally accepted and rejected claims, including the Late But Otherwise Eligible Claims, GCG recommends the following distribution plan:

a.      GCG will distribute to Authorized Claimants their *pro-rata* share of 90% of the available balance of the Net Settlement Fund, after deducting the payments previously allowed and requested herein, and after the payment of any estimated taxes and the costs of preparing appropriate tax returns and any escrow fees, to the Authorized Claimants who would receive at least $10.00 based on their Recognized Loss Amounts in comparison to the total Recognized Loss Amounts of all Authorized Claimants (the "Initial Distribution").

b.      In order to bring to GCG's, Lead Counsel's and, if necessary, the Court's attention a challenge by an Authorized Claimant that his, her or its Recognized Claim amount or Initial Distribution amount was not properly determined under the terms of the Court-approved Plan of Allocation, each Authorized Claimant who receives an Initial Distribution from the Net Settlement Fund shall simultaneously receive notification advising that, should an Authorized Claimant disagree with the calculation of his, her or its Recognized Claim amount or Initial Distribution amount, such disagreement must be made in writing, detailing the disagreement, and must be sent to GCG, postmarked no later than twenty (20) days after the Initial Distribution draft is mailed.  The notification

also will advise each Authorized Claimant that should he, she or it fail to timely advise GCG of his, her or its objection in the manner provided, he, she or it shall be deemed to have forever waived all objections to the amount of their Initial Distribution and any subsequent distribution of the Net Settlement Fund pursuant to paragraph 26 of the Stipulation.

      c.      In order to encourage Authorized Claimants to promptly cash their Initial Distribution drafts promptly, and to avoid or reduce future expenses relating to unpaid Initial Distribution drafts, all Initial Distribution drafts will bear a notation "CASH PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]."[2]

      d.      Authorized Claimants who do not cash their Initial Distribution drafts within the time allotted will irrevocably forfeit all recovery from the Settlement unless good cause is shown. The funds allocated to all such stale-dated drafts will be available

---

[2] In an effort to have as many Authorized Claimants as possible cash their drafts, GCG will perform extensive follow-up with those Authorized Claimants whose drafts are initially uncashed, either because they are returned to us as undeliverable or because the Authorized Claimant simply did not cash the draft after a period of time elapses. For Authorized Claimants whose drafts are returned as undeliverable, GCG will endeavor to locate new addresses by running the undeliverable addresses through the USPS National Change of Address database and, where appropriate, via Internet search techniques and by calling the Authorized Claimants. Where a new address is located, GCG will update the database accordingly and re-issue a distribution draft to the Authorized Claimant at the new address. For many Authorized Claimants whose distributions are not returned but who simply do not cash their drafts, GCG will use a mix of automated and personalized telephone calls to urge such Authorized Claimants to cash their distribution drafts. Authorized Claimants will be informed that, if they do not cash their drafts within 120 days from the mail date, their payment draft will lapse, their entitlement to recovery will be irrevocably forfeited and the funds will be re-allocated to other Authorized Claimants. In the event an Authorized Claimant loses or damages his, her or its draft, or otherwise requires a new draft, GCG will issue replacements to those Authorized Claimants that notify GCG within a timely manner. Distribution re-issues will be undertaken only upon written instructions from the Authorized Claimant, and provided that the Authorized Claimant returns the first draft where appropriate. If a distribution is deemed lost, GCG will void the initial payment draft prior to re-issuing a payment. In addition, and to maximize our efforts to have all distributions cashed, GCG has trained the staff at our Call Center to handle the various issues that likely will arise during the Initial Distribution of the Net Settlement Fund. Typically, the Call Center receives calls with respect to the calculation of Proofs of Claim, distribution amounts, and the timing of this distribution and any future distributions. We expect a high call volume during the weeks immediately following dissemination of the payments. Requests for reissued checks in connection with any re-distribution will be handled in the same manner.

in subsequent distributions to be re-distributed to other Authorized Claimants. Similarly, Authorized Claimants who do not cash subsequent distributions within the time allotted will irrevocably forfeit any further recovery from the Settlement, unless good cause is shown.

      e.     GCG will conduct a second distribution of the Net Settlement Fund (the "Second Distribution"), pursuant to which the amount remaining in the Net Settlement Fund (including the 10% reserve and the funds for all void stale-dated drafts), after deducting GCG's additional reasonable costs and expenses incurred in connection with administering the Settlements, including the estimated costs of such Second Distribution, and after the payment of any estimated taxes and the costs of preparing appropriate tax returns, will be made to Authorized Claimants who have cashed their Initial Distribution drafts and who would receive at least $25 from such re-distribution.

      f.     In order to allow a final distribution of any balance that may remain in the Settlement Fund after the Second Distribution, whether by reason of returned funds, tax refunds, interest, uncashed drafts, or otherwise:

          i.     If cost effective, not less than six months after the Second Distribution is conducted, a further distribution of the Net Settlement Fund, pursuant to which all funds from undeliverable, uncashed, or returned checks, after payment to any Authorized Claimants who validly contest the amount they deserve, and after payment of any unpaid costs or fees incurred or to be incurred in connection with administering the Net Settlement Fund (including the estimated reasonable costs of conducting such additional distributions), shall be distributed to Authorized Claimants who cashed their Second Distribution drafts and who would receive at least $25 in such further distribution based on their

Recognized Claims, with additional redistributions thereafter in six-month intervals until GCG and Lead Counsel determine that further redistribution is not cost-effective; and

ii.     At such time as GCG and Lead Counsel determine that further redistribution is not cost-effective, the balance of the Net Settlement Fund, after payment of any unpaid reasonable costs or fees incurred in connection with administering the Net Settlement Fund, shall be donated to non-sectarian, not-for-profit, 501(c)(3) organization(s) designated by Lead Counsel.

g.     In order to allow the full and final distribution of the Net Settlement Fund, it is necessary to bar any further claims against the Net Settlement Fund beyond the amount allocated to Authorized Claimants, and to provide that all persons involved in the review, verification, calculation, tabulation, or any other aspect of the processing of the Proofs of Claim submitted herein, or otherwise involved in the administration or taxation of the Settlement Fund or the Net Settlement Fund, be released and discharged from any and all claims arising out of such involvement.  Accordingly, GCG agrees with Lead Plaintiffs' request that the Court release and discharge all persons involved in the review, verification, calculation, tabulation, or any other aspect of the processing of the Proofs of Claim submitted herein, or otherwise involved in the administration of the Settlement Fund or the Net Settlement Fund from any and all claims arising out of the such involvement, and bar all  Class Members, whether or not they receive payment from the Net Settlement Fund, from making any further claims against the Net Settlement Fund, Lead Plaintiff,  Lead Counsel, the Claims Administrator, the Escrow Agent or any other agent retained by Lead Plaintiff or  Lead Counsel in connection with the administration

21

or taxation of the Settlement Fund or the Net Settlement Fund beyond the amount allocated to Authorized Claimants.

h.      No Proof of Claim received after September 30, 2010 may be accepted for payment, and no further adjustments to Proofs of Claim may be made for any reason after September 30, 2010.

i.      Unless otherwise ordered by the Court, one year after the Distribution, GCG will destroy the paper copies of the Proofs of Claim and all supporting documentation, and three years after the Distribution GCG will destroy electronic copies of the same.

## CONCLUSION

39.      GCG respectfully requests that the Court enter an Order approving our administrative determinations accepting and rejecting the Proofs of Claim submitted herein received on or before September 30, 2010 and approving the distribution plan proposed by Lead Plaintiff. GCG further respectfully requests that the Court approve its reasonable fees and expenses in connection with the distribution plan as stated herein.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Melville, New York on October 8, 2010.

_____
Stephen J. Cirami

22